**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| WHIRLPOOL CORPORATION, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CASE NO. 2:15-CV-1528-JRG |
| | § | |
| TST WATER, LLC, | § | |
| | § | |
| *Defendant*. | § | |
| | § | |
| | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court are Plaintiff Whirlpool Corporation's Opening Claim Construction Brief

(Dkt. No. 42), Defendant's response (Dkt. No. 46), and Plaintiff's reply (Dkt. No. 47). The

Court held a claim construction hearing on July 18, 2016.

The Court addressed construction of the disputed terms in the patent-in-suit in a

Provisional Claim Construction Order entered on July 19, 2016. (Dkt. No. 55.) That Provisional

Claim Construction Order is superseded by this expanded Memorandum Opinion and Order,

which is and shall be effective as of July 19, 2016.

**Table of Contents**

I. BACKGROUND ..................................................................................................... 3

II. LEGAL PRINCIPLES .......................................................................................... 3

III. CONSTRUCTION OF AGREED TERMS ......................................................... 7

IV. CONSTRUCTION OF DISPUTED TERMS ...................................................... 8

   A.  Preambles of Claims 1 and 4 ......................................................................... 8

   B.  "about 2 cm" ................................................................................................ 17

   C.  "longitudinal axis" ...................................................................................... 20

   D.  "distal" and "proximal" ............................................................................. 21

   E.  "cam surface" .............................................................................................. 24

   F.  "portion of said cam surface . . . is vectored" .......................................... 25

   G.  "inlet fitting" and "outlet fitting" ............................................................. 27

V. CONCLUSION ...................................................................................................... 30

## I.  BACKGROUND

Plaintiff alleges infringement of United States Patent No. 7,000,894 ("the '894 Patent").

(Dkt. No. 42, Ex. A.).  The '894 Patent, titled "Fluidic Cartridges and End Pieces Thereof,"

issued on February 21, 2006, and bears a filing date of April 25, 2003.  The Abstract states:

> In the treatment of water, an end piece is connected to a treatment cartridge
> housing and inserted into an appliance having bypass, inlet, and outlet valves.
> The end piece has an end piece wall from which an inlet fitting, outlet fitting, and
> protrusion extend.  The inlet fittings, outlet fittings, protrusion, and cartridge
> housing each have a longitudinal axis.  The inlet and outlet fittings have a cam
> surface for actuating the inlet and outlet valves, respectively.  Further, the cam
> surfaces of the inlet and outlet fittings are angled and vectored in relation to their
> respective longitudinal axis.  The protrusion is shaped for actuating the bypass
> valve.

## II.  LEGAL PRINCIPLES

It is understood that "[a] claim in a patent provides the metes and bounds of the right

which the patent confers on the patentee to exclude others from making, using or selling the

protected invention."  *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed.

Cir. 1999).  Claim construction is clearly an issue of law for the court to decide.  *Markman v.

Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370

(1996).

"In some cases, however, the district court will need to look beyond the patent's intrinsic

evidence and to consult extrinsic evidence in order to understand, for example, the background

science or the meaning of a term in the relevant art during the relevant time period."  *Teva

Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015) (citation omitted).  "In cases

where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings

about that extrinsic evidence.  These are the 'evidentiary underpinnings' of claim construction

that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal." *Id.* (citing 517 U.S. 370).

To ascertain the meaning of claims, courts look to three primary sources: the claims, the specification, and the prosecution history. *Markman*, 52 F.3d at 979. The specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. *Id.* A patent's claims must be read in view of the specification, of which they are a part. *Id.* For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Id.* "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's invention. Otherwise, there would be no need for claims. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). Although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

This Court's claim construction analysis is substantially guided by the Federal Circuit's decision in *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). In *Phillips*, the court set forth several guideposts that courts should follow when construing claims. In particular, the court reiterated that "the claims of a patent define the invention to which the

patentee is entitled the right to exclude." 415 F.3d at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To that end, the words used in a claim are generally given their ordinary and customary meaning. *Id.* The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313. This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention and that patents are addressed to, and intended to be read by, others skilled in the particular art. *Id.*

Despite the importance of claim terms, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument." *Id.* at 1315 (quoting *Markman*, 52 F.3d at 978). Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims. *Id.* at 1314-17. As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). In addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998):

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim

> language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Phillips*, 415 F.3d at 1316. Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation. Like the specification, the prosecution history helps to demonstrate how the inventor and the United States Patent and Trademark Office ("PTO") understood the patent. *Id.* at 1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id.* Nevertheless, the prosecution history is intrinsic evidence that is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims. *Id.*; *see Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004) (noting that "a patentee's statements during prosecution, whether relied on by the examiner or not, are relevant to claim interpretation").

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony. The *en banc* court condemned the suggestion made by *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes. *Phillips*, 415 F.3d at 1319-24. According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Id.* at 1321.

*Phillips* emphasized that the patent system is based on the proposition that the claims cover only the invented subject matter. *Id.*

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings. Instead, the court assigned dictionaries a role subordinate to the intrinsic record. In doing so, the court emphasized that claim construction issues are not resolved by any magic formula. The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language. *Id.* at 1323-25. Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant.

## III.  CONSTRUCTION OF AGREED TERMS

In their April 25, 2016 Joint Claim Construction and Prehearing Statement (Dkt. No. 39), the parties stated that they had "not agreed on any constructions." (Dkt. No. 39, at 1.) During the course of briefing, however, the parties reached agreement as to certain terms, and the parties included those agreed-upon constructions in their July 5, 2016 Joint Claim Construction Chart. (*See* Dkt. No. 50, Ex. A, at 36.) Those agreements are set forth herein.

## IV. CONSTRUCTION OF DISPUTED TERMS

### A. Preambles of Claims 1 and 4

**"an end piece for operatively engaging a head assembly, the head assembly comprising one or more valves, for the treatment and control of fluid passing through the head assembly, said end piece comprising" (Claim 1)**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| As part of the preamble, this term is non-limiting and needs no further construction.<br><br>To the extent construction is deemed necessary, the term should be given its plain and ordinary meaning.<br><br>Alternatively, "an end piece that is intended to be connected to a head assembly, with the head assembly including one or more valves, for treating and controlling fluid that passes through the head assembly, the end piece comprising." | This preamble to Claim 1 is part of the claim and limits the claim to require the combination of an end piece and a head assembly that is operatively engaged by the end piece as described. |

**"a cartridge for operatively engaging a head assembly, the head assembly comprising one or more valves, for the treating and control of fluid passing through the head assembly, said cartridge comprising" (Claim 4)**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| As part of the preamble, this term is non-limiting and needs no further construction.<br><br>To the extent construction is deemed necessary, the term should be given its plain and ordinary meaning.<br><br>Alternatively, "a cartridge that is intended to be connected to a head assembly, with the head assembly including one or more valves, for treating and controlling fluid that passes through the head assembly, the cartridge comprising." | This preamble to Claim 4 is part of the claim and limits the claim to require the combination of a cartridge and a head assembly that is operatively engaged by the cartridge as described. |

(Dkt. No. 39, Ex. A, at 1; Dkt. No. 42, at 6; Dkt. No. 50, Ex. A, at 1-3.)

<u>(1)  The Parties' Positions</u>

Plaintiff argues that these preambles are not limiting because the body of each claim sets forth a complete invention and does not rely upon the preamble for antecedent basis for any term in the body, and each preamble merely states a purpose or intended use.  (Dkt. No. 42, at 7-10.)

Defendant responds that these preambles recite essential structure, were relied upon during prosecution to distinguish prior art, and provide antecedent basis for terms appearing later in the claims.  (Dkt. No. 46, at 5.)

Plaintiff replies that even though the preambles refer to structure, such structure is set forth merely as part of non-limiting statements of intended use.  (Dkt. No. 47, at 2.)

<u>(2)  Analysis</u>

> In general, a preamble limits the invention if it recites essential structure or steps, or if it is "necessary to give life, meaning, and vitality" to the claim.  *Pitney Bowes*[*, Inc. v. Hewlett-Packard Co.*], 182 F.3d [1298,] 1305 [(Fed. Cir. 1999)].  Conversely, a preamble is not limiting "where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention."  *Rowe v. Dror*, 112 F.3d 473, 478, 42 USPQ2d 1550, 1553 (Fed. Cir. 1997).

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002); *see, e.g., Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003) ("When limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention.").  Also, "the purpose or intended use of the invention . . . is of no significance to claim construction . . . ."  *See Pitney Bowes*, 182 F.3d at 1305.  This principle has sometimes been characterized as "the presumption against reading a statement of purpose in the preamble as a claim limitation."  *Marrin v. Griffin*, 599 F.3d 1290, 1294-95 (Fed. Cir. 2010).

Claims 1 and 4 recite (emphasis added):

1.  An end piece *for operatively engaging a head assembly, the head assembly comprising one or more valves*, for the treatment and control of fluid passing through the head assembly, said end piece comprising:
> A. an end piece wall;
> B. an inlet fitting having a cam surface, said inlet fitting having a longitudinal axis; and
> C. an outlet fitting; and
> D. a protrusion having a longitudinal axis;
> Wherein said inlet fitting, said outlet fitting, and said protrusion extend from said end piece wall, wherein said protrusion is positioned between said inlet and said outlet fittings, wherein the distance from said longitudinal axis of said inlet to said longitudinal axis of said outlet is less than the distance from said longitudinal axis of said inlet to said longitudinal axis of said protrusion, and wherein the distance from said longitudinal axis of said inlet to said longitudinal axis of said protrusion is greater than the distance from said longitudinal axis of said outlet to said longitudinal axis of said protrusion, wherein the distance from said longitudinal axis of said inlet to said longitudinal axis of said outlet is about 2 cm, and wherein the distance from said longitudinal axis of said inlet to said longitudinal axis of said protrusion is about 2 cm, and wherein the distance from said longitudinal axis of said outlet to said longitudinal axis of said protrusion is about 2 cm, and wherein at least a portion of said cam surface is vectored from said longitudinal axis of said inlet fitting.

* * *

4.  A cartridge *for operatively engaging a head assembly, the head assembly comprising one or more valves*, for the treating and control of fluid passing through the head assembly, said cartridge comprising:
> A. An end piece, said end piece comprising:
>> i. an end piece wall;
>> ii. an inlet fitting having a cam surface, said inlet fitting having a longitudinal axis;
>> iii. an outlet fitting having a cam surface, said outlet fitting having a longitudinal axis; and
>> iv. a protrusion having a longitudinal axis and positioned between said inlet fitting and said outlet fitting;
>> Wherein said inlet fitting, said outlet fitting, and said protrusion extend from said end piece wall; and
> B. A cartridge housing having a first end, a closed second end, and a longitudinal axis extending therebetween;
>> Wherein said end piece wall is connected to said first end of said cartridge housing, and wherein a portion of said cam surface of said inlet fitting is vectored from at least one of said longitudinal axis of said inlet fitting, said

longitudinal axis of said outlet fitting, and said longitudinal axis of said cartridge housing, and wherein a portion of said cam surface of said outlet fitting is vectored from at least one of said longitudinal axis of said inlet fitting, said longitudinal axis of said outlet fitting, and said longitudinal axis of said cartridge housing.

On one hand, recital of structure in a preamble does not necessarily mean that the preamble is limiting. *See, e.g., Marrin*, 599 F.3d at 1294 ("the mere fact that a structural term in the preamble is part of the claim does not mean that the preamble's statement of purpose or other description is also part of the claim"). For example, structures that are referred to in a preamble may merely provide "reference points . . . that aid in defining" the claimed invention. *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1350 (Fed. Cir. 1998). Likewise, "it is generally not appropriate to limit claim language to exclude particular devices because they do not serve a perceived purpose of the invention." *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1325 (Fed. Cir. 2008) (citation and internal quotation marks omitted); *see Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 908 (Fed. Cir. 2004) ("The fact that a patent asserts that an invention achieves several objectives does not require that each of the claims be construed as limited to structures that are capable of achieving all of the objectives."). Thus, at least at first blush, the preamble language "for operatively engaging a head assembly" could be read as setting forth a reference point or a statement of purpose.

On the other hand, dependent Claim 15 (which depends from Claim 1) and Claim 24 (which depends from Claim 23, which depends from Claim 21, which in turn depends from Claim 4) recite the "head assembly" and "valve" that first appear in the preambles of the above-reproduced independent claims:

15. The end piece of claim 1, when the end piece is engaged with the *head assembly*, a distal end of the protrusion actuates a *valve of the head assembly*.

* * *

> 24.  The cartridge of claim 23, when the end piece is engaged with the *head assembly*, a distal end of the protrusion actuates a *valve of the head assembly*.

Plaintiff has cited authority from another district court noting that "[t]he Federal Circuit has found a statement of intended use in a preamble to be non-limiting, even where the body of the claim relied upon the preamble for antecedent basis." *Civix-DDI, LLC v. Cellco P'ship*, 387 F. Supp. 2d 869, 890 n.20 (N.D. Ill. 2005) (citing *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368 (Fed. Cir. 2001)); *see Civix-DDI*, 387 F. Supp. 2d at 890 n.20 ("the mere fact that the body of the claim relies on the preamble for antecedent basis does not, by itself, render the preamble limiting"). *Civix-DDI* is of minimal persuasive weight, if any, because the court found that "[t]he parties have not sufficiently developed these issues in their briefing in order for the Court to make a decision on this issue of law." *Id.* at 890.

Further, *Bristol-Myers* is distinguishable. The preamble language there at issue concerned "[a] method for reducing hematologic toxicity in a cancer patient . . . ." 246 F.3d at 1371. Although the body of the claim recited "said patient," thus relying upon the preamble for antecedent basis, the court found that "reducing hematologic toxicity" was not a limitation because: "The steps of the three-hour infusion method are performed in the same way regardless whether or not the patient experiences a reduction in hematologic toxicity, and the language of the claim itself strongly suggests the independence of the preamble from the body of the claim." *Id.* at 1375. Here, by contrast, the above-quoted dependent claims recite interaction between structures recited in the bodies of the claims and structures introduced in the preambles. The preambles at issue thus set forth limitations rather than merely statements of purpose.

Finally, although Plaintiff has argued claim differentiation as to the above-quoted dependent claims, these dependent claims recite more than merely that a structure is configured to engage with a head assembly. Plaintiff's claim differentiation argument is therefore of limited weight and is unpersuasive. *See Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001) ("Claim differentiation, while often argued to be controlling when it does not apply, is clearly applicable when there is a dispute over whether a limitation found in a dependent claim should be read into an independent claim, *and that limitation is the only meaningful difference between the two claims*.") (emphasis added).

On balance, the above-quoted dependent claims weigh in favor of finding that the preambles of Claims 1 and 4 are limiting. *See Pacing Techs., LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1024 (Fed. Cir. 2015) (preamble of independent claim found to be limiting because, among other factors, the preamble provided antecedent basis for a term in a dependent claim).

Also, the preamble language is necessary to understand the structures recited even in the bodies of the independent claims. *Deere & Co. v. Bush Hog, LLC*, cited by Defendant, is analogous:

> Unlike non-limiting preamble terms, "rotary cutter deck" does not merely state a name or a use for the claimed box section. Rather, the term describes a "fundamental characteristic of the claimed invention" that informs one of skill in the art as to the structure required by the claim. *Poly-Am., L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1310 (Fed. Cir. 2004). For example, that the claim is drawn to a "rotary cutter deck" informs the meaning of the "torsional stiffness" limitation—the claimed structure must possess sufficient stiffness to withstand the torsional loads imposed by the operation of a rotary cutter.

703 F.3d 1349, 1358 (Fed. Cir. 2012); *see Pacing Techs*, 778 F.3d at 1024.

Such a reading is consistent with the specification, which discloses the recited cartridge in the context of engaging with a head assembly that has valves. *See, e.g.,* '894 Patent at 1:6-9, 1:40-44, 4:30-33 ("the present invention is directed to cartridges and end pieces thereof that

13

actuate one or more valves and other features on a head assembly into which an end piece is received"), 10:39-63 & 15:8-11; *Catalina Mktg.*, 289 F.3d at 808 ("when reciting additional structure or steps underscored as important by the specification, the preamble may operate as a claim limitation"); *Gen. Elec. Co. v. Nintendo Co., Ltd.*, 179 F.3d 1350, 1361-62 (Fed. Cir. 1999) ("[T]he . . . specification makes clear that the inventors were working on the particular problem of displaying binary data on a raster scan display device and not general improvements to all display systems. In light of the specification, to read the claim indiscriminately to cover all types of display systems would be divorced from reality."). Although Plaintiff has argued that *General Electric* is distinguishable as having involved preamble language that set forth a specific improvement rather than merely a reference point, the above-quoted dependent claims and the above-cited portions of the specification reinforce that the claimed invention is recited in the context of a head assembly.

Such a reading is further confirmed by prosecution history. During *ex parte* reexamination, the patentee distinguished the "Koslow" and "Fritze" references by arguing that the claimed invention requires actuating a valve. (*See* Dkt. No. 46, Ex. 6, Aug. 15, 2013 Response to Office Action, at 17 & 21-22.) Because valves are recited in the preamble as part of a head assembly, the patentee thus relied upon the preambles as requiring that the claimed invention is configured to be connected to a head assembly. *See Catalina Mkt'g*, 289 F.3d at 808 ("clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art transforms the preamble into a claim limitation because such reliance indicates use of the preamble to define, in part, the claimed invention"); *see also MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1330 (Fed. Cir. 2007) (similar).

The Examiner, evidently having this same understanding, accepted this argument by finding that "none of the alleged cam surfaces of the prior art of record includes any surface that physically touches a follower of a valve for the purpose of actuating the valve, as required by the special definition of 'cam surface' from the specification." (*See id.*, Ex. 7, Feb. 13, 2014 Notice of Intent to Issue Ex Parte Reexamination Certificate, at 4; *see also Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359 (Fed. Cir. 1984) (patent examiners are "assumed . . . to be familiar from their work with the level of skill in the art"), *abrogated on other grounds*, *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011); *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1304 (Fed. Cir. 2008) (citing *American Hoist*); *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1347 (Fed. Cir. 2005) ("Statements about a claim term made by an Examiner during prosecution of an application may be evidence of how one of skill in the art understood the term at the time the application was filed."); *St. Clair Intellectual Prop. Consultants, Inc. v. Canon Inc.*, Nos. 2009-1052, 2010-1137, 2010-1140, 412 F. App'x 270, 276 (Fed. Cir. Jan. 10, 2011) ("Because an examiner in reexamination can be considered one of ordinary skill in the art, his construction of the asserted claims carries significant weight.").)

Plaintiff has cited *Summit 6* and *Intirtool*, but those decisions are distinguishable because *Summit 6* did not involve antecedent basis or reliance on the preamble during prosecution, *see Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1292 (Fed. Cir. 2015) (finding preamble language "duplicative of the limitations in the body of the claim"), and in *Intirtool* the patentee during prosecution had relied on "specific structural limitations set forth in the body" rather than on the preamble, *Intirtool, Ltd. v. Texar Corp.*, 369 F.3d 1289, 1295 (Fed. Cir. 2004).

Thus, because "the claim drafter cho[se] to use *both* the preamble and the body to define the subject matter of the claimed invention, the invention so defined, and not some other, is the

one the patent protects." *Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 620 (Fed. Cir. 1995).

The preambles are thus limiting as to the following language: "for operatively engaging a head assembly, the head assembly comprising one or more valves." *See Proveris Scientific Corp. v. Innovasystems, Inc.*, 739 F.3d 1367, 1373 (Fed. Cir. 2014) ("The phrase 'the image data' clearly derives antecedent basis from the 'image data' that is *defined in greater detail in the preamble* as being 'representative of at least one sequential set of images of a spray plume.'") (emphasis added).

Construction is appropriate to clarify that this preamble language sets forth configuration requirements in relation to head assemblies and valves but does not necessarily itself require the actual presence of head assemblies and valves. That is, Defendant has not demonstrated that the phrase "for operatively engaging" should be interpreted so as to require actual engagement.

The Court therefore hereby finds that the preambles of Claims 1 and 4 are limiting as specified above, and the Court hereby construes the preambles as set forth in the following chart:

| Term | Construction |
|---|---|
| **"an end piece for operatively engaging a head assembly, the head assembly comprising one or more valves"**<br><br>**(Claim 1)** | **"an end piece that is configured to be connected to a head assembly, with the head assembly including one or more valves"** |
| **"a cartridge for operatively engaging a head assembly, the head assembly comprising one or more valves"**<br><br>**(Claim 4)** | **"a cartridge that is configured to be connected to a head assembly, with the head assembly including one or more valves"** |

**B. "about 2 cm"**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning, no construction necessary.<br><br>Alternatively, "approximately 2 centimeters." | "between 1.95 cm and 2.05 cm" |

(Dkt. No. 39, Ex. A, at 2; Dkt. No. 42, at 10; Dkt. No. 50, Ex. A, at 3.) The parties have submitted that this term appears in Claims 1 and 27. (Dkt. No. 39, Ex. A, at 2; Dkt. No. 50, Ex. A, at 3.)

(1) The Parties' Positions

Plaintiff argues that "[t]he word 'about' does not have a specialized meaning in the '894 patent," and "[t]he Court therefore should give the phrase its plain and ordinary meaning, or, alternatively, construe 'about' as 'approximately' consistent with the case law." (Dkt. No. 42, at 11.)

Defendant responds that whereas "a typical juror would likely believe that 'about 2 cm' or 'approximately 2 cm' should encompass everything that rounds to 2 cm – that is, everything from 1.5 cm to 2.5 cm," "such an interpretation would conflict with the specification." (Dkt. No. 46, at 15.)

Plaintiff replies that "[Defendant's] focus on the 'about 0.5 cm' and 'about 0.7 cm' language is completely irrelevant, as these numerical dimensions are not in the asserted claims, and they do not purport to set the tolerance for 'about 2 cm.'" (Dkt. No. 47, at 7.)

(2) Analysis

The specification discloses examples of relative distances, such as in terms of whole centimeters and tenths of centimeters, but the specification does not define the term "about":

> As shown in FIG. 2-A, the distance L1 (preferably from about 0.2 cm, about 0.5 cm, about 0.8 cm to about 2 cm, about 4 cm, about 5 cm) from the longitudinal axis 14 of the inlet fitting 30 to the longitudinal axis 16 of the outlet fitting 32 is less than the distance L2 (preferably from about 0.5 cm, about 0.7 cm, about 1 cm, about 2 to about 3 cm, about 5 cm, about 6 cm) from the longitudinal axis 14 of the inlet fitting 30 to the longitudinal axis 34 of the protrusion 33. Further, as shown in FIG. 2-A, the distance L2 from the longitudinal axis 14 of the inlet fitting 30 to the longitudinal axis 34 of the protrusion 33 is less than the distance L3 (preferably from about 0.7 cm, about 1 cm, about 1.5 cm, about 2 to about 3 cm, about 6 cm, about 7 cm) from the longitudinal axis 16 of the outlet fitting 32 to the longitudinal axis 34 of the protrusion 33. As mentioned above, the inlet and outlet fittings 30 and 32 may be reversed, or otherwise arranged, such that the distance L2 would be greater than the distance L3.

'894 Patent at 5:42-59; *see id.* at 7:32-33 (referring to distances such as "about 0.05 cm," "about 0.08 cm," "about 0.15 cm," and "about 0.25 cm").

Yet, "a sound claim construction need not always purge every shred of ambiguity." *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007) ("The resolution of some line-drawing problems . . . is properly left to the trier of fact.") (citing *PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998) ("after the court has defined the claim with whatever specificity and precision is warranted by the language of the claim and the evidence bearing on the proper construction, the task of determining whether the construed claim reads on the accused product is for the finder of fact")); *see EON Corp. IP Holdings LLC v. Silver Springs Networks, Inc.*, 815 F.3d 1314, 1318-19 (Fed. Cir. 2016) (citing *PPG*). Further, Defendant has not adequately supported its suggestion that a finder of fact would likely interpret "about 2 cm" as meaning between 1.5 cm and 2.5 cm, particularly in light of the above-quoted disclosure of various distances ranging from "about 0.05 cm" to "about 7 cm."

Ultimately, "[a]lthough it is rarely feasible to attach a precise limit to 'about,' the usage can usually be understood in light of the technology embodied in the invention. When the claims are applied to an accused device, it is a question of technologic fact whether the accused device

meets a reasonable meaning of 'about' in the particular circumstances." *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1554 (Fed. Cir. 1996); *see Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1369-72 (Fed. Cir. 2005) (finding that the term "about" "should be given its ordinary and accepted meaning of 'approximately'" because the specification "fails to redefine 'about' to mean 'exactly' in clear enough terms to justify such a counterintuitive definition of 'about'").

The Court therefore hereby expressly rejects Defendant's proposal of limiting "about" to meaning within 0.05 centimeters. No further construction is necessary. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."); *see also O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010) ("Unlike *O2 Micro*, where the court failed to resolve the parties' quarrel, the district court rejected Defendants' construction."); *ActiveVideo Networks, Inc. v. Verizon Commcn's, Inc.*, 694 F.3d 1312, 1326 (Fed. Cir. 2012); *Summit 6*, 802 F.3d at 1291.

The Court accordingly hereby construes **"about 2 cm"** to have its **plain meaning**.

## C. "longitudinal axis"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning, an example of which is set forth in the patent specification. No construction necessary.<br><br>Alternatively, "axis running along the length and through the center of the referenced object." | "the axis running along the length and through the center of the referenced object" |

(Dkt. No. 39, Ex. A, at 2; Dkt. No. 42, at 12.)  The parties have submitted that this term appears in Claims 1, 2, 4, 10, 12, 13, 17, 18, 21, 22, 27, and 28.  (Dkt. No. 39, Ex. A, at 2; Dkt. No. 50, Ex. A, at 36.)

Plaintiff argued that "[t]he plain meaning and context of the claim language make the meaning of 'longitudinal axis' clear," and "defining this well-known phrase 'longitudinal axis' using more detailed words from the specification therefore might confuse the jury and is unnecessary."  (Dkt. No. 42, at 13.)

Defendant responded that "[t]he '894 patent, the dictionary, and common sense are all in accord: an object can have only one longitudinal axis."  (Dkt. No. 46, at 17.)

Plaintiff replied that "[t]o narrow the issues for the Court, [Plaintiff] agrees to [Defendant's] proposed construction: 'the axis running along the length and through the center of the referenced object" – as expressly stated in the '894 patent.'"  (Dkt. No. 47, at 7 (citing '894 Patent at 3:47-49).)  Nonetheless, Plaintiff maintains that irregular shapes can have a longitudinal axis.  (*Id.*, at 7-8 (citing '894 Patent at Figs. 2B, 7 & 8.)

In their July 5, 2016 Joint Claim Construction Chart, the parties submitted an agreed-upon construction for this term.  (Dkt. No. 50, Ex. A, at 36.)  The Court therefore concludes that there no longer exists any claim construction dispute as to this term.  At the July 18, 2016

hearing, upon inquiry by the Court, the parties confirmed that there is no longer any claim construction dispute as to this term.

The Court accordingly hereby adopts the parties' agreement that **"longitudinal axis"** means **"the axis running along the length and through the center of the referenced object."**

### D. "distal" and "proximal"

| "distal" (Claims 2, 12, 14, 15, 21, 23, and 24) | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Plain and ordinary meaning, an example of which is set forth in the patent specification. No construction necessary.<br><br>Alternatively, an "area in a direction situated away from the end piece wall."[1] | "farther from the end piece wall and the person inserting the filter cartridge" |

| "proximal" (Claims 12, 13, 14, 21, 22, and 23) | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Plain and ordinary meaning, an example of which is set forth in the patent specification. No construction necessary.<br><br>Alternatively, an "area situated in a direction closer to the end piece wall."[2] | "closer to the end piece wall and the person inserting the filter cartridge" |

(Dkt. No. 39, Ex. A, at 2; Dkt. No. 42, at 15 & 18; Dkt. No. 50, Ex. A, at 5 & 8.)

---

[1] Plaintiff previously proposed: "area in a direction away from the end piece wall." (Dkt. No. 39, Ex. A, at 2.)

[2] Plaintiff previously proposed: "area in a direction closer to the end piece wall." (Dkt. No. 39, Ex. A, at 2.)

<u>(1)  The Parties' Positions</u>

Plaintiff argues that these disputed terms are "used in common parlance and ha[ve] no special meaning in the art."  (Dkt. No. 42, at 15 & 18-19.)  Plaintiff also argues that Defendant's proposed constructions "import[] terms foreign to the specification, alter[] the term[]s['] plain meaning[s], and create[] ambiguity."  (*Id.*, at 16 & 19.)  For example, Plaintiff submits:

> The only reference to a "person" in the specification is in relation to a person removing the cartridge.  '894 patent at 18:46-47 ("Once the button 110 is pushed to an unlatched position, the cartridge 20 may be removed manually by a person.").  Even there, however, the person's position plays no role in defining the term "distal."

(Dkt. No. 42, at 16 n.2.)

Defendant responds that "the average juror will be unfamiliar with these terms, and therefore the Court should construe them to avoid confusion at trial."  (Dkt. No. 46, at 22.)  As to "proximal," for example, Defendant argues that its proposed construction appropriately specifies a direction, and "[n]o juror will be confused, as [Plaintiff's] brief suggests, by the possibility that a user might grasp the wrong end of the cartridge in a frustrating and fruitless attempt to insert the cartridge backwards."  (*Id.*, at 23.)

Plaintiff replies that "[Defendant] does not dispute that [Plaintiff's] construction is faithful to the specification and avoids the reference point issues that [Defendant's] constructions raise."  (Dkt. No. 47, at 8.)

<u>(2)  Analysis</u>

These disputed terms are technical terms and are potentially confusing, so "[t]he Court believes that some construction of the disputed claim language will assist the jury to understand the claims."  *See TQP Dev., LLC v. Merrill Lynch & Co., Inc.*, No. 2:08-CV-471, 2012 WL 1940849, at *2 (E.D. Tex. May 29, 2012) (Bryson, J.).  In particular, the *Summit 6* case cited by

Plaintiff is distinguishable as involving a non-technical phrase, namely "being provided to." *See* 802 F.3d at 1291.

As to the proper construction, the specification expressly defines these disputed terms as follows:

> As used herein, the term "distal" refers to the area situated in a direction away from the end piece wall.

> As used herein, the term "proximal" refers to the area situated in a direction nearest to the end piece wall.

'894 Patent at 3:53-56.

"[T]he inventor's lexicography governs," *Phillips*, 415 F.3d at 1316, and Defendant's proposal of introducing a "person inserting the filter cartridge" would tend to confuse rather than clarify, such as by introducing a subjective element as to how a particular person might choose to hold a filter cartridge when interacting with a particular appliance. The extrinsic dictionary definitions submitted by Plaintiff are likewise consistent with the lexicography. (*See* Dkt. No. 42, Ex. H, *Merriam-Webster's Collegiate Dictionary* 337, 941 (10th ed. 1998) (defining "distal" as "situated away from the point of attachment or origin or a central point esp. of the body — compare PROXIMAL"; defining "proximal" as "situated close to" or "next to or nearest the point of attachment or origin, a central point, or the point of view; *esp* : located toward the center of the body — compare DISTAL"); *see also id.*, Ex. I, *The American Heritage College Dictionary* 402, 1102 (3d ed. 1997) (similar).)

The Court therefore hereby construes these disputed terms as set forth in the following chart:

| Term | Construction |
|------|-------------|
| **"distal"** | **"area situated in a direction away from the end piece wall"** |
| **"proximal"** | **"area situated in a direction nearest to the end piece wall"** |

**E. "cam surface"**

| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
|------|-------------|
| Plain and ordinary meaning, an example of which is set forth in the patent specification. No construction necessary.

Alternatively, a "surface that physically touches a follower of a valve for the purpose of actuating the valve." | "the sum of all surfaces that physically touch a follower of a valve for the purpose of actuating the valve" |

(Dkt. No. 39, Ex. A, at 2-3; Dkt. No. 42, at 20.)  The parties have submitted that this term appears in Claims 1, 2, 4, 10, 12, 13, 14, 17, 18, 20, 21, 22, 23, 25, 26, and 28.  (Dkt. No. 39, Ex. A, at 2-3; Dkt. No. 50, Ex. A, at 36.)

Plaintiff argued that this disputed term "is another common phrase that would readily have been understood by one of ordinary skill in the art at the time of invention."  (Dkt. No. 42, at 20.)

Defendant responded that "[t]here is no basis for deviating from the specification's definition, especially as [Plaintiff] quoted this definition exactly during prosecution and relied on it to distinguish the prior art."  (Dkt. No. 46, at 23 (citing '894 Patent at 3:61-63).)

Plaintiff replied:

[Defendant] concedes that, under its construction of "cam surface" as the "sum of all surfaces that physically touch a follower of a valve for the purpose of actuating the valve," "the entirety of each such surface [does not need] to contact the valve."  ([Defendant's] Resp. Br. at 23-24).  [Defendant] further concedes that not "every point on a cam surface must contact the valve follower."  (*Id.* at 24.)

Finally, [Defendant] does not dispute its prior suggestion that the construction of this phrase is unnecessary to resolving any issue. (*Compare* [Plaintiff's] Br. at 20-21 *with* [Defendant's] Br. at 23-24.)

In light of those concessions, and to narrow the issues for the Court, [Plaintiff] agrees to [Defendant's] proposed construction: "the sum of all surfaces that physically touch a follower of a valve for the purpose of actuating the valve" – as expressly stated in the '894 patent. (*See* '894 patent at 3:61-63; JCCS, Ex. A at 2-3.)

To the extent that [Defendant's] application of its construction would require that a cam surface actually be used in combination with the valve of a head assembly to infringe, [Plaintiff] disagrees for the same reasons with respect to the preambles, above.

(Dkt. No. 47, at 8.)

In their July 5, 2016 Joint Claim Construction Chart, the parties submitted an agreed-upon construction for this term. (Dkt. No. 50, Ex. A, at 36.) The Court therefore concludes that there no longer exists any claim construction dispute as to this term. At the July 18, 2016 hearing, upon inquiry by the Court, the parties confirmed that there is no longer any claim construction dispute as to this term.

The Court accordingly hereby adopts the parties' agreement that **"cam surface"** means **"the sum of all surfaces that physically touch a follower of a valve for the purpose of actuating the valve."**

## F. "portion of said cam surface . . . is vectored"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning, an example of which is set forth in the patent specification. No construction necessary.<br><br>Alternatively, "a cam surface or a portion thereof that radially faces away to some degree from a referenced line or axis" | "a cam surface (or a portion thereof) that is not perpendicular to the reference axis"<br><br>Alternatively, "vectored" may be construed to mean "not perpendicular to the reference axis."<br><br>Alternatively:<br>    "a cam surface (or a portion thereof) that is parallel or at an angle to the reference axis" |

(Dkt. No. 39, Ex. A, at 3; Dkt. No. 42, at 22; Dkt. No. 46, at 24; Dkt. No. 50, Ex. A, at 10.)  The parties have submitted that this term appears in Claims 1, 2, 4, 10, 12, 13, 14, 17, 18, 20, 21, 22, 23, and 28.  (Dkt. No. 39, Ex. A, at 3; Dkt. No. 50, Ex. A, at 10.)

(1)  The Parties' Positions

Plaintiff argues that "[i]n the context of the claim language, the meaning of a cam surface that is 'vectored' has a plain and ordinary meaning that is unambiguous."  (Dkt. No. 42, at 22.) Plaintiff also argues that Defendant's proposal of "not perpendicular" lacks support in the specification, and "negative constructions are disfavored."  (*Id.*, at 23.)

Defendant responds that construction is appropriate because "[t]he jury likely will not be familiar with this term, and the specification's convoluted fifteen-line definition is far from a model of clarity."  (Dkt. No. 46, at 24.)  Defendant argues that "'vectored' encompasses surfaces that are parallel or at an angle to the reference axis, and excludes surfaces that are perpendicular to that axis."  (*Id.*)

Plaintiff replies by reiterating that whereas Defendant's proposed constructions are unsupported and confusing, Plaintiff's proposal "comes directly from the '894 patent."  (Dkt. No. 47, at 9 (citing '894 Patent at 4:7-21).)

(2)  Analysis

Claim 1, for example, recites in relevant part (emphasis added):

1.  An end piece for operatively engaging a head assembly, the head assembly comprising one or more valves, for the treatment and control of fluid passing through the head assembly, said end piece comprising:
. . .
B. an inlet fitting having a cam surface, said inlet fitting having a longitudinal axis; . . .
. . . wherein at least a *portion of said cam surface is vectored* from said longitudinal axis of said inlet fitting.

The specification discloses:

> As used herein, the term "vectored" refers to a cam surface or a portion thereof having a vector with a radial component some degree from a referenced line or axis (i.e., a vector which at least partially diverges radially some degree from a referenced line or axis). *A vectored cam surface radially faces away to some degree from a referenced line or axis* (which is generally the longitudinal axis of a fitting). A vectored cam surface or portion thereof can have a vector which extends only in a radial or transverse direction, that is, 90 degrees in relation to the referenced line or axis (herein referred to as "fully vectored") or a vectored cam surface or portion thereof can have a radial or transverse component, that is, greater than about 1 degree and less than about 90 degrees in relation to the referenced line or axis (herein referred to as "partially vectored").

'894 Patent at 4:7-21 (emphasis added).

Particularly in light of this disclosure that a cam surface may be "fully vectored" by being at "90 degrees in relation to the referenced line or axis" (*id.*), the Court hereby expressly rejects Defendant's proposal of "not perpendicular to the reference axis."

As to Plaintiff's proposal that no construction is necessary, however, the term "vectored" is a technical term, and "some construction of the disputed claim language will assist the jury to understand the claims." *See TQP*, 2012 WL 1940849, at *2 (Bryson, J.).

The Court therefore hereby construes **"vectored"** to mean **"radially faces away to some degree from a referenced line or axis."**

## G. "inlet fitting" and "outlet fitting"

| "inlet fitting" (Claims 1, 2, 3, 4, 5, 10, 11, 12, 13, 14, 17, 19, 20, 21, 22, 23, 25, 27, and 28) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Plain and ordinary meaning, no construction necessary.<br><br>Alternatively, "part for the intake of fluid." | "an extension from the end piece that mates with the head assembly and contains a channel for fluid to flow from the head assembly into the interior space of the cartridge housing" |

| "outlet fitting" (Claims 1, 2, 3, 4, 18, 19, 20, 26, 27, and 28) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Plain and ordinary meaning, no construction necessary.<br><br>Alternatively, "part for the outflow of fluid." | "an extension from the end piece that mates with the head assembly and contains a channel for fluid to flow from the interior space of the cartridge housing back into the head assembly" |

(Dkt. No. 39, Ex. A, at 3; Dkt. No. 42, at 24 & 27; Dkt. No. 46, at 24 & 25 n.4; Dkt. No. 50, Ex. A, at 18-19 & 28-29.)

<u>(1)  The Parties' Positions</u>

Plaintiff argues that "[i]n the context of the claim language, the plain and ordinary meaning of 'inlet fitting' is clear: it refers to the part for the intake of fluid."  (Dkt. No. 42, at 25.)  Likewise, Plaintiff argues, "[i]n the context of the claim language, the plain and ordinary meaning of 'outlet fitting' is clear: it refers to the part for the outflow of fluid."  (*Id.*, at 28.) Plaintiff also argues that Defendant's proposal should be rejected because the fittings need not actually be inserted into a head assembly.  (*Id.*, at 26 & 28.)  As to Defendant's proposal of "a channel for fluid to flow," Plaintiff argues that "[t]hese words, too[,] are absent from all independent claims."  (*Id.*, at 26.)

Defendant responds that in the Abstract and the Summary of the Invention as well as in every embodiment, the fittings are end piece wall extensions that mate with the head assembly. (Dkt. No. 46, at 25.)  Defendant also argues that "unless the terms 'inlet fitting' and 'outlet fitting' are limited to channels for conveying fluid, the construction of these terms will read on the protrusion," which does not contain a channel for conveying fluid from one component to another."  (*Id.*, at 26.)

Plaintiff replies that Defendant's proposed constructions should be rejected because the fittings need not be mated to a head assembly and because the claims themselves already recite when the fittings "extend from the end piece wall." (Dkt. No. 47, at 10.) Plaintiff also argues that Defendant's proposal of "channel" limitations is contrary to claim differentiation, and "[a]lthough [Defendant] argues that the 'channel' is necessary to distinguish the fittings from the 'protrusion,' [Plaintiff's] alternate constructions already clarify that the fittings permit the 'intake of fluid' and 'outflow of fluid.'" (*Id.* (citations omitted).)

(2) Analysis

As discussed above, the Court finds that the preambles of Claims 1 and 27 are limiting as to configuration with respect to a head assembly. Further, Claim 28 is a method claim that expressly recites a head assembly as part of the claimed method steps.

Nonetheless, as to Defendant's proposal of requiring a "channel," dependent Claim 26 recites "wherein the outlet fitting includes a fluid channel, and the cam surface of the outlet fitting is positioned in the fluid channel of the outlet fitting." *See also* '894 Patent at Cls. 5-7 & 25 (similar). Although this claim recites more than merely a limitation of "includes a fluid channel," the doctrine of claim differentiation nonetheless weighs at least somewhat against Defendant's proposal. *See Phillips*, 415 F.3d at 1315 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim."); *but see Wenger*, 239 F.3d at 1233 ("Claim differentiation, while often argued to be controlling when it does not apply, is clearly applicable when there is a dispute over whether a limitation found in a dependent claim should be read into an independent claim, and that limitation is the *only meaningful difference* between the two claims.") (emphasis added).

The Court thus hereby expressly rejects Defendant's proposed constructions. On balance, no further construction is necessary, particularly in light of the extrinsic dictionary definitions submitted by Plaintiff that indicate that "inlet," "outlet," and "fitting" have well-established meanings that are readily applicable in the context of the '894 Patent. (*See* Dkt. No. 42, Ex. H, *Merriam-Webster's Collegiate Dictionary* 602 (10th ed. 1998) (defining "inlet" as "2: a way of entering; *esp* : an opening for intake"); *id.* at 826 (defining "outlet" as "1 a : a place or opening through which something is let out : EXIT, VENT"); *id.*, Ex. J, *McGraw-Hill Dictionary of Engineering* 220 (2d ed. 2003) (defining "fitting" as "[a] small auxiliary part of standard dimensions used in the assembly of an engine, piping system, machine, or other apparatus").)

The Court therefore hereby construes **"inlet fitting"** and **"outlet fitting"** to have their **plain meaning**.

## V. CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the patents-in-suit, and in reaching these conclusions the Court has considered and relied upon extrinsic evidence. The Court's constructions thus include subsidiary findings of fact based upon the extrinsic evidence presented by the parties in these claim construction proceedings. *See Teva*, 135 S. Ct. at 841.

The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

Within thirty (30) days of the issuance of this Memorandum Opinion and Order, the parties are hereby ORDERED, in good faith, to mediate this case with the mediator agreed upon by the parties.  As a part of such mediation, each party shall appear by counsel and by at least one corporate officer possessing sufficient authority and control to unilaterally make binding decisions for the corporation adequate to address any good faith offer or counteroffer of settlement that might arise during such mediation.  Failure to do so shall be deemed by the Court as a failure to mediate in good faith and may subject that party to such sanctions as the Court deems appropriate.  No participant shall leave the mediation without the approval of the mediator.

**So ORDERED and SIGNED this 22nd day of July, 2016.**

_____
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE