```
 1                  IN THE UNITED STATES DISTRICT COURT
                    FOR THE EASTERN DISTRICT OF TEXAS
 2                           MARSHALL DIVISION

 3   WHIRLPOOL CORPORATION        )
                                  )       DOCKET NO. 2:15cv1528
 4        -vs-                    )
                                  )       Marshall, Texas
 5                                )       9:25 a.m.
     TST WATER, LLC               )       March 6, 2017
 6
                     TRANSCRIPT OF VOIR DIRE AND JURY TRIAL
 7                            MORNING SESSION
                     BEFORE THE HONORABLE RODNEY GILSTRAP,
 8                      UNITED STATES DISTRICT JUDGE

 9                          A P P E A R A N C E S

10   PLAINTIFFS:

11   RICHARD S.J. HUNG
     BARBARA N. BARATH
12   CHRISTOPHER JAMIESON KENDALL
     RACHEL S. DOLPHIN
13   MORRISON & FOERSTER LLP
     425 Market St.
14   San Francisco, CA 94105

15   MELISSA R. SMITH
     ALLEN GARDNER
16   GILLAM & SMITH, LLP
     303 S. Washington Ave.
17   Marshall, TX 75670

18   T. JOHN WARD, JR.
     WARD, SMITH & HILL, PLLC
19   1507 Bill Owens Parkway
     Longview, TX 75604
20

21   COURT REPORTER:          MS. SHELLY HOLMES, CSR-TCRR
                              FEDERAL OFFICIAL COURT REPORTER
22                             TO THE HONORABLE RODNEY GILSTRAP
                              100 E. Houston Street
23                            Marshall, Texas 75670

24   Proceedings taken by Machine Stenotype; transcript was
     produced by a Computer.
25
```

```
 1  DEFENDANT:

 2
    JOHN B. SGANGA, JR.
 3  SEAN M. MURRAY
    JUSTIN J. GILLETT
 4  KIM A. KENNEDY
    KNOBBE, MARTENS, OLSON & BEAR, LLP
 5  2040 Main St.
    Fourteenth Floor
 6  Irvine, CA 92614

 7
    ELIZABETH L. DeRIEUX
 8  CAPSHAW DERIEUX, LLP
    114 E. Commerce Ave.
 9  Gladewater, TX 75647

10

11                  **************************

12                      P R O C E E D I N G S

13            (Jury panel in.)

14            COURT SECURITY OFFICER:  All rise.

15            THE COURT:  Good morning.  Please be seated.

16            Good morning, Ladies and Gentlemen.  Thank you for

17  being here.  My name is Rodney Gilstrap, and I'm the resident

18  United States District Judge here in the Eastern District of

19  Texas with responsibility for the Marshall Division.

20            I've lived in Marshall since 1981.  I practiced law

21  here for about 30 years before I was appointed to the federal

22  bench.  I've been on the bench here since 2011.  I was born

23  in Florida; I was not born in Texas.  But as they say, I got

24  to Texas as fast as I could.

25            I came to Texas at the ripe old age of 18 to attend
```

1   college at Baylor University.  I stayed there to go to law

2   school, and I've been here ever since.  I'm married, I have

3   two grown children, and my wife owns and operates a retail

4   floral business here in Marshall.

5        Now, I tell you all those things because in a few

6   moments, I'm going to ask each of you to tell me the same

7   kind of information about each of you.  And I think you're

8   entitled to know as much about me as I'm about to find out

9   about each one of you.

10        We're about to engage in the selection of a jury in

11   a civil case involving allegations of patent infringement.

12   However, before we go any further, I'd like to briefly

13   explain to you and review with you how we came to have a jury

14   trial system for civil cases like this one.

15        If you look back in history, and if you begin with

16   the Pentateuch, the first five books of the Old Testament,

17   you'll find that the ancient Jewish nation impaneled juries

18   for the purpose of establishing ownership of property and the

19   value of property.

20        The ancient Greeks began using a jury system about

21   1500 B.C.  The Romans adopted the jury system from the

22   Greeks.  And if you'll recall, the Romans copied a lot of

23   things from the Greeks.  The Romans then brought the jury

24   system to England in the 4th century A.D. when they conquered

25   that island all the way up to what is now Scotland where

1    they've built Hadrian's Wall.

2            So by the 12th century A.D., the jury system had

3    been a part of everyday life and the judicial system in

4    England for over 800 years.

5            In the 12th century A.D., however, a tyrannical

6    king came to the throne of Great Britain known as King John,

7    and King John set about to do away with the jury trial system

8    in England.  King John ended up in a crisis with his nobles

9    confronting him and disagreeing with his many decisions, one

10   of which was to do away with the jury trial system; and that

11   confrontation and that crisis between King John and his

12   nobles was ultimately concluded at a place in England called

13   Runnymede.  And out of that resolution of that crisis, a

14   document was written.  And we know that today as the Magna

15   Carta.

16           The Magna Carta guarantees the right to trial by

17   jury to Englishmen.  As a matter of fact, Ladies and

18   Gentlemen, you might be interested to know that 28 state

19   constitutions among our 50 states in the United States have

20   adopted the language from the Magna Carta as to the guarantee

21   of a right to trial by jury, verbatim.  And that language

22   from the Magna Carta in the 12th century has been placed into

23   28 of our 50 states' state constitutions.

24           So you can see that our founding fathers who came

25   here as British colonists came here deeply engrained with the

tradition of the jury system.  And if you'll fast forward
from the 12th century to the 18th century, you'll find that
British colonists in America had been practicing the jury
system at that time for over a hundred years.

But, again, a rather tyrannical king came to the
throne of Great Britain.  This time the king's name was King
George, III.  And King George, III, among other things, went
about to reduce and limit and do away with the right to trial
by jury among his British colonists here in America.

That led to another crisis between the King and his
colonists.  And a gentleman that we all know as one of our
founding fathers, Thomas Jefferson, sat down to write a
document laying out the various disputes and reasons why the
American colonists should separate from England and form an
independent nation.  We call that document the Declaration of
Independence.

In that document, Thomas Jefferson specifically
spelled out, among many other reasons, the hindrance of the
right to trial by jury as one of the specific reasons
supporting a revolution and separation from England and the
formation of the United States.

As you all know, we did separate from England.  We
did form our own country, and we adopted our American
constitution.

Immediately after the constitution was adopted, we

1    set about adopting 10 amendments to the constitution.  Many

2    of the states that ratified the constitution said they would

3    only ratify it if it was immediately followed with certain

4    amendments.  So those 10 amendments to the constitution were

5    ratified and adopted in the 1890s, 1891.

6          Among them in the Bill of Rights, those first 10

7    amendments, is the Seventh Amendment.  And the Seventh

8    Amendment to our U.S. Constitution guarantees the right to a

9    trial by jury in a civil case such as this one.

10         So you can see, Ladies and Gentlemen, based on that

11   history, we, as American citizens, have enjoyed a

12   constitutional guarantee of a right to trial by jury in civil

13   cases for over 200 years.

14         I always tell citizens, who show up like you have

15   this morning for jury service, that in my personal opinion

16   jury service is the second highest form of public service

17   that any American citizen can perform.  It's my personal

18   opinion that the highest form of public service for any

19   American are those young men and women that wear the uniform

20   of our country and serve in the armed forces.

21         Now, when the lawyers address you today, they're

22   going to ask you various questions, and I want you to

23   understand they're not trying to inquire into your personal

24   affairs unduly.  They're not trying to be nosy.  They are

25   simply asking questions because they're entitled to ask

1    questions as a part of securing a fair and impartial jury to

2    hear the evidence in this case.

3          I don't know if it will happen during the process

4    today, Ladies and Gentlemen -- it rarely does -- but I want

5    to make you aware, if at any time a question should be asked

6    during jury selection and directed to one of you that you

7    believe is so personal and so private that you're not

8    comfortable answering it in front of everyone else on the

9    panel, then you can simply say, I'd like to talk about that

10   with Judge Gilstrap.  And if that's your answer, I'll provide

11   an opportunity for you to answer that question outside of the

12   presence of everyone else on the panel.

13         However, as I say, that doesn't come up very often,

14   but I want you to know that option does exist.  The important

15   thing for each of you is that the answers you give to the

16   questions that are asked are full, complete, and truthful

17   answers.  As long as your responses are full, complete, and

18   truthful, there are no wrong answers to the questions that

19   you'll be asked today.

20         Now, the trial in this case is going to begin later

21   today.  After we break for lunch, we will begin the trial.

22   And I expect that the trial will last through Friday of this

23   week.  In other words, I expect that the trial will take the

24   entirety of this week to complete.

25         Now, any of you that are selected from this panel

1    to serve on our jury will need to be available throughout

2    this period of time to complete your jury service.  So if

3    there is anyone on the panel who has a predetermined surgical

4    operation that they could not easily reschedule, surgery --

5    surgery for a close family member that's dependent upon you,

6    or even if you have travel plans with non-refundable airline

7    tickets, non-refundable reservations, if you have anything of

8    that serious of a nature that would keep you from being able

9    to serve if you were selected, that's something I need to

10   know about at this time.

11          If that applies to anyone on the panel, if there's

12   any other reason for scheduling purposes you could not be

13   available, then I need you to raise your hands and let me

14   make a note of that.

15          Okay.  Panel Member No. 13.

16          Anybody else?

17          Okay.  Thank you very much.

18          All right.  At this time, I'm going to call for

19   announcements in the case of Whirlpool Corporation v. TST

20   Water, LLC.  This is Civil Case No. 2:15cv1528.

21          And, Counsel, as you give your announcements on the

22   record this morning, if you would not only introduce

23   yourselves, but introduce each of the members of your trial

24   team and introduce any corporate representatives that you

25   have with you.

1              We'll start with the Plaintiff.  What says the

2    Plaintiff?

3              MR. WARD:  Johnny Ward for Whirlpool, and Whirlpool

4    is ready to proceed.

5              Seated with me at counsel table is Barbara Barath,

6    Rich Hung, Melissa Smith.  Tara Trask will be here during

7    trial helping us.  And our corporate representative is

8    Mr. Brett Dibkey from Whirlpool.

9              THE COURT:  Thank you, Counsel.

10             What says the Defendant?

11             MS. DERIEUX:  Elizabeth DeRieux on behalf of TST

12   Water.  With me at counsel table, Mark Gerard, Sean Murray,

13   John Sganga, Kim Kennedy, Justin Gillett, and Mr. Mike Baird,

14   who will be our corporate representative in the courtroom

15   with us today.

16             THE COURT:  All right.  Thank you, Counsel.

17             Ladies and Gentlemen, as I've told you, this case

18   arises under the patent laws of the United States.  And what

19   the Plaintiff, Whirlpool, is claiming is that its patent is

20   being infringed by the Defendant, TST Water.  And it's

21   seeking the recovery of money damages to compensate it for

22   that alleged infringement.

23             The Defendant, TSTC -- TST Water denies that it is

24   infringing any of the intellectual property rights of

25   Whirlpool, and it contends also that Whirlpool's patent is

1    invalid.

2         Now, what I just told you is a very informal,

3    shorthand version in layman's terms of what this case is

4    about.  I know you've seen the patent video film provided by

5    the Federal Judicial Center; and having seen that, you know

6    more about patent cases at this point than most people do who

7    appear for jury duty.

8         Now, the lawyers for both sides are about to

9    question the members of the panel to gather information so

10   that they can exercise what are called their peremptory

11   challenges to secure a jury of eight individuals who will

12   serve in this case and will hear the evidence.

13        Again, there are no wrong answers to the questions

14   as long as your responses are full, complete, and truthful.

15        Also, Ladies and Gentlemen, if any of the lawyers

16   should ask a question that I believe is improper, I will

17   certainly stop them and let them know.  However, you should

18   understand that these are very experienced trial lawyers.

19   They're familiar with the Federal Rules of Civil Procedure.

20   They're familiar with the Local Rules of this Court, and I

21   don't expect that to happen.  But if it should happen, I'll

22   certainly intervene.

23        One thing I do want to call your attention to

24   before we proceed with questions from the lawyers, because

25   it's quite possible some of them may ask you about your

1    ability to apply this, is the burden of proof that will be

2    used in this case.

3              The jury that's selected may apply a burden of

4    proof -- actually will apply two different burdens of proof

5    in this case.  One burden of proof that the jury will apply

6    to the evidence is called the preponderance of the evidence.

7    And there's a second burden of proof that the jury will also

8    apply to some of the evidence, and that's called clear and

9    convincing evidence.

10             Now, when responding to any questions from the

11   lawyers about the burden of proof, I need to instruct you

12   that when a party has the burden of proof on any claim or

13   defense by a preponderance of the evidence, that means that

14   the jury must be persuaded by the credible and believable

15   evidence that that claim or defense is more probably true

16   than not true.  I'll say that again, more probably true than

17   not true.

18             This is sometimes talked about as being the greater

19   weight and degree of credible testimony.  Let me give you an

20   example.  I think everyone on the panel can see in front of

21   me and in front of our court reporter the statue of the Lady

22   of Justice.

23             She holds in her right hand the sword of justice

24   lowered at her right side.  She holds in her left hand raised

25   above her the Scales of Justice.  Those scales are exactly

1    equal and exactly balanced.  And that's where the parties

2    should start off in this case, exactly equal and exactly

3    balanced.

4           Over the course of the trial, the jury is going to

5    be presented with various evidence from both sides of this

6    case.  When all the evidence is in, the jury will retire to

7    the jury room to answer certain questions that I will give

8    them.  Those questions and the jury's answers to those

9    questions will form what we call the verdict in this case.

10          And when deciding how to answer those questions in

11   the verdict form and considering the evidence that's been

12   placed on one side or the other of those scales during the

13   course of the trial, the jury needs to understand that if the

14   party who has the burden of proof by a preponderance of the

15   evidence has those scales with all the evidence on one side

16   or the other tip in their favor, even if it tips in their

17   favor ever so slightly, then that party has met their burden

18   of proof by a preponderance of the evidence.

19          However, on the other hand, where a party has the

20   burden of proving any defense by clear and convincing

21   evidence, that second burden of proof I mentioned, it means

22   that the jury must have an abiding conviction that the truth

23   of that party's factual contentions are highly probable.  And

24   I'll say that again, an abiding conviction that the truth of

25   that party's factual contentions are highly probable.  This

1    is a higher standard of proof than the preponderance of the

2    evidence.

3            If you imagine the same example that I gave you a

4    moment ago but this time apply it to clear and convincing

5    evidence, when -- when the trial is complete and all the

6    evidence has been presented, if you think about that evidence

7    as being placed on one side or the other of those scales and

8    the jury's asked to answer the questions in the verdict form,

9    then if a party who has the burden of proof by clear and

10   convincing evidence has those scales tip in their favor, and

11   they must tip more than ever so slightly, they must

12   definitely tip -- if, in fact, they tip definitely in that

13   party's favor, then they have met their burden of clear and

14   convincing evidence.

15           Now, neither of these two burdens of proof, Ladies

16   and Gentlemen, should be confused with a third and unrelated

17   burden of proof that I'm sure all of you have heard about in

18   the media and on television called beyond a reasonable doubt.

19           Beyond a reasonable doubt is the burden of proof

20   that's applied in a criminal case.  It has absolutely no

21   application at all in a civil case like this.  You should not

22   confuse clear and convincing evidence with evidence beyond a

23   reasonable doubt.

24           Clear and convincing evidence is not as high a

25   burden as beyond a reasonable doubt, but it is a higher

 1    burden of proof than the preponderance of the evidence.

 2              Now, I give you these instructions in case either

 3    of the lawyers for either of the parties decide to ask you

 4    during their examination of the panel whether you can

 5    properly apply those two burdens of proof as the Court has

 6    instructed you.

 7              Now, before the lawyers question the panel, I'm

 8    going to ask and I'm going to allow each of you all to stand

 9    and give me your answers to the questions that you have, both

10    in written form and on the screens in front of you.  This is

11    where I get to learn as much about you as I've told you about

12    myself.

13              This is how we're going to do this, Ladies and

14    Gentlemen:  Our Court Security Officer, Mr. Nance, has a

15    handheld microphone, and he's going to bring that to each

16    member of the panel.  And when it gets to be your turn, I'm

17    going to ask you to stand and then, if you will, give your

18    answers to those questions to the lawyers here in the

19    courtroom and to the Court.

20              Also, you need to understand that later in the

21    process, as the lawyers ask individual questions of members

22    of the panel, you may need to give responses.  And I'm going

23    to ask you to do it in that case in the same way, and that

24    is, wait until the handheld microphone is brought to you,

25    then stand, and then give your answers directed toward the

1    counsel tables here in the courtroom.

2              So we'll follow it that way throughout the rest of

3    the process when questions are asked.  And we'll do that

4    beginning now with your answers to these nine questions.

5              So, Mr. Nance, if you'll take the microphone to

6    Panel Member No. 1, Ms. Miller, we'll start with her and ask

7    her to give us her answers to those nine questions.

8              JUROR MILLER:  Good morning.  My name is Elizabeth

9    Miller.  I am from Omaha, Texas.  I have two wonderful boys.

10   I am employed with Morris County Farm Bureau.  I've worked

11   there for three years.  I ended up going and getting my high

12   school diploma and my basics at Northeast Texas Community

13   College until I became a widow.  And then, of course, I went

14   to work and to take care of my two kids.  And I've only

15   served on a civil case.

16             THE COURT:  Thank you, ma'am.  Where did you serve

17   on a civil case?

18             JUROR MILLER:  Morris County.

19             THE COURT:  Thank you.  All right.  Panel Member

20   No. 2, if you'll stand and give us your answers, sir.

21             JUROR BATTERSHELL:  My name is Ryan Battershell.  I

22   live in Elysian Fields, Texas.  I have two -- two young

23   children.  I work for Luminant.  I'm a mechanic out there.

24   I've been out there for about nine years.

25             I graduated here from Marshall.  Went to TSTC.  No

1   kind of degree.

2           My wife's name is Jean.  She's a self-employed

3   occupational therapist.  She's been doing that for about

4   15 years.  And I've served on a civil trial here in Marshall

5   as a juror.

6           THE COURT:  Thank you, sir.

7           Panel Member No. 3, Mr. Fisher.

8           JUROR FISHER:  My name is Daniel Fisher.  I live in

9   Gilmer, Texas.  I have four children.

10          Today, I begin new employment with RS&H

11  Engineering.  I am previously retired from TxDOT, 21 years.

12  High school education.

13          My wife's name is Pamela.  She's employed with the

14  VA.  She's been there about six years.  And I've not served

15  on a case.

16          THE COURT:  All right, sir.  Thank you.

17  If you'll hand the microphone to Panel Member No. 4,

18  Ms. Enochs.

19          JUROR ENOCHS:  Hi.  My name is Denise Enochs.  I

20  live in Marshall, Texas.

21          THE COURT:  If you'd hold that microphone a little

22  closer.

23          JUROR ENOCHS:  I'm sorry.

24          THE COURT:  Thank you.

25          JUROR ENOCHS:  I live -- My name is Denise Enochs.

```
 1    I live in Marshall, Texas.  I have two grown children.  I
 2    work for Camterra Resources.  That's an oil and gas company.
 3    I've been there since 1994.
 4              I have a Bachelor of Science degree from Stephen F.
 5    Austin University.
 6              My husband's name is Ron, and he works at Cook
 7    Composites -- or I believe it might be called Polynt now.
 8    It's a chemical company here in Marshall.  And he's been
 9    there for about 35 years.
10              And I have never served on a jury.
11              THE COURT:  All right.  Thank you, ma'am.
12              Next is Panel No. 5.
13              JUROR BALD:  Yes, my name is James Bald.  And I
14    have two young boys in the process of becoming men.
15              I have worked for the City of Longview at the water
16    purification plant.  We provide drinking -- treat the
17    drinking water for the City of Longview.  I've -- in April,
18    I'll have been there four -- four years.
19              I went to two years of college for marketing and
20    business administration, but I got -- I did not receive my
21    degree.  I had an opportunity -- job opportunity I couldn't
22    pass up.
23              My -- my wife's name is Penny, Penny Bald, and she
24    works for Strategic Fulfillment Group in the thriving
25    metropolis of Big Sandy.  And she's worked there for two
```

 1    years.

 2              And I did serve as an alternate on the jury in

 3    Longview, but I was just an alternate.

 4              THE COURT:  Thank you, sir.

 5              Next is Panel Member No. 6, Ms. Davis.

 6              JUROR DAVIS:  Good morning.  My name is Carolyn

 7    Davis.  I live in Gilmer, Texas.  I have no children.

 8    I work at AI Core Products in Longview, Texas.  I've been

 9    there 17 years.

10              I graduated from New Diana High School with a

11    semester at Kilgore College, and I have -- I have no spouse,

12    and I haven't served on a jury.

13              THE COURT:  All right.  Thank you, ma'am.

14              No. 7 is next, Ms. Cox.

15              JUROR COX:  My name is Kathleen Cox.  I live in

16    Atlanta, Texas.  I have two young daughters.

17              I work at Red River Pharmacy there in Atlanta,

18    Texas.  I've worked there for almost four years.  Went to

19    Queen City High School.  No college.

20              My husband's name is Sean.  He works at Red River

21    Army Depot as a mechanic.  He's been out there for about

22    almost four years.

23              And I have never been on a jury before.

24              THE COURT:  Thank you.

25              If you'll hand that microphone back to Mr. Nance,

1    he'll take it around to Panel Member No. 8, and we'll

2    continue the process.

3              JUROR KLITZ:  My name is Sarah Klitz.  I don't have

4    any children.

5              I work at Excel Ford Lincoln in Carthage, Texas.

6    I'm a parts-counter person.  I've been there for a year, the

7    end of this month.

8              I graduated TSTC with an associate of applied

9    sciences in office technology and a certificate in

10   computer-aided drafting.

11             I'm not married.  And I have never served on any

12   jury before.

13             THE COURT:  Thank you, ma'am.

14             If you'll hand that to Panel Member No. 9,

15   Ms. Childers.

16             JUROR CHILDERS:  Hi.  I'm Jenice Childers.  I have

17   four adult children.  I own The UPS Store here in Marshall.

18   I've had it for 12 years.

19             I went to high school and college in California.

20   My spouse's name is Bill Childers.  He's retired from the

21   Department of Homeland Security as a TSA supervisor.

22             And I've been on one auto accident jury.

23             THE COURT:  And where was that?

24             JUROR CHILDERS:  Here in Harrison County.

25             THE COURT:  Thank you.

1              Panel Member No. 10.

2              JUROR STEGLINSKI:  My name is John Steglinski.  I

3    live in Gilmer, Texas.  I have one adult child.

4    I work for the Post Office as a mail handler and clerk.  I've

5    retired from the Navy.

6              I'm a high school graduate and some college

7    background.

8              My wife's name is Barbara.  She currently doesn't

9    work because of her health.

10             And I worked -- I had one criminal case in Upshur

11   County.

12             THE COURT:  Thank you, sir.

13             Panel Member No. 11.

14             JUROR BERAN:  Good morning.  My name is Beverly

15   Beran.  I have three adult sons, two of which work in the

16   military.

17             I currently work at Region VII Education Service

18   Center in Kilgore.  I am the associate director for special

19   education over there, and have been there for about three

20   years now.

21             I do have a master's in special education and a

22   principal certification.

23             My husband's name is Gordon.  He currently works as

24   a civil employee at Barksdale Air Force Base.  He is retired

25   from the Air Force about eight months ago, and so he's been

1    working there now for eight months as a civil employee.

2              And no prior jury services.

3              THE COURT:  Where did you do your college work,

4    your bachelor's and your master's?

5              JUROR BERAN:  Actually, I moved a lot in the

6    military, so I have been in Anchorage, Alaska; and in

7    Valdosta, Georgia; and Mississippi.  And I finally finished

8    at Grand Canyon University, and my principal certification is

9    through Stephen F. Austin.

10             THE COURT:  Thank you, ma'am.

11             JUROR BERAN:  Yes, sir.

12             THE COURT:  Panel Member No. 12.

13             JUROR MONTEAU:  My name is Terri Monteau.  I have

14   two grown children and two grandchildren.

15             And I have -- I'm semi-retired.  I spend most of my

16   day negotiating with my grandchildren.  I was a preschool

17   teacher, and I have traveled mostly around the country with

18   my husband as he changed employment.

19             I completed one semester of college.  I had an

20   opportunity to get a job for an attorney, and started

21   working -- that's where I started my career.

22             My spouse's name is Gary Monteau.  And like I said,

23   I've traveled around the country with him, various

24   employments.  He's been in the oilfield, traveled quite a bit

25   with that.

1          THE COURT:  What does he do now, ma'am?

2          JUROR MONTEAU:  He is semi-retired.  He worked for

3  Chicago Bridge & Iron out of Tyler.

4          THE COURT:  Thank you.

5          JUROR MONTEAU:  And --

6          THE COURT:  Do you have any prior jury service?

7          JUROR MONTEAU:  No prior jury service.

8          THE COURT:  Okay.  Thank you.

9          Next is Panel Member No. 13.

10          JUROR ASHLOCK:  Good morning.  My name is Sheila

11  Ashlock.  I live in Hughes Springs, Texas.  I have two grown

12  children.

13          I served in the military.  For the last 23 years

14  I've been a teacher.  And for the last 11, I've been a sixth

15  grade world history teach in Hughes Springs.

16          I have a Bachelor of Science degree from Texas A&M

17  Texarkana.

18          My husband is Gene Ashlock, 37 years.  And he has

19  20 years with the Navy and 20 years with U.S. Steel.  I think

20  that's all I'm going to be able to talk him into doing.

21          And I've served on a civil case here in Marshall.

22  And then I just served three weeks ago on a criminal case in

23  Morris County.

24          THE COURT:  Was the civil case you served on in

25  Marshall here in Federal Court?

1              JUROR ASHLOCK:  Yes, sir.

2              THE COURT:  Okay.  Thank you, ma'am.

3              No. 14, Mr. Baxter.

4              JUROR BAXTER:  My name is Eugene Baxter.  I'm from

5    Pittsburg, Texas.  I have two grown daughters and four

6    wonderful grandchildren.

7              I'm a retired teacher from Mt. Pleasant Independent

8    School District.  I taught there for 17 years.  I have a

9    Bachelor of Science from Texas A&M Texarkana.

10             My wife's name is Linda.  She's a retired

11   government employee from U.S. Department of Agriculture.  She

12   was there for 31 years.

13             And I have no prior jury experience.

14             THE COURT:  Thank you, sir.

15             If you'll hand that microphone to our Court

16   Security Officer, he'll take it to Panel Member No. 15,

17   Ms. Floyd.

18             JUROR FLOYD:  Good morning.  My name is Rita Floyd,

19   and I'm from Pittsburg, Texas.  I have one grown child.

20             And I'm currently working contract with CK Family

21   Services.  I've only -- it's been about two weeks.  Prior to

22   that, I was two years with CASA of Titus, Camp, and Morris

23   Counties.

24             I have a Bachelor -- Bachelor of Applied Arts and

25   Sciences from Texas A&M Texarkana.

1          My spouse's name is W.H. Floyd.  He's retired

2    twice.  First place was Alcoa, and second place was Calhoun

3    County.  He was a commissioner there.  Worked -- worked there

4    all his life.

5          Yes, I have served on civil -- civil case here in

6    Marshall.

7          THE COURT:  All right.  Thank you, ma'am.

8          If you'll hand that to Panel Member No. 16,

9    Ms. Morton.

10          JUROR MORTON:  My name is Staci Morton, and I live

11    in Pittsburg.  I have two children.  One --

12          THE COURT:  Ms. Morton, hold that microphone a

13    little closer to you.

14          JUROR MORTON:  Oh, sorry.

15          THE COURT:  Thank you.

16          JUROR MORTON:  My name is Staci Morton.  I have two

17    children, one grand -- grandson.  I work at Pittsburg Nursing

18    Center.  I'm a med aide, and I'm a certified nurse aide.  I

19    did my -- I graduated from Pittsburg High School, and I did

20    my college at NTCC.  I'm not married.  And I have never

21    served on a jury trial.

22          THE COURT:  All right.  Thank you, ma'am.  If

23    you'll hand that to No. 17.

24          JUROR SCHLATRE:  My name is Mike Schlatre.  I live

25    in Queen City.  I've got one grown daughter and two -- and

1    three grown stepchildren.

2              I'm retired from Cooper Service in Texarkana after

3    21 years.  I'm -- I'm -- I've got an Associate's degree from

4    Texarkana Junior College.

5              My wife's name is Robin.  She's not working either.

6    She had -- over 17 years at Cooper Service -- Collom & Carney

7    in Texarkana.  She was there 17-and-a-half years.

8              I've been called to jury duty twice, but I haven't

9    been picked either time.

10             THE COURT:  Thank you, sir.

11             Panel Member No. 18, Mr. Warlick.

12             JUROR WARLICK:  My name is Harvey Warlick.  I live

13   in Gilmer, Texas.  I have one child, three grandkids.  I've

14   been with Pine Tree ISD as a bus mechanic for 17 years.

15   Retired in six months.  I'm widowed.  And I have no prior

16   jury service.

17             THE COURT:  All right, sir.  Thank you.  If you'll

18   hand that microphone back to Mr. Nance, he'll hand it to

19   Panel Member No. 19, Ms. Turner.

20             JUROR TURNER:  My name is -- my name is Diann

21   Turner, and I live at Cason, Texas.  I have one grown

22   daughter and four grandkids.

23             I'm employed at Daingerfield Independent School

24   District as a school bus driver and a sub.  And I've worked

25   there for about seven years.  I finished high school and went

1    to Draughon's Training Institution in Longview and received a

2    certificate for medical clerk.

3            My spouse's name is Dewayne Turner.  He's employed

4    at the wastewater plant in Daingerfield, Texas.  He's been

5    there about seven years.  And I have no prior jury.

6            THE COURT:  Thank you, ma'am.

7            Next is Mr. Williams, No. 20.

8            JUROR WILLIAMS:  Name is Brian Williams.  I'm from

9    Gilmer, Texas.  I have two grown children.  Place of

10   employment, we own Gilmer Lumber Company.  I've worked there

11   off and on my entire life.

12           Educational background, I graduated from high

13   school.  I do have some college, Sam Houston State.

14           Spouse's name is Irma Williams.  She works for

15   Upshur Rural Electric, and she's worked there for about 25

16   years.

17           And I do have prior jury service with Upshur County

18   in a criminal -- criminal court.

19           THE COURT:  Thank you, sir.

20           No. 21, Mr. Wallace.

21           JUROR WALLACE:  My name is Tommy Wallace.  I'm from

22   Jefferson, Texas.  I've got two children.  I work at General

23   Cable here in Scottsville, engineering tech, and I've been

24   there for 33 years.  I graduated high school in Jefferson.

25           My wife's name is Patty.  She works for Linebarger

1    Law Firm.  She's an area manager.  I think she's been with

2    them about five years.

3           And I have no prior jury service.

4           THE COURT:  Thank you, sir.  If you'll hand the mic

5    to No. 22, Mr. Summers.

6           JUROR SUMMERS:  Richard Summers.  Got three kids --

7    grown kids, four grandchildren.  Work for Eastman Chemical 27

8    years.  I'm retired.  Works in -- worked in research and

9    development department.

10          I went one year to college.

11          My wife's name is Nakita.  She works for an

12   environmental lab.  She's a lab tech at AWWS.  She's been

13   there over 20 years.

14          And I've been in civil jury.

15          THE COURT:  Where was that, sir?

16          JUROR SUMMERS:  Across the road over here.

17          THE COURT:  Here in Harrison County?

18          JUROR SUMMERS:  Yes, sir, and also a child custody.

19          THE COURT:  Okay, sir.  Thank you.  If you'll hand

20   that mic to Panel Member No. 23, Mr. Richardson.

21          JUROR RICHARDSON:  My name is Frank Richardson.  I

22   have four kids.  I'm employed at Joy Global of Longview.

23   Been there 10 years.  I'm a CNC machinist.  And I went to

24   Longview High School.

25          My wife's name is Chamika.  She's employed at

Wellness Point in Longview, Texas.  She's been there 15

years.  She's a revenue manager.

And I served on one criminal jury.

THE COURT:  And where was that, sir?

JUROR RICHARDSON:  Here.

THE COURT:  Here in Harrison County?

JUROR RICHARDSON:  Yes, sir.

THE COURT:  Thank you.  All right.  That brings us

to Panel Member No. 24, Ms. Archer.

JUROR ARCHER:  My name is Donna Pritchett-Archer.

I live in Gilmer, Texas.  I have two grown children.  And I

work for the State of Texas.  I'm a commercial driver's

license examiner.

Previous to that, I worked for a personal injury

attorney and a big insurance company in Dallas.  I've worked

for the State now for over 20 years.  I graduated from high

school and business college.  I'm not currently married.  And

previous jury services was a civil case many, many, many,

many years ago in Gregg County.

THE COURT:  Thank you, ma'am.

Next is Panel Member No. 25, Ms. Angel.

JUROR ANGEL:  My name is Elizabeth Angel.  I have

five grown daughters and six grandchildren and two cooking.

I am a professional grandmother.  I quit my job to stay home

and take care of my grandkids.

1              Before that, I worked in retail for five years, and

2      then 10 years in home security before that.  I just have a

3      GED.

4              My spouse's name is Harold Angel.  He is a

5      registered nurse in pediatrics out of Jefferson.  He's been

6      with one patient for five years.

7              And no prior jury service.

8              THE COURT:  Thank you, ma'am.  If you'll hand the

9      microphone to Ms. Thomas, Panel Member No. 26.

10             JUROR THOMAS:  Hi.  My name is Denver Thomas.  And

11     I live here in Marshall.  I have two young children, one

12     stepdaughter.  I work for the Women's Center of East Texas.

13     And that means that I'm an advocate against domestic violence

14     and sexual assault, along with human trafficking.  I've been

15     there almost 10 years.

16             My husband's name is Ronald Thomas, Jr.  He works

17     for CenterPoint.  He's been there about two years.

18             I attended White Oak High School.  I have an

19     Associate's from Tyler Junior College, a Bachelor's from

20     Stephen F. Austin, with Master level courses in counseling.

21             And I have no prior jury service.

22             THE COURT:   Thank you, ma'am.

23             Next is Panel Member No. 27.

24             JUROR HORTON:  Hello.  I'm Judith Horton.  I've

25     lived in Marshall for 32 years.  I have two grown children.

I'm a retired public school art teacher, 24 years.  And last week I substituted four days.  That's a recent change.

Since then, I am the sole proprietor of a business called Jesi Veez Services out of my home.  Very small business.  I do alterations, sewing, teach art lessons, teach sewing lessons, do some art.  It's -- it's whatever the customer wants.

See, I also have been the organist and accompanist at St. Mark's United Methodist Church in Marshall on Jasper for 30 years.

Let's see, educational background, I have a Bachelor of Fine Arts, major in art, minor in education, from the University of North Texas.  I also have a scattering of post-college work, some of it graduate, some of it not, to learn specific things to teach specific classes.

Let's see, my spouse's name is Steve Horton.  He is the librarian at East Texas Baptist University.  I don't know exactly how long he's been there, but I know it's more than 10 years.

I have been summoned to jury duty, but I have never been chosen, so I have never been part of a jury on a case.

THE COURT:  Thank you, ma'am.

Next is No. 28, Mr. Carter.

JUROR CARTER:  My name is Norman Carter.  I'm from Marietta, Texas.  I have three grown children, two boys, a

daughter, five grandchildren.  I am currently retired, three years now, from Shell Oil and Enbridge.  Combined service of 35 years.  I have a high school diploma.  Graduated from Atlanta, Texas.

My spouse's name is Fay.  She's not working due to health.

And I have no prior jury service.

THE COURT:  Thank you, sir.

Thank you, Ladies and Gentlemen.

Now, I need to say a couple more things to you before I turn the questioning over to the lawyers.  The jurors that are actually selected to serve in this case will serve as the judges of the facts.  And the jurors selected in this case will make the sole determination about what the facts are in this case.

Now, my job as the Judge is to rule on questions of law, procedure, evidence, maintain the decorum of the courtroom, and to oversee the flow of the evidence during the trial.

Additionally, I want to say a couple things to you about our judicial system that, hopefully, will put things in a proper perspective.

In any jury trial, in addition to the actual Plaintiff and Defendant, the parties themselves, there are always three participants:  The jury, the Judge, and the

1    lawyers.

2              With regard to the lawyers, it's important for each

3    of you to understand that our judicial system is an adversary

4    system, which -- which simply means that during the trial of

5    the case, each of the parties, through their counsel, will

6    seek to present their respective cases to the jury in the

7    very best light possible.

8              Now, it's no surprise to any of you that lawyers

9    are often criticized in the media, but it's the Court's

10   observation that some of that criticism comes from a basic

11   misunderstanding of our adversary system in which the lawyers

12   act as advocates for the competing parties.

13             And as an advocate, a lawyer is ethically and

14   legally obligated to zealously assert his or her client's

15   position under the rules of our adversary system.  And by

16   presenting the best case possible on behalf of their clients,

17   the lawyers hopefully will enable the jurors to better weigh

18   the relevant evidence, to determine the truth, and to arrive

19   at a just verdict based on that evidence.

20             Now, this adversary system of justice has served

21   our nation well for over 200 years, and America's lawyers

22   have always been and continue to be an integral part of that

23   system.  So as we go forward during the trial, even though I

24   might occasionally frown or even growl at the lawyers, it's

25   simply because I'm trying to make sure that their advocacy

```
 1    doesn't get outside the boundaries of our adversary system
 2    and our rules of court.
 3            But please keep in mind, they are doing their jobs
 4    and what they are charged to do as an indispensable part of
 5    our system.  And I think it's important for all of you to
 6    understand that and put it in a proper perspective as we go
 7    forward.
 8            Also, Ladies and Gentlemen, I want you to know that
 9    over the course of the trial, I am going to do my very best
10    to make sure that you have absolutely no idea about what I
11    think about the evidence in this case because evaluating the
12    evidence and from that evidence determine -- determining what
13    the facts are is the job and the sole job of the jury.  It is
14    not my job.
15            So those of you that are selected to serve as our
16    eight members of the jury should not take any expressions
17    that you see or you think you see as coming from me as a
18    factor to consider in making your ultimate decision about
19    what the facts are in this case.
20            Now, with those instructions, we're going to hear
21    directly from counsel for both of the parties.  We will start
22    with the Plaintiff.
23            Mr. Ward, you may address the panel on behalf of
24    the Plaintiff.  Would you like a warning on your time?
25            MR. WARD:  Yes, Your Honor, if I could have a
```

1    two-minute warning, that'd be great.

2            THE COURT:  You may.  And you may proceed when

3    you're ready.

4            MR. WARD:  Thank you.  May it please the Court.

5            THE COURT:  Proceed, Counsel.

6            MR. WARD:  Good morning.

7            JURORS:  Good morning.

8            MR. WARD:  As I have mentioned when we started, my

9    name is Johnny Ward, and it's my honor to represent Whirlpool

10   in this case.

11           As you've heard, this is a patent case.  It's about

12   this patent.  And this is the '894 patent, and those of you

13   that make it on the jury, you'll have that -- that number

14   memorized, and you might have it memorized by the end of jury

15   selection because that's how we refer to patents during the

16   course of the case.

17           Judge Gilstrap gives us three minutes to give you a

18   brief overview, so that's what I'm going to do; and then I'm

19   going to ask you all some questions.

20           We've got your questionnaires, and that gave us a

21   lot of information, and we appreciate it.  One of the things

22   that you told us in those questionnaires is that many of you

23   own refrigerator products that are manufactured by Whirlpool

24   or other manufacturers, and I know you're all familiar with

25   in-the-door water dispensers.  Those water dispensers work

1    with water filters.

2         And you're going to learn that back in 2001,

3    Whirlpool entered into a partnership with a company named PUR

4    that was a division of Proctor & Gamble, and they developed

5    some new technology that deals with water filters.

6    They were issued the '894 patent, and they started

7    manufacturing a filter called the Filter 3.

8         And the Filter 3 was -- had some innovative

9    features.  It was compact, it was easier to install, and it

10   did -- did a good job of filtering water, and it was also

11   interoperable.  It would work in many of the refrigerators in

12   these platforms.  And you'll hear about the refrigerator

13   platforms that Whirlpool develops.

14        This innovative design is something that folks saw

15   and they liked, and they sold a lot of these water filters.

16        You're going to learn that Whirlpool has a history

17   of innovation, innovation around many of its products but

18   specifically around these refrigerator platforms and the

19   filters that go into those refrigerators.

20        Whirlpool sought this patent so it could protect

21   its property from people trespassing on it.  It's our

22   position that TST is infringing on that patent by making this

23   filter.  They call it the W-5, Filter 3, W-5.

24        Now, there's going to be no dispute that TST was

25   well aware of Whirlpool's patent many years before they

1    started manufacturing their product.  They don't deny that

2    fact, they just say they're different.  They say their

3    product is different, and they do not trespass.  And they say

4    even if they do trespass, this patent is invalid, and they

5    have the burden of proving that.

6            There's also a dispute about how much money they

7    owe.  If they're wrong about infringement and validity, we

8    say they owe over $8 million in damages.  They say that

9    number is about -- a little over 600,000.

10           So that's a high level.  You can tell we've got a

11   dispute here, and we're going to need your assistance in

12   resolving it.

13           I'm not going to tell you any more of the facts

14   because they're really not important to what we need to do as

15   far as you all serving on this jury.  The ones that make it

16   on the jury are going to hear the evidence.

17           Now, some of you might be thinking, you know, if I

18   don't say anything, then I probably won't get on this jury.

19   I can tell you from experience, folks that don't talk, end up

20   on the jury.  Because lawyers, we think, well, the juror must

21   love everything that I said, and he or she will be good for

22   us, and you end up on the jury.  So I encourage you to speak

23   up.  Our -- our goal is not to embarrass you but to learn

24   more about you to see if you're the right juror for this

25   case.

1          Because let me see a show of hands, how many when

2   you came to court this morning, and many of you have served

3   on juries before, how many of you said, I need to be fair to

4   both sides, I want to be fair to both sides?

5          Anybody that didn't feel that way?

6          JUROR DAVIS:  I didn't even think about it.

7          MR. WARD:  Okay.  Fair enough.  You showed up,

8   though, and so we appreciate it.

9          THE COURT:  And I'm going to remind the panel,

10  let's use the microphone, and stand up when you give any

11  responses to their questions.

12         Go ahead, Counsel.

13         MR. WARD:  Thank you.

14         We all come here wanting to be fair, but can you

15  agree with me that we all have different life experiences

16  that shape our view of the world?  And those life experiences

17  can start you leaning one way or the other before you ever

18  hear any of the evidence.  That's just human nature, and

19  there's nothing wrong with it.

20         And leaning, in the courtroom, we call it bias or

21  prejudice.  Outside the courtroom those have bad

22  connotations, but in the courtroom it just means you lean.

23         And let me tell you this:  There's nothing wrong

24  with leaning one way or the other before you hear the

25  evidence.  The problem is if you lean to such an extent that

1    you can't set that feeling aside and decide the case based

2    upon the facts and the law as Judge Gilstrap gives it to you.

3              So nothing wrong with leaning, and that's what I

4    want to find out about.  And then find out if you do -- do

5    lean to such an extent that you feel like you couldn't be

6    fair to one side or the other.

7              So let's start out with who we might know in the

8    courtroom.  TST's -- one of their lawyers is Ms. Betty

9    DeRieux.  She lives over in Gladewater.  She's part of a law

10   firm called Capshaw & DeRieux.  And Ms. DeRieux is my friend.

11   She was one of the first lawyers I ever met.  She was my

12   supervisor in my first job 22 years ago.  And here we are 22

13   years later on the opposite side of the courtroom.

14             So anybody know Ms. DeRieux?

15   And when I say "know," I'm using the broadest sense of the

16   term, if you recognize her maybe -- her kids are all grown up

17   now, but your kids grew up with her kids.  Broadest sense of

18   the word.  Anybody?

19             She has a partner named Calvin Capshaw.  Anyone

20   know Mr. Capshaw?

21             Anyone ever been represented by their firm or know

22   anyone that works for that firm?

23             Nobody?

24             Anybody on the panel, looking around, know anybody

25   else, any other member of the panel?

1             There we go.

2             All right.  So, Ms. Ashlock, you know Mr. Baxter

3    and vice versa?  Can you tell us how you know each other?

4             JUROR ASHLOCK:  Yes, sir.  I used to work at Mt.

5    Pleasant ISD, and that's when he was there, too.

6             MR. WARD:  Okay.  Mr. Baxter, anything about the

7    fact that you and Ms. Ashlock know each other?  If you were

8    selected on this jury and y'all ended up on the jury

9    together, would you be your own person, you'd be independent

10   and make your decisions based upon what you think the

11   evidence is?

12            JUROR BAXTER:  Yes, sir, I can.

13            MR. WARD:  All right.  Ms. Ashlock, same question

14   to you.  Anything about the fact that you know Mr. Baxter

15   that would affect your ability to be fair in this case?

16            JUROR ASHLOCK:  No, it wouldn't.  I'll be fair.

17            Thank you.

18            MR. WARD:  All right.  Thank you.

19            And I tell you what, while I've got you,

20   Ms. Ashlock, you indicated that you've been a juror in

21   another case, a patent case?

22            JUROR ASHLOCK:  Yes, sir.

23            MR. WARD:  And that -- was that a patent case in

24   this courtroom?

25            JUROR ASHLOCK:  It was.

1     MR. WARD:  All right.  What case was that, if you

2  remember?

3     JUROR ASHLOCK:  Apple was the Defendant.

4     MR. WARD:  Okay.

5     JUROR ASHLOCK:  And it was a lone person that was

6  the Plaintiff.

7     MR. WARD:  Was the Plaintiff?

8     JUROR ASHLOCK:  Uh-huh.

9     MR. WARD:  Anything about that experience -- you've

10  got some experience.  Did that case go to verdict?

11     JUROR ASHLOCK:  Yes, sir.

12     MR. WARD:  Anything about being involved in that

13  case that starts you leaning one way or the other before we

14  even get started here?

15     JUROR ASHLOCK:  No, sir.  In fact, it was closing

16  arguments before I could --

17     MR. WARD:  Before you could deliberate?

18     JUROR ASHLOCK:  That's correct.

19     MR. WARD:  Okay.  But nothing about that experience

20  starts leaning?

21     JUROR ASHLOCK:  Oh, on this case?  No, sir.

22     MR. WARD:  All right.  All right.  Thank you.

23     And I think we had one other person that had been a

24  juror in a patent case.

25     Ms. Floyd, you mind telling us which case that was,

1    if you remember?

2              JUROR FISHER:  I honestly don't.  I've been

3    wracking my brain, but I don't.  It was in this courtroom,

4    though, but I don't remember.

5              MR. WARD:  Anything -- anything about that

6    experience that starts you leaning one way or the other

7    before you hear the evidence?

8              JUROR FLOYD:  No, huh-uh.

9              MR. WARD:  All right.  Thank you.

10             Let's see, Mr. Williams, No. 20.  Mr. Williams, I'm

11   going to tell you something because this is what voir dire is

12   about.  It's about learning about connections that people

13   have, leanings that people might have.  I think one of your

14   cousins is a good friend of mine, Amy Brown.

15             JUROR WILLIAMS:  Yes.

16             MR. WARD:  Is she -- is she your first cousin?

17             JUROR WILLIAMS:  First cousin, yes.

18             MR. WARD:  And that's something that we want to

19   draw out, if the people know anybody on the panel.  It might

20   not be directly, but you know somebody who knows somebody.

21             You know her husband, Jeff Brown?

22             JUROR WILLIAMS:  Yes, I know Jeff.

23             MR. WARD:  All right.  I know him, too.  We're

24   good friends.  You're not going to hold that against me, are

25   you?

1          JUROR WILLIAMS:  No, sir, I won't this time.

2          MR. WARD:  All right.  Anything about the fact that

3    we've got this connection that your first cousin is Amy Brown

4    and Jeff Brown is my good friend, that starts you leaning one

5    way or the other?

6          JUROR WILLIAMS:  No, sir.

7          MR. WARD:  All right.  Mr. Richardson, what year

8    did you graduate from Longview High School?

9          JUROR RICHARDSON:  '88.

10         MR. WARD:  All right.  That's what I thought.  I

11   did, too.  You know Jeff Brown?  You remember him?

12         JUROR RICHARDSON:  Yes.

13         MR. WARD:  All right.  I do, too.  But we won't

14   hold that against each other, will we?  Anything about the

15   fact that we graduated the same year from high school start

16   you leaning one way or the other in this case?

17         JUROR RICHARDSON:  No, sir.

18         MR. WARD:  All right.  Thank you.

19         Mr. Wallace, your wife works for the Linebarger Law

20   Firm; is that right?

21         JUROR WALLACE:  That's correct.

22         MR. WARD:  And -- and tell me again -- you told me,

23   and I was trying to write down fast.  Tell me what you do.

24         JUROR WALLACE:  What I do?

25         MR. WARD:  Yes, sir.

1          JUROR WALLACE:  Engineering technician at General

2   Cable here in Scottsville, Texas.

3          MR. WARD:  All right.  Anything about the fact that

4   your wife works for a law firm that starts you leaning one

5   way or the other in this case before you hear any evidence?

6          JUROR WALLACE:  None at all.

7          MR. WARD:  And Linebarger, is that a property --

8   kind of an appraisal law firm?

9          JUROR WALLACE:  She deals with delinquent property

10  taxes and -- and things of that nature.

11         MR. WARD:  And how long has she worked there?

12         JUROR WALLACE:  With that law firm, about five

13  years.

14         MR. WARD:  Okay.  Thank you, sir.

15         Now, let me talk to you a little bit about the

16  parties in this case.

17         Obviously, Whirlpool is the one who filed the

18  lawsuit against TST.  It's -- it's the Plaintiff in the case.

19  And it is a large corporation.  Everyone knows that.

20         And TST -- has any -- anyone ever heard of TST

21  before you got to court?  If you had, raise your hand.

22         All right.  It's obviously a much smaller

23  corporation.  Just based upon the -- the fact that we've got

24  a large company filing a lawsuit against a smaller company,

25  anyone start out leaning in favor of TST before they hear

```
 1    anything?
 2              Mr. Bald, Juror No. 5?
 3              JUROR BALD:  Yes, sir.
 4              MR. WARD:  Anything about that that starts you
 5    leaning one way or the other before you hear any evidence,
 6    just based upon the fact that we've got a big company that's
 7    well-known versus a small company that's not?
 8              JUROR BALD:  No, sir.
 9              MR. WARD:  You can --  you can decide the case
10    based upon the evidence?
11              JUROR BALD:  Yes, sir.
12              MR. WARD:  All right.  Mr. Battershell, same
13    question to you.  Anything about the fact that we've got a
14    large company in a lawsuit against a smaller company starts
15    you leaning one way or the other?
16              JUROR BATTERSHELL:  Yes.
17              MR. WARD:  All right.  Thank you.
18              And that's -- I want to follow up with you.
19    There's -- I told you, there are no wrong answers here,
20    right?  The fact that you're leaning, before you've heard any
21    evidence, the Judge will instruct us that we've got to treat
22    everyone the same.
23              And, in fact, that's an instruction he'll give at
24    the conclusion at the case, and he might give it at the
25    beginning of the case, as well.  The fact that you start out
```

1    leaning, do you think that's something you're going to be

2    able to set aside and decide the case based upon the

3    evidence, or is it a strong feeling you have?

4            JUROR BATTERSHELL:  It's a pretty strong feeling.

5            MR. WARD:  All right.  And is it a feeling that you

6    can set aside, or is it something that we need to be

7    concerned about?  Because only you can tell me that.

8            JUROR BATTERSHELL:  I don't -- I don't know --

9    honestly know.

10           MR. WARD:  Okay.  Is it -- is it something -- a

11   life experience that you've had that starts you leaning one

12   way or the other?  Do you want to share it?  If not, we can

13   do it at the bench, outside the presence of everybody else,

14   or we can talk about it here.

15           JUROR BATTERSHELL:  Pretty much the way I grew up.

16           MR. WARD:   Okay.  And so which way are you

17   leaning?

18           JUROR BATTERSHELL:  For the little guy.

19           MR. WARD:  Okay.  That's fair enough.  I appreciate

20   you telling me that.

21           Anyone that's sitting there right now that says,

22   you know what, I agree with what Mr. Battershell said?

23           Anyone else on the first row?

24           Right next to you, Mr. Fisher.  And I'll come --

25   I'll get back to you.

1            I just saw your hand, Mr. Warlick.  Do you start

2  out leaning for the little guy before you've heard any

3  evidence?

4            JUROR FISHER:  No, sir.

5            MR. WARD:    Okay.  Thank you.

6            Yes, ma'am, Juror No. 6, Ms. Davis.

7            JUROR DAVIS:  Yes.

8            MR. WARD:  Do you start out leaning for the little

9  guy, too?

10           JUROR DAVIS:  Yes.

11           MR. WARD:  Okay.  And that's fair enough.  And my

12  same question that I asked to Mr. Battershell.  Is it a

13  leaning that you feel like you can set aside and hear the

14  evidence and give both sides a fair trial, or is it something

15  that you feel like, you know, I can't set this aside, it's a

16  strong feeling I've got, and I think I can't follow the

17  Court's instructions?

18           JUROR DAVIS:  I don't know.

19           MR. WARD:  All right.  Only you know, so that --

20           JUROR DAVIS:  It's just -- I don't know.

21           MR. WARD:  You don't know as you sit here right

22  now?

23           JUROR DAVIS:   Yeah.  I just lean toward the little

24  man.

25           MR. WARD:  All right.  And fair enough.  Fair

```
 1        enough.  All right.  Thank you, Ms. Davis.
 2                  Anyone on the back row that agrees with what
 3        Mr. Battershell and Ms. Davis said that they start out
 4        leaning before they've heard evidence because we've got a big
 5        company versus a smaller company?
 6                  Mr. -- we made eye contact, so I'm going to call --
 7        Mr. Steglinski, how do you feel about that?
 8                  JUROR STEGLINSKI:  I'm neutral.
 9                  MR. WARD:  All right.  You're not starting out
10        leaning one way or the other?
11                  JUROR STEGLINSKI:  No, sir.
12                  MR. WARD:  And, Ms. Childers, right next to you,
13        Juror No. 9, do you start out leaning one way or the other?
14                  JUROR CHILDERS:  Not at all.
15                  MR. WARD:  All right.  Anybody on the back row
16        leaning before we get started?
17                  All right.  So I've got first row, second row, and
18        then I'm going to call you all on the front row there, the
19        third row.
20                  Mr. Warlick, you raised your hand?
21                  JUROR WARLICK:  I just always root for the smaller
22        guy.
23                  MR. WARD:  All right.  Did you root for the Atlanta
24        Falcons?
25                  JUROR WARLICK:  I don't have anything to do with
```

1   football.

2              MR. WARD:  Okay.  I don't really follow football

3   too closely either, but I was pulling for the Falcons because

4   the Patriots have won so much.

5              JUROR WARLICK:  I don't watch TV.

6              MR. WARD:  Okay.  Do you start -- is it a leaning

7   that you've got that you feel like, you know what, I've

8   pulled so much for the little guy, that I don't think I could

9   base my decision in this case upon the evidence that comes

10  in?

11             JUROR WARLICK:  Honestly, I cannot answer that

12  question right now.

13             MR. WARD:  Okay.  But it's a strong feeling that

14  you have?

15             JUROR WARLICK:  I've always rooted for the little

16  guy.

17             MR. WARD:  Okay.  Fair enough.

18             Anybody else in the front row that -- that feels

19  like Mr. Warlick where you're not sure whether or not you can

20  be fair in this case because you always root for the little

21  guy, and TST is the little guy here?

22             Right next here, Schlatre?

23             JUROR SCHLATRE:  Well, I did root for the Falcons

24  because I like the underdog --

25             MR. WARD:  Right.

1          JUROR SCHLATRE:   -- but in something like this, no,
2    I can be fair.   I mean, I -- I don't have any feelings one
3    way or the other on this.
4          MR. WARD:   All right.   Thank you, Mr. Schlatre.
5          All right.   Let's go to the fourth row.   Anybody in
6    the fourth row that starts out leaning one way or the other
7    before you've heard any evidence?
8          Mr. Summers, you start out leaning one way or the
9    other?
10         JUROR SUMMERS:   No.
11         MR. WARD:   Okay.   Anybody else, Mr. Williams, you
12   leaning one way or the other?
13         Ms. Turner, you leaning one way or the other, Juror
14   No. 19?
15         JUROR TURNER:   No.
16         MR. WARD:   All right.   Thank you, ma'am.
17         And anyone in the last row, anyone leaning one way
18   or the other before we get started?
19         Now, I know everyone's heard of Whirlpool.   They
20   sell lots of different appliances.   They -- they sell
21   KitchenAid, Maytag, Jenn-Air, Amana.
22         How many of y'all have owned -- currently own or
23   have owned those appliances?
24         All right.   Lots of you.
25         Anyone had an experience with one of those

1    appliances that you're unhappy with that:  My Whirlpool

2    refrigerator broke six months after I got it, and Whirlpool

3    wouldn't take care of it.  Or Amana or KitchenAid, anyone

4    have any of those types experiences that you're like:  This

5    is my chance to be fair and be fair to Whirlpool?

6            Anyone in the first row have a bad experience with

7    a Whirlpool appliance?

8            Second row?

9            Nobody?

10           And when I say "Whirlpool," I'm including all those

11   brands.

12           Third row, anybody?

13           Fourth row?

14           Last group?

15           Now, everyone has a refrigerator or has access to a

16   refrigerator, right?  All right.  No one's -- no one's using

17   blocks of ice outside in the cooler still.  Like -- or maybe

18   when you're hunting or camping but not -- not every day,

19   right?

20           If you're like me -- some of you might be and some

21   of you might not be -- I don't know what brand of

22   refrigerator I had until I got hired by Whirlpool, and then I

23   went and I looked.

24           How many of you sitting on the panel know who

25   manufactured your -- your refrigerator?

1          Let's -- let's start in the first row.  Let's do it

2     this way, who does not?

3          Juror No. 5 and Juror No. 7 don't know who

4     manufactures their refrigerator.

5          In the second row, who does not know, raise your

6     hand if you don't know who manufactured your refrigerator.

7          And that'd be Jurors No. -- Ms. Klitz, you don't

8     know.

9          Ms. Beran -- Beran, you don't know.

10          Ms. Monteau -- did I pronounce that right?

11          JUROR MONTEAU:  That's correct.

12          MR. WARD:  Ms. Monteau.

13          Ms. Ashlock, you don't know.

14          And now let's go to the third row.  Who does not

15     know who manufactures your refrigerator?

16          Ms. Floyd doesn't know.

17          Nobody else?

18          And now fourth row, who does not know who

19     manufactured your refrigerator, if you don't know raise your

20     hand.

21          And last row?

22          Okay.  Ms. Thomas, you don't know who manufactured

23     your refrigerator.

24          I just wanted to make sure I got the right hands.

25          And is there another hand?

1           Yes, sir, Mr. Carter, you don't know.

2           JUROR CARTER:  No.

3           MR. WARD:  All right.  Now, this is for those of

4 you who know who manufactured your refrigerator.  If you were

5 going shopping today and you had to buy a new refrigerator,

6 how many of you would buy the same brand that you currently

7 own?

8           First row, that you're happy with it, and you'd go

9 back and buy that -- that same brand?

10           Juror No. 1, Ms. Miller, you'd buy the same brand

11 that you had?

12           JUROR MILLER:  Yes, sir, I would.

13           MR. WARD:  And what brand do you have.

14           JUROR MILLER:  Frigidaire.

15           MR. WARD:  Frigidaire?

16           JUROR MILLER:  Yes, sir.

17           MR. WARD:  Okay.  And then Juror No. 3, Mr. Fisher,

18 you'd buy the same brand you've got?

19           JUROR FISHER:  Very possible.

20           MR. WARD:  And what is it?

21           JUROR FISHER:  GE.

22           MR. WARD:  GE.  You've been happy with it?

23           JUROR FISHER:  Correct.

24           MR. WARD:  If it ain't broke, don't fix it, right?

25           JUROR FISHER:  Correct.  Well, actually, I'm having

1    a new one delivered today, but I couldn't tell you what it is

2    because my wife bought it.

3              MR. WARD:  All right.  Fair enough.

4              Yes, ma'am, Ms. Enochs, what brand do you own?

5              JUROR ENOCHS:  I believe it's a Whirlpool.  I -- we

6    just remodeled a couple of years ago and had brought one in

7    and it was the wrong size, and we had to change it out.  But

8    I'm pretty sure it's a Whirlpool.

9              MR. WARD:  All right.  And if you had to go

10   shopping today, would you consider a Whirlpool again?

11             JUROR ENOCHS:  Yes, I would.

12             MR. WARD:  Okay.  Anybody else on the front row?

13             Yes, ma'am, Ms. Davis?

14             JUROR DAVIS:  Yes.

15             MR. WARD:  What -- what brand do you own?

16             JUROR DAVIS:  Whirlpool.

17             MR. WARD:  If you had to go shopping, would you buy

18   another one?

19             JUROR DAVIS:  Yeah.

20             MR. WARD:  All right.  Thank you.

21             Second row, those of you who know what brand you

22   have, and if you had to go shopping you'd buy the same brand

23   you've got?  Anybody on that second row?

24             I know there are a lot -- yes, ma'am, Juror No. 9,

25   Ms. Childers, what brand do you own?

1          JUROR CHILDERS:  I've had two Whirlpools, and I

2    would consider it again.

3          MR. WARD:  All right.  Thank you, ma'am.

4          Third row, folks that know that would go shopping

5    and buy the same brand?

6          Nobody?

7          No one knows, okay.

8          Fourth row, you know what your brand is, you'd go

9    shopping and buy the same one?

10         And I think it was everybody, did everybody raise

11   their hand on that row?

12         Okay.  Thank you.

13         And last row, just raise them high so I can call

14   out your numbers.

15         Juror No. 24.  And 27, Ms. Horton.

16         All right.  Let me talk to you about water filters.

17   We've actually got some folks that have some experience with

18   water filtration on the jury.

19         Mr. Bald, Juror No. 5, you've got some experience

20   with water filtration, right?  That's what you do over -- for

21   the City of Longview?

22         JUROR BALD:  Yes, sir, I work for the City of

23   Longview in water purification.  And we treat the drinking

24   water for Longview, Texas and surrounding area.

25         MR. WARD:  And obviously not the same technology,

1   but we'll be talking about filtration.

2              JUROR BALD:  Not really, no.

3              MR. WARD:  Anything about your experience in water

4   filtration that starts you leaning one way or the other in

5   this case?

6              JUROR BALD:  No, no.

7              MR. WARD:  Nothing, okay.  Thank you, sir.

8              And then, Mr. Battershell, I think you told me on

9   your questionnaire you had some experience?

10             JUROR BATTERSHELL:  Yes, sir, I serviced ice

11  machines.

12             MR. WARD:  Okay.

13             JUROR BATTERSHELL:  For the school district here in

14  Marshall.

15             MR. WARD:  Anything about that experience that

16  starts you leaning one way or the other before you hear the

17  evidence?

18             JUROR BATTERSHELL:  No, no.

19             MR. WARD:  Okay.  Thank you, sir.

20             How many folks on the jury panel have ever changed

21  a water filter that is similar to one of these or identical

22  to one of them?

23             Let's start on the first row, and we'll raise our

24  hand.

25             Juror No. 2 and Juror No. 5, you've changed out

1   water filters in your refrigerator.

2           Second row --

3           JUROR BALD:  It's my mother's refrigerator.

4           MR. WARD:  Okay.

5           JUROR BALD:  It was my mom's refrigerator, but I --

6   we don't have the numbers.

7           MR. WARD:  Okay.  Thank you, sir.

8           And on the second row, how many of you have

9   purchased and replaced these types of water filters?

10           Juror No. 14, 12, 10, and 9.

11           Third row?

12           Juror No. 17.

13           Fourth row?

14           Jurors No. 20 and 21.

15           And 19, maybe.  Let me make sure, Ms. Turner --

16           Will you take the -- I'm working you today, aren't

17   I?

18           Ms. Turner.

19           JUROR TURNER:  I don't know what kind it is, but my

20   husband changed them out.

21           MR. WARD:  Okay.  And then the last row, any of you

22   purchased and changed these types of water filters?  Anybody?

23   Nobody on the last row.

24           All right.  Whirlpool's filter runs about $50 in

25   the store.  TST's -- this is one that sells under the Home

1   Depot brand, they're in a partnership with Home Depot, they

2   sell two for $50.  They sit right next to each other on the

3   rack.

4           Is there anyone in the first row who wouldn't

5   consider getting two for one?  Anybody in the first row, if

6   you walk in and you said, there's a name brand, Whirlpool,

7   but I can get two for one, Home Depot, anybody in the first

8   row wouldn't consider it?

9           Yes, ma'am, No. 6, Ms. Davis, you wouldn't consider

10  it?

11          JUROR DAVIS:  No, I would consider it.

12          MR. WARD:  Oh, you would consider it?

13          JUROR DAVIS:  Yes.

14          MR. WARD:  Maybe I -- my question might not have

15  been --

16          JUROR DAVIS:  I would consider it.

17          MR. WARD:  How many of you would not consider

18  saying, I'm going to try the two for one, anybody that would

19  not consider doing that?

20          Second row, is there anyone who says, you know,

21  what, I love Whirlpool so much, and I'm going to pay $50 for

22  one when I can check out Home Depot two for one, anybody who

23  would not consider doing that?

24          All right.  No hands.

25          Third row?

 1              Fourth row?

 2              Last row?

 3              JUROR HORTON:   I would consider it after I found

 4    out who manufactured the house brand, knowing a lot of times

 5    house brands are made by a famous brand.  And I would wonder

 6    if Whirlpool was actually manufacturing both.

 7              MR. WARD:   Okay.  And you're Juror No. 27, correct?

 8              All right.   Thank you, Ms. Horton.  I'm sorry I

 9    missed your hand earlier.

10              Some of you all have had experience with lawsuits,

11    whether it be personally or you sat on juries.  Let me tell

12    you a fact that will come out during this case.

13              Whirlpool has filed over 40 lawsuits against other

14    companies that have copied their filters, all right?  I'm not

15    going to talk to you right now about how those lawsuits got

16    resolved; but how many of you -- based upon that fact alone,

17    the fact that Whirlpool -- and they filed them in this

18    courthouse -- has filed 40 other lawsuits against folks

19    manufacturing, copying their filters, say, you know what, I

20    don't need to know any facts.  I lean against Whirlpool

21    because they've pursued so many folks that have copied their

22    patented water filters.

23              Anyone on the first row say, you know what, that's

24    a lot of lawsuits and I just -- I'm not comfortable?  Anyone

25    on the first row feel that way, just based upon that fact

1    alone?

2         Ms. Cox, I haven't talked to you this morning.  You

3    start out leaning one way or the other, just based upon the

4    fact that they've filed that many lawsuits?

5         JUROR COX:  No, sir.  They have their right to do

6    it if they feel that they need to.

7         MR. WARD:  All right.  Thank you, ma'am.

8         Anyone on the second row disagree with what Ms. Cox

9    said?  That they don't have the right to do that?  Anyone --

10   even if they have the right to do it, it starts me leaning

11   towards TST because Whirlpool's filed so many lawsuits?

12        Mr. Baxter, do you have feelings one way or the

13   other on that?

14        JUROR BAXTER:  No, sir, I do not.

15        MR. WARD:  Okay.  Anyone else on the second row?

16        Y'all will be happy to know I only get 30 minutes,

17   and we're 27 -- 27 down.

18        Third row?

19        Fourth row, that's going to start out leaning based

20   upon that number of lawsuits?

21        And last row?

22        Burden of proof.  Judge Gilstrap told you about

23   these two burdens of proof, right?  We have the burden of

24   proof to prove infringement.  We have to prove that TST is

25   trespassing on our patent, and that's preponderance of the

1    evidence, more likely true than not true, the greater weight

2    of the evidence.

3          TST has this higher burden, clear and convincing

4    evidence, that degree of evidence that leaves in your mind a

5    high degree of probability that the facts that we assert

6    are -- or that they assert are, in fact, true.

7          You're like, what does that mean?  It's just -- let

8    me tell you that, it's higher.

9          Here's my question.  Anyone in the first row saying

10   that might be the law, but I'm starting out leaning in favor

11   of TST because I don't think it's fair that they've got a

12   higher burden than Whirlpool?  They're a smaller company, yet

13   they have a higher burden to invalidate the patent?

14          THE COURT:  Two minutes remaining.

15          MR. WARD:  Anyone on the first row, based on what

16   I've just told you, say you know what, I don't think that's

17   fair?  First row, anyone feel that way?

18          Mr. Battershell -- is it Batter -- Battershell?  Do

19   you -- do you feel that way?  I know you told us about

20   leaning because of small companies and big companies, but how

21   about this differing burdens of proof?  Do you start out

22   leaning one way or the other?

23          JUROR BATTERSHELL:  No.

24          MR. WARD:  Okay.  Anyone on the second row start

25   out leaning one way or the other based upon these differing

1    burdens?

2             Third row?

3             Fourth row?

4             Last row?

5             And -- and there's a reason why the law does that

6    because there is a presumption of validity.  There's a

7    presumption that the Patent and Trademark Office did its job,

8    because someone's already reviewed the validity of it when

9    they issued the patent the first time.

10            But TST has the right to come here.  They have the

11   right to come in and challenge the validity of the patent,

12   and ask a jury to invalidate.  But that's why the law says

13   you've got a higher burden of proof.

14            I think I've got 30 seconds left, so here's my last

15   question to you.  Anyone sitting there going, you know what,

16   if Mr. Ward had asked this question, he would know I'm not

17   the right juror for this case, I'm leaning, but he didn't ask

18   that question?  Anyone leaning so hard right now that you say

19   he should have asked this question and he would have known?

20            First row, anyone have that?

21            Second row?

22            Third row?

23            Fourth row?

24            Last row?

25            All right.  I appreciate your time.  I appreciate

```
 1    you letting me ask you these questions.  I appreciate your

 2    answers, and we look forward to presenting our case.

 3            THE COURT:  All right.  Ms. DeRieux, you may

 4    address the panel on behalf of the Defendant.

 5            MS. DERIEUX:  May I have a two-minute warning, Your

 6    Honor?

 7            THE COURT:  You certainly may.  Proceed when you're

 8    ready.

 9            MS. DERIEUX:  Good morning.

10            I'm Elizabeth DeRieux, and I want to say, first of

11    all, thank you very, very much for being here this morning.

12    We recognize that y'all had other things to do this morning,

13    and we appreciate you being here with us.  I'm going start

14    out with the information that y'all gave us.

15            I'm Elizabeth DeRieux.  I live in Gladewater,

16    Texas.  I got my education -- I got an English degree from

17    Lamar University in Beaumont and started out teaching high

18    school, and then went to law school at the University of

19    Houston.  I now practice law with my partner, Calvin Capshaw

20    in Gladewater, Texas.

21            My husband is Pete Adams.  He has retired from the

22    practice of law, and we own and he operates Gladewater Books.

23    We have four grown children.

24            And I have never been selected to sit on a jury.

25            My client is TST Water, and it's a company that
```

1    designs and manufactures water filters.  And I want to take

2    just a minute to talk to you just -- at just a very high

3    level, introductory information about the case.

4            Mr. Mike Baird, who you met earlier, founded TST

5    Water in 2004 after working in the water filtration industry

6    since the 1980s.  He started his company because he wanted to

7    give consumers a choice to buy quality water filter products

8    at a reasonable price.  TST owns patents for some of its

9    designs, and it respects patents that are owned by its

10   competitors.

11           You will hear from Whirlpool's witnesses that they

12   claim that TST's products are low quality, but TST is a -- is

13   trusted in the industry.  It sells filters in Home Depot,

14   Lowes, Targets, and other national stores.

15           TST manufactures Home Depot's in-house filters

16   under the HDX brand, and it's also licensed to manufacture

17   Culligan filters which is a very respected water filtration

18   company that you might be familiar with.

19           TST manufactures its products here in the United

20   States so it can respond quickly to any quality control

21   issues that come up.  We are also certified by independent

22   test -- independent testing agencies to remove certain

23   impurities from water.

24           This case focuses on a specific product.  It's the

25   TST W-5 refrigerator water filter, which fits into the same

1    refrigerator as Whirlpool's Filter 3 that you'll hear a lot
2    about before the end of this case.
3            Before TST began selling the W-5 filter that's
4    accused in this case, it considered and prototyped a number
5    of different designs.  Mr. Baird worked on those designs for
6    several years and did not begin to sell the product until the
7    W-5 design was different from and better from -- better than
8    Whirlpool's patented design.
9            During the design process for the W-5 filter,
10   Mr. Baird was aware of Whirlpool's '894 patent, and he
11   studied it carefully.  The patented Whirlpool design was not
12   the first replaceable water filter on the market.  They've
13   been on the market for decades.
14           Other patents, which predate the '894 patent, show
15   all the same features listed in the '894 patent.  The jury's
16   going to hear about inlets, outlets, cams, valves, bypass
17   valves, protrusions.
18           In a nutshell, the '894 patent should never have
19   been issued by the PTO because all of these features were
20   well-known in the prior water filter systems and contained no
21   improvements over the prior art.
22           THE COURT:  Let's move on to specific questions,
23   Ms. DeRieux.
24           MS. DERIEUX:  Thank you, Your Honor.
25           Can I see hands of folks who have bought generic --

1    generic products, not just water filters, but you would buy a

2    generic or a house brand product if you went to the store?

3            I'm talking anything, green beans, water filters,

4    whatever?

5            Let me ask it the other way:  Is there anyone who

6    would not consider buying a generic or house brand product?

7            Okay.  I'm going to ask -- I'm going to -- I'm

8    going to maybe use people's numbers if I can't remember your

9    name or can't see your name.

10           No. 3, tell me what product you might have used

11   that's a generic product.

12           JUROR FISHER:  Many -- foods.

13           MS. DERIEUX:  Foods?  Any mechanical products?

14           JUROR FISHER:  Excuse me?

15           MS. DERIEUX:  Any mechanical products?

16           JUROR FISHER:  I'm sure it is.  I can't think of

17   anything offhand, but I'm sure, yes.

18           MS. DERIEUX:  Have you had an experience that was

19   either particularly good or particularly bad when you bought

20   a generic product?

21           JUROR FISHER:  Both.  Both, yes.  Yeah.

22           MS. DERIEUX:  Okay.  Tell me -- can you think of

23   one that was particularly bad?

24           JUROR FISHER:  Not specifically, not really, not

25   offhand.

1          MS. DERIEUX:  Anything stands out in your mind as

2     particularly good?

3          JUROR FISHER:  I've found the quality matches the

4     name brand, you know.  But, again, I can't be specific, just

5     generically speaking.

6          MS. DERIEUX:  Is there anything about your

7     experience with generic products that would start you out in

8     this case, as Mr. Ward said, leaning to one side or the other

9     in this lawsuit?

10         JUROR FISHER:  No, not at all.

11         MS. DERIEUX:  All right.  Thank you very much.

12         Ms. Cox.

13         JUROR COX:  In the line of work that I'm in, I see

14    in everyday generics from, I mean, with the medications,

15    there's generics coming out every day for different

16    medications.  So to me, going with the generic beforehand,

17    just to test it, would be realistic for me.

18         But at the same time, I have, like I say, like my

19    car battery, I would purchase name brand over buying a

20    generic just because of the fact that I have had generic

21    batteries run out on me faster.  So it really just depends on

22    the product as far as past history for me.

23         MS. DERIEUX:  All right.  Thank you very much.

24         JUROR COX:  Thank you.

25         MS. DERIEUX:  I'm going to say I think it's Mr. --

1    Ms. -- I'm not sure how to pronounce your name correctly.

2    Juror No. 8.

3              JUROR KLITZ:  I don't have any particular either

4    way for brand names or generic brand.  I mean, I've never had

5    any bad experiences.  I haven't had any experiences that were

6    just particularly -- particularly fantastic with generic

7    brand either, though.  I mean, it's about 50/50 for me.

8              MS. DERIEUX:  Okay.  Thank you.

9              Anybody on the panel that had -- that's had a

10   particularly bad experience when they purchased a generic or

11   house brand product?

12             Anybody that has one come to mind that was a

13   particularly good experience?

14             All right.  I'm going to ask you if you have had

15   any business or you're familiar with the attorneys who are

16   representing Whirlpool in this matter.  I think you've met

17   some of the individuals from Morrison & Foerster.

18             You, certainly, spoke with Mr. Johnny Ward of Ward,

19   Smith & Hill.  He has other partners that practice with him

20   that you might be familiar with that I want to ask you about

21   real quickly:  John Ward, Bruce Smith, Wes Hill, Claire

22   Henry, Brett Miller, and Andrea Fair.

23             Is there anyone on the panel that knows any of

24   those individuals or has done business with the -- the law

25   firm?

1          I also want to ask you about the law firm also

2   representing Whirlpool of Gillam & Smith, that includes

3   Ms. Melissa Smith, which -- who you met this morning, also

4   Gil Gillam, Allen Gardner, and Bobby Lamb.  Anyone know any

5   of those individuals?

6          Anybody work for either of these law firms, had any

7   business with them?

8          Has anybody on the panel heard any media reports

9   about this case?

10         Anyone on the panel heard any media reports about

11  patent litigation here in Marshall or more generally?

12         How many of you have personally changed a water

13  filter in a refrigerator?  I think we talked about this a

14  little bit earlier.

15         Juror No. 17?

16         JUROR SCHLATRE:  Yes.

17         MS. DERIEUX:  Was it inside the refrigerator or

18  under the grill, do you remember, or maybe behind?

19         JUROR SCHLATRE:  No, it was up top.  When you open

20  the door, it's up at the top.

21         MS. DERIEUX:  Okay.  Did you have any problems with

22  that installation?  Did it leak?  Did you have a good

23  experience, a bad experience?

24         JUROR SCHLATRE:  No, it was very easy.

25         MS. DERIEUX:  Okay.

1          JUROR SCHLATRE:  Too expensive, but very easy.

2          MS. DERIEUX:  Thank you.

3          One more question.

4          JUROR SCHLATRE:  Oh, yes.

5          MS. DERIEUX:  Do you remember what brand it was,

6    what brand the filter was?

7          JUROR SCHLATRE:  I got it at Home Depot, I think it

8    was PUR, I believe.

9          MS. DERIEUX:  Okay.

10          JUROR SCHLATRE:  I believe.

11          MS. DERIEUX:  Thank you.

12          Has anyone on the panel ever personally replaced a

13   water filter that was installed underneath the grill of the

14   refrigerator?

15          Okay.  I'm going to ask No. 12, talk to you about

16   that a minute.

17          JUROR MONTEAU:  Yes, ma'am, that's one thing I do

18   not like.  The older I get, the harder it is to change it.

19   It is underneath.

20          MS. DERIEUX:  Is it in the refrigerator you own

21   now?

22          JUROR MONTEAU:  Yes.

23          MS. DERIEUX:  Okay.  And tell me about that

24   experience, I mean, other than just it's harder to get to.

25   Did it leak?  Did you have any problems with it?

1          JUROR MONTEAU:  No problems, just getting to it.

2          MS. DERIEUX:  Okay.  Do you remember what brand the

3    filter was?

4          JUROR MONTEAU:  I believe my husband now is

5    ordering them online.  It's -- it's an off-brand.

6          MS. DERIEUX:  Okay.  Is there anything about that

7    experience that is -- you're going to bring to this lawsuit,

8    because we're going to be talking about underneath the grill

9    water filters, and is there anything from your personal

10   experience that you're going to bring into the courtroom

11   that's going to impact how you see the evidence in this case?

12         JUROR MONTEAU:  No, other than it being

13   inconvenient because I -- I have since -- my mom has gotten a

14   new refrigerator and hers is inside the door, and it's really

15   easy to get to.  I've had a little comparison.  But other

16   than that, no.

17         MS. DERIEUX:  Do you know what brand your mom's is?

18         JUROR MONTEAU:  I don't.

19         MS. DERIEUX:  Okay.

20         JUROR MONTEAU:  I don't.

21         MS. DERIEUX:  Thank you.

22         I think we had another hand on the second row.

23         Yes, sir?

24         JUROR BAXTER:  I have one that's under the -- under

25   the refrigerator, it's a Kenmore.

1          MS. DERIEUX:  Okay.

2          JUROR BAXTER:  And it's fairly easy to replace.

3   And I have a -- I buy the Kenmore because that's all they

4   know that's available for it.

5          MS. DERIEUX:  Okay.  So the -- the filter that

6   you're talking about is also a Kenmore brand filter?

7          JUROR BAXTER:  Yes.

8          MS. DERIEUX:  Okay.  No problems with the

9   installation?

10         JUROR BAXTER:  No.

11         MS. DERIEUX:  Or the -- or the -- your satisfaction

12  with it?

13         JUROR BAXTER:  It doesn't leak, and it works

14  properly.

15         MS. DERIEUX:  Okay.  Thank you.

16         Anyone on the third, fourth, or fifth row

17  personally installed an under the grill water filter?

18         Yes, sir?

19         JUROR WALLACE:  Yes, I've -- I've changed one.

20         MS. DERIEUX:  Do you -- is that the kind of

21  refrigerator you have right now?

22         JUROR WALLACE:  Yes, it's a Whirlpool.

23         MS. DERIEUX:  And do you know what brand of filter

24  you use?

25         JUROR WALLACE:  I don't have a clue.

1          MS. DERIEUX:  Okay.  But you personally replace

2     them?

3          JUROR WALLACE:  I do.

4          MS. DERIEUX:  And you've not had any problems with

5     them?

6          JUROR WALLACE:  None at all.

7          MS. DERIEUX:  Anything with that experience, the

8     fact that you're a Whirlpool customer, that you would bring

9     into the courtroom if you were selected to be on this jury?

10          JUROR WALLACE:  I once had a Whirlpool appliance

11     that had a defect in it that caused a leak in my house, and

12     they stood by their product.  I didn't have any problems with

13     it with them, and I appreciated that, but that's all I could

14     offer with regards to that.

15          MS. DERIEUX:  All right.  Thank you.

16          JUROR WALLACE:  Uh-huh.

17          MS. DERIEUX:  Let me ask you sort of the opposite

18     of that question, is there anyone on the jury who has never

19     replaced a water filter in their refrigerator, and just

20     simply wouldn't do it because -- just because in your

21     household, someone else does that or you hire it done, those

22     kinds of tasks on your -- in your household, you would never

23     replace a water filter in a refrigerator?

24          Yeah, we can start right there just because it's

25     easier.

1          JUROR KLITZ:  No, I don't replace them.  Someone

2   else in my household does.

3          MS. DERIEUX:  Okay.

4          JUROR KLITZ:  I don't buy from, I don't replace it,

5   nothing like that.

6          MS. DERIEUX:  Do you know what -- what brand

7   refrigerator filter you use?

8          JUROR KLITZ:  No.

9          MS. DERIEUX:  Do you use a refrigerator filter?

10          JUROR KLITZ:  I honestly couldn't tell you.

11          MS. DERIEUX:  All right.  Yeah, we had another hand

12   back here.

13          JUROR ASHLOCK:  I'm not allowed near anything

14   mechanical in my house.  That's the truth.

15          MS. DERIEUX:  Thank you very much.

16          I think we had some hands over here in the third or

17   fourth row.

18          JUROR FLOYD:  I'm kind of with her.  My husband

19   deals with all that, but I honestly don't ever recall that

20   even happening, changing any filters out so...

21          MS. DERIEUX:  Do you think you have a filter in

22   your refrigerator?

23          JUROR FLOYD:  I don't -- does refrigerator -- all

24   refrigerators have them?

25          MS. DERIEUX:  No.

1          JUROR FLOYD:  Then I don't think we have one.

2          MS. DERIEUX:  Okay.  Yeah, thank you very much.

3          I'm going to move on.  We just need to talk to some

4   of these other folks real quickly, and I want to do that

5   before we run out of time.

6          Ms. Davis, you're No. 6?

7          JUROR DAVIS:  Yes.

8          MS. DERIEUX:  I believe you told us on your

9   questionnaire that you're a machine operator?

10          JUROR DAVIS:  Yes.

11          MS. DERIEUX:  For a coil company.

12          JUROR DAVIS:  Uh-huh.

13          MS. DERIEUX:  Can you describe what you do?  I'm

14   not sure that I understand what that job is.

15          JUROR DAVIS:  It's like air conditioning coils.

16          MS. DERIEUX:  Yes, ma'am.

17          JUROR DAVIS:  The copper piece that runs the freon

18   through the unit, it -- that -- it's a certain length and a

19   certain bend in it.  I run the machine that does that,

20   that...

21          MS. DERIEUX:  That makes sense.  Thank you.  I just

22   wasn't sure what -- what that -- what that -- what those

23   responsibilities might have been.

24          Ms. Enochs, yes, ma'am, do you know what type of

25   filter your -- you've used in -- I believe you said in

1    your --

2              JUROR ENOCHS:  I think it's a Whirlpool, but I'm

3    not going to be a hundred percent.  But, no, I do not.  My

4    husband changes them.

5              MS. DERIEUX:  Okay.

6              JUROR ENOCHS:  I never have.  I would if I had to,

7    but he does that, so I don't have to.

8              MS. DERIEUX:  Let me ask a -- a question about

9    your -- I believe you said that you've worked for a company

10   call Camterra?

11             JUROR ENOCHS:  Camterra.

12             MS. DERIEUX:  Tell me what that is and what you do.

13             JUROR ENOCHS:  It's an oil and gas company, and I

14   work in the Accounting Department --

15             MS. DERIEUX:  Okay.

16             JUROR ENOCHS:  -- payables and joint billing.

17             MS. DERIEUX:  Okay.  One more question for you.

18             What -- how would you characterize yourself in

19   terms of like household handyman kind of things?  Are those

20   things that you're comfortable doing, that you would do for

21   yourself or that you would ask --

22             JUROR ENOCHS:  I would do it if I thought I

23   could -- if I thought I was able to.  If not, my husband

24   couldn't do it, well, he -- he's pretty handy.

25             MS. DERIEUX:  What kinds of things have you

1    personally done in terms of household handyman kinds of

2    things?

3         JUROR ENOCHS:  Gosh.  I -- you know, I'm sorry, I

4    just can't think of anything right off offhand.

5         MS. DERIEUX:  That's okay.

6         JUROR ENOCHS:  Anything mechanical, I probably

7    don't do.  He either does, or we -- you know, we hire

8    somebody to do it.  He usually takes care of all that.

9         MS. DERIEUX:  Okay.  All right.  Thank you.

10   Anybody on the panel do simple car repairs for themselves or

11   their families?  Well, good.  I need to talk with our very

12   first juror here.

13        JUROR MILLER:  Yes, ma'am.

14        MS. DERIEUX:  Tell me what kind of repairs you do.

15        JUROR MILLER:  Well, being the daughter of a

16   mechanic, anything that really needs to be done.  I was

17   raised by my father, and I can get underneath a vehicle and

18   change the oil or change the battery.  I've even had to

19   change a starter once or twice, but...

20        MS. DERIEUX:  Okay.  Thank you very much.

21        Who else?  I need to see your hands again, I'm

22   sorry?  I'm going to try to talk to some folks we haven't

23   talked with.

24        I believe No. 17?

25        JUROR SCHLATRE:  Yes.

1            MS. DERIEUX:  Tell me about your experience in

2    terms of car repair.

3            JUROR SCHLATRE:  Well, general stuff, like changing

4    the battery or filling up wiper fluid, checking oil, checking

5    tire pressure.

6            MS. DERIEUX:  Have you ever changed the oil?

7            JUROR SCHLATRE:  Yes, numerous times.

8            MS. DERIEUX:  All right.  Is there anybody here

9    who's the sort of go-to person in their family or their

10   church or their community where -- if you have a handyman

11   problem, you're the person they call?  Any of those folks?

12           All right.  No. 18, tell me about some of the kinds

13   of things you do in that realm.

14           JUROR WARLICK:  Well, I'm a bus mechanic forever

15   working on Cummins.  And I do all my own work.  I've got an

16   El Camino that's stripped down right now.  I have people over

17   at Shady Grove wanting me to replace water faucets, hot water

18   heaters, just whatever.

19           MS. DERIEUX:  Do you have formal training in

20   plumbing?

21           JUROR WARLICK:  No.

22           MS. DERIEUX:  No?

23           JUROR WARLICK:  I'm hands on.

24           MS. DERIEUX:  All right.  Thank you very much.

25           Anyone -- anyone here does -- has formal training

```
 1    in -- in plumbing?  How about informal training you've

 2    just -- you've learned to do it over the years and you do

 3    your own plumbing?

 4             Mr. Baxter, I wanted to ask you about your

 5    experience in any kind of lawsuit or related to jury service

 6    or as a litigant.  I believe in your questionnaire, you said

 7    that you were a litigant in a lawsuit?

 8             JUROR BAXTER:  In an automotive accident.

 9             MS. DERIEUX:  And you were the Plaintiff?

10             JUROR BAXTER:  I was the one that was hit in the

11    back of the car, yeah.

12             MS. DERIEUX:  Okay.  And tell me about your

13    experience in that litigation.  Is there anything that you

14    bring out of that experience that would impact your ability

15    to be fair in this case?

16             JUROR BAXTER:  I don't have anything there, no.  It

17    turned out all right.

18             MS. DERIEUX:  Did you go to trial?

19             JUROR BAXTER:  No.

20             MS. DERIEUX:  Okay.  It was resolved before trial?

21             JUROR BAXTER:  Yes, ma'am.

22             MS. DERIEUX:  Okay.  I believe Ms. Miller --

23    Elizabeth Miller -- yes, ma'am.  I believe you were involved

24    in some litigation, as well, according to your questionnaire?

25             JUROR MILLER:  At this time, it is still gathering
```

1    paperwork because my son has not been released medically yet.

2    But my son was a victim in an accident that took place on

3    June 6th on 259.  A tractor pulled in front of my son.

4              MS. DERIEUX:  Is there anything about that that

5    would be -- make it difficult for you to sit as a juror in

6    this case?

7              JUROR MILLER:  No.

8              MS. DERIEUX:  Okay.  And you don't believe that

9    you would bring any experience from that litigation into the

10   courtroom here to -- to change or color how you would view

11   the parties in this case?

12             JUROR MILLER:  No.

13             MS. DERIEUX:  All right.  Thank you.

14             All right.  Is there anyone on the panel that's a

15   member of a union?

16             JUROR BATTERSHELL:  Of a what, union?

17             MS. DERIEUX:  A union, a labor union?  Tell me a

18   little bit about what -- what your experience is with the

19   labor union.

20             JUROR BATTERSHELL:  I've enjoyed it.

21             MS. DERIEUX:  Are you a leader in the union?  Do

22   you have -- do you hold a leadership position?

23             JUROR BATTERSHELL:  No.

24             MS. DERIEUX:  Okay.  And how long have you been a

25   member?

1          JUROR BATTERSHELL:  Almost nine years.

2          MS. DERIEUX:  All right.  Thank you very much.

3          Anyone else?

4          Ms. Klitz, I've come back to you about four times,

5  but I keep finding questions I wanted to ask you.  You had

6  some education -- I believe you said you had a certification

7  in CAD?

8          JUROR KLITZ:  Computer-aided drafting, yes.

9          MS. DERIEUX:  And do you use that since you

10 graduated?

11         JUROR KLITZ:  No.

12         MS. DERIEUX:  Do you use it personally?

13         JUROR KLITZ:  Yes.

14         MS. DERIEUX:  You use it personally but not in your

15 work?

16         JUROR KLITZ:  Correct.

17         MS. DERIEUX:  Okay.  Thank you.

18         Is there anyone on the panel that believes that if

19 you had a Whirlpool product in your home right now, you would

20 not consider a generic or house brand replacement filter or

21 other kind of replacement -- I think there's lint screens, if

22 you have a Whirlpool clothes dryer -- in other words, there's

23 other examples?  Is there anyone who would say, no, I would

24 always or only buy a Whirlpool replacement part?

25         Yes, ma'am?

1              JUROR HORTON:  I have a Whirlpool clothes washing

2   machine, and I believe I would use Whirlpool parts if it --

3   if something broke.

4              MS. DERIEUX:  Okay.  Thank you.

5              And I need to speak with Juror No. 16.

6              Tell me a little bit about what you do at work,

7   please?

8              JUROR MORTON:  Excuse me?

9              MS. DERIEUX:  What -- what you do at -- at your

10  job?

11             JUROR WARLICK:  Oh, I'm a med aide.  I pass meds,

12  and I -- and I'm also a CNA, and I take care of residents.

13             THE COURT:  Ms. Morton, hold that microphone closer

14  to your mouth.  I'm having trouble hearing you.

15             JUROR MORTON:  Oh, I'm a med aide.  I pass meds,

16  and I take care of residents, the elderly.

17             MS. DERIEUX:  And do you work in a convalescent

18  center where most of your patients are elderly people?

19             JUROR MORTON:  Yes, ma'am.

20             MS. DERIEUX:  Okay.  And tell me a little bit about

21  your education.

22             JUROR MORTON:  I graduated from Pittsburg High

23  School, and I did my basics at NTCC.  That's the college in

24  Mt. Pleasant.

25             MS. DERIEUX:  Okay.  And did you have any courses,

1    while you were going through school, that were based like

2    on -- I'm trying to figure out sort of what kind of

3    preparation you needed for the job you had.  Was it basic

4    sciences?  Was it --

5                JUROR MORTON:  It was like nursing.

6                MS. DERIEUX:  Okay.

7                JUROR MORTON:  I took my basics in nursing.

8                MS. DERIEUX:  And do you have any education beyond

9    the -- when you got your certification?

10                JUROR MORTON:  No, ma'am.

11                MS. DERIEUX:  All right.  Thank you.

12                And I want to wind up with the same questions that

13    Mr. Ward asked.  And sometimes this is where I find out the

14    most about you.

15                Is anyone sitting there thinking, you know, if she

16    had asked me this question, this is going to be really

17    relevant to the decision these folks are going to make about

18    who's the appropriate person to sit on this jury?

19                Some experience that you had, some education that

20    you've had, is there anyone on the panel that's saying, you

21    know, I keep waiting for her to ask this question, and she's

22    just not asking it?  Is there anyone?

23                All right.  I want to say thank you to everyone for

24    coming today, and we look forward to seeing eight of you here

25    back after lunch.  Thank you.

 1          THE COURT:  All right.  Counsel, approach the

 2   bench, please?

 3          (Bench conference.)

 4          THE COURT:  Mr. Ward, does the Plaintiff have any

 5   challenges for cause?

 6          MR. WARD:  Yes, Your Honor, we do.  And there's

 7   a -- there's a juror, No. 19, on a questionnaire, she said

 8   there was a private -- something private about a lawsuit that

 9   she didn't want to discuss in public that we'd like to ask

10   her a question at the bench before we gave you our strikes.

11          THE COURT:  Ms. Turner?

12          MR. WARD:  Yes, sir.

13          THE COURT:  All right.  Other than that, are there

14   any challenges for cause you want to offer for Plaintiff?

15          MR. WARD:  Yes, sir, Your Honor.  Juror No. 2, No.

16   6, and No. 18 all for the same reason.  They were the ones

17   who said that they started out leaning in favor of the

18   smaller company.  And all three of them said they didn't know

19   if they could put that aside, even if you had instructed them

20   that they were to treat us fairly.

21          THE COURT:  All right.  Ms. DeRieux, do you have

22   any challenges for cause for the Defendant?

23          MS. DERIEUX:  We do not.

24          THE COURT:  All right.  Then I intend to bring up

25   the three challenges for cause by Plaintiff.  I also intend

1    to bring up No. 13, Ms. Ashlock, who's indicated she has a

2    scheduling problem.  And then based on Mr. Ward's

3    representation, that Ms. Turner has indicated on her

4    questionnaire a private matter that needs to be discussed

5    with the Court.  I'll bring her up, unless Defendant has any

6    problem with that?

7              MS. DERIEUX:  I do not.

8              MR. WARD:  And, Your Honor, she didn't say discuss

9    with the Court.  It was in -- it was private -- she wouldn't

10   talk in her questionnaire about what the issue was with some

11   lawsuit, and I didn't want to ask her in front of the panel.

12             THE COURT:  That's fine.  That's fine.  We'll find

13   out up here.

14             MR. WARD:  Okay.

15             THE COURT:  All right.  Let me send the rest of the

16   panel out for recess, and we'll bring these up one at a time.

17             MR. WARD:  Okay.

18             (Bench conference concluded.)

19             THE COURT:  All right.  Ladies and Gentlemen, I'm

20   going to excuse the majority of the panel for a recess.  When

21   I release you, if those of you that are about to go on to

22   recess will exit through the double doors in the back of the

23   courtroom.

24             You might be interested if you take a left, going

25   out the doors and go around the corner, you'll find two

1   important things:  The water fountain and the restrooms.

2   I'm going to ask you to stay inside the building, not to exit

3   the building.  I'm also going to ask you not to discuss

4   anything that's happened in here this morning while you're on

5   recess.

6           I will tell you, you have heard absolutely no

7   evidence in this case so far.  So talk about this crazy

8   spring weather we're having, talk about March Madness is

9   coming up if you're a basketball fan, talk about whatever;

10  but don't talk about anything that's occurred in the

11  courtroom this morning.

12          And if you will bear with us, as soon as possible

13  I'll have you back in the courtroom to proceed, but I'm going

14  to excuse everyone on the panel for a recess except the

15  following members, and I'm going to ask these folks to stay

16  in your seats, if you will.

17          That's Panel Member No. 2, Mr. Battershell; Panel

18  Member No. 6, Ms. Davis; Panel Member No. 13, Ms. Ashlock;

19  Panel Member No. 18, Mr. Warlick; and Panel Member No. 19,

20  Ms. Turner.

21          Everyone except those members of the panel are

22  excused for recess at this time.

23          COURT SECURITY OFFICER:  All rise.

24          (Jury panel out.)

25          THE COURT:  All right.  Please be seated.

1          Counsel, if you'll approach the bench, please.

2          And, Mr. Battershell, would you come up and join

3     us, please?

4          (Bench conference.)

5          THE COURT:  Right up here.

6          Good morning, sir.

7          These are our microphones, you and I are going to

8     talk quietly into those, all right?

9          You indicated during the questioning earlier this

10    morning that you naturally lean toward the smaller company

11    and lean away from the bigger company.  I -- I have in my

12    notes that you said that was a pretty strong -- you have a

13    pretty strong feeling for the little guy.

14         My question, Mr. Battershell, is:  Can you put that

15    out of your mind and treat both of these parties equally?

16    Because it's essential that you be able to do that.  Can you

17    do that?

18         JUROR BATTERSHELL:  I can.

19         THE COURT:  Okay.  Even though you've got -- and

20    properly told everybody this morning you had a pretty strong

21    feeling toward the little guy, and you're telling me you can

22    treat them both the same, start out at the same position, and

23    let your answers to the questions that will be in the verdict

24    form be determined solely by the evidence that comes in

25    during the trial?

1          JUROR BATTERSHELL:  Yes, sir.

2          THE COURT:  You're confident that you can do that?

3          JUROR BATTERSHELL:  Yes, sir.

4          THE COURT:  All right.  Mr. Ward, do you have any

5   questions of Mr. Battershell?

6          MR. WARD:  Very briefly.

7          Mr. Battershell, when I asked you that during voir

8   dire, could you put it aside, you said, I don't know.  And

9   now you're telling -- telling us you can.  What -- what

10  happened in the interim that makes you feel that you can put

11  it aside?

12         JUROR BATTERSHELL:  I probably -- I probably should

13  have expressed myself a little different.  But I said I don't

14  know because I hadn't heard any evidence.

15         MR. WARD:  Okay.

16         JUROR BATTERSHELL:  I can make a good judgment, but

17  I need more.  But you asked me if I leaned, and I do.

18         MR. WARD:  Okay.  And -- and you're leaning before

19  you hear any evidence because you favor the little guy?

20         JUROR BATTERSHELL:  That's correct.

21         MR. WARD:  But you're saying that if we present

22  some evidence during the trial, you might come around to our

23  side?

24         JUROR BATTERSHELL:  Yes, sir.  Yes, sir.  Yes, sir.

25         MR. WARD:  But -- but you start out leaning?

1              JUROR BATTERSHELL:  That's right.

2              MR. WARD:  Because that's your strong feeling, the

3    way that you were raised?

4              JUROR BATTERSHELL:  That's correct.

5              MR. WARD:  Even though you're going to be

6    instructed to treat everybody fairly, that's just how you

7    start out?

8              JUROR BATTERSHELL:  Yes, sir.

9              MR. WARD:  All right.

10             THE COURT:  All right.  Ms. DeRieux, do you have

11   any questions of Mr. Battershell?

12             MS. DERIEUX:  Yes, sir.

13             Would it make a difference if you had some

14   information about how big and how little these companies

15   were?  Because if you're characterizing something as a little

16   company, you don't know yet if we have three employees or 300

17   employees, would that make a difference once you've heard the

18   evidence?

19             JUROR BATTERSHELL:  Explain that question again,

20   please.

21             MS. DERIEUX:  Well, I -- we haven't really defined

22   for you what a little company is.

23             JUROR BATTERSHELL:  Right, right.

24             MS. DERIEUX:  And you said that you started out

25   leaning because of your personal feelings --

1           JUROR BATTERSHELL:  Right.

2           MS. DERIEUX:  -- toward the little guy.  And I just

3    am asking you if the evidence came in that defined what a

4    little guy was or what a big guy was, if you could set aside

5    these personal feelings --

6           JUROR BATTERSHELL:  Yes.

7           MS. DERIEUX:  -- and just rely on the evidence --

8           JUROR BATTERSHELL:  Yes.

9           MS. DERIEUX:  -- that you heard in the courtroom?

10          JUROR  BATTERSHELL:  Yes.

11          THE COURT:  All right.  Mr. Battershell, let me

12   follow up with a question.

13          What I need to know is before you've heard any

14   evidence, can you put both of these parties in the same

15   position in your mind?

16          JUROR BATTERSHELL:  Yes.

17          THE COURT:  Okay.  You're not going to be leaning

18   toward the Defendant and away from the Plaintiff, and then

19   it's going to be up to the Plaintiff to show you that you

20   should lean back their way?

21          JUROR BATTERSHELL:  No, sir.

22          THE COURT:  You're going to be able to start them

23   out at the same place?

24          JUROR BATTERSHELL:  That's correct.

25          THE COURT:  Okay, sir.

1            All right.  I'm going to let you join the rest of

2    the group outside.  Just don't talk about anything that we've

3    discussed in here.

4            JUROR BATTERSHELL:  All right.

5            THE COURT:  Okay?  Thank you, sir.

6            (Juror Battershell leaves the courtroom.)

7            THE COURT:  I'm going to overrule Plaintiff's

8    challenge for cause to Panel Member No. 2.

9            (Open court.)

10           THE COURT:  Ms. Davis, would you come up and join

11   us, please?

12           (Bench conference continued.)

13           THE COURT:  Good morning, ma'am.

14           JUROR DAVIS:  Good morning.

15           THE COURT:  These are microphones.  If you will,

16   just talk softly with me here.

17           JUROR DAVIS:  Okay.

18           THE COURT:  During the questioning, you were asked

19   if you leaned for or against the smaller company here.  And

20   my notes show that you said you leaned toward the little guy.

21           And you were asked if you could take that natural

22   meaning toward the little guy out of your thinking and could

23   you treat both of them the same from the very beginning --

24           JUROR DAVIS:  Uh-huh.

25           THE COURT:  -- of the trial if you were selected.

1            JUROR DAVIS:  Yeah.

2            THE COURT:  And you said you weren't sure you could

3    set that aside, so what I really need to know is can you

4    treat both of these parties the same way from the beginning

5    and let the evidence that you hear during the trial be the

6    sole basis for any decisions you might make if you're part of

7    this jury and you have to answer the questions that make up

8    the verdict form?

9            JUROR DAVIS:  No.

10           THE COURT:  You can't do it?

11           JUROR DAVIS:  No.

12           THE COURT:  Okay.  Mr. Ward, do you have any

13   questions of Ms. Davis?

14           MR. WARD:  No, Your Honor.

15           THE COURT:  Ms. DeRieux?

16           MS. DERIEUX:  No, sir.

17           THE COURT:  Okay.  I appreciate your honesty,

18   Ms. Davis.  That's what the process is for.  I'm going to let

19   you join the rest of the panel outside on recess.  Just don't

20   discuss anything we've about in here.

21           JUROR DAVIS:  Okay.

22           THE COURT:  Okay.  Thank you, ma'am.

23           JUROR DAVIS:  Let me give you a reason why.

24           THE COURT:  I don't really need to know why, but

25   I'll be glad to hear it.

1            JUROR DAVIS:  Okay.  Right now it wouldn't have

2    anything to do with the trial.  I would lean toward her

3    because she's close to me in Gilmer and Gladewater, and she's

4    a female.

5            THE COURT:  Okay.  Okay.

6            JUROR DAVIS:  And that's why.

7            THE COURT:  But whether it's because you like Ms.

8    DeRieux or whether it's because one company's bigger than the

9    other, what you're telling me is you can't treat them --

10           JUROR DAVIS:  That -- that -- I can't.

11           THE COURT:  -- you can't treat both sides equally?

12           JUROR DAVIS:   No.

13           THE COURT:  Okay.  Thank you, ma'am.  I'll let you

14    join the rest of the group outside.

15           JUROR DAVIS:  All right.

16           (Juror Davis leaves the courtroom.)

17           THE COURT:  All right.  I'm going to sustain

18    Plaintiff's objection or challenge for cause as to Panel

19    Member No. 6, and Ms. Davis is excused.

20           (Open court.)

21           THE COURT:  Ms. Ashlock, would you join us, please?

22           (Bench conference continued.)

23           THE COURT:  Good morning.

24           JUROR ASHLOCK:  Good morning.

25           THE COURT:  Glad to have a returning veteran here.

1          JUROR ASHLOCK:  Well, I've been dying for you to

2    call me back.

3          THE COURT:  Well, here you are.  You raised your

4    hand and told me you might not be available --

5          JUROR ASHLOCK:  Yes.  Well --

6          THE COURT:  -- if you were selected.  Tell me about

7    that.

8          JUROR ASHLOCK:  -- I've got -- I've got one of

9    those milestone birthdays coming, and I didn't know until

10   this weekend my high school girlfriends have bought and paid

11   for me a trip, but I don't leave until Sunday, so if

12   you're --

13         THE COURT:  Sunday of next week?

14         JUROR ASHLOCK:  This coming Sunday.

15         THE COURT:  We'll be through before Sunday.

16         JUROR ASHLOCK:  Thought I'd just better ask, just

17   in case.

18         THE COURT:  No.  We may -- we may start early and

19   go late, but we'll be through before Sunday.

20         JUROR ASHLOCK:  Okay.  All right.

21         THE COURT:  And so if you're selected, you can

22   serve?

23         JUROR ASHLOCK:  Yes, sir.

24         THE COURT:  Okay.

25         JUROR ASHLOCK:  Okay.

```
1              THE COURT:  Any questions for Ms. Ashlock?

2              MR. WARD:  No.

3              MS. DERIEUX:  No.

4              THE COURT:  I'm going to let you join the rest of

5    the group outside, just don't talk about anything that we've

6    discussed in here.

7              JUROR ASHLOCK:  You got it.  Thank you.

8              THE COURT:  Thank you.

9              (Juror Ashlock leaves the courtroom.)

10             THE COURT:  All right.  Ms. Ashlock remains on the

11   panel.

12             (Open court.)

13             THE COURT:  Mr. Warlick, will you join us, please?

14   Good morning, sir.

15             (Bench conference continued.)

16             JUROR WARLICK:  Good morning.

17             THE COURT:  These are our little microphones.  I'm

18   just going to ask you, and I talk softly here at the bench.

19   During the questioning this morning, you said that you always

20   root for the little guy.

21             JUROR WARLICK:  Yes.

22             THE COURT:  And you said when asked if you could

23   put that preference out of your mind and treat both of these

24   parties the same from the beginning of the trial, you said:

25   I can't say I could be fair.
```

1                    JUROR WARLICK:  I said honestly, but I add --

2                    THE COURT:  I want you to elaborate on that.

3                    JUROR WARLICK:  May I add something?

4                    THE COURT:  Yes, sir.  That's why you're up here.

5                    JUROR WARLICK:  I seen the two filters -- I seen

6      the two filters.  I don't see the big deal.  Personally, I

7      don't use any filters on my refrigerator, on my coal kitchen

8      and refrigerator.  I have a whole house.  But when his

9      attorney said they've got about 40 lawsuits, that sounds like

10     they're out to crush people.

11                    THE COURT:  All right.  Well --

12                    JUROR WARLICK:  I'm just trying to be honest.

13                    THE COURT:  You've only heard what you've heard --

14                    JUROR WARLICK:  Yes.

15                    THE COURT:  -- and as I said, when I sent the rest

16     of the panel out, you haven't heard any evidence yet.

17                    JUROR WARLICK:  Right.

18                    THE COURT:  My question to you is whether it came

19     up during the examination of the panel this morning, whether

20     you came to court with that feeling beforehand, or from

21     whatever source, if you're selected on this jury, can you

22     look Ms. DeRieux in the eye and Mr. Ward in the eye, and say

23     I'm going to treat both of your clients exactly the same from

24     the beginning, we're going to start off equal, and I'm going

25     to let only the evidence that comes into the trial push me

1   toward one side or the other?  And I'm going to make my

2   decision, if I'm on this jury, as to how to answer the

3   questions in the verdict form solely from what I hear under

4   oath in the courtroom?  Can you tell me you can do that?

5              JUROR WARLICK:  All I can say is I can do my best.

6              THE COURT:  You can't tell me that you know for a

7   hundred percent sure you can; is that right?

8              JUROR WARLICK:  Well --

9              THE COURT:  I don't mean to pin you down, but I've

10  got to pin you down.  This is the time.

11             JUROR WARLICK:  From about 40 lawsuits, I don't

12  know.

13             THE COURT:  You're not sure --

14             JUROR WARLICK:  I'm not sure.

15             THE COURT:  -- you can treat them both the same; is

16  that right?

17             JUROR WARLICK:  I don't -- I'm not sure.

18             THE COURT:  Okay.  Mr. Ward, do you have any

19  questions of Mr. Warlick?

20             MR. WARD:  No, sir.

21             THE COURT:  Ms. DeRieux, do you have any questions

22  of Mr. Warlick?

23             MS. DERIEUX:  No, sir.

24             THE COURT:  Mr. Warlick, I'm going to let you join

25  the rest of the group outside.  Just don't discuss anything

```
 1   we've talked about in here.
 2             JUROR WARLICK:  Yes, sir.
 3             THE COURT:  Thank you very much.
 4             (Juror Warlick leaves the courtroom.)
 5             THE COURT:  I'm going to sustain the challenge for
 6   cause to Mr. Warlick.  He's no longer on the jury panel.
 7             MR. WARD:  And, Your Honor, this is the jury
 8   questionnaire.  I think you've seen the jury -- that's --
 9   that's what we wanted to talk about.
10             (Open court.)
11             THE COURT:  Okay.  Ms. Turner, would you come up,
12   please?
13             (Bench conference continued.)
14             THE COURT:  Good morning, ma'am.
15             JUROR TURNER:  Good morning.
16             THE COURT:  These are our microphones.  If you'll
17   come up, you and I are just going to talk quietly into these.
18             The reason you're here, Ms. Turner, is on this
19   questionnaire that you filled out before you appeared this
20   morning for jury service, on Question 21, it says:  Have you
21   or any immediate family member ever been a witness, filed a
22   lawsuit, or been sued?  You put:  Private.  And what I really
23   need to know is what you meant by that.
24             JUROR TURNER:  Well --
25             THE COURT:  And would it influence your ability to
```

1   be fair or impartial?

2          JUROR TURNER:  Oh, no, no.  It was a lady ran a red

3   light speeding and texting and hit me, totaled my car out.

4   And it hurt my daughter's mother-in-law.

5          THE COURT:  She was in the car?

6          JUROR TURNER:  She was in the car.

7          THE COURT:  How long ago did that happen?

8          JUROR TURNER:  Eight or nine years ago.

9          THE COURT:  Okay.  So you've had that experience,

10  but would that cause you to lean in favor of Plaintiff or

11  Defendant before we get started?

12         JUROR TURNER:  No, no.

13         THE COURT:  And you could make your decision on

14  this jury, if you're selected, solely based on the evidence

15  you hear in court?

16         JUROR TURNER:  Sure.

17         THE COURT:  Okay.  Any questions for Ms. Turner,

18  Mr. Ward?

19         MR. WARD:  No, Your Honor.

20         THE COURT:  Ms. DeRieux?

21         MS. DERIEUX:  No, sir.

22         THE COURT:  Okay.  Ms. Turner, I'm going to let you

23  join the rest of the group outside.  Just don't discuss

24  anything we've talked about in here.

25         JUROR TURNER:  Okay.

1              THE COURT:  Thank you, ma'am.

2              (Juror Turner leaves the courtroom.)

3              THE COURT:  All right.  Ms. Turner remains on the

4    jury panel.

5              That means Mr. Battershell is still on.  Ms. Davis

6    is off.  Ms. Ashlock is still on.  Mr. Warlick is off.  I've

7    excused No. 18, and I've excused No. 6.

8              We're going to seat eight jurors.  Four peremptory

9    challenges per side.  That should get us through -- through

10   19 or 18?

11             MR. WARD:  18 or 19 I've got.

12             MS. DERIEUX:  16, 17, 18.

13             MR. WARD:  Through 18.

14             MR. SGANGA:  You don't need 19.

15             THE COURT:  Okay.  How long -- well, let's see,

16   it's 25 minutes after 11:00.

17             MS. DERIEUX:  I actually think we need 19 because

18   18 --

19             MR. WARD:  Yeah.

20             THE COURT:  I think you do.

21             MR. WARD:  Yeah.

22             THE COURT:  Because 18 is gone, and 6 is gone.

23   Well, you've got your original list, less No. 6 and less No.

24   18.  You've got four strikes per side.

25             MR. WARD:  We just go to 17.

1          THE COURT:  I'll give you until 10 minutes until

2   noon to strike your lists.  If you'll have your strikes back

3   to Ms. Lockhart, our Courtroom Deputy, by then.

4          MR. WARD:  Okay.  Thank you, Your Honor.

5          THE COURT:  Mr. Ward, I'll give you that back.

6          MR. WARD:  Thank you.

7          (Bench conference concluded.)

8          THE COURT:  All right.  While counsel exercise

9   their peremptory challenges, the Court will stand in recess.

10          The Court stands in recess.

11          COURT SECURITY OFFICER:  All rise.

12          (Jury panel out.)

13          (Recess.)

14          (Jury panel in.)

15          COURT SECURITY OFFICER:  All rise.

16          THE COURT:  Be seated, please.

17          All right.  Ladies and Gentlemen, if you'll listen

18   carefully as your names are called, please come forward and

19   take your seat in the jury box.

20          We're going to seat eight jurors on this jury.

21   Obviously, there are more than eight seats in the jury box.

22   I'm going to ask the first four names called to go to the

23   front row of the jury box, and I'm going to ask the first

24   juror called to stand in front of the third chair from the

25   end, leaving two chairs empty beyond where Juror No. 1 will

1       stand.

2               And then the next three, if you'll come in behind

3       that Juror No. 1 and stand in front of your respective

4       chairs.

5               And then if the second four jurors will go to the

6       back row of the jury box and stand -- position themselves

7       behind their counterparts on the front row, that will center

8       the eight members of our jury in the -- in the center of the

9       jury box.

10              And if all eight members of the jury will remain

11      standing until all eight are in the box, I'll seat you at

12      that time.

13              Ms. Lockhart, if you'll call out of the names of

14      our jurors, please?

15              COURTROOM DEPUTY:  Elizabeth Miller, Daniel Fisher,

16      Denise Enochs, Kathleen Cox, Sarah Klitz, Terri Monteau,

17      Eugene Baxter, and Michael -- is it Schlatre?

18              THE COURT:  Thank you, Ladies and Gentlemen.

19              Please have a seat.

20              Mr. Ward.

21              MR. WARD:  May I approach, Your Honor?

22              THE COURT:  Approach the bench.

23              (Bench conference.)

24              MR. WARD:  We just need to double-check our strike

25      list for the Plaintiff.

1          THE COURT:  Okay.  Plaintiff struck No. 2, No. 5,

2     No. 6 was struck for cause.  You struck Ms. Klitz.

3          MR. WARD:  She's on the panel.

4          THE COURT:  No. 8, she's on the jury, she was

5     struck by Plaintiff.

6          Okay.  Here's both strike lists.  Go through

7     them -- turn around and go through them right now, and let's

8     see what we come up with.

9          Just stay where you are, Counsel.  This shouldn't

10    take very long.  There were no double strikes, as I recall.

11         MR. WARD:  There were not.

12         MS. DERIEUX:  That's correct.

13         MR. WARD:  I think 8 will be gone, and 17 will be

14    on is what --

15         THE COURT:  Are you saying that 17 was struck?

16         MR. WARD:  No, I don't believe so.

17         MS. DERIEUX:  I don't believe.

18         THE COURT:  Okay.  Did you say 17 would be on --

19         MR. WARD:  I believe so.

20         THE COURT:  -- or gone?

21         MR. WARD:  On, I'm sorry.

22         THE COURT:  Okay.  We'll see.

23         MR. WARD:  Is that what you have?  We're going to

24    know in a second.

25         THE COURT:  Yeah, let's just wait.

1          All right.  Counsel, I want you to double-check for

2   me.

3          Neither party struck Jury Panel Member No. 1, so

4   Ms. Miller is our first juror.

5          Plaintiff's struck No. 2, so No. 2 is off.

6          Neither side struck No. 3, Mr. Fisher, so he's

7   Juror No. 2.

8          Nobody struck No. 4 on the panel, Ms. Enochs, so

9   she's on as Juror No. 3.

10         No. 5, Mr. Bald, was struck by Plaintiff.

11         No. 6, Ms. Davis, was excused for cause.

12         No. 7, Ms. Cox, neither side struck, so Ms. Cox is

13  our fourth juror.

14         No. 8, Ms. Klitz, was struck by Plaintiff.

15         No. 9, Ms. Childers, was not struck by either

16  party.  She's Juror No. -- she's on as No. 5.

17         All right.  No. 10, Mr. Steglinski, was stuck by

18  Plaintiff.

19         No. 11, Ms. Beran or Beran, however it's

20  pronounced, neither side struck her so she's on as Juror

21  No. -- let's see, she'll be --

22         MS. DERIEUX:  Defendant's struck 11.

23         THE COURT:  Oh, Defendant's struck 11, you're

24  correct.  So 11 is not on.

25         Okay.  12, Ms. Monteau, neither side struck.  So 12

1    is on.  She becomes Juror No. 6.

2              All right.  No. 13, Ms. Ashlock, she was struck by

3    Defendant.

4              No. 14, Mr. Baxter, was not struck by either party.

5    So Mr. Baxter becomes Juror No. 7.

6              And No. 15 was struck by Defendant.

7              No. 16 was struck by Defendant.

8              So No. 17, Mr. Schlatre, he becomes Juror No. 8.

9              So that should give us --

10             MR. WARD:  Just to confirm, did Defendants already

11   exercise four peremptory strikes, yes?

12             THE COURT:  None on the first page.

13             MR. WARD:  Okay.

14             THE COURT:  Four on the second page.

15             MR. WARD:  Okay.

16             THE COURT:  That should give us then Miller as

17   Juror No. 1, Fisher as Juror No. 2, Enochs as Juror No. 3,

18   Cox as Juror No. 4, Childers as Juror No. 5, Monteau as Juror

19   No. 6, Baxter as Juror No. 7, and Schlatre as Juror No. 8.

20             MR. WARD:  Correct.

21             THE COURT:  Does Plaintiff agree with that?

22             MR. WARD:  Yes, sir.

23             THE COURT:  Does Defendant agree with that?

24             MS. DERIEUX:  We do.

25             THE COURT:  All right.  Why don't you return to

1    your seats, Counsel.

2              (Bench conference concluded.)

3              THE COURT:  All right.  Sorry for the delay, Ladies

4    and Gentlemen.  We had an error in our tabulations, so we're

5    going to fix that right now.

6              Ms. Klitz, you're not on the jury.  So you can

7    return to where you were.  Sorry.

8              And Panel Member No. 17, Mr. Schlatre.

9              JUROR SCHLATRE:  Yes.

10             THE COURT:  You are on the jury.  Good.

11             JUROR SCHLATRE:  Oh, I am.

12             THE COURT:  You are, yes, sir, have a seat.  Have a

13   seat.

14             Okay.  Our jury should be Elizabeth Miller, who

15   will be Juror No. 1.  Daniel Fisher as Juror No. 2.  Denise

16   Enochs as Juror No. 3.  Kathleen Cox as Juror No. 4.

17   And Ms. Childers, No. 9, you'll fill this seat that Ms. Klitz

18   just vacated.  If you'll come forward.

19             Ms. Childers will be Juror No. 5.  Ms. Monteau will

20   be Juror No. 6.  Mr. Baxter is Juror No. 7.  And

21   Mr. Schlatre, you stay as Juror No. 8.

22             That will be the eight members of our jury.  I

23   apologize for the miscalculation.

24             All right.  Those of you that have not been

25   selected for our jury, I'm about to excuse you at this time.

1    I want to excuse you with the heartfelt thanks and

2    appreciation of the Court and the Court staff.

3              Ladies and Gentlemen, I'm very much aware of the

4    fact that every one of you had other places that you could

5    have been today and were important to your respective

6    individualized lives for you to be there, and you set that

7    aside.  You sacrificed that, and you appeared as summonsed

8    for jury duty this morning.

9              And even though you weren't selected to serve on

10   this jury, you have performed very real and important public

11   service by being here.  And you have the sincere appreciation

12   and thanks of the Court.

13             The Court could not do what it's charged to do

14   under our constitution without having ordinary citizens such

15   as yourselves answer the call to jury duty, appear, and

16   present yourself for jury service.  Even though you weren't

17   selected, you've performed a very important function this

18   morning for your nation and your government, and we thank you

19   and appreciate what you've done.

20             As you leave in just a moment, if you will go by

21   the clerk's office on the way out, they're going to want to

22   recover from you each of those very expensive numbers that

23   you're wearing on your chest and your little pens and badges

24   that go with it.

25             If you need any information in written form from

1    the clerk verifying for an employer where you've been this

2    morning and why you didn't show up at work, they will be glad

3    to furnish you with that kind of information.

4            If you have any questions about your service as

5    prospective jurors, please direct it to the clerk's office,

6    and they will accommodate you any way that they can.

7            Again, Ladies and Gentlemen, thank you for being

8    here.  Thank you for taking your citizenship seriously.  And

9    with those instructions and words from the Court, those of

10   you not selected on the jury are excused at this time.

11           COURT SECURITY OFFICER:  All rise.

12           (Unselected jury panel members leave the

13           courtroom.)

14           THE COURT:  All right.  If everyone in the

15   courtroom except the members of the jury would be seated.

16           And Ladies and Gentlemen of the Jury, at this time,

17   I'm going to ask our Courtroom Deputy, Ms. Lockhart, to

18   administer the oath to you as jurors.

19           (Jurors sworn.)

20           THE COURT:  Please be seated.

21           Ladies and Gentlemen of the Jury, I'm about to

22   excuse you for lunch; but before I do, there are a couple

23   instructions that I need to give you and go over with you.

24           First of all, when you return after lunch today,

25   we'll proceed with the trial as I've indicated.  I'm going to

1    ask you to make sure that you leave your cell phones and any

2    electronic devices either in your car or in the jury room,

3    but don't bring them back into the courtroom.

4           No matter how many times you think you put that

5    cell phone on silent, I guarantee you, you will have missed

6    it somehow, and we'll have an interruption during the trial.

7           I want you to also understand that the lawyers in

8    this case and their support staff are entitled to have

9    electronics in the courtroom because in today's world those

10   are tools of practicing law; however, they are under the same

11   requirements you are.

12          And if their devices ring unexpectedly or interrupt

13   the trial, my practice has been to confiscate them.  So

14   they're -- they're under a pretty heavy burden to make sure

15   that those phones and devices are silenced.  But for your

16   purposes, please leave it in your car or leave it in the jury

17   room.

18          We will have recesses throughout the trial and

19   breaks throughout the trial, and you will have plenty of

20   opportunities to check email or text messages or make phone

21   calls or return phone calls that are important, but let's

22   leave them outside the courtroom at all times.

23          Also, Ladies and Gentlemen, do not discuss this

24   case with anyone.  I'm -- I'm giving you several

25   instructions, every one of them is important.  No instruction

1    is more important than this one.  Do not discuss the case

2    with anyone in any way.

3         At the end of the trial, after you've heard all the

4    evidence, I'm going to direct you to retire to the jury room

5    and to deliberate upon the verdict and answer the questions

6    in that verdict form.  That form and your answers will

7    comprise the verdict in this case and will determine and

8    establish what the facts are in this case.

9         It is absolutely essential that the sole source of

10   any information you have in answering those questions come to

11   you under oath from the witness stand in open court subject

12   to cross-examination and through the documents and other

13   tangible things that the Court has admitted into evidence.

14        There must be no other source of information from

15   which you will answer the questions in the verdict form.

16   Therefore, if you are to violate my admonition about not

17   discussing the case with anyone, then you risk us having to

18   start over, lose all the work that's gone into this so far,

19   and that would be a great expense to the Court and to the

20   parties.  So it is critical that you not discuss the case

21   with anyone.

22        Now, when you get home this evening, unless you

23   live by yourself, whoever is there is going to meet you with

24   one question, and it's going to be:  What happened in federal

25   court in Marshall today?

1        Do not even try to answer that question.  Whoever

2   asks it, just smile, look at them, and say, that very stern

3   Federal Judge told me I'm not even supposed to try and answer

4   this question, so until I've been released, until the trial

5   is over, until I'm no longer a juror, I can't even begin to

6   try and answer that question.  After that, I'll be glad to

7   talk about it with you if you want me to.

8        That's the response you need to give.  Because if

9   you try to answer it, you invariably are going to violate my

10  instruction to you.  And when I say don't discuss the case

11  with anyone, that means in the broadest sense of the word

12  don't communicate about the case with anyone.

13       That means don't email about it, don't post to

14  Facebook, don't tweet on Twitter, don't snap on Snapchat,

15  don't do anything of a social media nature or any kind of

16  communication in writing, electronically, orally, no

17  communication, whatsoever.

18       Also, Ladies and Gentlemen, you are not to do any

19  independent investigation of any kind about anything related

20  to this case.  Do not go home and look in your refrigerator

21  or under your refrigerator to see if there's a filter there

22  and who made it and how it fits and how it works.  Ignore

23  your refrigerator throughout this trial.

24       Do not go home and get on Wikipedia and try to find

25  out more about Ms. DeRieux or Mr. Ward or the parties or any

1    of the other lawyers or any of the witnesses.  Do not do any

2    research of any kind, whatsoever.

3           Again, this all centers around the central truth

4    that the sole universe of the information that you will call

5    to mind to answer the questions in the verdict form at the

6    end of the trial must come to you only through what's

7    presented in open court in this trial under oath and subject

8    to cross-examination.  That's it.  That's the governing rule

9    that applies to all these instructions.

10          Also, Ladies and Gentlemen, I do not think this

11   will happen, but this is an important case, it's important to

12   the Plaintiff, and it's equally important to the Defendant.

13          Therefore, it is within the realm of possibility

14   that some third party might try to approach you and influence

15   your decision in this case from some outside source.

16          If you receive any communication from any source

17   that you personally think is suspect, unusual, out of place,

18   questionable, if you have any qualms about it yourself, then

19   you should report that communication directly to the clerk's

20   office.  They will advise me, and the Court will deal with

21   it.  I don't think it's likely.  But I want you to know it's

22   within the realm of possibility, and you need to be on your

23   guard about it.

24          Also, Ladies and Gentlemen, throughout the course

25   of the trial, there are going to be times when you're coming

1    and going through the courthouse, recesses, breaks for lunch.

2              You are almost unavoidably going to pass on the

3    sidewalks, on the steps, in the hallways, one or more of

4    these lawyers, the witnesses, the corporate representatives,

5    the support staff connected with the trial of this case.

6              None of those people are going to stop and visit

7    with you.  None of those people are going to smile and enter

8    into a conversation with you as we typically do in friendly

9    East Texas.  And that, again, is because you must receive no

10   information or any communication outside of what you receive

11   from the witness stand in open court.  They are simply doing

12   what the Court has instructed them to do.

13             So when one or more of these lawyers or witnesses

14   or corporate representatives walk by you and don't speak,

15   don't say good morning, don't say good afternoon, don't

16   smile, pretend that you're not there, they are doing what I

17   require them to do.

18             So do not hold them accountable for that.  Do not

19   think they're rude or unfriendly or mean or cold.  They are

20   simply doing what the Court requires them to do.

21             Again, it comes back to that central truth that the

22   information you will call upon to answer the questions in the

23   verdict form must come from open court under oath and subject

24   to cross-examination.

25             And in that regard, Ladies and Gentlemen, when I

113

 1    say do not discuss the case with anyone, that also means you

 2    are not to discuss the case among yourselves at any time

 3    until you have heard all the evidence and I have instructed

 4    you to return to the jury room and deliberate upon the

 5    verdict in this case.

 6           Now, when all the evidence is in and I've

 7    instructed you to deliberate upon the verdict, then it

 8    becomes your duty to discuss the case or the evidence among

 9    each other.  But until that time, you are not to discuss the

10    case among yourselves, you're not to discuss the case with

11    anyone.

12           And, again, by -- by using the word "discuss," I

13    mean communicate in the broadest sense of the term.

14           All right.  With those instructions, Ladies and

15    Gentlemen, I'm going to recess for lunch.  And we're going to

16    give you a break to have lunch.  It's 20 minutes after 12:00,

17    according to the clock in the courtroom.

18           Hopefully, the rush at the local places to eat has

19    subsided a little bit by now.  I'm going to ask you to be

20    back in the jury room ready to go by 15 minutes after 1:00,

21    and we'll proceed as close to a quarter after 1:00 p.m. as

22    possible.

23           With those instructions, Ladies and Gentlemen,

24    you're excused for lunch at this time.

25           COURT SECURITY OFFICER:  All rise for the jury.

1            (Jury out.)

2            THE COURT:  All right.  Counsel, are there any

3   questions from Plaintiff before we recess for lunch?

4            Mr. Ward, any questions from Plaintiff?

5            MR. WARD:  No, Your Honor.

6            THE COURT:  Any questions from Defendant,

7   Ms. DeRieux?

8            MS. DERIEUX:  No, sir.

9            THE COURT:  We stand in recess for lunch.

10            (Lunch recess.)

11

12                        CERTIFICATION

13            I HEREBY CERTIFY that the foregoing is a true and

14   correct transcript from the stenographic notes of the

15   proceedings in the above-entitled matter to the best of our

16   abilities.

17

18   /s/ Shelly Holmes
     SHELLY HOLMES, CSR, TCRR              March 6, 2017
19   Official Court Reporter
     State of Texas No.:  7804
20   Expiration Date:  12/31/18

21
     /s/ Shea Sloan
22   SHEA SLOAN, CSR, RPR
     Official Court Reporter
23   State of Texas No.:  3081
     Expiration Date: 12/31/18

24

25