1        IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF TEXAS
2                    MARSHALL DIVISION

3   WHIRLPOOL CORPORATION        )
                                 )    DOCKET NO. 2:15cv1528
4        -vs-                    )
                                 )    Marshall, Texas
5                                )    1:21 a.m.
    TST WATER, LLC               )    March 6, 2017
6
                    TRANSCRIPT OF JURY TRIAL
7                      AFTERNOON SESSION
           BEFORE THE HONORABLE RODNEY GILSTRAP,
8              UNITED STATES DISTRICT JUDGE

9               A P P E A R A N C E S

10  PLAINTIFFS:

11  RICHARD S.J. HUNG
    BARBARA N. BARATH
12  CHRISTOPHER JAMIESON KENDALL
    RACHEL S. DOLPHIN
13  MORRISON & FOERSTER LLP
    425 Market St.
14  San Francisco, CA 94105

15  MELISSA R. SMITH
    ALLEN GARDNER
16  GILLAM & SMITH, LLP
    303 S. Washington Ave.
17  Marshall, TX 75670

18  T. JOHN WARD, JR.
    WARD, SMITH & HILL, PLLC
19  1507 Bill Owens Parkway
    Longview, TX 75604
20
    COURT REPORTER:        MS. SHELLY HOLMES, CSR-TCRR
21                         FEDERAL OFFICIAL COURT REPORTER
                            TO THE HONORABLE RODNEY GILSTRAP
22                         100 E. Houston Street
                           Marshall, Texas 75670
23

24  Proceedings taken by Machine Stenotype; transcript was
    produced by a Computer.
25

1   DEFENDANT:

2
    JOHN B. SGANGA, JR.
3   SEAN M. MURRAY
    JUSTIN J. GILLETT
4   KIM A. KENNEDY
    KNOBBE, MARTENS, OLSON & BEAR, LLP
5   2040 Main St
    Fourteenth Floor
6   Irvine, CA 92614

7
    ELIZABETH L. DeRIEUX
8   CAPSHAW DERIEUX, LLP
    114 E. Commerce Ave.
9   Gladewater, TX 75647

10

11                  * * * * * * * * * * * * * * * * * * * * * * * *

12                        P R O C E E D I N G S

13          (Jury out.)

14          COURT SECURITY OFFICER:  All rise.

15          THE COURT:  Be seated, please.

16          All right.  Let's bring in the jury, please,

17   Mr. Nance.

18          COURT SECURITY OFFICER:  All rise for the jury.

19          (Jury in.)

20          THE COURT:  Welcome back from lunch, Ladies and

21   Gentlemen.  Please be seated.

22          Thank you for being on time.  We're going to try to

23   keep the case moving so that we can stick to the schedule

24   that I told you about during jury selection.

25          I have some preliminary instructions that I want to

1   give you before we start with the opening statements from the

2   lawyers and then get on to the evidence.

3        You've now been sworn as the jurors in this case.

4   And as the jury, you are the sole judges of the facts, and

5   you will decide and determine all of the facts in this case.

6        As the Judge, I will give you instructions on the

7   law, I will decide any questions of law that arise during the

8   trial, I'll handle -- handle matters of evidence and

9   procedure, and I'm also responsible for managing the flow of

10  the evidence and maintaining the decorum of the courtroom.

11       At the end of all the evidence, Ladies and

12  Gentlemen, I'll give you detailed instructions about the law

13  that your are to apply in this case, and I'll give you a list

14  of questions that you are then to answer.  This list of

15  questions is called the verdict form.  And your answers to

16  those questions must be unanimous, and those unanimous

17  answers to those questions will constitute the verdict in

18  this case.

19       I now want to briefly tell you about what the case

20  is about.  This case, as you know, involves a dispute

21  regarding one certain United States patent.  I know you've

22  seen the patent video film this morning, but I want to give

23  you some instructions now and on the record about a patent

24  and how one is obtained.

25       Patents are granted or denied by the United States

1    Patent and Trademark Office, sometimes simply called the PTO.

2    A valid United States patent gives the patentholder the right

3    for up to 20 years from the date the patent application is

4    filed to prevent others from making, using, offering for

5    sale, or selling the patented invention within the United

6    States or from importing it into the United States without

7    the patentholder's permission.

8           A patent is a form of property called intellectual

9    property.  And like other forms of property, a patent can be

10    bought or sold.  A violation of the patentholder's rights is

11    called infringement.  The patentholder may try to enforce a

12    patent against persons it believes to be infringers by filing

13    a lawsuit in federal court, and that's what we have before us

14    in this case.

15           The process of obtaining a patent is called patent

16    prosecution.  To obtain a patent, one must first file an

17    application with the PTO.  The PTO is an agency of the United

18    States Government that employs trained examiners to review

19    patents, patent applications.

20           The application includes what is called a

21    specification.  The specification contains a written

22    description of the claimed invention telling what the

23    invention is, how it works, how to make it, and how to use

24    it.

25           The specification concludes or ends with one or

1    more numbered sentences.  These numbered sentences are called

2    the patent claims.  When a patent is granted by the Patent

3    and Trademark Office, it is the claims that define the

4    boundaries of its protection and give notice of the public of

5    those boundaries.

6          Patent claims may exist in two forms.  They're

7    referred to as independent claims and dependent claims.  An

8    independent claim does not refer to any other claim in the

9    patent.  It is independent.  It is not necessary to look to

10   any other claim to determine what an independent claim

11   covers.

12         On the other hand, a dependent claim refers to at

13   least one other claim in the patent.  A dependent claim

14   includes each of the limitations or elements of the other

15   claim or claims to which it refers, as well as the additional

16   limitations or elements recited within the dependent claim

17   itself.

18         Therefore, to determine what a dependent claim

19   covers, it's necessary to look at both the dependent claim

20   itself and the independent claim or claims from which it

21   refers, or we sometimes say from which it depends.

22         The claims of the patents-in-suit use the word

23   "comprising."  Comprising means including or containing.  A

24   claim that includes the word "comprising" is not limited to

25   the methods or devices having only the elements recited in

1    the claim but also covers methods or devices that add

2    additional elements.

3            Let me give you an example.  Take, for example, a

4    claim to a table.  If the claim recites a table comprising a

5    tabletop, legs, and glue, the claim will cover any table that

6    contains these structures, even if the table also con --

7    includes other structures, such as a leaf for the top or

8    wheels to go on the ends of the legs.  And that's a simple

9    example using the word "comprising" and what it means.

10           In other words, Ladies and Gentlemen, it can have

11   other features in addition to those that are covered by the

12   patent.

13           After an applicant files an application with the

14   patent -- Patent and Trademark Office, an examiner from that

15   office reviews the application to determine whether or not

16   the claims are patentable; that is, to say appropriate for

17   patent protection and whether or not the specification

18   adequately describes the invention that's claimed.

19           In examining a patent application, the examiner

20   reviews certain information about the state of the technology

21   at the time the application was filed.  The PTO searches for

22   and reviews this type of information that is publicly

23   available or that was submitted by the applicant.

24           This type of information is called prior art.  The

25   examiner reviews this prior art to determine whether or not

1    the invention is truly an advance over the state of the art

2    at the time.

3         Prior art is defined by law, and I'll give you at a

4    later time specific instructions on what constitutes prior

5    art.  However, in general, prior art includes information

6    that demonstrates the state of the technology that existed

7    before the claimed invention was made or before the

8    application for a patent was filed.

9         A patent also contains a list of prior art that the

10   examiner has considered.  The items on this list set forth

11   within the patent are called the cited references.

12        After the prior art search and examination of the

13   application by the examiner, the examiner informs the

14   applicant in writing of what the examiner has found and

15   whether the examiner considers any claim to be patentable

16   and, thus, would be allowed.

17        This writing from the examiner to the applicant is

18   called an Office Action.  If the examiner rejects the claims,

19   the applicant has an opportunity to respond to the examiner

20   to try and persuade the examiner to allow the claims.  The

21   applicant also has a chance to change or amend the claims or

22   to submit new claims.

23        Now, Ladies and Gentlemen, this process may go back

24   and forth between the applicant and the examiner until the

25   examiner is satisfied that the application meets the

1    requirements for a patent, in which case the application

2    issues as a United States patent, or in the alternative, if

3    the examiner ultimately concludes that the application should

4    be rejected, then no patent is issued.

5         The papers generated through these communications

6    back and forth between the examiner and the applicant are

7    called the prosecution history.  And sometimes patents are

8    issued after appeals within the Patent and Trademark Office

9    or to a court.

10         The fact that the Patent and Trademark Office

11    grants a patent does not necessarily mean that the invention

12    claimed in the patent, in fact, deserves the protection of a

13    patent.

14         While an issued patent is presumed to be valid

15    under the law, a person accused of infringement has the right

16    to argue here in federal court that a claimed invention in a

17    patent is invalid.

18         It's your job as the jury to consider the evidence

19    presented by the parties and to determine independently and

20    for yourselves whether or not the Defendant has proven that

21    the patent is invalid.

22         Now, to help you follow the evidence, I'll give you

23    a brief summary of the positions of the parties.  As you

24    know, the party who brings the lawsuit is called the

25    Plaintiff.

1          In this case, the Plaintiff is Whirlpool

2   Corporation, who will simply be referred to throughout the

3   trial as either the Plaintiff or Whirlpool.

4          And as you know, the party against whom a lawsuit

5   is brought is called the Defendant.  The Defendant in this

6   case is TST Water, LLC, who will simply be referred to

7   throughout the trial either as the Defendant or TSTC Water --

8   TST Water.  And I suspect may simply get referred to every

9   once in a while as just TST.

10          As I told you during jury selection, this is a case

11  of alleged patent infringement, and there is one patent at

12  issue in this case.  That is United States Patent No.

13  7,000,894.

14          Now, patents are commonly known by their last three

15  digits.  So throughout this trial, the patent at issue will

16  be referred to simply as the '984 (sic) -- or the '894

17  patent.  And at various times this patent will be referred to

18  as the patent-in-suit or the asserted patent.

19          The patent -- this patent generally relates to

20  water treatment cartridges.  And you'll have a complete copy

21  of the '894 patent, the patent-in-suit, in your juror

22  notebooks which will be passed out to you in a few moments.

23          Now, the Plaintiff in this case, Whirlpool,

24  contends that the Defendant in this case, TST Water, is

25  directly and indirectly and willfully infringing certain

1     claims of the '894 patent by importing, making, or selling

2     products that include their patented technology.

3            Whirlpool also contends that it's entitled to money

4     damages as a result of that infringement.

5            TST -- TST Water denies that it is infringing the

6     '894 patent, and it contends that the asserted claims of that

7     patent are invalid as being obvious in light of the prior

8     art.

9            TST Water also contends that Whirlpool is not

10    entitled to any damages and that Whirlpool did not properly

11    mark its products with the patent number of the asserted '894

12    patent.

13           I'll give you more detailed instructions regarding

14    the meanings of these terms in just a few moments.

15           Now, Ladies and Gentlemen, I know that there are

16    new words and new concepts that are being thrown at you

17    today.  I'm going to define a lot of those words and concepts

18    for you as we go through these instructions.

19           The attorneys are going to discuss them in their

20    opening statements.

21           The witnesses are also going to help you through

22    their testimony to understand those words.  So please do not

23    feel overwhelmed at this stage.  It will all come together as

24    we go along, I promise you.

25           Your job in this case is to decide whether the

1   asserted claims have been infringed and whether the asserted

2   claims of the patents-in-suit -- patent-in-suit are invalid.

3       If you decide that any claim of the '894 patent has

4   been infringed by the Defendant, TST Water, and is not

5   invalid, then you'll need to decide whether TST Water's

6   infringement has been willful.  You will also then need to

7   decide what amount of money damages should be awarded to

8   Whirlpool to compensate it for that infringement.

9       Now, my job in the case is to tell you what the law

10  is, to decide and handle matters related to evidence and

11  procedure, and to oversee the trial as effectively and

12  efficiently as possible.

13      In determining the law, it is specifically my job

14  to determine the meanings of any of the claim language from

15  within the asserted patent that needs interpretation.  I've

16  already determined the meanings of the claims of the

17  patent-in-suit.

18      And you must accept the meanings and definitions

19  that I give you and use those meanings and constructions when

20  you decide whether any particular claim has or has not been

21  infringed and whether or not any claim is invalid.  You'll be

22  given a document in a few moments that sets forth these

23  definitions and constructions that I have adopted.

24      For any claim term, however, for which I have not

25  provided you with a definition, you should apply the plain

1    and ordinary meaning.  If I have provided you with a

2    definition, however, you are to apply and must apply the

3    definition to those terms that I've given throughout the

4    case.

5          However, my interpretation of the language of the

6    claims should not be taken by you as an indication that I

7    have a personal opinion regarding the issues in this case,

8    such as infringement and invalidity.  Those issues, Ladies

9    and Gentlemen, are yours alone to decide.

10          I'll provide you with more detailed instructions on

11    the meanings of the claims before you retire to deliberate

12    and reach your verdict.

13          In deciding the issues that are before you, you

14    will be asked to consider specific legal rules.  I'll give

15    you an overview of those rules now; and then at the

16    conclusion of the case, I'll give you much more detailed

17    instructions.

18          The first issue you'll be asked to decide is

19    whether TST Water has infringed any of the asserted claims of

20    the '894 patent.

21          Infringement is assessed on a claim-by-claim basis.

22    And Whirlpool, the Plaintiff, must show by a preponderance of

23    the evidence that a claim has been infringed.  Therefore,

24    there may be infringement as to one claim but no infringement

25    as to another claim.

1          Also, Ladies and Gentlemen, there are a few

2     different ways that a patent can be infringed.  I'll explain

3     the requirements for each of these types of infringement to

4     you in detail at the conclusion of the case.

5          In general, however, the Defendant may infringe the

6     asserted patent by making, using, selling, or offering for

7     sale in the United States or importing into the United States

8     a product meeting all the requirements of a claim of the

9     asserted patent without the patent owner's permission.

10          I'll provide you with more detailed instructions on

11     the requirements of infringement at the conclusion of the

12     case.

13          The second issue that you'll be asked to decide is

14     whether the asserted patent is invalid.  Invalidity is a

15     defense to infringement.  Therefore, even though the PTO has

16     allowed the asserted claims and even though a patent is

17     presumed to be valid, you, the jury, must decide whether

18     those claims are invalid.

19          And after hearing all of the evidence presented

20     during the case, you may find a patent to be invalid for a

21     number of reasons, including because it claims subject matter

22     that is not new or is obvious.

23          For a patent to be -- or patent claim to be invalid

24     because it is not new, the Defendants must show by clear and

25     convincing evidence that all of the elements or limitations

1    of a claim are sufficiently described in a single previous

2    printed publication or patent.  We call these items prior

3    art.

4         If a claim is not new, it is said to be

5    anticipated.  Another way that a claim can be found to be

6    invalid is that it may have been obvious.  Even though a

7    claim is not anticipated because every element of the claim

8    is not shown or sufficiently described in a single piece of

9    prior art, the claim may still be invalid if it would have

10    been obvious to a person of ordinary skill in the field of

11    technology of the patent at the relevant time.

12         You'll need to consider a number of questions in

13    deciding whether the invention claimed in the asserted patent

14    is obvious.  And I'll provide you with more detailed

15    instructions on these questions at conclusion of the trial.

16         If you decide that any claim of the '894 patent has

17    been infringed and is not invalid -- that is, the presumption

18    of validity has survived -- then you'll need to decide

19    whether TST Water's infringement has been willful.  You will

20    also need to decide what amount of money damages should be

21    awarded to Whirlpool to compensate it for the infringement.

22         A damages award must be adequate to compensate the

23    patentholder for the infringement, and in no event may the

24    damage award be less than what the patent owner would have

25    received had it been paid a reasonable royalty for the use of

1   its patent.

2          However, the damages you award, if any, are meant

3   to compensate the patent owner and not to publish (sic) the

4   Defendant.  You may not include in your award an additional

5   amount as a fine or a penalty above what is necessary to

6   fully compensate the patentholder for the infringement.

7          Additionally, damages cannot be speculative.  And

8   the Plaintiff, Whirlpool, must prove the amount of its

9   damages for TST Water's alleged infringement by a

10  preponderance of the evidence.

11         I'll give you more detailed instructions on the

12  calculation of damages for the alleged infringement of the

13  patent-in-suit at the conclusion of the trial, including by

14  giving you more specific instructions with regard to the

15  calculation of a reasonable royalty.

16         However, the fact that I'm instructing you on

17  damages, does not mean, Ladies and Gentlemen, that Whirlpool

18  is or is not entitled to recover damages.

19         Now, throughout this trial you're going to be

20  hearing from a number of witnesses, and I want you to keep an

21  open mind while you're listening to the evidence and not

22  decide any of the facts until you've heard all of the

23  evidence.

24         While the witnesses are testifying, it is important

25  for you to remember that you will have to decide the degree

1    of credibility and believability to allocate to each of the

2    witnesses and the evidence that -- that is presented.

3         So while the witnesses are testifying over the

4    course of the trial, you should be asking yourselves things

5    like this:  Does the witness impress you as being truthful?

6    Does he or she have a reason not to tell the truth?  Does he

7    or she have any personal interest in the outcome of the case?

8    Does the witness seem to have a good memory?

9         Did he or she have the opportunity and ability to

10   observe accurately the things that they testified about?  Did

11   the witness appear to understand the questions clearly and

12   answer them directly?  And, of course, does the witness's

13   testimony differ with the testimony of any other witness, and

14   if it does, how does it differ?

15        These are the kinds of things that you should be

16   thinking about while you're listening to each of the

17   witnesses.

18        Also, Ladies and Gentlemen, I want to talk to you

19   briefly about expert witnesses.  When knowledge of a

20   technical subject may be helpful to you, the jury, a person

21   who has special training and experience in that particular

22   field, we call them an expert witness, is permitted to

23   testify to you about his or her opinions on those technical

24   matters.

25        However, you're not required to accept an expert's

1  or any other witness's opinion at all.  It's up to you to

2  decide who -- whether you believe an expert witness or any

3  witness, for that matter, and whether you believe they're

4  correct or incorrect or whether you want to believe or not

5  believe what they say.

6         Now, I anticipate that through this trial, there

7  will be expert witnesses testifying in support of each of the

8  sides in this case.  But it will be up to you, the jury, to

9  listen to their qualifications.  And when they give an

10 opinion and explain the basis for that opinion, you'll have

11 to evaluate what they say and whether you believe it and to

12 what degree, if any, that you want to give it weight.

13        Remember, judging and evaluating the credibility

14 and the believability of each and every witness is an

15 important part of your job as jurors.

16        Now, during the trial it's possible that there will

17 be testimony from one or more witnesses that are going to be

18 presented to you through what we call a deposition.  In

19 trials such as this, it's difficult, if not impossible, to

20 get every witness here in person at the same time.  So the

21 lawyers for each side prior to the trial take the depositions

22 of the witnesses.

23        In a deposition, there's a court reporter present,

24 the witness is present and placed under oath just as if he or

25 she were personally in court, and the parties ask them

1   questions, and their answers to those questions are recorded.

2           Now, portions of these video recordings of the

3   questions and answers from these witnesses may be played back

4   to you as a part of this trial so that you can see the

5   witness and hear their testimony.

6           That deposition testimony is entitled to the same

7   consideration insofar as possible and is to be judged as to

8   the credibility, weight, and otherwise considered by the jury

9   in the same way as if the witness had been physically present

10  and given their testimony in open court from the witness

11  stand.

12          Now, during the course of the trial, it's possible

13  that the lawyers will make certain objections, and when they

14  do, I'll make rulings as to those objections.  It's the duty

15  of an attorney for each side in the case to object when the

16  other side offers testimony or evidence that the attorney

17  believes is not proper under the orders of the Court and the

18  Rules of Evidence.

19          Upon allowing the testimony or other evidence to be

20  introduced over the objection of an attorney, the Court does

21  not, unless expressly stated, indicate any opinion as to the

22  weight or effect of that evidence.  As I've said before, you,

23  the jury, are the sole judges of the credibility and

24  believability of all the witnesses and the weight and the

25  effect to give to all the evidence.

1          Now, I want to compliment both of the parties in

2   this case, Ladies and Gentlemen, because up until today,

3   they, along with the Court, have worked very hard to examine

4   and present arguments for and let the Court make rulings on

5   all the exhibits that may be used during this trial.

6          And because we've done that before today, that has

7   saved you a lot of time throughout this trial so that you

8   will not have to listen to presentations, objections,

9   responses, and arguments about the exhibits in this case.

10          Through these pre-trial procedures, all the rulings

11   have already been made by the Court about the admissibility

12   of all the exhibits.  And a lot of time has already been

13   saved because we've worked through this in advance to -- to

14   resolve these objections so you don't have to listen to them

15   through the course of the trial.

16          This means that when the parties show you an

17   exhibit, it means that I have already ruled on the

18   admissibility of that exhibit.  If I had not admitted the

19   exhibit, it would not be shown to you.  And the parties may

20   present them as they wish, and they may ask questions about

21   them to place them in the proper context.

22          But I want you to know that both sides have worked

23   hard and diligently to streamline these issues and to save

24   time as we go through the evidence in this case.

25          So you should listen to questions about exhibits,

1    about when it was made, who made it, et cetera.  Or let me

2    say this:  You won't have to listen to questions about when

3    the exhibit was made and who made it and those kinds of

4    things.  That's already been done.  And that process, I

5    promise you, has saved you a lot of time.

6          However, it's still possible -- that having been

7    done, it's still possible that through the course of the

8    trial, objections may arise during the trial.  And if I

9    sustain an objection to a question addressed to a witness,

10   then you, the jury, must disregard the question entirely, and

11   you may draw no inference from the wording of it or speculate

12   about what the witness would have said if I had permitted

13   them to answer that question.

14         On the other hand, if I overrule an objection to a

15   question, then you should consider the question and the

16   answer just as if no objection had been made.

17         You should also know, Ladies and Gentlemen, that

18   the law of the United States permits a United States District

19   Judge to comment to the jury on the evidence in a case.  But

20   such comments by the Judge are only an expression of the

21   Judge's opinion, and as such, may be disregarded by the jury

22   in their entirety, because as I've said before, you, the

23   jury, are the sole judges of the facts, the sole judges of

24   the credibility of the witnesses, and the sole judges as to

25   how much weight to be given to the witness's testimony.

1          Even though the law permits me to make such

2     comments on the evidence, as I told you earlier, I'm going to

3     work very hard to make sure that you have no idea about what

4     I think about testimony or the witnesses or the exhibits that

5     are introduced in this case.

6          Also, as you can see in front of me, we have a

7     Court Reporter who is taking down everything that's said in

8     the courtroom.  But the written transcript of everything

9     that's been taken down by the Court Reporter is not going to

10    be ready in time for you to use in your deliberations.  The

11    transcript is prepared in the event there's an appeal of this

12    case to an appellate court at a -- at a later time.  So as a

13    consequence, you're going to have to rely on your memories of

14    the evidence in this case.

15          In a moment, each of you are going to be given a

16    juror notebook.  In the back of those notebooks, you're going

17    to find a legal pad -- a legal pad with blank pages, and you

18    can use that to take notes during the course of the trial, if

19    you want to.  It's up to each of you to decide whether or not

20    you want to take notes over the course of the trial.  And if

21    so, how detailed you want those notes to be.

22          But, remember, the notes are for your personal use

23    only.  You're going to have to rely on your memory of the

24    evidence, and that's why you should pay close attention to

25    the testimony of each and every witness.

1          You should not abandon your own recollection of the

2    evidence because somebody else's notes indicate something

3    different.  The notes are to refresh your recollection, and

4    that's the only reason you should be keeping them.

5          I'm now going to ask Mr. Nance, our Court Security

6    Officer, to hand out these juror notebooks to each of the

7    members of the jury.

8          In these notebooks, Ladies and Gentlemen, you'll

9    see that you each have a copy of the '894 patent, the

10   patent-in-suit, as we've talked about.  You'll also find a

11   section where you have witness pages with photographs of each

12   witness and space below their picture and name for you to

13   take notes, if you choose to.

14         There might be a page in there for somebody who's

15   not called as a witness, but you should have a page in there

16   for every witness that's called during the course of the

17   trial.

18         Whenever you leave each day, you should leave those

19   notebooks on the table in the jury room.  They should either

20   be in your possession in the jury box where you are now, or

21   they should be in the jury room on the table at the end of

22   the day.

23         There may be short recesses over the course of the

24   trial where I will specifically say to you, Ladies and

25   Gentlemen, this is going to be a short recess.  You may

1    simply close your notebooks and leave them in your chairs.

2    But unless I give you specific instructions, they should

3    either be in your possession or on the table in the jury

4    room.

5           Also, in the back of those notebooks, you'll find a

6    legal pad, as I mentioned, that you can use to take notes on

7    if you choose to, and you should find a pen in each of those

8    notebooks.

9           Now, we're going to have opening statements in just

10   a few minutes.  But I want to give you a -- a brief roadmap

11   of the trial and how it's going to be structured before we

12   have those opening statements.

13          We're missing a pen?

14          COURT SECURITY OFFICER:  Yes, sir.

15          THE COURT:  All right.  After the opening

16   statements, Ladies and Gentlemen, Whirlpool, the Plaintiff,

17   will present its evidence in support of its contentions that

18   the claims of the '894 patent have been and continue to be

19   infringed by the Defendant, TST Water.

20          To prove infringement on any claim, Whirlpool must

21   persuade you that it is more likely true than not true that

22   TST Water has infringed that claim; that is, by a

23   preponderance of the evidence.

24          Now, after Whirlpool, the Plaintiff, has presented

25   its evidence and rests its case, the Defendant, TST Water,

1  will present its evidence that the asserted claims of the

2  patents-in-suit are invalid.

3        To prove invalidity on any claim, TST Water must

4  persuade you by clear and convincing evidence that the claim

5  is invalid.

6        In addition to presenting evidence as to

7  invalidity, the Defendant, TST Water, will then put on

8  evidence responding to Whirlpool's proof of infringement and

9  damages.  After that, the Defendant, TST Water, will rest its

10 case.

11       When that occurs, then the Plaintiff, Whirlpool,

12 will have an opportunity to put on additional evidence

13 responding to the Defendant's evidence that the claims of the

14 patent-in-suit are invalid, and offer any rebuttal evidence

15 regarding infringement and damages.  That is called the

16 Plaintiff's rebuttal case.

17       When the Plaintiff's rebuttal case has concluded

18 and all the evidence has been presented, I will give you

19 final instructions on the law that applies in this case.

20       Those final instructions from me to you are often

21 called the Court's charge to the jury.  After I have given

22 you my charge to the jury, the lawyers in the case will

23 present their closing arguments.

24       After you've heard closing arguments from counsel,

25 then I will direct that you retire to the jury room and

1   deliberate upon and reach your verdict.

2   Let me again repeat my earlier instruction to you

3   that throughout this entire process it is critical that you

4   not discuss the case or communicate about the case with

5   anyone.  Only when all the evidence is in and I have told you

6   to retire to the jury room and to deliberate on your verdict,

7   only then should you discuss the case among yourselves.

8   Also, as I mentioned before, the lawyers and the

9   witnesses and the representatives have been instructed by me

10  not to communicate with you during the course of the trial.

11  So as you pass them on the sidewalk out front or

12  anywhere in the building, they're not going to speak to you.

13  Don't hold that against them.  Don't think they're being rude

14  or unfriendly.  They're simply doing what the Court requires

15  of them.

16  All right.  Ladies and Gentlemen, with those

17  instructions, we're now going to hear opening statements from

18  the Plaintiff in the case, Whirlpool.

19  Mr. Ward, would you like a warning on your time?

20  MR. WARD:  Five-minute warning, please, sir.

21  THE COURT:  All right.  You may proceed with your

22  opening statement.

23  MR. WARD:  May it please the Court.  Counsel.

24  We learned some pretty simple lessons young in

25  life.  One of those lessons, don't take things that don't

1    belong to you.  And we carry that lesson with us throughout
2    our lives.

3         But, apparently, it's a lesson that TST does not
4    understand because it has taken Whirlpool's intellectual
5    property, and it refuses to give it back.  And we need your
6    help getting that property back.

7         We all know that when someone takes something that
8    doesn't belong to you and refuses to play by the rules, that
9    you really have two choices.  You can sit back and do nothing
10   about it or you can stand up for your rights.  In here, we
11   take those parties to court, and we ask for the assistance of
12   a jury like the eight of you.  And that's what Whirlpool has
13   done.  We're asking for your help to get Whirlpool's property
14   back.

15        During the course of this case, you're going to
16   learn that Whirlpool spent many years and lots of money
17   developing the intellectual property that was awarded in the
18   '894 patent.  It's Plaintiff's Exhibit No. 1, and this is a
19   certified copy of that patent.  You'll have an opportunity to
20   look at that, if you ask for it, when we go back -- when you
21   go back to retire to deliberate.

22        You're going to learn that, like TST, there were
23   over 30 other companies who tried to use this intellectual
24   property without permission.  And as I told you during voir
25   dire, Whirlpool brought them all to court right here in

1    Federal Court in Marshall.

2            But unlike TST, every one of those companies agreed

3    to get off of Whirlpool's property.  They agreed that the

4    patent was valid.  But not TST.

5            It wants its day in court.  And so does Whirlpool.

6    We've been waiting a year-and-a-half since we filed this

7    lawsuit, so we, too, are anxious to get our case in front of

8    you and to present the evidence to you and let you all

9    decide.

10           During the next 25 minutes, I'm going to tell you a

11   little bit about both of these companies.  I, too, will give

12   you a roadmap of what we expect the evidence to be in the

13   case.  And at the end, I'm going to tell you what we think

14   that the evidence supports as far as a verdict.

15           So who is TST?  TST is a company that does not make

16   refrigerators.  It's a company that sells over 30 -- or over

17   20 different water filters -- replace -- replacement filters.

18   It's been in business since 2004.  It was making filters for

19   years, and Whirlpool didn't have a problem with it.  If it

20   wanted to copy a product that wasn't patented, no problem.

21   If it wanted to copy a -- a filter that the patent had

22   expired, no problem.

23           But there was one filter that we do have a problem

24   with them copying, and that's the '894, because that's what

25   they did, they copied our -- our filter, they used our

1  intellectual property, and they've been doing it without our

2  permission.

3          And this is the product that they released back in

4  2015.  They're -- they sell this product under several

5  different brands.  WaterSentinel is one.  You'll see another

6  one called the Home Depot home brand that we'll show you.

7          And I want you to -- to pay attention during the

8  course of the trial to something that you're going to see TST

9  does, because I think you'll see that they take one position

10 outside of the courtroom, yet when they get sued in their

11 lawsuit -- they're in a lawsuit, they come in and they take a

12 different position.  And this is just one example.

13         They guarantee the WaterSentinel filter.  This is

14 the HDX.  They're identical, other than the branding on it.

15 Outside the courtroom they guarantee this filter to fit in

16 place of this one.  They have to, if they're going to sell it

17 as a replacement, right?

18         But then they come in before you, and they say, but

19 we're different.  We're different.

20         One of Whirlpool's main lines of businesses is

21 manufacturing refrigerators, and they manufacture those

22 refrigerators under several brands.  And it's expensive to do

23 this.  It takes up to a hundred million dollars to start a

24 new refrigerator platform, and that's money that Whirlpool

25 invests.  They do research and development into

refrigerators, how to maximize the space because folks want more space in the refrigerators, and they want them to work right.

And one of the things they spend money on is designing these filters. They design filters for the refrigerators because -- they make no apologies. They're in business to make a profit, but they're also in business to fund the next round of research. And you're going to hear from Mr. Dibkey, and he's going to tell you about that research and development.

You're also going to learn about a partnership that was formed back in 2001 between Whirlpool and PUR. It was a division of Proctor & Gamble. And what happened was Whirlpool and PUR formed this partnership because they wanted to build a new water filter, something that was compact, that maximized space in the refrigerator, and still needed to provide clean water, that was easy to install, and was interoperable, something that worked across these refrigerator platforms.

And they wanted something that was patentable, something that they could protect, something that they could patent so that they could protect their investment in developing these new refrigerators and filters. And they were successful in getting that. They got the '894 patent.

And I'll tell you, a patent by itself, not

1    necessarily really valuable.  Folks have patents and nothing

2    every gets commercialized.  That's not the case in this case.

3    Consumers really liked this Filter 3.  It was easy to

4    replace.  It took up very little room.  One filter would

5    filter 1600, 16-ounce glasses of water.  That works out to

6    about three cents per glass of water.  So you cut down on

7    waste and landfills, but you also save money over buying

8    bottled water.

9         And you're going to learn that they sold tens of

10   millions of these filters.  Since 2013, they've sold nine

11   million Filter 3s.

12        Now, other folks saw how successful these filters

13   were.  Other folks in the marketplace.  And people started

14   copying these filters.  One company you're going to hear

15   about is called Swift Green.  Swift Green copied the filter,

16   and Whirlpool sued it.  And one of the things that Swift

17   Green did, which anybody can do, is they filed for

18   re-examination.

19        They asked the Patent and Trademark Office to take

20   a second look at the '894 patent.  And the Patent and

21   Trademark Office did that.  And they said, you know what, we

22   got it right the first time.  And they issued a certificate

23   of re-examination confirming the validity of the '894 patent.

24        You're going to learn that TST knew everything I

25   just told you about.  They knew about the '894 patent.  They

1    were knew -- they knew that the Patent and Trademark Office

2    had confirmed the validity of this patent, not once, because

3    they confirmed it when they issued it, but a different

4    examiner reviewed it this second time and said, we got it

5    right.  They knew that.

6            They also knew that this was really successful.

7    And so they bought over 150 Filter 3s and started tearing

8    them apart so that they could copy the Filter 3 design.  And

9    they launched the W-5 in the face of all that.  And they put

10   it on the Home Depot shelves, two for one.

11           And guess what happened?  Whirlpool's sales

12   plummeted, almost 50 percent in the first month after the W-5

13   was released, over 50 percent during the second month.  They

14   released in July of 2015, and you'll see these documents,

15   you'll see the graphs, we'll bring you an expert.

16   Whirlpool's sales plummeted.

17           So what is the case about?  It's about TST

18   intentionally violating our intellectual property and causing

19   us damage and our need to protect that property and get it

20   back and to get compensation for it.

21           I'm going to talk to you about willful

22   infringement, I'm going to talk to you about how we're going

23   to prove infringement.  It's called literal infringement.

24   And then by another theory called the Doctrine of

25   Equivalents.  Talk to you briefly about validity.  And then I

1   want to talk to you about damages.  But first, I want to talk
2   to you about Whirlpool.

3          Whirlpool was actually founded on a patent back in
4   1911.  It was founded on a patent, and it resulted in the
5   development of one of the world's first electric washing
6   machines.  Whirlpool started with 15 employees.  And since
7   that time, they've grown into the corporation that you're
8   familiar with now that many of you have these products in
9   your home.

10          They employ over 93,000 people around the world.
11  They have manufacturing facilities, research and development
12  facilities in over 70 countries.  They employ over 25,000
13  folks in the United States, over $15,000 -- or 15,000 people
14  in manufacturing.  They've got manufacturing facilities in
15  Iowa, Ohio, Pennsylvania, Oklahoma, Massachusetts.  They're
16  proud of what they do, and I think you're going to see that
17  pride in the witnesses that testify before you.

18          I think many of you are probably familiar with
19  these -- these brands, Whirlpool, KitchenAid, Amana, Maytag.
20  One of those proud employees that you're going to hear from
21  is Mr. Todd Rose.  He's a principal quality engineer at
22  Whirlpool.  He's been there since 1997.  He's one of the
23  named inventors on the '894 patent.  And he's going to come,
24  he'll take the stand, and he'll swear -- swear the oath, and
25  he'll testify before you.  And TST's going to get a chance to

1    ask him questions.

2         He's going to tell you about the difficulties that

3    they faced in designing and developing refrigerators and the

4    corresponding filters.  He'll talk to you about Whirlpool's

5    investment in time, hours, money.  He'll talk to you about

6    how they -- their goal was to maximize space and come up with

7    an easy-to-install filter.

8         You'll learn about water filters that have evolved

9    through Whirlpool.  They -- Filter 5, Filter 4, Filter 3,

10   which this case is about, Filter 1 came next.  They've got a

11   funny numbering system.  And then Filter 2.  And you might

12   even hear about a prototype they're working on right now,

13   Filter 0.  But this case is going to be about Filter 3.

14        Mr. Brett Dibkey.  He's seated at the counsel

15   table, and he'll be here throughout the trial, as well.  He's

16   a vice president at Whirlpool.  He's here to answer questions

17   that we ask him that -- that TST wants to ask him.  He's here

18   to answer their questions about any documents they want to

19   ask him about.  And he's going to tell you all about the

20   problems that Whirlpool has had with folks copying the

21   intellectual property outlined in the '894.

22        He's going to talk to you about the resources that

23   they've had to spend pursuing these copiers.  These over 40

24   lawsuits that they've had to file.  He'll also talk to you

25   about the research and development that goes into developing

1    these refrigerator platforms and the filters.

2             And, remember, these refrigerator platforms and the

3    filters, that's something that TST has nothing to do with.

4    They spend all this money and time developing refrigerators.

5    And without refrigerators, there'd be no market for TST.  Yet

6    TST, what they want to do is come in and get a free ride on

7    all that research and development and say:  Well, look, we

8    can cut the price and take their profits.  But they can't do

9    that if there's a patent.

10            And that's why we say they're willfully infringing

11   upon our patent.

12            The evidence will be that Mr. Baird, TST's

13   president and founder, owner, was aware of the patent in

14   2011; and he started studying it.  He's aware that Swift

15   Green requested an examination -- a re-examination of the

16   patent.

17            You're going to see the emails where he's watching

18   it and monitoring what goes on in that lawsuit.  He's

19   actually talking on the phone with the president of Swift

20   Green.  You're going to see emails that in the face of that,

21   they've decided to launch a product nonetheless.

22            You're going to see that he was aware the Patent

23   Office confirmed the validity of the patent a second time.

24   He's -- you're going to see that he was aware that Swift

25   Green said:  Okay, we've -- we've had our challenge.  We

1    give.  And it was his decision to launch anyway.

2            We've got all these other copiers that we've filed

3    lawsuits against.  It's a matter of public record.

4    Everything that goes on in this courthouse, there's a

5    document filed, and TST's lawyers are good lawyers.  They

6    know how to get on the system.  They can see that these folks

7    were signing off on consent judgments saying, we'll stop,

8    your patent is valid.

9            So why would TST do this?  You'll learn why.  What

10   motivates a lot of folks?  Money.  Because in 2014, Mr. Baird

11   was staring in a hole, a hole in his budget, a hole that was

12   created when Home Depot said we can't buy certain filters

13   from you that are manufactured by GE.

14           There's some type of contract, you'll hear about

15   it, between GE and Home Depot.  And GE told Home Depot they

16   had to buy genuine parts.  And that was a large part of TST's

17   business was providing these replacement parts.

18           And it left this seven-million-dollar hole, and

19   that's a pretty big hole in a company whose entire revenue is

20   $20 million.

21           And it was too much for TST to pass up.  You're

22   going to see emails from Mr. Baird and other folks at TST

23   where they start telling their customers, retailers like

24   Lowe's, Home Depot, Target, Walmart, Maynard's you might be

25   familiar with.  They start telling them, we're coming to

1    market.  This is in October of 2014.

2           Janine Gompper, who is a witness who I think you're

3    going to -- you'll hear from her in this trial.  She's

4    referring to the Filter 3.  She says:  We are currently in

5    the works of getting that one added to our line.  We should

6    be ready to go to market with it in February of 2015.  That

7    particular filter is one of the highest-sellers for everyone

8    in retail.  Perhaps that's why the shelf is empty.

9           They knew it was flying off the shelves.  They did

10   projections for how much they would sell.  They projected

11   that they'd sell $30 million worth of filters in 2015 if they

12   could just add the W-5, the knock-off, the Filter 3.  And

13   they did it.  And they made the money.

14          They did it in 2016.  They made the money.  They're

15   continuing to make the money right now.  With this lawsuit

16   going on, they haven't backed off one bit.

17          So how are we going to prove infringement?  One way

18   is with their documents and what they say outside of the

19   courtroom.  Guaranteed to fit.

20          Now, they're going to come in here and say we don't

21   trespass.  It's different.  We're going to prove to you that

22   their products, these W-5 filters, infringe Claims 1, 4, 10,

23   15, 17, 20, and 27.

24          We'll have an expert that goes through this, a

25   Dr. Joseph Beaman.  He's a professor at the University of

1   Texas, in mechanical engineering.  He'll be here to testify,

2   and he's going to talk to you about two different theories of

3   infringement, one called literal infringement, and the other

4   one called Doctrine of Equivalents.

5          And you don't need to write this down.  I'm giving

6   you a high-level roadmap of where we're going.

7          As Judge Gilstrap mentioned, we throw a lot at you

8   in a hurry, and it's new terms; but I just want to tell you

9   generally what it's about and then the experts, who know this

10  stuff backwards and forwards, are going to talk to you about

11  it.

12         This is Claim 1.  It's in the patent.  And this is

13  just generally to familiarize you with it.  The claim is what

14  governs.  We compare the accused product to the claim.  Dr.

15  Beaman will look at the claims.  He's already done this, and

16  he compares the claim to the accused product.

17         And there's lots of words in here, and all the

18  words are important.  But what the dispute really comes down

19  to, I think, there might be something -- something different,

20  but I think where the dispute is going to come down to is

21  what I've actually highlighted.  It's going to be about this

22  said inlet fitting having a longitudinal axis, and then this

23  other element of said protrusion extending from said

24  end-piece wall.

25         Now, longitudinal axis, you're going to learn that

1  the longitudinal axis is that line that runs right up through

2  the -- the middle.  See if I can touch it here.  Where that

3  redline is -- I mean, the red dot to the red dot.  That's the

4  longitudinal axis.  This is Plaintiff's Exhibit 200.

5       And guess who did this drawing before the lawsuit

6  got started?  TST.  This is TST's drawing.  But now they're

7  going to come to court, I think, and they're going to say,

8  oh, no, the longitudinal axis just runs from here to here.

9       And then we've got a different longitudinal -- or a

10  different axis that runs from here to here, so we have two

11  axes.  They're going to act that this line that's above here

12  just doesn't exist.

13       So think about what they say outside the courtroom

14  and what they say inside the courtroom.

15       The other one deals with a protrusion that extends

16  from the end-piece wall.  And this is the protrusion, right

17  here.  And it shows up on this drawing, and this is -- Dr.

18  Beaman will walk you through.  The claim element will be on

19  one side, and the accused product on the other.  And it gets

20  down to whether or not this protrusion extends from something

21  called the end-piece wall, the end of this cartridge.

22       First, we say it literally extends from the

23  end-piece wall.  They've got an argument for why it doesn't

24  actually extend from the end-piece wall, but there's

25  something called the Doctrine of Equivalents.  And that is if

1    it's practically the same and there's a test and His Honor

2    will instruct you on what that test is, Dr. Beaman will walk

3    you through it.  But if it's practically the same, you don't

4    escape infringement.  You're still trespassing.

5           And that test is -- and this is the -- the W-5,

6    just an animation of it going in.  That protrusion at the

7    bottom is what actuates a bypass valve and actually gets

8    water flowing through this filter.  But if it has

9    substantially the same function, substantially the same way,

10   and has substantially the same result, then you still have

11   infringement.

12          I'll take it one step further.  Their protrusion

13   has exactly the same function in exactly the same way with

14   exactly the same result as our filter does.  They've made

15   some cosmetic changes to try and avoid infringement, but it

16   works exactly the same way.

17          This is just an animation of both filters going

18   into what's called the head assembly.  That's what's inside

19   of your refrigerator.  And that's why they have to guarantee

20   it to fit because they know it works exactly the same way.

21          Validity.  I'm going to be brief because remember,

22   this is their burden.  They've got the burden to prove to you

23   by clear and convincing evidence that the Patent Office

24   didn't just get it wrong once, one examiner they say messed

25   up, and they say another examiner messed up the second time

1    when they confirmed the validity of the patent.  That's their

2    right.  They get to come before you and present evidence, and

3    they're going to tell you that this patent is obvious.

4         And I understand that the examiners at the Patent

5    and Trademark Office are also trained to look for what's

6    called obviousness combinations; that there can be an

7    obviousness invalidity defense when you combine different

8    references to invalidate.  But they say that the Patent

9    Office got it wrong, that this invention is obvious,

10   something that it took TST 150 filters to purchase and tear

11   apart, four years to figure out.  But they say they missed

12   it.

13        Damages.  There's two components to our damages

14   claim.  One is lost profits, which are about 146,000 filters

15   we seek to recover lost profits on.  And then something

16   called reasonable royalty.  And I'll talk to you real briefly

17   about both of these concepts.

18        What you're looking at, and the evidence will be in

19   this case, that this was a projection of sales at the Home

20   Depot for Filter 3s.  Let's talk about what was done outside

21   of court, because Whirlpool prepared this forecast before TST

22   ever came to market.  All right?  So this is done before

23   there's a product on the market.

24        Whirlpool, as part of its ordinary course of

25   business, prepared sales forecasts.  They wanted to project

1    revenue.  They wanted to see what kind of money they think

2    will come in so that they can pay their employees, make a

3    profit, fund the next round of refrigerators, you name it.

4    Businesses rely on forecasts.

5          What's interesting about this forecast is we have a

6    good snapshot, a before and after, because look what happens

7    when TST enters the market.  I showed you that chart earlier

8    where we could see their sales, but we can compare those

9    actual sales to the red -- is actually sales that were

10   captured undisputed.  These are -- these are sales that are

11   captured that TST makes.  They make those sales.

12         Now, what they say is we don't have enough proof to

13   prove lost profits.  We can't prove that but for them

14   entering the market, that we would have made those sales.

15   But we had a forecast.  They enter the market, our sales

16   plummet, and they make those sales.

17         We seek to recover lost profits.  You're going to

18   learn our profit is between 15 to $20 a unit.  We'll seal the

19   courtroom to tell you the exact number.  Because we don't

20   want all our competitors knowing that exact number, but

21   you're going to hear it.

22         THE COURT:  Five minutes remaining.

23         MR. WARD:  We seek to recover lost profits.

24   We also seek to recover something called reasonable

25   royalties.  And those are the pink -- those are the

1 additional sales that TST made when they came to market. So

2 they enter the market. And, immediately, they start selling

3 tens of thousands of these W-5s immediately.

4 Remember, they haven't been advertising them for

5 years, they hadn't been building refrigerators and building

6 demand for the product. They come in on our coattails, use

7 our intellectual property, and they start capturing sales.

8 They start capturing those sales.

9 And it's -- there's -- there's a good reason why.

10 They were selling them for half as much as we were selling

11 them for. Everyone on the jury panel said, yeah, I'd look at

12 two for one. We all would, right?

13 And so what -- what we seek to recover are the

14 royalties that we say TST owes for those sales. One of the

15 things you're going to hear from -- from TST is they say,

16 well, look, our profit is only $4 a unit, and you're going to

17 learn our reasonable royalty is over $15 a unit.

18 Actually, we have an expert named Bruce McFarlane.

19 He's going to tell you why the reasonable royalty should be a

20 little over $15 a unit.

21 And I think you're going to hear TST say, but wait

22 a minute, we're only making $4 a unit. You can't -- you

23 can't get more than our profit.

24 That'd be like me going down to test drive a new

25 Chevy pickup, they're 35, $40,000. I take it for a test

1    drive.  Maybe my neighbor really likes it.  I like the truck,

2    Mr. Ward.  I'll sell it to you for 10 grand.

3         And I sell that truck for $10,000.  You think that

4    Chevy dealership, when they come looking for me, you think I

5    can just tell them, well, look, yeah, I took it; it wasn't

6    mine; but I only sold it for $10,000; I can't give you what

7    it was really worth?

8         No way.  But that's what TST wants you to do for

9    them.  They want to say, well, yeah, we started selling these

10   products, we knew the patent was there, we knew all about it,

11   we knew it had been confirmed in the re-exam.  We had been

12   selling with the lawsuit staring at us.  We knew this day was

13   coming, but don't make us pay more than $4 in profit.

14        In fact, they're going to say make us sell $1.

15   That's what they're going to tell you.  They're going to say

16   that -- what they say is fair and reasonable is $1 per unit

17   on something that we make a profit between 15 to $20 that

18   they knowingly took without our permission.

19        So Mr. McFarlane is going to present the evidence

20   to you.  He's going to show you that lost profits total

21   2.5 million, reasonable royalty is 6.2 million.  And we will

22   unapologetically ask you for $8.7 million because that's what

23   TST owes to Whirlpool.

24        And we're going to ask you for a verdict that finds

25   that TST has willfully infringed both literally and by the

1    Doctrine of Equivalents; that the '894, for the third time,

2    is indeed valid; and that they owe us for what they've taken.

3              Thank you for your time.  We look forward to

4    presenting our case to you.

5              THE COURT:  All right.  Defendant may now present

6    its opening statement to the jury.

7              Mr. Sganga, would you like a warning on your time?

8              MR. SGANGA:  Yes, Your Honor, please, at one

9    minute.

10             THE COURT:  One minute.  All right.  Sir, you may

11   proceed when you're ready.

12             MR. SGANGA:  Thank you.  If I could have a moment

13   to set up here?

14             May I proceed, Your Honor?

15             THE COURT:  You may proceed, Counsel.

16             MR. SGANGA:  Thank you.

17             Good afternoon, everyone.  I'm John Sganga.  And as

18   you know, I represent TST Water.

19             And in this case we will prove that TST does not

20   infringe the Whirlpool patent; and that the patent never

21   should have been issued because the '894 patent did not

22   advance the state of the art.  All of its features were shown

23   in the prior art.  It was obvious.

24             And in this trial, you're going to hear about more

25   than just patents.  You'll hear how TST became an American

success story.  Mr. Baird left a steady job to take a chance
and form TST as a start-up in 2004.  And he believed there
was a need for a reasonably-priced high-quality water filter.
He believed that the big appliance makers were not serving
that need.  And he believed that if he used his decades of
experience in the water filtration industry and he worked
hard and he risked his own money, that he could build a
company that gave consumers a choice that they didn't have.

TST is now a thriving business with its own
manufacturing plant in California with over a hundred
employees that design, manufacture, and sell nothing but
water filters.  TST takes great pride in the fact that its
products are made in America by American workers.  And most
of its products are replacement filters for refrigerators
that are used at home.

And they're sold at the biggest retail chains in
the country; Home Depot, Lowe's, Target, Ace Hardware.  And
TST filters fit a number of different refrigerators made by
companies like GE, Samsung, LG, and other Whirlpool
refrigerators.

But TST also makes filters used in commercial
settings by restaurants like Dunkin' Donuts and Subway.  And
those filters filter the water used in the soda machines at
those restaurants.  And TST also has filters that are used in
places like hotels and hospitals on ice machines to filter

1   the water for those.

2            TST is a company that knows the water filter

3   industry, and Mr. Baird is the man that companies seek out to

4   solve their water filtration problems.

5            The evidence will show that TST competes fairly.

6   TST respects patents by designing new and different products,

7   products that improve the filters that they replace.  TST

8   manufactures those products here in the U.S. in the same

9   building as TST's offices.  That's shown in the photo here.

10  And the production is in the same building as the offices.

11           So Mr. Baird and his team of engineers and quality

12  control experts can monitor the quality of those filters

13  directly.

14           TST believes in the quality of its products so much

15  that it supports those products with a money back guarantee.

16  They have a customer service hotline that TST's employees

17  answer, and they work in this same building.  TST tests its

18  products and labs in the same building and then has them

19  retested by independent certification bodies.  Their names

20  are NSF and WQA.  And they test to determine if the TST

21  standards remove contaminants -- TST filters remove

22  contaminants according to standard.

23           And the filter block that's inside the TST

24  cartridge that removes the contaminants that filters them

25  out, those are made by the same U.S. companies that

1    manufactures filter blocks that Whirlpool used to use before

2    Whirlpool moved its Filter 3 manufacturing outside of the

3    country.

4            Now, like many start-ups, at first, TST struggled

5    financially.  Mr. Baird had to sacrifice personally, had to

6    max out his credit cards, take out mortgages on his home,

7    didn't draw a salary for over a year.  But he stuck to the

8    goal that he had when he decided to form TST, which was to

9    make quality water filter products and sell them at a

10   reasonable price for a reasonable profit.

11           He believed in that goal because he worked in the

12   water filter industry since the 1980s, and he saw there was

13   an unmet need.

14           He spent decades making products for bigger

15   companies that made either their own refrigerators or big

16   companies that had their own well-known brand names.  He

17   worked closely with Frigidaire to help design and then

18   manufacture for them the very first built-in refrigerator

19   water filter.  And that was in the 1990s.

20           I'm going to show you, this is -- this is what

21   that -- that filter looked like, and this was mounted inside

22   the refrigerator.

23           Mr. Baird also worked with GE to design and build

24   their under the sink water filter systems, and he helped

25   Brita make refrigerator water filters.  He saw that all the

1  big refrigerator makers, the OEMs eventually added built-in

2  water filters into their refrigerators after they saw

3  Frigidaire do it.

4         And when they did, at first they all went to

5  experienced water filter companies to design and manufacture

6  the filters, not -- not just Frigidaire.  Whirlpool went to a

7  company called Cuno and then to a company called PUR to have

8  its filters made originally.  Mr. Baird had made products for

9  both of those companies.

10        When GE launched its first refrigerator water

11 filters, it went to Culligan.

12        Mr. Baird saw the opportunity to go directly to

13 consumer, with his industry experience, and give consumers a

14 better choice.

15        Whirlpool's own financial expert recognizes that

16 when TST gave consumers the choice to buy its W-5 product and

17 it's a lower price -- you heard it's about half what

18 Whirlpool charges -- the overall market for these replacement

19 filters grew.  Whirlpool acknowledges that three out of the

20 four sales that TST makes, those are sales that Whirlpool

21 wouldn't make itself.  There are consumers who would never

22 pay the $50 for Whirlpool's brand name filter, and they would

23 have no other choice without TST.

24        So you'll hear how Mr. Baird got his start in the

25 water filter industry in 1986 when he joined Mr. Chuck Lacy.

1    He had a company called Hydro-Flow, and Mr. Baird was

2    Employee No. 3 at that company.  And neither Mr. Baird nor

3    Mr. Lacy had formal education in engineering.

4            So what they did is they learned from hands-on

5    experience how to design and build water filters and how to

6    mass-produce them.

7            Mr. Baird also gained experience in the patent

8    system.  He filed for and was granted patents on water filter

9    designs that he invented, both before and after joining TST.

10   He also gained experienced understanding how to respect and

11   avoid competitors' patents.  He applied those decades of

12   experience when he designed the W-5 product that's at issue

13   here.

14           Now, he started designing that product in 2012 --

15   2012, but TST didn't start selling it until 2015.  Over those

16   three years, you'll hear how Mr. Baird came up with a series

17   of different designs.  He kept going back to the drawing

18   board to work on improving it, to give it more features to

19   make it work better, to make it work in a different way than

20   the Whirlpool patent.

21           And at one point in 2014, Mr. Baird had molds made

22   and he was ready to manufacture a product, but he wasn't

23   satisfied that he had changed the design as much as he could.

24   He even scrapped those molds, which cost him $30,000 to make.

25   And at times he even had customers that were asking him if he

1    had a replacement filter for the Filter 3.  He turned it

2    down.

3         He kept working on it, but he eventually came up

4    with designs that he felt were different enough from what

5    Whirlpool had done.  And he filed two different patent

6    applications for his approach, and both of those patents are

7    pending.  Both refer to the Whirlpool '894 patent in this

8    case, and both explain improvements that Mr. Baird thought

9    that he had made over the Whirlpool design, improvements that

10   are substantial differences, which means that the TST design

11   is not equivalent to the Whirlpool patent.

12        The evidence will show that Mr. Baird needed to

13   look at the Whirlpool product closely in order to make sure

14   that his filter cartridge would fit in place of the Whirlpool

15   cartridge and be compatible.

16        Now, TST didn't have the benefit of looking at

17   Whirlpool's engineering drawings with all the detailed

18   dimensions upon them.  He didn't hire anybody who used to

19   work at Whirlpool who knew how to make the Whirlpool product.

20   So what he did is he studied information that was available

21   to the public.  This included the Whirlpool patent.

22        And the evidence will show that Mr. Baird read and

23   understood the '894 patent in order to know how to respect

24   the property lines drawn in that patent.  He determined from

25   studying the patent which features Whirlpool claimed as part

of its invention and which of those features he could

eliminate from his design to avoid infringement.

Now, TST has also been careful to avoid any

suggestion that the TST W-5 product is associated with

Whirlpool in any way.  TST labels its products prominently

with the Home Depot house brand.  I'll show you a sample

here.  It says HDX at the top, or it uses its own -- its own

brand, WaterSentinel.

And, again, that's prominent at the top of the box.

And it just says that this -- these products fit in place of

Whirlpool's Filter 3, but it even notes that Whirlpool is --

is their trademark.  TST doesn't own the trademark.

Now, the evidence will show that TST actually

changed the instructions that it gave to its consumers on how

to use the product to explain that the TST product was, in

fact, the right part to fit in their refrigerator even though

it looked so much different than the Whirlpool Filter 3.

We'll present evidence of Mr. Baird's efforts to

respect and avoid Whirlpool's patent.  But we're also going

to talk about what -- whether the patent ever should have

been issued in the first place.

You saw the video about the patent process, and

you've heard it's possible for the Patent Office to make a

mistake.  And the evidence is going to show that's what

happened here.  The Patent Office didn't realize that before

1    Whirlpool came up with its idea, older patents filed by other
2    inventors showed the same features that Whirlpool said it
3    invented.

4         Now, I'm going show you the long list of some of
5    the prior patents that were considered by the Patent Office
6    when they were deciding what to do with the Whirlpool patent.
7    And these are just printed at the front of that '894 patent.
8    And it's a lot of fine print, but that's because there's a
9    lot of patents listed here.  There's over 300 of these old
10   patents.

11        And what we'll show you is exactly where in that
12   long list the Patent Office should have been looking.  And
13   we'll show you how the Patent Office got pointed in the wrong
14   direction by that company Swift Green that started that
15   second proceeding in the Patent Office, that re-exam.

16        And -- and, by the way, TST had no involvement in
17   that proceeding.  There -- there was, in fact, a call.  The
18   Swift Green folks called Mr. Baird, and Mr. Baird said,
19   thanks, but no thanks, I don't want to get involved in that.
20   So we didn't participate in this at all.

21        And what happened in that proceeding is that the
22   Patent Office said that none of the old patents showed a cam
23   that opened the valve in one of these refrigerator water
24   filters.  We'll show you exactly where the old patents did
25   show that and how the Patent Office missed it and made a

1    mistake.

2         The evidence will show that Whirlpool -- the

3    Whirlpool patent has such small differences from earlier

4    refrigerator filters that Whirlpool did not advance the state

5    of the art.

6         By 2003 when Whirlpool filed its patent, the

7    general idea of a removable water filter built into a

8    refrigerator was already old.  The filter in the patent is

9    pushed in, instead of twisted in, but Whirlpool wasn't the

10   first to come up with that idea.

11        Whirlpool wasn't the first to come up with the idea

12   of a push button to release the filter.  Whirlpool says that

13   makes it easier to use the filter, but that push button idea

14   was old.

15        And Whirlpool says the problem it solved with the

16   '894 patent was saving space under the fridge where the

17   filter is mounted.  But the evidence is going to show this

18   really wasn't a challenging problem at all.

19        Now, here's a photo we took of the underside of a

20   Whirlpool refrigerator.  We laid it on its back and -- and

21   took the bottom off here.  And what you're seeing here --

22   this is that -- that part, the white part in the photo,

23   that's this head assembly that you heard about.  And the

24   hoses come out of the head assembly right here at the bottom.

25   And you can see from the photo all the space that's open.

1        The evidence will show that for someone skilled in

2   the art of designing these kinds of plumbing devices, it was

3   obvious how to make a filter cartridge fit into all that

4   space.

5        Now, in the Whirlpool patent, the claims are the

6   part that lay out exactly where the property lines are.  When

7   we focus on that claim language, we can find those same

8   features in the old patents that predate Whirlpool's patent.

9        The Whirlpool patent calls for cartridges with

10  inlet and outlet fittings that extend from the end-piece

11  wall.

12       But they weren't the first to come up with that

13  idea, inlet and outlet fittings.  And I'm going to -- I'm

14  going to show you on a chart here just two of the old patents

15  that we're going to be talking about.

16       One of them we're going to refer to as Knuth.

17  There's so many different numbers that we're going to call

18  these by the names of the inventors, Knuth and Fritze.  And

19  you'll hear a lot about those two folks.  And did they have

20  filters with inlets, outlets, and end-piece walls, as the

21  Whirlpool patent claim calls for?  Well, yeah, they both do.

22       The evidence will show that, so that's why I'm

23  checking both of these boxes here.

24       The Whirlpool patent claim also calls for a bypass

25  valve, but Whirlpool wasn't the first to come up with the

idea of a bypass valve.  You'll -- you'll hear about bypass valves more, but I'm going to check both of those boxes here because both Fritze and Knuth chose them.

Now, the patent claims also talk about a protrusion extending from the end wall, and they say where the protrusion is located, it's got to be on the end of the cartridge, but they weren't the first to come up with that idea.  That was shown in this Fritze patent.  It had a cartridge for a refrigerator and -- and wall with a protrusion sticking out of it.

Now, I didn't check the box for Knuth.  Knuth has a protrusion, it's just coming down from the head assembly and touching the end-piece wall as opposed to being attached to the end-piece wall and sticking up into the head assembly.

So close call whether to check the box, but I didn't check it here for you.  I wanted you -- wanted you to know that it did have a protrusion, though.

And those protrusions both actuate valves in the head assembly.  The idea is that as the cartridge is loaded in, it pushes on the valves, and the valves open up.  And both of the old patents show that.

So now what Whirlpool's going to start to do is talk about details, like, well, the idea of turning the valves in the head 90 degrees so that they make an L shape with the cartridge, that was clever, because that kept from

bending -- bending the hoses.  But the idea of this L shape was old.

Here's another patent we're going to -- we're going to show you, and there's -- there's -- this piece that's marked with the red arrow, that's going to move up.  And as that moves up, the -- the valve is going to move to the right in the direction of the blue arrow.  So we've got an L shape opening of the valve.

Whirlpool's patent claims also call for a cam surface to actuate the valve.  Well, that's a feature the patent examiner said no one else had but Whirlpool -- in fact, Whirlpool was not the first to come up with this idea of a cam to open a valve.  That's just what you saw here with this Dorfman patent.

And you'll hear about how cams are common.  They've been used for ages.  They're all around us.  And I'm going to show you one right here.

Your Honor, can I step around the --

THE COURT:  You may.

MR. SGANGA:  Here's something you may have seen before, it's a door.  And there's a -- there's a little latch here.  The latch moves in and out, so in this direction.  But when we close the door by pushing it in another direction, we push the latch in.  So we get this L shaped motion.

And what we have here is curved surfaces on the

1  latch and the strike plate, that's a cam surface.  And this

2  latch that moves in, that's a follower.  So you move the door

3  in one direction and the cam makes the follower move in

4  another direction.  That's an example of a cam.

5       And you'll hear evidence that this same idea of a

6  cam was used to open long before Whirlpool and in

7  refrigerator water filters.

8       And here's that Fritze patent again we looked at.

9  That -- that little -- that little angled red surface, that's

10 a cam surface.  You push that up in the direction of the red

11 arrow, and the valve opens in the direction of the blue

12 arrow.  Simply nothing new here that's worthy of a patent and

13 worthy of excluding competition.

14       Now, all these patents that I showed you, they're

15 on that long list of patents you saw earlier.  The patent

16 examiner had them when he decided to grant the patent to

17 Whirlpool.

18       But let's look at what he said when he made his

19 decision to grant the patent.  This is the examiner writing

20 his statement of reasons for patentability.  He says that

21 none of the cam surfaces of the prior art include any surface

22 that physically touches a follower of a valve for the purpose

23 of actuating a valve.  So he can't find it.

24       But that kind of cam surface is exactly what I just

25 showed you here in this Fritze patent.  Let's -- let's zoom

1  in a little bit on this.

2          So that -- that angled surface we've highlighted in

3  red, that's the cam surface.  And that little orange tip,

4  that's the follower, and they're touching each other.

5  They're physically touching.  You move the cam up in the

6  direction of the red arrow, that opens the valve.

7          Now, this is where the examiner made his big

8  mistake.  He said that the prior art was missing exactly this

9  kind of cam.  But no one ever pointed out to him what I just

10  showed you here.  And the examiner never found it.

11          Now, we've been talking about how the evidence will

12  show similarities between Whirlpool's patents and the prior

13  patents of others, but I want to talk now about the

14  differences between Whirlpool's patents and TST's cartridge.

15          Let's go -- start again with the wording of the

16  claim.

17          Now, Whirlpool had two different chances at the

18  Patent Office to pick the words to describe their invention

19  and lay out their property lines.  Whirlpool never just

20  claimed the idea of any filter cartridge that will fit into

21  our refrigerator, our Filter 3 refrigerator.

22          What did happen is Whirlpool originally submitted

23  claims that didn't mention the protrusion at all or that the

24  protrusion extended from the end wall of the cartridge.  The

25  claims about the protrusion were rejected by the Patent

1  Office.

2         Now, what Whirlpool did, instead of fighting, it

3  changed the wording of its claim, and it added in a

4  requirement for a protrusion extending from the end wall.  It

5  chose where to draw its property lines.

6         Now, here's the language that they put in these

7  claims, all of the claims require a protrusion that extend

8  from the end-piece wall.

9         And one example of this is shown in the drawings of

10  the patent here.  In pink, we've highlighted what is the

11  protrusion.

12         Now, you'll hear how Mr. Baird went about trying to

13  improve the protrusion.  He wanted to make the protrusion

14  stronger, less likely to break off in shipping.  And he also

15  wanted to put it in a different place so it wasn't extending

16  from the end-piece wall like the patent called for.

17         Now, he made a prototype -- prototype, but he

18  rejected it.  He kept wanting to make it more different from

19  Whirlpool's patent.  And better.  And he came up with the

20  idea of using a -- and here's the first prototype design he

21  considered and one of the many he considered and rejected.

22         But he decided to keep going back at it, and he

23  came up with this.  This is the idea of using a V shape to

24  support the protrusion, a lateral support.  It made the

25  protrusion stronger, more stable, and he got to move it away

1    from the end-piece wall, which is exactly what the Whirlpool

2    patent required.

3            Mr. Baird thought it was so different he filed for

4    a patent on it.  And you can see here how much space there is

5    between the protrusion.  We're looking at the side of the TST

6    cartridge.  Look at how much space there is between the end

7    of the protrusion and the end wall on the cartridge.

8            Now, Mr. Baird just wasn't satisfied with launching

9    a product with one change from the Whirlpool patent.  He

10   studied the patent again and saw that the claims all say that

11   you have to have a longitudinal axis.  The fittings have a

12   longitudinal axis.

13           So here's where the patent explains what the

14   longitudinal axis is.  It's says the term refers to an axis

15   running along the lengths and through the center of the

16   object, in this case the fitting.

17           Now, there's one example of that in the patent.

18   You can see these are long, straight tubes.  These are the

19   fittings that are shown in the figures of the patent.  We've

20   highlighted the axis nice and straight.

21           But what Mr. Baird did is he changed the shape of

22   this fitting.  So there wasn't one axis along its whole

23   length and through the center of it along its whole length.

24   No longer had a single axis.  So this design is unique.  He

25   angled the ends of the fitting so it was bent.  He added a

1    new axis.

2         The one axis in green goes through the straight

3    part of the fitting, the base, but it doesn't go through the

4    bent part at the tip.  And he's got another axis at the bent

5    end.  That is shown in red.  That axis goes through the bent

6    part, but it doesn't go through the base.

7         Now, the bent fittings also improved on the

8    Whirlpool design because this angled tip, this could help

9    break up ice that might be forming inside the head assembly.

10   And also this outside wall of the -- of the fitting would

11   press against the valve.  That would be the thing that would

12   push open the valve.  That would be the thing that would push

13   open the valve.

14        Now, in the Whirlpool patent, they had a little

15   wall here we've highlighted in red.  That's right in the flow

16   path.  That's right in the place in the fittings where the

17   water flows.  And Mr. Baird thought, I can -- I can improve

18   upon that.  I don't like the idea of ice forming and blocking

19   the flow here.

20        So what he did is he had the outside of the fitting

21   become the thing that pressed open the valve.  We've

22   highlighted that in red.  And the -- what you can see is that

23   the opening where the water flows through has nothing

24   blocking it, nothing in its path at all.  So that's wide

25   open.

1          He moved the cam surface away from the flow path

2    and on to the outside wall, which is circled here in blue.

3          Again, Mr. Baird thought it was not only different,

4    he thought it was better.  He filed for his own patent.

5          Now, this work spread out over years.  Mr. Baird

6    considered made many different designs, considered many

7    different alternatives, made many different prototypes.  I

8    want to just show you some now.

9          Here's just a -- here's just a few of the

10   prototypes that got made as he spent years considering

11   different alternatives and different ways to design the

12   fittings, the cams, the protrusion, and ultimately, to get to

13   the design that he chose.  This wasn't copying.  This was a

14   lot of hard work over a long time.

15         And Mr. Baird waited to launch the commercial

16   product until he was confident that he had avoided the

17   Whirlpool patent.

18         Now, we maintain we've been competing fairly, and

19   we don't owe any royalties to -- or damages to Whirlpool.

20         And when you look at how Whirlpool comes up with

21   its theories, it thinks that no one can make a Filter 3

22   compatible cartridge without infringing their patent.  They

23   call it a blocking patent.

24         But that's not how they worded their claims.  They

25   didn't say in the Patent Office any filter that fits in our

1  Filter 3 refrigerator.  Instead, they drew their property

2  lines the way I showed you.

3        Whirlpool's expert is going to talk about

4  Whirlpool's profit margin and say that that justifies the

5  royalty that Whirlpool seeks in this case.  That royalty is

6  more than three times TST's profits.  You'll hear why it

7  wouldn't make sense for TST to pay more than its profit for a

8  license.  We're going to have to raise prices higher than

9  what consumers would be willing to pay.

10        Now, the evidence is going to show that all of

11  those Whirlpool profits come from Whirlpool blocking

12  competition and not from Whirlpool developing better

13  technology that consumers want to pay more for.

14        We'll show that the patent doesn't filter the water

15  any better, doesn't make the cartridge easier to use, or save

16  any space.

17        Whirlpool even knew that its patents -- patented

18  design wasn't easier to use for the refrigerator owners.

19        Here's an internal Whirlpool document where --

20  after they'd surveyed some consumers and -- and here's what

21  Whirlpool says:  The current design is difficult for

22  consumers to change.

23        Now, in this case you're going to hear their

24  witnesses say it's easy to use.  And one way to decide

25  whether it really is easy to use is to listen to the

technical experts that will testify.  They both measured how much force you have to apply to insert this Filter 3 cartridge into the refrigerator.  Experts on both sides measured about 40 pounds of force.

And you'll see how you have to go about applying that 40 pounds of force.  The cartridges at the grill -- at the base of the refrigerator by the floor, you'll have to get on your knees in front of the refrigerator and bend over and with one hand, push with and apply all of that 40 pounds of force.

And you're going to hear that Whirlpool has already phased out the Filter 3.  It started that phase-out in 2010 when it introduced a new filter.  And that's one of the reasons why Filter 3 sales started declining on their own before TST entered the market.  There's less refrigerators out there that use the Filter 3.

Now, filter -- Whirlpool's phasing out that next generation called the Filter 1, and they're going to the Filter 2 you heard about.

Now, we've got an internal document that explains why they were doing that.  They thought the patent that they had on the Filter 2 was stronger than the patent in this lawsuit.  And here's why they say.

Whirlpool patented the work-arounds to Filter 2. So Whirlpool expected consumers to do exactly -- competitors,

1    rather, to do exactly what TST did.  And sometimes Whirlpool

2    can get a patent that has big property lines, and they can

3    stop work-arounds -- that is, competitors products that are

4    different still fit but don't infringe -- but sometimes, like

5    with the Filter 3, they can't get a patent that strong that

6    stops all those work-arounds.

7         And here's Whirlpool admitting that the patent in

8    this case is not so strong as to stop work-arounds.  TST will

9    show there's a way to make a compatible filter that fits but

10   doesn't cross over Whirlpool's property line on its '894

11   patent.

12        Now, Whirlpool says it wasn't interested in -- in

13   licensing the patent.  And really what they're trying to do

14   here is to stop consumers from having a choice to buy a

15   filter at a lower price.  In fact, they never told consumers,

16   when they bought the cartridge, that they would have to

17   always buy Whirlpool filters.

18        THE COURT:  One minute remaining, Counsel.

19        MR. SGANGA:  Thank you, Your Honor.

20        Now, you're going to hear questions from Whirlpool

21   about the quality of TST's products.

22        Well, as I mentioned, they're certified.  They're

23   sold by the biggest retailers.  Mr. Baird has served on

24   industry organizations.  And, in fact, we use the same filter

25   block that filters out the contaminants that Whirlpool used

1    to use before they moved their manufacturing to Taiwan and

2    Mexico.

3          Thank you in advance for serving on this jury and

4    spending the week with us to resolve this.  It's an important

5    case for both sides.  And we think by the end of the week,

6    you're going to see that the evidence shows that the

7    Whirlpool patent never should have been granted because it

8    was not an advance in the state of the art.  And the evidence

9    will show that Mr. Baird and TST respected the patent and

10    don't infringe it in any way.  TST is not trespassing on

11    Whirlpool's property and doesn't owe Whirlpool any money.

12          Thank you.

13          Thank you, Your Honor.

14          THE COURT:  All right.  You've now heard opening

15    statements from both Plaintiff and Defendant.

16          At this time, let me ask if there are persons

17    present in the courtroom that anticipate being called as a

18    witness in this case.

19          If all potential witnesses would come forward at

20    one time, I'll ask our Courtroom Deputy to swear them in as a

21    group.  Hopefully, that will save us some time as we go

22    through the trial.  If you anticipate being called as a

23    witness, please come forward.

24          All right.  Ms. Lockhart, if you'll swear in the

25    witnesses, please?

1                    (Witnesses sworn.)

2              THE COURT:  Thank you.  You may return to your

3    seats.

4              Counsel, does either party wish to invoke the Rule?

5              MR. SGANGA:  Yes, Your Honor.  We would like to

6    have the -- the fact witnesses sequestered.

7              THE COURT:  All right.  You're requesting that the

8    Rule be invoked, but that it be excluded as to expert

9    witnesses?

10             MR. SGANGA:  Correct, Your Honor.

11             MR. WARD:  We'd agree with that, Your Honor.

12             THE COURT:  All right.  The Rule having been

13   invoked, except as to expert witnesses, if you are designated

14   as a witness in this case but you are not designated as an

15   expert witness, then you must remain outside the courtroom

16   until the time that you're called to testify.

17             Of course, that does not apply to corporate

18   representatives of the two parties.  So unless you're a

19   corporate representative of the two parties or an expert

20   witness, if you're otherwise to be a witness in this case,

21   you're subject to the Rule and should exclude yourself from

22   the courtroom until you're called to testify.

23             All right.  At this time, Ladies and Gentlemen, I

24   would ask the Plaintiff to call their first witness; but

25   before we do that, we're going to take a short recess.

1          Typically, first witnesses are rather lengthy, so

2   we're going to take this opportunity for you to have a break,

3   stretch your legs, get a drink of water, and we'll be back in

4   here shortly to put on the first witness by the Plaintiff.

5          This is one of those times you may simply close

6   your notebooks and leave them in your chairs.  Don't discuss

7   the case in any way among yourselves.  And, again, we'll be

8   back in here shortly to continue.

9          The jury is excused for recess at this time.

10          COURT SECURITY OFFICER:  All rise for the jury.

11          (Jury out.)

12          THE COURT:  Plaintiff, who is your first witness?

13          MS. SMITH:  Your Honor, it's Mr. Brett Dibkey.

14          THE COURT:  All right.  We'll take a short recess.

15          When we return, Mr. Dibkey can be called to the

16   witness stand.

17          The Court stands in recess.

18          (Recess.)

19          COURT SECURITY OFFICER:  All rise.

20          THE COURT:  Be seated, please.

21          All right.  Is the Plaintiff prepared to call their

22   first witness?

23          MS. SMITH:  Yes, Your Honor.

24          THE COURT:  All right.  Let's bring in the jury

25   then, please, Mr. Nance.

1          COURT SECURITY OFFICER:  All rise for the jury.

2          (Jury in.)

3          THE COURT:  Please be seated, Ladies and Gentlemen.

4          All right.  Plaintiff call your first witness.

5          MS. SMITH:   Your Honor, Plaintiff calls Mr. Brett

6     Dibkey.

7          THE COURT:  All right.  Sir.  If you'll please come

8     forward.

9          You've previously been sworn, correct?

10         THE WITNESS:  Yes, sir.

11         THE COURT:  Please have a seat.

12         All right.  Ms. Smith, you may proceed.

13         MS. SMITH:  Thank you, Your Honor.

14        BRETT DIBKEY, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

15                       DIRECT EXAMINATION

16    BY MS. SMITH:

17    Q.   Good afternoon, Mr. Dibkey.

18    A.   Good afternoon.

19    Q.   If you would, introduce yourself to the jurors?

20    A.   Yeah.  My name is Brett Dibkey, and I'm a vice president

21    at Whirlpool Corporation in Ann Arbor, Michigan.

22    Q.   And, Mr. Dibkey, where do you live?

23    A.   I live with my wife and three children in St. Joseph,

24    Michigan, which is a town close to Benton Harbor.

25    Q.   Mr. Dibkey, you said you were a vice president at

1  Whirlpool, correct?

2  A.    Correct.

3  Q.    And how long have you been at Whirlpool?

4  A.    I've been at Whirlpool for nine years.

5  Q.    Did you start out as vice president?

6  A.    I did not.  I started my career at Whirlpool as a senior

7  director in the product development organization.

8  Q.    And as senior development and director of the product

9  organization, did you oversee a number of people in that

10  position?

11  A.    I oversaw a small team in that position but then was --

12  after a fairly short period of time, about a year, promoted

13  to lead our global dishwasher business, which includes

14  everything from developing, marketing, and manufacturing

15  dishwashers.  And in that capacity I oversaw about 3,500

16  people.

17  Q.    Following your role over the dishwasher organization,

18  you were promoted then to VP?

19  A.    I was, yeah.

20  Q.    And what year was that?

21  A.    May of 2012.

22  Q.    Mr. Dibkey, if you could explain to the jurors what your

23  responsibilities are currently as a VP of Whirlpool?

24  A.    Yes.  So I have responsibility for a portfolio of

25  businesses.  I think they're captured here on the -- the

1    slide.  I have responsibility for our Jenn-Air business,

2    which is a full line of kitchen appliances, kind of a premium

3    brand for us.

4        Gladiator, which is a garage door and organization

5    business.  Our Maytag commercial laundry business that sells

6    washers and dryers to hotels and hospitals and laundromats.

7    Our consumer products business, which has a portfolio of

8    different brands, including our EveryDrop water filtration

9    business.  And I oversee our innovation incubator called

10   W Labs.

11   Q.   Mr. Dibkey, you -- you mentioned the consumer products

12   group and EveryDrop, does that mean that you have

13   responsibility over refrigerator water filters, the subject

14   matter of this suit here today?

15   A.   I do, yes.

16   Q.   Sir, I'm not familiar with the W Labs up on the screen.

17   For the benefit of the jury, can you tell us a little bit

18   more about W Labs?

19   A.   Yeah, again, W Labs is an innovation incubator within

20   Whirlpool that is charged, really, with bringing

21   new-to-the-world innovation to market and solving unique and

22   emerging consumer problems.  A couple of examples of recent

23   product launches, actually one hasn't quite launched yet, are

24   on the -- on the slide.

25       On the left is a food recycler.  Over 40 percent of the

 1   food that's generated in the United States is wasted, and so

 2   this machine takes food waste and turns it into fertilizer in

 3   less than a day.

 4       The machine on the right hasn't quite launched yet.  It

 5   will be launching later in -- in the summer, May/June time

 6   frame.  And over 7 billion people on planet earth, 4 billion

 7   of those people don't do their laundry in machines, they do

 8   them in streams and rivers and with buckets.

 9       And it's a very time-consuming laborious process, and so

10   Whirlpool has really focused on solving that problem for the

11   world's population by bringing a human-powered washing

12   machine that takes considerable time and effort out of the

13   process.

14   Q.   Now, taking a -- a step back, Mr. Dibkey, can you tell

15   the jurors a little bit about Whirlpool's history?

16   A.   Yeah.  As -- as Mr. Ward shared in his opening,

17   Whirlpool was founded in Benton Harbor, Michigan, which is on

18   the shores of Lake Michigan.  We're 106 years old this year

19   and have been innovating in the appliance industry.  It's

20   really all we do.  We're not in any other line of business,

21   for all 106 years.

22       On the top of the slide that's in front of you is an

23   example.  On the top row are some of our laundry innovations,

24   starting with the first electric ringer washer in the upper

25   left.

1    Some various innovations over the years leading most

2 recently to the first front-loading washing machine that was

3 introduced back in the early 2000s under the Maytag brand.

4    And then on the bottom, the first frost-free automatic

5 defrosting refrigerator.

6    The middle picture is one of my favorite, it's a space

7 kitchen that was on the Apollo space missions in the 1960s.

8    And then the far right picture is a picture of the first

9 microwave.

10    So our company has a long-standing tradition of

11 innovation within the appliance space.

12 Q.    And bringing you up to today, Mr. Dibkey, can you tell

13 the jurors what products Whirlpool manufactures today?

14 A.    Yeah.  We manufacture a full line of both laundry room

15 and kitchen appliances.  And the laundry room, of course,

16 washers and dryers.  And the kitchen, it's refrigerators,

17 dishwashers, ranges and ovens, microwave.

18 Q.    What are some of the brands that Whirlpool sells under,

19 that the jurors might be familiar with in the U.S.?

20 A.    Yeah.  Again, Mr. Ward covered this in -- in his

21 opening, but these are our four more prominent brands.  We

22 have a fairly broad brand portfolio globally and some other

23 smaller brands here within the U.S., but the brands that are

24 listed on the slide, Whirlpool, KitchenAid, Maytag, and

25 Amana, are our four big brands in the U.S.

1   Q.   Now, Mr. Dibkey, you mentioned that you live in

2   Michigan, and that's where the headquarters -- Whirlpool

3   headquarters is; is that correct?

4   A.   Correct, yeah.

5   Q.   Are the products that we see on this screen manufactured

6   and designed in Michigan or in the U.S.?

7   A.   The products on this screen, most of them are designed

8   and developed in Michigan.  We have a number of engineers

9   in -- in Michigan and a variety of different technology

10  centers in the state.  About 80 to 85 percent of what we sell

11  in the United States is manufactured in the United States.

12       And I should also point out that we're the only

13  U.S.-based appliance manufacturer remaining.  But our -- our

14  plants are scattered, really, throughout the country:  Iowa,

15  Oklahoma, Massachusetts, Ohio, and Tennessee.

16  Q.   And I'll be a little bit more narrow with you and direct

17  your attention to the Filter 3 product that's involved in

18  this lawsuit.  Where is the Filter 3 designed?

19  A.   Filter 3 was actually a product of a joint development

20  effort between ourselves and a partner, Proctor & Gamble,

21  back in the early 2000s.  The technology teams that designed

22  that filter were in Michigan, as I mentioned, and in

23  Cincinnati, Ohio, which was our -- our partner.

24  Q.   And where is that Filter 3 manufactured today?

25  A.   The filters are manufactured in two locations, in Mexico

1    and Taiwan.

2    Q.   Mr. Dibkey, how important is Whirlpool's refrigerator

3    business to Whirlpool?

4    A.   It is a critically important part of our -- our

5    business.  Behind washers and dryers, our laundry room

6    product, it's the No. 2 revenue generator for our company.

7    So it's very important.

8    Q.   And what about refrigerator filters?

9    A.   Filters also are -- are very important to us.  They help

10   offset the development cost of our refrigerators.  No. 1,

11   from a business perspective, they're really critically

12   important.

13        And then No. 2, from a consumer perspective, consumers

14   increasingly over the years are shopping for refrigerators

15   and looking for the features and benefits, convenience, piece

16   of mind of having a filter in the refrigerator.

17   Q.   Are there alternatives to filters in refrigerators?

18   A.   Yeah.  There are a number of alternatives.  Water

19   bottles, Mr. Ward talked about in his -- his opening and

20   shared the -- the fact that, you know, one water filter is

21   equivalent to about 1600 water bottles.  Bottled water is

22   fairly inconvenient, lugging it in and out of the house.

23   It's contributing a lot of plastic to -- to landfills, and so

24   filters are a good alternative to bottled water.

25   Q.   How long does one of your filter cartridges last?

1   A.   Typically about 200 gallons.  We test higher than that,

2   but 200 gallons is what we -- we claim on our packaging,

3   which for the average household, is about six months.

4   Q.   Mr. Dibkey, I'm showing you up on the screen what's been

5   marked as Plaintiff's Exhibit 496.  Are you familiar with

6   that -- that filter?

7   A.   I am, yes.

8   Q.   And what is that?

9   A.   This is the Filter 3 that is covered under the '894

10   patent.

11   Q.   Is that -- is that a good seller for Whirlpool?

12   A.   Yes.  It is our No. 1 selling filter.

13   Q.   And if you could explain to the jurors how Filter 3 came

14   about.

15   A.   Filter 3, again, was the -- the product of a

16   co-development effort with Proctor & Gamble.  Proctor &

17   Gamble, as you may know, manufactures a whole host of various

18   household products like, you know, Tide washing machine

19   detergent, Cascade dish detergent.  And then they previously

20   owned the PUR brand, so a lot of their products work in our

21   products.

22       And as a result of that, we've had a very long-standing

23   relationship, share very similar values.  They're a

24   midwestern-based company like -- like ourselves.

25       And back in the early 2000s, they were innovating a fair

1    amount in the -- the cartridge technology that actually

2    filtered the water.  Of course, we had great capability in

3    refrigeration and dispensing systems, and so it was kind of a

4    natural relationship to join forces and -- and bring this new

5    technology -- technology to market.

6    Q.   You described that relationship between Whirlpool and

7    Proctor & Gamble as being long-standing.  How else would you

8    describe that relationship?  Was it a good one?

9    A.   Yeah.  It -- it -- I would say it -- you know, the

10   highest levels of the organization, it is a -- a very good

11   one.  We've had a long-standing relationship with them for

12   decades.  At least once a quarter, our leadership is in

13   Cincinnati or theirs may be in Benton Harbor.

14       Having said that, we're both, you know, big companies.

15   And like any big companies that get together, there are

16   brother/sister issues occasionally.  But by and large, we

17   have a very strong relationship and continue to do so with --

18   with P&G.

19   Q.   Where does Whirlpool sell and distribute its Filter 3

20   products?

21   A.   We sell at a number of different retailers and -- and

22   distributors, most notably, the big appliance retailers like

23   Lowe's and Sears and Home Depot.  Other smaller independent

24   appliance retailers, as well.  And then we also sell in

25   the -- the big box retailers like Walmart and Target.

1    Q.   Out of the list of the various retailers that you just

2    provided to the jury, who are your biggest customers?

3    A.   Our biggest customers are the appliance -- the big

4    appliance retailers, Lowe's, Sears, Home Depot.

5    Q.   And, Mr. Dibkey, are you involved in the pricing of the

6    Filter 3s for sale at those various outlets -- retail

7    outlets?

8    A.   Yeah.  We -- we establish a price to the retailer, and,

9    of course, the retailer determines the price that they sell

10   to the consumers, but I'm involved in setting the price to

11   the retailer for sure.

12   Q.   If you could explain to the jurors how you go about

13   setting the prices to those retailers, please.

14   A.   Yeah.  We take into account really a number of -- of

15   factors.  One is our relative competitive positioning, so as

16   we compete with folks like General Electric and Frigidaire

17   and LG and Samsung, we look at where they are in the market.

18        We also look at recovering the cost of the R&D

19   investment.  There's no refrigerator filter without a

20   refrigerator.  Refrigeration margins are extraordinarily

21   thin.

22        It is the most competitive category within our industry

23   by a wide margin.  In large part because of the entrance of a

24   number of new Asian competitors from Korea, LG and Samsung

25   have really driven prices down in -- in that market.  And so

1   filter sales help offset the cost of, you know,

2   hundred-million-dollar plus investment to bring new

3   refrigerator platforms to market.

4   Q.   Mr. Dibkey, I'll direct your attention to Plaintiff's

5   Exhibit 297 on the screen.  Can you see that all right?

6   A.   I can, yeah.

7   Q.   Sir, if you'll look at that bottom row of blue boxes,

8   what's that bottom row show?

9   A.   EveryDrop is -- is our brand that is, again, compatible

10  with our portfolio of -- of product, Whirlpool, Maytag,

11  KitchenAid, et cetera.  It shows our price for filters,

12  relative to our appliance competitors Electrolux, GE, LG,

13  Samsung.  They're all listed at the same price as -- as ours.

14  Q.   And when you say our price, this is the price that the

15  retailers are charging the consumers?

16  A.   Correct, yes.

17  Q.   Now, I heard you mention a moment ago the

18  hundred-million-dollar price tag, and what -- what does that

19  represent?

20  A.   So hundred-million-dollar price tag is the -- the cost

21  of bringing a new refrigerator to market.  It is very

22  expensive.  Obviously, there's a lot of very heavy equipment.

23      There are large machines, fairly sophisticated machines

24  that require a -- a lot of engineering.  So that would

25  include the cost of bringing that product to market.

1    Q.   Are you always able to recover that

2    hundred-million-dollar research and development cost through

3    the sales of your refrigerators?

4    A.   Unfortunately, not.  Again, I mentioned that it is a --

5    a hyper, hyper competitive market for us.  2015 is an

6    example.  You know, for every hundred dollars of revenue we

7    generated selling a refrigerator, we made just over a dollar

8    in profits.  So our profit margin is just a little more than

9    1 percent selling refrigerators.

10        And I don't think this is unique to us by any stretch.

11   I think all of these manufacturers do this.  They recover

12   the -- the cost developing and bringing new refrigerators to

13   market based on the basis of their -- their water filters.

14   Q.   Now, Mr. Dibkey, I see over here on the far right of

15   Plaintiff's Exhibit 297, a 20.95 price tag.  Has Whirlpool

16   ever been approached by making a cheaper line of filters?

17   A.   We have, yes.

18   Q.   And did Whirlpool decide to pursue that?

19   A.   We did not, no.

20   Q.   Why not?

21   A.   Well, for a lot of the reasons I mentioned.  Obviously,

22   the price point is -- is a fair amount less.  And it affects

23   our ability to invest in new refrigerator platforms in some

24   of the new products that I showed earlier.  So we've decided

25   to not pursue it because it has a pretty adverse impact on

1    our business, to be honest, but also, it creates a bit of

2    consumer confusion in the marketplace, as well.

3    Q.    What do you mean when you say "consumer confusion"?

4    A.    Well, when we're manufacturing the filter and selling

5    the filter, we establish the -- the test protocols and

6    standards to not only ensure that the contaminant removal

7    that is claimed is real, but very importantly, the integrity,

8    the structural integrity of the filter itself is sound.

9         You know, when there are lots of generics or knock-offs

10   in the market, we don't have the ability to do that same

11   testing.  And, typically, whether it's our filter or not, if

12   there's a filter problem that may cause a leak, the filter

13   problem becomes a refrigerator problem.  The refrigerator

14   problem becomes the brand problem.

15        And, you know, our -- our company prides itself on

16   building trust in our brands.  And so when we have water

17   filter leaks or problems it does affect and accrue in a bad

18   way to our brands.

19   Q.    Mr. Dibkey, do you know whether the Filter 3 patent --

20   the Filter 3 product is patented?

21   A.    I do.  It is.

22   Q.    Going to direct your attention to what I've marked as

23   Plaintiff's Exhibit 1 on the screen.

24        What is that, Mr. Dibkey?

25   A.    This is the -- the Filter 3 '894 patent.

1    Q.    And can you read the actual name of that patent for me?

2    A.    You know, I'm getting old.  So -- and this is -- is very

3    fuzzy on the screen, to be honest.  I can't -- I can't read

4    the patent, I'm sorry.

5          There you go.  Scroll down, all right.

6          Fluidic cartridges and end pieces thereof.

7    Q.    And so at -- at a very high level, can you describe to

8    the jurors what the patent covers and what it doesn't cover?

9    A.    Yeah.  The patent basically just covers the end-piece

10   assembly.  That's it.  It doesn't really have anything to do

11   with the filtration cartridge or the -- the technology that

12   filters the water.  It purely covers the end piece and the

13   interface with the refrigerator.

14   Q.    So it doesn't cover what I'm calling the middle part,

15   kind of the guts of the filter?

16   A.    It does not cover the guts, no.

17   Q.    It doesn't cover how many contaminants are filtered out?

18   A.    No, has nothing to do with contaminant removal, water

19   filtration really at all, other than the assembly and how it

20   fits into the refrigerator.

21   Q.    Now, sir, when does that patent expire?

22   A.    The patent expires in 2023, November.

23   Q.    What has Whirlpool done other than what we're seeing in

24   this courtroom today to protect that patented technology, its

25   patented technology?

1  A.   Again, because of the consumer experiences that -- that

2  we referred to, we've been very aggressive in protecting our

3  patents.  To date, we've filed 40 lawsuits.

4  Q.   Have you also received help from the government in

5  your -- in protecting your intellectual property?

6  A.   Yeah.  Both the FBI and Homeland Security have been very

7  actively involved in supporting our efforts to stop

8  counterfeiters.

9  Q.   You mentioned those 40 lawsuits.  When did Whirlpool

10  begin filing those lawsuits?

11  A.   The first lawsuit was filed in 2011.

12  Q.   And who was that first lawsuit filed against?

13  A.   That was the lawsuit that was filed against Swift Green

14  that Mr. Ward referenced in his opening.

15  Q.   And you were working at Whirlpool at the time?

16  A.   I was, yes.

17  Q.   And are you familiar with that Swift Green lawsuit?

18  A.   I am, yes.

19  Q.   Can you give the jury some understanding of what

20  happened as a result of that first lawsuit?

21  A.   They -- they -- they stopped selling the infringing

22  filter, and then filed a motion with the Patent and Trademark

23  Office for re-examination.

24       And then I think it was in 2014, the Patent and

25  Trademark Office confirmed, I guess, for a second time, that,

1  in fact, the patent was valid.  And as a result of that,

2  they -- they exited the market.  They paid us $40,000 to

3  offset some legal fees.  And agreed to the extent they

4  violated the -- the patent on a go-forward basis, they would

5  pay us $30 per unit sold.

6  Q.    You said they exited the market.  They stopped selling

7  all the filters?

8  A.    They did, yes.

9  Q.    And did you give -- did you give -- did Whirlpool give

10  Swift Green a license to the patents?

11  A.    We did not, no.

12  Q.    What about other lawsuits, the other lawsuits you filed,

13  can you tell us a little bit about those?

14  A.    Yes.  So, again, we've -- we've filed 40 to date, 30

15  have been resolved.  I think the schedule on the screen is a

16  schedule of the 30 that have been resolved to date.

17  Q.    In response --

18          THE COURT:  Counsel -- Counsel, approach the bench,

19  please.

20          (Bench conference.)

21          MS. SMITH:  Yes, Your Honor?

22          THE COURT:  Just a minute.

23          MS. SMITH:  I'm sorry.

24          THE COURT:  I know we don't have a direct order in

25  limine on this, but tell me what the relevance is of going

1    through other litigation against other Defendants as relates

2    to the issues in this case.

3              MS. SMITH:  Just that we -- we have to protect our

4    intellectual property.  And it -- in order to -- I mean,

5    generally, there's no objection to this, Your Honor.  And

6    this was a pre-admitted exhibit.

7              THE COURT:  Well, I -- I understand there's no

8    objection.  I just am having a hard time following the

9    relevance.

10             MS. SMITH:  It's just a general background of how

11   we protect our intellectual property, and I'm nearing the

12   end, if that's helpful for Your Honor.

13             THE COURT:  All right.  Let's move along.

14             MS. SMITH:  Okay.  I have two lawsuits specifically

15   that I want to talk about because they relate to the sale of

16   TST filters.

17             THE COURT:  Well --

18             MS. SMITH:  Which is very relevant, obviously.

19             THE COURT:  To the extent there's an objection

20   based on 402, I'll take it up when it's made.

21             MS. SMITH:  Thank you, Your Honor.

22             THE COURT:  But -- but I just can't see spending a

23   lot of time talking about extraneous lawsuits that don't

24   involve this Defendant or necessarily their products.

25             MS. SMITH:  It goes to willfulness, and it also

1    goes to the rates because these people have entered in a

2    consent judgments at a rate of $25 going forward if they sold

3    an infringing product.

4              THE COURT:  These people being?

5              MS. SMITH:  The 30 on the slide.

6              THE COURT:  All right.

7              MS. SMITH:  So it would be helpful to our damage

8    case and to our damage expert.

9              THE COURT:  All right.  Well, let's proceed.

10              MS. SMITH:  Thank you, Your Honor.

11              (Bench conference concluded.)

12              THE COURT:  All right.  Let's proceed.

13              MS. SMITH:  Thank you, Your Honor.

14   Q.   (By Ms. Smith)  Why doesn't Whirlpool just license these

15   companies under the patents?

16   A.   Again, when -- when we license, we lose control over the

17   experience for consumers.  The -- the quality, reliability,

18   durability of the filter is something that we can control.

19        And, again, if there's a problem, and we've seen

20   problems with -- with knock-offs, that problem more often

21   than not is not the problem of the knock-off filter

22   manufacturer.  The problem is with Whirlpool.  And so it --

23   it damages our well-earned reputation, and it damages

24   valuable relationships with consumers.

25        And also, there's -- there's clearly a business impact.

1    We -- we invest very heavily in building this technology;

2    and, you know, we don't get the benefit of recovering that

3    investment.

4    Q.   Mr. Dibkey, I'd like to direct your attention to one of

5    these companies in particular.  And that is Pavel.  I believe

6    it's No. 21 on the screen, for your convenience.

7         What was Pavel selling?

8    A.   Pavel was selling a infringing Filter 3 manufactured by

9    TST.

10   Q.   And are you familiar with the terms of the Pavel

11   settlement?

12   A.   I am, yes.

13   Q.   Can you generally explain to the jury what those terms

14   were?

15   A.   Generally speaking, they acknowledge the -- the validity

16   of our patent, the '894 patent.  They agreed to stop selling

17   immediately.  And then also agreed to pay us $25 for every

18   infringing filter that they sold.

19   Q.   I'd also like to direct your attention to No. 28, which

20   is a settlement with Water Filters Fast; do you see that

21   Mr. Dibkey?

22   A.   I do.

23   Q.   Are you familiar with the terms of that settlement?

24   A.   I am.  Very similarly, they acknowledge the validity of

25   our '894 patent.  They acknowledge that the TST water filter

1  was infringing that patent.  Also agreed to stop selling and

2  pay us $25 for every infringing filter sold.

3  Q.    And the filters that they agreed to stop selling, who

4  manufactured those filters?

5  A.    TST.

6  Q.    You understand the Defendant in this suit is -- is also

7  TST?

8  A.    I do, yes.

9  Q.    Before TST started selling its -- its W-5 filter, did

10  TST ever come to Whirlpool and ask to license the '894

11  patent?

12  A.    They did not, no.

13  Q.    Does Whirlpool want TST to license a version of the

14  Filter 3 filter?

15  A.    No.

16  Q.    Why not?

17  A.    They didn't invest one nickel in -- in bringing the

18  refrigerator to market that is required to leverage the

19  filter.  Again, refrigerator filters require refrigerators.

20  And they would undercut us on price and -- and that affects

21  our ability to recover the investment.  And, again, you know,

22  we lose control of the consumer experience in that case.

23  Q.    Is TST's W-5 filter sold at the same price as the

24  Whirlpool -- Whirlpool Filter 3?

25  A.    It is -- it is not.  As Mr. Ward shared in opening, it's

1  at about half the price, two for one.

2  Q.   Now, in opening statement, and you've mentioned as well,

3  that -- that Whirlpool teamed up with Proctor & Gamble to

4  develop the Filter 3; is that correct?

5  A.   Correct.

6  Q.   Are you familiar with the agreements between Whirlpool

7  and Proctor & Gamble?

8  A.   I am, yes.

9  Q.   Now, I've seen in some of those agreements that

10 Whirlpool set a rate of $2 for each filter that Proctor &

11 Gamble may have sold when the agreements expired; is that

12 correct?

13 A.   That is correct, yes.

14 Q.   Is -- is that what you want TST to pay in this lawsuit?

15 A.   Absolutely not.

16 Q.   Why not?

17 A.   Well, the context -- the situation is -- is very

18 different.  P&G was our partner.  Again, it's a very well

19 respected company, shares a lot of our same -- same values.

20 We developed that product and that patent together.

21     In fact, we co-owned the patent together for five years.

22 So they made the investment, alongside of -- of us, as well.

23     So the -- the $2 that is referred to in that agreement

24 is in part consideration for that development that they --

25 they led alongside of us.  And was only really introduced in

1   2007, five years after the -- the filter technology was

2   developed, when we had an interest in acquiring the other 50

3   percent of the patent.

4        So we each owned 50 percent of it effectively.  We

5   wanted full ownership.  And when we did that, in

6   consideration for that, we gave them the right upon

7   termination to license for $2.

8   Q.   And has Proctor & Gamble ever actually paid that $2?

9   A.   No, they've -- they've never entered the market with

10  a -- a product.

11  Q.   Thank you, Mr. Dibkey.

12            MS. SMITH:   Your Honor, I'll pass the witness.

13            THE COURT:  Cross-examination by the Defendant.

14            MS. KENNEDY:  May I approach?

15            THE COURT:  You may.

16            All right.  Mr. Sganga, you may continue with

17  cross-examination.

18                      CROSS-EXAMINATION

19  BY MR. SGANGA:

20  Q.   Good afternoon, Mr. Dibkey.  I'm John Sganga.

21  A.   Hi.

22  Q.   We haven't met before, right?

23  A.   We have not.

24  Q.   Okay.  Now, you've mentioned that you've got

25  responsibility at Whirlpool for their water filter products

1    now; is that correct?

2    A.    That's correct, yes.

3    Q.    And that's one -- as part of that consumer products

4    group that you manage?

5    A.    That's correct, yes.

6    Q.    And the consumer products group is one of six different

7    groups that you're responsible for, correct?

8    A.    Correct, yes, sir.

9    Q.    And -- and within that consumer products group,

10   refrigerator filters are just -- are one of several different

11   products that are involved there, right?

12   A.    That is correct, yes, sir.

13   Q.    And so your -- your first involvement, then, with the

14   water filter business for refrigerators began in what year?

15   A.    Would have begun in the 2010/2011 time frame.

16   Q.    And so you personally, you haven't designed water filter

17   products yourself, correct?

18   A.    I have not.

19   Q.    You're not an inventor on any water filter patents,

20   right?

21   A.    No.

22   Q.    And you don't personally know anybody at TST Water, do

23   you?

24   A.    I do not, no.

25   Q.    Okay.  Never met Mr. Baird before, have you?

1    A.    I have not, no.

2    Q.    And you've never been to TST's facility in California,

3    correct?

4    A.    No, sir.

5    Q.    You've never called the TST customer service phone

6    number, have you?

7    A.    No, sir.

8    Q.    And you've never inspected TST's manufacturing plant,

9    have you?

10   A.    No, sir.

11   Q.    And, in fact, Whirlpool has never tested the claims on

12   the TST products as to how many contaminants its filter will

13   filter out, right?

14   A.    I don't know that to be true.  I don't know if we've

15   tested it or not.

16   Q.    And you talked about structural integrity testing that

17   Whirlpool does of its filters, and that's so that you'll know

18   that they'll last in -- in consumers' homes?

19   A.    Correct, yes.

20   Q.    You don't have any information about the kind of

21   structural integrity testing that TST does on its products,

22   do you?

23   A.    I do not, no.

24   Q.    And so you're -- you're not claiming here that -- that

25   TST mislabels its products to filter out more contaminants

1    that -- than it really does, do you?

2    A.    No, sir, no.

3    Q.    Okay.  And you're not saying that -- that the TST

4    product is a counterfeit, are you?

5    A.    No, sir.

6    Q.    You mentioned that you had gotten the -- law enforcement

7    to help you with some folks that counterfeit products that --

8    A.    We have.

9    Q.    You haven't done that with TST, have you?

10   A.    Oh, no, sir.

11   Q.    In fact, some of those -- those counterfeits are -- are

12   products that if I -- if I handed you a genuine Whirlpool

13   Filter 3 and a counterfeit Whirlpool Filter 3, would you have

14   trouble telling them apart?

15   A.    I would have trouble, yes.

16   Q.    But if I gave you a TST W-5 and a Whirlpool Filter 3,

17   you'd -- you'd know right away who made which one, right?

18   A.    Has a different label on it.  Yes, I'd know.

19   Q.    And the product has a different design, too, doesn't it?

20   A.    No.

21   Q.    It's not -- it's not identical, is it?

22   A.    It's pretty close to identical.

23   Q.    Okay.  But not identical?

24   A.    Not identical.

25   Q.    Okay.  And, in fact, you're not aware of anybody else

1  that manufactures a product having the same design as the TST

2  W-5 cartridge, do you?

3  A.   I'm not aware.

4  Q.   And you mentioned some folks that you'd sued that were

5  selling the TST product, right?

6  A.   Correct.

7  Q.   But no one else is -- is manufacturing a product that's

8  the same design as TST's that you know of?

9  A.   Not that I'm aware of.

10  Q.   And you -- you said that you settled some lawsuits with

11  the folks that had sold some TST products, right?

12  A.   Yes, sir.

13  Q.   And do you know how many cartridges any of those

14  Defendants had sold?

15  A.   I don't know the numbers off the top of my head, no.

16  Q.   Okay.  I'll -- I'll point you to the agreements later.

17  I just wanted to see if we could shortcut that.

18      But -- now, you also talked about the -- the guts -- you

19  testified about the guts, the cartridge.  Have you heard that

20  referred to as the carbon filter block?

21  A.   Carbon block, yes, sir.

22  Q.   Okay.  And so that's the part of the filter that

23  actually removes the contaminants?

24  A.   It is, yes.

25  Q.   Okay.  And so that's a pretty important part of the

1  filter, isn't it?

2  A.    Very important, yes.

3  Q.    So when Whirlpool makes its Filter 3 cartridges, it's --

4  it's important that it have a quality carbon filter block,

5  right?

6  A.    Sure, yes.

7  Q.    And does Whirlpool spend time making sure that whoever

8  it buys those carbon filter blocks from is, in fact,

9  providing a -- a quality product that filters out what it

10  says it does?

11  A.    Absolutely, yes.

12         THE COURT:  Mr. Dibkey, pull the microphone a

13  little closer to you --

14         THE WITNESS:   Oh, sorry.

15         THE COURT:    -- please.  Thank you.

16  Q.    (By Mr. Sganga) And so you were aware that a company

17  called KX supplied Whirlpool with carbon filter blocks?

18  A.    Historically, yes.

19  Q.    Okay.  And Whirlpool stopped using KX as a supplier when

20  it moved its manufacturing of the Filter 3 outside the U.S.?

21  A.    We did, yes.

22  Q.    And I just want to make sure it's clear, you had looked

23  at a map of the U.S. that said that 80 percent of Whirlpool's

24  products were manufactured in the U.S.?

25  A.    Correct.

1  Q.   But you're not saying that 80 percent of the Filter 3

2  products are made in the U.S.?

3  A.   No.  Again, the Filter 3 product is manufactured in both

4  Taiwan and Mexico.

5  Q.   Now, when Whirlpool sells refrigerators, it has a

6  variety of different models of refrigerators, doesn't it?

7  A.   It does, yes.

8  Q.   So those models differ, based on things like size,

9  right?

10  A.   Sure.

11  Q.   Features?

12  A.   Sure.

13  Q.   The door arrangement?

14  A.   Sure.

15  Q.   And -- and the price of the refrigerator?

16  A.   Yes.

17  Q.   So if I walked into a Home Depot, I -- and went shopping

18  for a Whirlpool refrigerator, I'd see a number of different

19  Whirlpool refrigerator models, right?

20  A.   Sure.

21  Q.   But if I am looking in the home -- that same Home Depot

22  for a Filter 3 product, there's only one Whirlpool Filter 3

23  on the shelf, right?

24  A.   Yes.

25  Q.   And at -- at one price, right?

1  A.    Yes.

2  Q.    And so you make a lot of different refrigerators to give

3  consumers a choice in terms of what they want for their

4  particular home, right?

5  A.    Sure.

6  Q.    But when it comes to the Filter 3, there's only one

7  model?

8  A.    Correct.

9  Q.    Now, Whirlpool gets feedback from consumers, doesn't it,

10  about what they like and don't like?

11  A.    Sure, we do, yes.

12  Q.    So you -- you've done things like focus groups where you

13  ask consumers for -- for their opinions about Whirlpool

14  products?

15  A.    Yes.

16  Q.    And you've done that for refrigerator water filter

17  products, haven't you?

18  A.    Yes.

19  Q.    So I want to show you what's been marked as Defendant's

20  Exhibit 437.  Now, it's -- it's -- a hard copy is in the

21  binder that we gave you.

22          MR. SGANGA:  But if we pull that up on the screen

23  here.

24  Q.    (By Mr. Sganga) This is a report that was done for

25  Whirlpool by BFG; is that right?

1  A.    Correct, yes.

2  Q.    And that's in 2014?

3  A.    Yes, sir.

4  Q.    That was -- that was before TST got into the market with

5  its W-5 product?

6  A.    Yes.

7  Q.    So if we turn to Page 32, there's a -- there's a slide

8  there.  And do you see the bullet point there says:  Expense

9  is the top reason consumers are not replacing their filters

10  at all?

11  A.    Yes.

12  Q.    And that -- that was based on the feedback that

13  consumers gave to Whirlpool about the Whirlpool water filter

14  products, right?

15  A.    Yes.

16  Q.    And if we look at the chart below, there's a column --

17  the first column on the left with the number 40 percent at

18  the top.  And that says -- underneath it:  Refrigerator

19  filters are too expensive?

20  A.    Yes.

21  Q.    After Whirlpool got this feedback, did it -- did it

22  lower its prices on its refrigerator water filters?

23  A.    No.  We did -- we get this feedback on everything we

24  sell.  Everyone wants a cheaper refrigerator, a cheaper

25  washing machine.  But this is not the primary consideration

1  when we establish price.

2  Q.    But you still do consumer focus groups to get feedback

3  from them about --

4  A.    Yes.

5  Q.    -- their opinions?

6  A.    Yes.  Price, I would suspect in any industry, is always

7  number one.

8  Q.    And if you look at the column next to the -- the No. 16

9  percent on the right here, the one over from the far right.

10  A.    Yes.

11  Q.    And -- and a reason for not replacing filters is that

12  they do not remove enough contaminants.  That only got 16

13  percent, right?

14  A.    Yes.

15  Q.    And does Whirlpool promote the fact that its filters

16  remove a lot of contaminants from the water?

17  A.    Yeah, we promote the fact that we remove the most

18  contaminants.

19  Q.    And you think the Whirlpool Filter 3s are better because

20  they remove a lot of contaminants, right?

21  A.    They remove the most contaminants, yes.

22  Q.    And you think that's the reason for the price that

23  Whirlpool charges for the Filter 3s is the fact that they

24  remove a lot of contaminants, right?

25  A.    Again, as I mentioned earlier, there are a number of

1    factors that impact the price.

2    Q.   And removing contaminants is one of them?

3    A.   Is one.

4    Q.   Now, as -- as part of your job responsibilities, you

5    make decisions on -- on whether to file patent lawsuits?

6    A.   I do, yes.

7    Q.   And -- and you make decisions on whether to settle those

8    lawsuits?

9    A.   I do, yes.

10   Q.   And you're aware that it's -- it's in some cases

11   possible to do what's called a -- a work-around, right?

12   A.   Yes.

13   Q.   And -- and what that means is somebody changes the

14   design of a filter cartridge so that it still fits in the

15   Whirlpool refrigerator, but it doesn't infringe the Whirlpool

16   patent, right?

17   A.   Yes.

18   Q.   And when that happens then, if that's a successful

19   work-around, then Whirlpool has no patent infringement case,

20   right?

21   A.   That's right.

22   Q.   And when the TST W-5 filter first came out, there were

23   people at Whirlpool who thought it was a -- a legitimate

24   work-around, right?

25   A.   I'm not sure what other people at Whirlpool thought.

1   Q.   Well, there's a -- you know, a Jennifer Bonuso at

2   Whirlpool?

3   A.   I do.

4   Q.   And she -- she works directly for you, doesn't she?

5   A.   She does, yes.

6   Q.   And her responsibilities are primarily water filter

7   cartridges?

8   A.   That's right.  Along with other responsibilities.  She

9   leads the consumer products group, but yes.

10   Q.   And you had a lot of emails back and forth with

11   Ms. Bonuso as part of your work?

12   A.   I'm sure, yes.

13   Q.   Why don't we -- why don't you turn to DX-414 in your

14   cross binder, and we'll -- we'll pull that up on the screen,

15   Defendant's Exhibit 414.  And we'll enlarge that here so that

16   you can read it.

17        So this is an email from Jennifer Bonuso to you in July

18   2015, right?

19   A.   Correct, yes.

20   Q.   And at the -- at the bottom of the email, the last

21   sentence says:  You need to add a bullet that Filter 3 HDX

22   appears to have a work-around.  That represents about 40

23   percent of the business.

24        Right?

25   A.   Yes.

1    Q.   And so Filter 3 HDX, that's -- that's a reference to the

2    TST product that the W-5 product that replaces -- that fits

3    in place of a Filter 3 and is sold with the Home Depot HDX

4    brand, right?

5    A.   Yes, she says "appears."  And at this point, obviously

6    hadn't seen the filter, so this is all in the basis of what

7    someone else was telling her.  And she's like me, she's a

8    business person, not a technical person or a lawyer.  And to

9    me it says that there -- there may be an issue.

10   Q.   But you didn't respond to Ms. Bonuso, to this email,

11   saying, no, that's impossible, you can't ever work around the

12   '894 patent in this lawsuit?

13   A.   I didn't know.

14   Q.   And you --

15   A.   Based on the fact --

16        THE COURT:  Just a minute.  Just a minute,

17   gentlemen.  Let's make sure it's one at a time so we keep it

18   straight in the record.  Make sure the question is finished

19   before you answer.  And make sure the answer is given before

20   the next question.

21        All right.  Go ahead and finish your answer,

22   Mr. Dibkey, if you hadn't already finished it.

23   A.   Yeah, I was just saying that I wouldn't have said that

24   because if I didn't know it, either I didn't have any facts

25   at the time.

1          THE COURT:  All right.  Continue with the cross.

2     Q.   (By Mr. Sganga) And you did not send an email back

3     responding to this -- to that effect, did you?

4     A.   It was a long time ago.  I send a lot of emails.  I'm

5     not sure if I responded or not, to be honest.

6     Q.   Now, you talked about the agreements with PUR, Proctor &

7     Gamble, you were involved in some of those?

8     A.   I was, yeah.

9     Q.   And so there were -- there were a series of agreements

10    between Whirlpool and Proctor & Gamble, right?

11    A.   Yes, sir.

12    Q.   Would you rather call them PUR or Proctor & Gamble?

13    A.   Well, they've been done with both parties, again.  PUR

14    is no longer owned by Proctor & Gamble.  It was sold to Helen

15    of Troy, which is based in El Paso.  So it depends on which

16    agreement you're referring to whether it's PUR or Proctor &

17    Gamble.

18    Q.   Well, the -- I just want to ask you about how many

19    different agreements there were over the course of the

20    relationship, if you know generally?

21    A.   Inclusive after the business was sold to Helen of Troy?

22    Q.   Sure.

23    A.   Approximately six or seven.

24    Q.   Okay.  So there were a round of agreements when the

25    relationship first began.  That was in the early 2000s,

1　right?

2　A.　That's right.

3　Q.　And then in 2007, there were another group of

4　agreements?

5　A.　That's right.

6　Q.　And you were involved personally in negotiating those?

7　A.　I was not, no.

8　Q.　Okay.　Then there was a know round in 2011.　Were you

9　involved --

10　A.　I was --

11　Q.　Is that right?

12　A.　Yeah.

13　Q.　And then again in -- recently in 2016, now with this

14　company Helen of Troy?

15　A.　Correct, yes.

16　Q.　And none of those agreements are called a partnership

17　agreement, are they?

18　A.　No.

19　Q.　Okay.　So when -- when you referred to PUR and Whirlpool

20　as having a partnership, you didn't mean that -- that you

21　were legally partners together, did you?

22　A.　No, I -- strategically the way we operate the business,

23　we're partners.

24　Q.　And when you negotiated agreements, though, you -- you

25　had lawyers representing Whirlpool on one side, and they had

1    lawyers on their side, right?

2    A.    Sure, yes.

3    Q.    And you were trying to get the best deal for Whirlpool,

4    weren't you?

5    A.    It's my job, yes, sir.

6    Q.    And so what happened in the round of agreements in 2007

7    was that there was a term that allowed PUR to get a license

8    under the '894 patent as of 2017 when all the agreements

9    expired, right?

10   A.    Yes.

11   Q.    And that was for a two-dollar-per-cartridge royalty

12   rate, right?

13   A.    Yes.

14   Q.    And that's the -- the one agreement that Whirlpool has

15   ever entered with someone with terms about licensing the '894

16   patent where there wasn't a lawsuit pending, right?

17   A.    Again, as I mentioned during my testimony, they were

18   co-developers and co-owners of the patent.  They owned the

19   patent for five years with us.

20        So this was not just anybody.  It was our partner in the

21   development of the patent.

22   Q.    So they -- that was the one agreement, though, with the

23   license term on the '894 patent where there was no litigation

24   involved and the deal was negotiated, right?

25   A.    Absolutely, yes.

1    Q.   Okay.  And by 2011, when that round of -- of the

2    agreements was being negotiated, Whirlpool had already bought

3    and paid for the ownership rights in the '894 patent, right?

4    A.   We owned the patent outright at that point, yes.

5    Q.   Okay.  Now, under the most recent agreement, which is

6    exhibit -- Plaintiff's Exhibit 358, that's in the -- your

7    binder there for your direct examination.

8              MR. SGANGA:  We'll pull that up here.

9    Q.   (By Mr. Sganga)  This is the -- the most recent

10   agreement that was effective January of this year, right?

11   A.   Correct.

12   Q.   And in this agreement, Kaz agreed that they -- they

13   wouldn't be selling Filter 3 compatible cartridges going

14   forward under that two-dollar-a-unit license, correct?

15   A.   They agreed because they weren't the co-developer on

16   the -- the patent.  By this point, P&G had sold the PUR

17   business to Helen of Troy, yes, correct, or Kaz.

18   Q.   Well, Kaz, if they wanted to, could go ahead after --

19   after the agreements all expired and take advantage of that

20   two-dollar license agreement, right?

21   A.   According to the prior agreement that was drafted with

22   Proctor & Gamble, yes.

23   Q.   But what ended up happening is you -- you renegotiated

24   that deal, right, so they're -- they're not selling filter

25   cartridges on their own and paying Whirlpool a two-dollar

1  license, right?

2  A.   The prior agreement was expiring, and so we negotiated a

3  new agreement.   I wouldn't characterize it as a

4  re-negotiation.   It didn't re-negotiate anything that

5  existed.   It was a new agreement.

6  Q.   Well, the earlier agreement said that when it expired at

7  the end of 2016, there would be a license going forward at $2

8  per unit, right?

9  A.   Correct.

10  Q.   And what the arrangement now is, under this 2017

11  agreement with Kaz --

12       MR. SGANGA:   If we could go to Section 6.1(a)?

13  Q.   (By Mr. Sganga)   If you look at the -- the first two

14  lines of Section 6.1(a) of the agreement, it says that

15  Whirlpool's going to pay a royalty fee to Kaz of $1.50 for

16  each refrigerator filter that Whirlpool sells, right?

17  A.   That's -- it's not for the technology, though.   That's

18  a -- a brand license for the trademark.   They own the PUR

19  brand.   And we put the PUR brand on our filters.   We pay them

20  $1.50 for the right to use their brand on our filters.   It

21  has nothing to do with the technology of the filter itself.

22  It's a -- a brand -- brand license.

23  Q.   But as part of this deal where they get the hundred --

24  the $1.50 a unit under this license, likewise Kaz agrees it's

25  not going to sell competing Filter 3 cartridges, right?

1    A.    But -- yes, sir.  But this trademark license existed in

2    the P&G agreement, as well.  So this isn't new.

3    Q.    Well, that --

4    A.    It existed with P&G, as well.

5    Q.    But that -- again, that P&G agreement was expiring,

6    except for the patent license that would have continued at $2

7    a unit, right?

8    A.    Correct?  And we were interested in maintaining the --

9    the brand on our package, and so we licensed with Kaz, the

10   new owner of the PUR brand, for access to their trademark to

11   put on our packaging.

12   Q.    So on -- on your packaging now you've put the -- the

13   Whirlpool name, right?

14   A.    Correct.

15   Q.    And you got another name you call EveryDrop, right?

16   A.    Yes.

17   Q.    And then you put the -- the PUR name on it, as well?

18   A.    We did.

19   Q.    And the PUR name is the smallest of all those names that

20   appear at the bottom of the package, right?

21   A.    It is, yeah.

22   Q.    So let's talk about the Defendant Pavel again.

23            MR. SGANGA:  If you go to PX-533?

24   Q.    (By Mr. Sganga)  That's the settlement agreement with --

25   with Pavel, right?

1  A.   It is, yes.

2  Q.   And if you turn to Page 5 of that agreement, does --

3  does this refer to the number of the TST filters that Pavel

4  had sold at the -- the third line from the top of the page?

5  A.   It does, yes.

6  Q.   And so it's 348 TST filters that Pavel sold?

7  A.   Yes.

8  Q.   And those were being -- do you know how many dollars per

9  unit Pavel was selling those for in the market?

10  A.   Do I know what they were selling them for?

11  Q.   Yes.

12  A.   19, $20, somewhere in that neighborhood.

13  Q.   So they weren't making enough money to fight a lawsuit

14  with Whirlpool, were they?

15  A.   No.

16  Q.   And if we go to PX-534, that's another settlement

17  agreement between Whirlpool and a company Filters Fast?

18  A.   Yes.

19  Q.   And they had sold some TST filters, too?

20  A.   Yes.

21          MR. SGANGA:  And if we go to Page No. 2 of that

22  exhibit, and the -- the third whereas clause there, just the

23  one below that?  I think we've got to go -- one more above

24  that, sorry.  So the fourth one down from the top?

25  Q.   (By Mr. Sganga)  Do you see where it first says 574

1   replacement water filters?

2   A.   I do, yeah.

3   Q.   And that's the number of the TST filters that this

4   company had sold?

5   A.   Yeah.  Again, to me, the -- the number of filters being

6   sold isn't important.  You know, we got to a hundred years

7   old because we treat every consumer relationship the same.

8   And if we have 378 or 574 consumers with a bad experience,

9   that absolutely matters to our company.

10  Q.   Well, you said earlier that these guys agreed that the

11  patent was valid, right?

12  A.   They did, yes.

13  Q.   And I just wanted to know whether you thought they made

14  enough money on this to file a lawsuit?

15  A.   I frankly have no idea how much money they made.  These

16  companies sell a lot more than just these two filters.  So

17  how much money they have or haven't made, I honestly have no

18  idea.

19  Q.   So you -- you talked about the -- the controlling the

20  brand experience, is that how Whirlpool -- Whirlpool refers

21  to it?

22  A.   Yes, sir.

23  Q.   And is -- is -- Whirlpool wants the brand experience to

24  be always the same thing as what the consumer wants?

25  A.   We have a portfolio of brands that are targeted at

 1    different consumers.  I'm not sure I understand your

 2    question.  Sorry.

 3    Q.    But Whirlpool wants control over the brand experience,

 4    right?

 5    A.    We want to deliver a great brand experience to our

 6    consumers, absolutely, yes.

 7    Q.    So let's -- let's turn to the refrigerators that have

 8    the Filter 3 cartridges in them.  And would -- would you

 9    agree that -- I think -- I think you said you got to sell

10    refrigerators in order to sell filters, right?

11    A.    Yes.

12    Q.    And the more refrigerators there are that are designed

13    to use a certain kind of filter, then the bigger the market

14    for that particular filter, right?

15    A.    Yes.

16    Q.    So Whirlpool was using the Filter 3 in most of its

17    refrigerators, wasn't it, in the mid-2000s?

18    A.    We were, yeah.

19    Q.    And Whirlpool decided to phase out the Filter 3 in 2010,

20    right?

21    A.    We did, yeah.

22    Q.    So the sales of refrigerators with Filter 3 cartridges

23    started declining after 2010, right?

24    A.    Yes.

25    Q.    And as refrigerators get older, people stop using them,

1  right?

2  A.   No, sir.  I think as refrigerators get older, they still

3  use them.

4  Q.   Well, Whirlpool sometimes measures what they call an

5  install base, right?

6  A.   Yes, sir.

7  Q.   And you -- you assume that once refrigerators get to a

8  certain age, it's very unlikely that people still -- still

9  use them in their home, right?

10  A.   No.

11  Q.   No.  You -- you do believe, though, that the older the

12  refrigerator, the less likely, the less often it will be for

13  the consumers to replace the filters, right?

14  A.   I'm sorry, I don't -- the refrigerators are used

15  regardless of whether or not they're old.  The age of the

16  refrigerator has really absolutely no bearing on its use.  So

17  I'm not sure I'm tracking your question.

18  Q.   Okay.  What I'm asking is at some point, refrigerators

19  break and --

20  A.   And then they get a new one.

21  Q.   Exactly.

22  A.   Yes, sir, yes, sir.

23  Q.   And so Whirlpool assumes that after 10 years, there's a

24  fair number of refrigerators that are no longer in use,

25  right?

1    A.    Yeah, of course.  Yeah, they do.

2    Q.    And Whirlpool also assumes that its consumers are more

3    likely to change the water filter cartridges on a brand new

4    refrigerator than they are to on a 10-year-old refrigerator,

5    right?

6    A.    I don't -- I don't have that data, no.

7    Q.    You never heard of the compliance data where --

8    A.    Yeah, I know compliance data.

9    Q.    So you've never seen data that showed that the

10   replacement of those filters declines as the refrigerator

11   gets older?

12   A.    No, sir, not as the refrigerator gets older.  As there

13   are fewer models that accommodate that filter.

14   Q.    Okay.

15   A.    Because, you know, as we sell an older model of

16   refrigerator and introduce a new one that is replacing the

17   older -- older model.  But if a consumer has a refrigerator

18   for 10 years, she uses it for 10 years and may replace the

19   cartridge for 10 years.

20   Q.    And as there were fewer Filter 3 refrigerators being

21   sold after -- after 2010 by Whirlpool, Whirlpool would expect

22   that filter sales would go down?

23   A.    Yes, yes, the install base decline.  No longer are we

24   putting refrigerators in the market that would accommodate a

25   Filter 3, that is true.

1  Q.   Okay.

2         MR. SGANGA:  No further questions, Your Honor.

3         THE COURT:  All right.  Is there redirect by

4  Plaintiff?

5         MS. SMITH:  Please, Your Honor.

6         THE COURT:  Proceed.

7                    REDIRECT EXAMINATION

8  BY MS. SMITH:

9  Q.   Mr. Dibkey, Whirlpool doesn't make the consumers

10  purchase filters at all, does it?

11  A.   We do not, no.  The -- the refrigerator will still

12  dispense water with or without a filter.

13  Q.   And they can buy -- they can have a refrigerator that

14  requires a filter, but they can use bottled water, can't

15  that?

16  A.   Absolutely.

17  Q.   And they can use a Brita filter, couldn't they?

18  A.   Absolutely.

19  Q.   But you certainly want them at Whirlpool to buy filters?

20  A.   Sure, we do, yes.

21  Q.   You discussed Ms. Bonuso a little bit with counsel.  Is

22  she a lawyer?

23  A.   She is not, no.

24  Q.   Is she an engineer?

25  A.   No.

1    Q.   Does she make decisions about lawsuits like you do every

2    day on when to file them and when to settle them?

3    A.   She does not, no.

4    Q.   Okay.  She's out in the field?

5    A.   She is.

6    Q.   And what is her title?

7    A.   She's the director of the consumer products business,

8    which is primarily more of a marketing and sales function.

9    Q.   How many times does Ms. Bonuso send you an email that

10   says somebody is acting illegally, breaking the law?

11   A.   I don't think she's ever sent me an email saying that

12   anyone's breaking the law.

13   Q.   But if she saw somebody trying to design around or

14   circumvent or steal some of your -- some technology, what

15   would she do?

16   A.   I think she would send me a note similar to the one that

17   she apparently sent me in 2015 indicating that there was an

18   issue or the appearance of a potential issue.

19   Q.   You spoke with counsel about how important it is to

20   attain control of the customer experience from refrigerators

21   to filters; is that correct?

22   A.   Yes.

23   Q.   And he -- he suggested that you could just go to TST and

24   why hadn't you gone and knocked on their door.  Did you -- do

25   you remember that line of questioning?

1   A.    I do.

2   Q.    Do you think TST would open that door for you if you

3   went to inspect and test their filters?

4   A.    I -- I don't think so, no.

5   Q.    Why would Whirlpool need more than one filter on the

6   shelves of Home Depot?

7   A.    I don't know.  I didn't understand the question very

8   well; but that would add a lot of cost and complexity and

9   confusion for consumers, so I'm not sure why we would need a

10  second filter.

11  Q.    I'm going to direct your attention back to that P&G

12  partnership that you discussed.

13          MS. SMITH:  If I could see Plaintiff's Exhibit 358,

14  please?

15          And the later agreements, as well.

16  Q.    (By Ms. Smith)  Can you read the title of that agreement

17  to me, sir?

18  A.    Commercialization and license agreement.

19  Q.    And that's a little bit different.  These agreements --

20  a series of agreements, that's a little bit different than a

21  straight license agreement, isn't it?

22  A.    Correct.

23  Q.    About how many pages would you guesstimate are involved

24  in all of these various agreements through the partnership

25  through the years?

1    A.    A lot.  I don't -- I don't know.  Hundreds of pages,

2    though.

3    Q.    And what was P&G contributing to the partnership?

4    A.    At the onset of the agreement?

5    Q.    Yes.

6    A.    They were contributing technical know-how and knowledge

7    in filtration technology.

8    Q.    Because they had experience in filtration; is that

9    correct?

10   A.    Correct, yeah.

11   Q.    And what was Whirlpool bringing to the table?

12   A.    We brought to the table knowledge of cooling systems in

13   a refrigerator to cool the water, of course, but also

14   dispensing systems and all the mechanical systems required to

15   route water through the filter and dispense it to a consumer.

16   Q.    And that $2 was actually only in play if that

17   relationship ended; is that correct?

18   A.    Correct, yes.

19   Q.    Now, directing your attention back to the Pavel deal --

20              MS. SMITH:  Let's -- let's actually take a look at

21   Plaintiff's Exhibit 1.  There's our patent.

22   Q.    (By Ms. Smith)  And what was the date on the patent?

23   A.    February 21st, 2006.

24   Q.    A lot of years left on the patent; is that correct?

25   A.    Yes.

1   Q.  And is it reasonable -- was it your expectation that if

2   you didn't shut down Pavel, and if you didn't take away their

3   ability to sell TST filters, that they'd just keep on selling

4   them?

5   A.  Yes.

6   Q.  And is it reasonable to expect that hundreds would turn

7   into thousands?

8   A.  Yes.

9   Q.  I have one housekeeping item, Mr. Dibkey.  Plaintiff's

10   Exhibit 51, is that the Swift Green agreement?

11   A.  It is, yes.

12   Q.  And Plaintiff's Exhibit 534, is that the agreement with

13   Water Filters Fast?

14   A.  It is, yes.

15   Q.  Thank you, sir.

16          MS. SMITH:  Your Honor, I'll pass the witness.

17          THE COURT:  Is there additional cross?

18          MR. SGANGA:  No further questions, Your Honor.

19          THE COURT:  All right.  Mr. Dibkey, you may step

20   down.

21          Plaintiff, call your next witness.

22          MR. HUNG:  Your Honor, we call Todd Rose.

23          THE COURT:  All right.  I assume somebody stepped

24   out to get the witness.

25          MR. HUNG:  Yeah -- yes, Your Honor.

1          THE COURT:  Okay.

2              If you'll come forward, sir, have a seat at the

3  witness stand.

4              You've previously been sworn, correct?

5          THE WITNESS:  Yes.

6          THE COURT:  Our CSO is going to put a lapel mic on

7  your coat.

8          THE WITNESS:  Thank you.

9          THE COURT:  Please have a seat.

10             All right.  Counsel, you may proceed with your

11  direct examination.

12       TODD L. ROSE, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

13                       DIRECT EXAMINATION

14  BY MR. HUNG:

15  Q.   Good afternoon, Mr. Rose.

16  A.   Good afternoon.

17  Q.   Can you please tell the jury your name and introduce

18  yourself?

19  A.   Sure.  I'm Todd Rose.  I'm a principal engineer at

20  Whirlpool.

21  Q.   How long have you been with Whirlpool?

22  A.   Approximately 20 years.

23  Q.   And, sir, did you have anything to do with the '894

24  patent?

25  A.   Yes, I'm one of the inventors on the team.

1   Q.   Have you ever testified in open court before a jury,

2   sir?

3   A.   No, I have not.

4   Q.   Can we start by telling the jury just a little -- a

5   little bit about yourself?

6   A.   Sure.  I was -- I was born in Dayton, Ohio.  I went to

7   school there.  I then moved to Indianapolis, Indiana.  Went

8   to high school in the area there.  I went to Purdue

9   University.  I graduated 1991 with a degree in mechanical

10  engineering.  I met my wife while I was at Purdue.  And we

11  have two children.

12  Q.   And, sir, how did you come to work in the appliance

13  industry?

14  A.   I -- just before I graduated from college, I was made an

15  offer to join GE Appliances in Louisville, Kentucky.

16  Q.   What did you do for GE?

17  A.   I designed refrigerators and ranges.

18  Q.   How did you come to go from GE to Whirlpool?

19  A.   In 1997, I was interview -- Whirlpool asked me to come

20  interview for them at -- at their division -- both at their

21  headquarters in Evansville, at the tech center, and at Fort

22  Smith, Arkansas.

23  Q.   In the 19 or 20 years that you've been at Whirlpool,

24  have you focused on something in particular?

25  A.   In general, designing new -- new products, new

1  components, reliability and quality, as well.

2  Q.   What about -- what about different Whirlpool facilities?

3  Have you worked at different facilities?

4  A.   Yes, I have.

5  Q.   Which ones?

6  A.   I --

7  Q.   I'm sorry, go ahead.

8  A.   I worked in Fort Smith, Arkansas, for three years as a

9  cooling engineer.  I then worked in their tech center in

10  Evansville for about nine or ten years.  And then I've been

11  at corporate in Benton Harbor, Michigan.

12  Q.   Have you have you won any awards while you've been at

13  Whirlpool?

14  A.   Yes, I have.

15          MR. HUNG:  Let's put this on the screen.

16  Q.   (By Mr. Hung)  Sir, what is depicted on the screen?

17  A.   This is the W award for quality excellence.

18  Q.   And why did you -- why did you win this award?

19  A.   I was leading the team that worked on quality

20  improvements for dishwashers.

21  Q.   Is this award a big deal?

22  A.   Yes, it is.  It's the highest honor that a team or an

23  individual can win at Whirlpool.  It's voted on by the board

24  of directors and the CEO.

25  Q.   And you mentioned that you worked on dishwashers.  Where

1  were you working on dishwashers that led to this work?

2  A.    Yeah.  We put together a team that worked with our

3  Findlay, Ohio, plant where we built about three million

4  dishwashers a year, and we put about 42 engineers together.

5  I led that team to do quality improvements over the next 18

6  months.

7  Q.    You mentioned that you're a principal quality engineer.

8  What are you currently doing in that role at Whirlpool?

9  A.    Currently, I am a principal quality engineer for our

10  Amana facility.

11  Q.    What do you make at the Amana facility?

12  A.    It's in Amana, Iowa.  We make our most complicated

13  refrigerators, the French door bottom one.

14  Q.    And in terms of quality in that plant, what are you

15  focusing on?

16  A.    I'm focused on the quality of the new products we bring

17  there.  So new product introduction, as we go -- what I look

18  at cross-functionally is from the beginning of a project,

19  from its inception, until the final unit is ready to ship to

20  the first customer.

21  Q.    Is a product able to leave the Amana plant before you've

22  agreed that it can go out, sir?

23  A.    No.  On a new product, I'm the final proposal signature

24  on releasing that to the consumer.

25  Q.    And you mentioned that Whirlpool has quality guidelines

1    or that you apply quality.  What do you mean by that?

2    A.    We apply very high standards for our -- for the quality

3    of our products before they go to the consumers.  One of

4    the -- our -- they're just very high.

5    Q.    How high are your standards, sir?

6    A.    If you've heard of UL Laboratories or Underwriters

7    Laboratories or UL stickers that you see on components,

8    our -- our standards are higher than theirs.

9    Q.    Now, sir, you mentioned that you worked at a tech

10   center.  Is that the innovation team?

11   A.    Yes.  The refrigeration tech center was in Evansville,

12   Indiana, and that's when I was on the innovation team.

13   Q.    When were you working there?  What time frame?

14   A.    Specifically, the innovation, I was working from 2000 to

15   2005.

16   Q.    What products were you working on while you were part of

17   the innovation team?

18   A.    We developed new water filters.  We developed Gladiator,

19   which became products for storage solutions in your garage.

20   And we developed new refrigerator platforms.

21   Q.    Now, in terms of filters, what were you working on for

22   filters?

23   A.    The initial product was Project Tornado.

24   Q.    How did you come to be first involved in Project

25   Tornado?

1   A.   I was asked to join a meeting at our corporate offices.

2   It was a meeting between Whirlpool and PUR.

3   Q.   Do you recall when this meeting occurred?

4   A.   It was in the summertime.  It was a little bit before

5   September 11th, 2001.

6   Q.   Okay.  Let's take a look at PX-342.  What is PX-342

7   depicting on the slide?

8   A.   This is one of the pages of the documents we discussed

9   in that meeting with PUR and Whirlpool.

10   Q.   And when you went to this meeting just before 9/11, what

11   did you understand your role would be on Project Tornado?

12   A.   That I would lead the design team on the Whirlpool side

13   to work on the -- the new water filter.

14   Q.   All right.  Just to help the jury a little bit, there's

15   a reference to PUR on this slide.  Who was PUR at this time,

16   sir?

17   A.   PUR is a division of Proctor & Gamble.

18   Q.   Looking at the next slide, sir, what was PUR going to

19   bring to the table in terms of this Project Tornado

20   relationship, and what was Whirlpool going to bring?

21   A.   Okay.  PUR had a good chemistry and competency around

22   making carbon blocks and doing filtration.  They made faucet

23   mounts.  So they -- they would bring that side.  And

24   Whirlpool, we had the refrigerator, our long-standing

25   dispense of ice and water.  That's what we would bring.

1  Q.   Sir, let's take a -- let's take a look at this next

2  slide.  In terms of what you were thinking about, issues that

3  you wanted to solve in the market when you came -- when you

4  were working on Tornado, what were you thinking about?

5  A.   We were looking at what our customers were telling us

6  from the field about what their needs and wants were for the

7  product, whether quality safe water was instant access.

8  Q.   What do you mean by instant access, sir?

9  A.   We get -- when you get instant access, we were looking

10  at our -- the way our side-by-side dispenser models where you

11  can dispense water straight into your glass in your kitchen.

12  Q.   At this time did you and PUR discuss how you would

13  divide up the work on Project Tornado as between Whirlpool

14  and PUR?

15  A.   Yes.

16  Q.   Let's take a look at this slide, sir.  What is this

17  slide discussing in terms of that division of labor?

18  A.   We would expect PUR to deliver that stream of filter

19  innovation, so new filters, new media, and different --

20  different improvements on being able to take contaminants out

21  of the water.

22  Q.   What was Whirlpool going to bring to the table?

23  A.   And Whirlpool would be bringing our refrigerators to

24  accept those filters and be able to provide that water to the

25  consumer or purified water to the ice.

1  Q.  Now, the split that you contemplated at this time, did

2  the split end up working out that way?

3  A.  No, it did not.

4  Q.  Why not?

5  A.  As -- as we got to the first iterations with PUR, it

6  became evident that they didn't understand fully about

7  refrigerators so we would have to work jointly on all of the

8  aspects of the design.

9  Q.  And let's -- let's take a look at this next slide, sir.

10  And the design goals at the time, first of all, what were

11  your design goals at the time when you were designing the

12  Project Tornado filter?

13  A.  Our design goals were basic looking at improvement and

14  ease of install, improvements in compactness of the -- of the

15  entire package, and improvements in quality.

16  Q.  Sorry, sir, I jumped ahead.  Looking at PX-541, what's

17  depicted on the screen?

18  A.  This is what we would have referred to internally as the

19  Cuno filter.

20  Q.  What is this Cuno filter?

21  A.  Pardon?

22  Q.  What is the Cuno filter?

23  A.  Oh, Cuno filter was the filter system we were using

24  prior to the one we designed.

25  Q.  How does one install this filter into a refrigerator?

1   A.   You grab the -- you grab the end point, which is right

2   here, and then you inserted into the receptacle in the bottom

3   of the refrigerator, and then you have to turn it a quarter

4   turn to lock it in place.

5   Q.   Is that the grill?

6   A.   Yes, it's in the grill location.

7   Q.   Was this filter, this Cuno quarter turn filter easy to

8   install?

9   A.   No, it was not.

10  Q.   And did you have personal experience with this filter?

11  A.   Yes.  I even had one stuck in my home on a test that I

12  had to use pliers to remove.

13  Q.   What about this filter design in particular, PX-541,

14  made it hard to install or remove?

15  A.   There were a couple of key features.  One, the inlet and

16  outlet were combined together which makes for a large area

17  right here at the front of the filter.  The cam surface that

18  used to lock it in place was very steep.  So those combined

19  together made it difficult to insert or remove.

20  Q.   Did this Cuno filter have a bypass valve?

21  A.   Yes.

22  Q.   Can you explain to the jury what a bypass valve is?

23  A.   In general speaking, the bypass valve in our systems,

24  when the filter is removed, it allows regular house water to

25  come to your ice maker or your dispenser.  And when it's in

1   place it -- it redirects the water through the filter so that

2   you get filtered water on the product.

3   Q.   Now, did the team consider using a bypass valve in

4   connection with the Project Tornado filter?

5   A.   Yes.

6   Q.   Why?

7   A.   It was a base requirement that we had.  We wanted the

8   consumer to always be able to use the product whether they

9   had the filter there or not.  We wanted it to be automatic so

10   that they didn't have to fool around with keeping some kind

11   of little plastic gizmo that they had to put in there or

12   something else.

13   Q.   The second design goal you mentioned was compactness.

14   Why was that important?

15   A.   Compactness is always important in a refrigerator.  As

16   far as being able to maximize -- well, two things with the

17   filter.  Sorry.

18       With the filter compactness gives us the ability -- if I

19   make a smaller interface, then I can have a larger carbon

20   block, I can take out more contaminants from the water.  On

21   the -- so trying to get the housing as small as possible to

22   make the filter as large as possible was the main goal there.

23   Q.   And, sir, in terms of compactness in the refrigerator

24   itself, how does compactness of the filter impact the

25   refrigerator space?

1   A.   On the refrigerator space, what we're providing to the

2   customer is cold storage, the majority of the time with the

3   refrigerator.  Also trying to provide ice and water

4   dispensing.  But I -- we work very hard to make sure that we

5   have the maximum amount of cold storage space and still have

6   the appropriate design side, whether it's compressors,

7   condensers.  It -- it's really cramped in our machine

8   compartment area.  It's also cramped in all of our -- most of

9   our other spaces, our sidewalls, we have installation for --

10  to keep the energy usage down and let your product not use as

11  much electricity.

12  Q.   Sir, let's take a look at this next slide.

13       Did you -- did the Tornado team take into account the

14  types of refrigerators that you would put this filter into?

15  A.   Yes.  There were three primary.  There -- they are the

16  ones listed here.  This one on the left is a typical fold-out

17  side-by-side.  And that was our -- probably our largest

18  target model for the introduction.

19       Then this is the counter depth version of a

20  side-by-side.  Counter depth has really requirements for

21  small compact designs.  It -- it's about 5 to 6 inches

22  shallower front to back than our regular units.  And then

23  built-ins.

24  Q.   Now, sir, have you prepared a slide explaining this

25  issue of compactness?

1    A.    Yes.

2    Q.    Okay.  Let's turn to this slide.

3          What is this slide depicting?

4    A.    This is the machine compartment or the basic engine room

5    of your refrigerator.  It's in the bottom behind the grill

6    below your freezer or RC side, depending on which side of the

7    unit it is.

8          I have compressor, the condenser, I have the air flow

9    system with the fan that pulls the air flow through this

10   plenum across the compressor and then back out on this side

11   here.

12         I have the evaporator drain pan that collects the

13   defrost water.  We sell frost-free refrigerators so we have

14   to have some place to collect the frost water that we pull

15   out of the refrigerator.

16         And then I have the space that I had available on this

17   model for the water filter and then the two V-neck routes to

18   the water valves.

19   Q.    Now, sir, as I look at this picture, there's some space

20   between the filter head assembly and the fan below it, right?

21   A.    Yes.

22   Q.    Do you have that space in all fridges?

23   A.    No, we do not.  The other two models that we were

24   supposed to design this for didn't -- does not have this

25   space.

1  Q.  Sir, let's take a look at this refrigerator.  Do you

2  recognize what this refrigerator is?

3  A.  Yes.  This is the bottom of a -- the built-in

4  refrigerator we showed in the other picture.

5  Q.  How do you know what fridge this is?

6  A.  This is our leveling system.  I've used it in a couple

7  of different product designs.

8  Q.  And what are we seeing here in terms of the gap, that

9  space between the filter assembly and the -- whatever that

10  is, is that the evaporator?

11  A.  That's the evaporator drain pan that's -- that's there,

12  and that -- behind that metal box right there.  It's between

13  an 8th and a quarter-inch.

14  Q.  Why can't you simply shift the evaporator over or down

15  to make more use for the filter assembly?

16  A.  It's an existing design.  I would not want to redesign

17  a -- a platform there.  That -- that evaporator drain pan

18  needs to be below the evaporator inside the freezer so that I

19  get a straight defrost drain, and it doesn't freeze when it

20  defrosts.  So it -- and it's -- the size of that drain pan is

21  dedicated to the size of the refrigerator.  I really can't

22  make it any smaller on this one.

23  Q.  Now, sir, in terms of the distances and the spaces at

24  the bottom of a refrigerator or inside a refrigerator, how

25  much time do you spend focusing on those issues as part of

1    your work?

2    A.    On several different designs, not just on this

3    development, we're -- we spend several weeks just to get an

4    8th of an inch space designed into our refrigerator.  We can

5    spend millions just to grab an 8th of an inch out of a

6    product.

7    Q.    And why are you focused on such small distances?

8    A.    Because if I can get that, then I have more storage

9    space for the consumer.

10   Q.    Now, sir, finally, you mentioned high quality.  Why is

11   high quality important?

12   A.    High quality, especially in filter systems, is about I

13   need to dispense to the consumer when they want it, when they

14   need it, and provide it to them.  The -- the worst thing you

15   can do with a filter system is put water on somebody's floor.

16   I don't want it to leak inside the product or outside the

17   product.

18   Q.    And so, sir, in terms of high quality, were you thinking

19   about any specific design goals or features to help you get

20   high quality?

21   A.    Yes.  So the main one was to -- we knew we wanted to

22   turn the valve head assembly 90 degrees for two reasons.

23   One, because we had the space constrained on some of the

24   models like you see here.  But the second reason was so that

25   I can get the water tubing to run in an unconstrained area

1   because that promotes less leaks.

2   Q.   Now, sir, did the Project Tornado design team come up

3   with its goals of building a filter?

4   A.   Sorry?

5   Q.   Did it build the filter?

6   A.   Yes.

7   Q.   Now, the -- did the first design work?

8   A.   No.

9   Q.   Let's take a look at this, sir.  Is this a drawing that

10  you created?

11  A.   Yes, it is.

12  Q.   What is being depicted on this -- what is being depicted

13  on the screen?

14  A.   Sure.  This is a rendition of the first filter system

15  that PUR came up with and brought to us at the beginning of

16  the project.

17  Q.   And what was wrong with this filter?

18  A.   It's -- it's large.  It takes up a lot of space, as you

19  see inside underneath the refrigerator shelf.  It has an

20  inlet and an outlet, but it does not have an automatic bypass

21  feature.  And it would swell under pressure and stick into

22  the housing, and we could not remove it.  Also, susceptible

23  to bursting because of the shape.

24  Q.   Who created this initial design?

25  A.   This is one that PUR did.

1  Q.   And after you received this design, what did the

2  Whirlpool team realize?

3  A.   That we were going to have to spend a lot more time

4  doing all of the designs and work jointly with PUR on -- at

5  every step.

6  Q.   Okay.  Let's take a look at PX-26.

7       Do you recognize this drawing?

8  A.   Yes.

9  Q.   What is this drawing?

10 A.   This is the drawing of the first -- or the first

11 iteration of the cartridge that we wanted to move forward

12 with.

13 Q.   And do you see a date in the corner of this document?

14 A.   Yes.  May 29th, 2002.

15 Q.   In the drawings that the jury is looking at, who drew

16 these drawings?

17 A.   Judd Olson -- or not -- sorry, Judd Olson is the

18 signature on the upper corner, but John Boros.

19 Q.   And who is John Boros?

20 A.   John Boros was the CAD leader at PUR.  And it was agreed

21 upon between us that he was going to do most of our design

22 work.

23      MR. HUNG:  Let's turn to the next slide.

24 Q.   (By Mr. Hung)  And can you explain to the jury what

25 they're looking at in terms of the filter on this page?

1    A.    Yes.  You're looking at the main filter body housing.

2    You see the inlet and outlet and the protrusion.

3    Q.    And let me blow up that -- that -- let me enlarge that

4    picture in the lower left-hand corner.

5          And what is the jury looking at here?

6    A.    You're looking at the inlet/outlet and protrusion.  It's

7    a triangular relationship that we used here to make sure that

8    the filter would always go into the housing the same way,

9    provide a -- a keen effect.

10   Q.    Let's break that down a little bit.  What is the inlet?

11   A.    The inlet filter or the inlet to the filter is where the

12   water comes into the cartridge.

13   Q.    And what's the outlet?

14   A.    Outlet is where filtered water comes out to the product.

15   Q.    And what is the protrusion?

16   A.    Protrusion is the way we chose to operate the bypass

17   valve.

18   Q.    And you mentioned a keying effect, what do you mean by

19   that?

20   A.    There we -- we worked with a lot of different designs

21   and relationships here, but we came up with an uneven

22   triangle to give us a key way of making sure -- when you look

23   at the triangular relationship here, that would get the

24   filter to lock into the product the same way every time.

25   Q.    Did you focus on any distances between the inlet

1   fitting, the outlet fitting, and the protrusion?

2   A.    Yes, we did.  We locked in on about two centimeters

3   between those.

4   Q.    And how do you lock in on that -- on that dimension --

5   those dimensions?

6   A.    We did tolerance stacks which are basics when we're

7   looking at new designs.  We also then looked at other

8   components, art design constraints of trying to keep the

9   relationship between the inlet and outlet valve and the --

10  and the bypass valve as small as possible.

11  Q.    Sir, let's look at this next enlargement.  What is the

12  jury seeing on the right side of this enlargement from

13  Plaintiff's Exhibit 26?

14  A.    We see the inlet and outlet fitting, the bypass

15  protrusion relationship between them, and a cam surface here.

16  Q.    You just mentioned a cam surface.  What did you -- what

17  do you understand a cam surface to mean?

18  A.    We're trying to trade -- we're changing the direction of

19  motion by using a cam surface.

20  Q.    Let's look at this next slide, sir.  What are we seeing

21  in this slide?

22  A.    On the right-hand side, I see a cartridge that is

23  entering the end valve assembly.  The O-rings are about to

24  seal on the inlet and outlet as it comes into place.

25  Q.    And what about on the left side?

1    A.    And on the left side I see the cam surface has already

2    engaged the valves and opened them, and the protrusion has

3    opened the bypass valve, allowing full function of the valve

4    head assembly and -- and the filter.

5    Q.    Have you provided an animation of how this would

6    actually work?

7    A.    Yes, I have.

8    Q.    Let's take a look at that.  And what is the jury seeing

9    here?

10   A.    The animation just shows when you're -- when you're

11   inserting a new cartridge, you would see the cam surface come

12   in, open the valves, and then momentarily later -- I don't

13   know how many microseconds it is -- but then you open the

14   bypass valve.

15   Q.    What is the benefit here of having a cam surface?

16   A.    It changes the linear motion of insertion by 90 degrees

17   to open the valve in the direction of the valve heads.

18   Q.    So, for example, sir, in this picture, where are the

19   water lines?

20   A.    The water lines are here.

21   Q.    And if you didn't have a cam surface, where would the

22   water lines be?

23   A.    They would be out the back.

24   Q.    Let's look at this next slide, sir.  Is this a slide

25   that you drew?

1    A.    Yes.

2    Q.    And what is this slide depicting?

3    A.    This shows -- if we had turned the valve head

4    assembly -- this is the way we did go into production with

5    it.  If we had turned it the other direction, then I would

6    have had the water lines interfering with the air flow system

7    for the side-by-side.

8    Q.    And let's look back on this page, sir.  Does this page

9    depict the value of having a cam surface at a right angle?

10   A.    Yes, it does.  I would not have been able to put a

11   filter head assembly and housing in this product.

12   Q.    And that was DX-757?

13   A.    Yes.

14   Q.    So let's look at the next slide.  And what -- going back

15   to PX-26, what are we seeing in PX-26 on this page?

16   A.    PX-26, this is an exploded view of the design of the

17   components that go into the valve head assembly.  I see the

18   inlet and outlet fittings, the plungers, O-rings for

19   providing the seal, springs that hold tension, hold -- hold

20   the valve seals shut when the filter is not in place, the

21   bypass valve assembly, and its o-rings and springs.

22   Q.    And what about on this page, sir?

23   A.    This is the full assembly without the filter in place.

24   The filter head assembly, then -- then the body of the

25   assembly and then the push button that we used to eject the

1  cartridge.

2  Q.    And by push button, what do you mean?  Why is there a

3  push button?

4  A.    That was the chosen method that we wanted to use, moving

5  from Cuno being a quarter turn to -- to this design.

6  Q.    Okay.  Sir, do you recognize this document, PX-27?

7  A.    Yes, sir.

8  Q.    And what is PX-27?

9  A.    It's the cover page prepared for a concept evaluation in

10  Tollgate.

11  Q.    What is a concept evaluation Tollgate?

12  A.    It would be a point in time when the design team was

13  ready to tell the business that we were ready to invest more

14  money into the product and development.

15  Q.    Did you actually attend this Tollgate meeting?

16  A.    Yes, I did.

17  Q.    When did the meeting occur?

18  A.    December 6th, 2002.

19  Q.    As of the date of this Tollgate presentation, how far

20  along would you have been in the process of designing the

21  filter?

22  A.    We would have had our final designs done and prototyped

23  and tested on at least one or two units.

24  Q.    Let's take a look at this slide.  What is this slide

25  from Exhibit 27 showing?

1    A.    It's part of the presentation from the CET.

2    Q.    And what are you seeing in terms of the grill on the

3    filter?

4    A.    This shows the user interface, how the customer would

5    interact with the final product.  It's a mockup, and you

6    would have had the push button -- would have pressed the

7    button, and then you would be able to pull -- the customer

8    would be able to pull the cartridge out.

9    Q.    And what are we seeing on this slide in this concept

10   evaluation Tollgate?

11   A.    The valve head assembly.

12   Q.    And what about in this slide?

13   A.    We would see the full assembly out of the PUR, the

14   filter inserted into housing, the push button, and then the

15   valve head assembly in the back.

16   Q.    Mr. Rose, have you seen any videos about how to install

17   this filter?

18   A.    Yes, I have.

19   Q.    Do you mind if I play it?

20   A.    Sure.

21            (Videoclip playing.)

22   Q.    (By Mr. Hung)  All right.  That was Exhibit 269.  And,

23   sir, looking at this refrigerator, if you don't use -- do you

24   have to use a filter with the refrigerator?

25   A.    No, you do not.

```
1    Q.    And what happens if you don't?

2    A.    You get unfiltered water in your ice and dispense.

3    Q.    Sir, did Whirlpool get a patent -- any patents on its

4    work on the Tornado project?

5    A.    Yes.

6    Q.    How many?

7    A.    Three.

8    Q.    Why did Whirlpool want a patent on the Tornado project?

9    A.    We spent a lot of time developing it.  We wanted to

10   keep -- we wanted to ensure that the consumer could get the

11   product to dispense water as we saw it to be.

12   Q.    Let's turn to PX-1.  Do you recognize this document?

13   A.    Yes.

14   Q.    And what is this?

15   A.    This is the front page of the '894 patent.

16   Q.    When did this patent issue?

17   A.    February 21st, 2006.

18   Q.    Do you recognize all the names under inventors?

19   A.    Yes, I do.

20   Q.    And which of the inventors worked with PUR?

21   A.    Judd Olson, David Emmons, John Boros, and Donald Bretl.

22   Q.    And what about with Whirlpool?

23   A.    Alan Mitchell and myself.

24   Q.    Let's take a look at Figure 1 of the patent.  What is

25   this showing?
```

1    A.   This is showing the final filter cartridge and the

2    filter head assembly as we looked at on the drawings earlier.

3    Q.   What about Figure -- Figure 2A, what is that showing?

4    A.   It shows the -- the end of the cartridge where the inlet

5    and outlet fil -- and the protrusion.

6    Q.   And if you look on the -- on the right side of the page,

7    Figure 3, what are you seeing there?

8    A.   I see the inlet and outlet fielding the cam surface, the

9    protrusion to drive the bypass valve.

10    Q.   Looking at Figures 9A and 9B on the next slide.

11        Are these the head assemblies that we saw earlier?

12    A.   Yes, they are.

13    Q.   And how are these actuated, in the same way or

14    different?

15    A.   They're actuated the same way we showed in the animation

16    earlier.  This one is the one where we're approaching -- the

17    O-rings made a seal, but it hasn't yet to open -- water or

18    the bypass valve is not connected.  And this one is fully

19    inserted on the -- 9A is fully inserted.

20    Q.   Let's take a step back.

21        Looking at Figure 3, was this the only design for the

22    end piece that you were working on or thought of at the time?

23    A.   No, we worked on multiple.

24    Q.   Let's take a look.

25        What are we looking at on this slide?

1  A.   Four renditions of alternate end pieces for the filter

2  cartridge.

3       In Figure 4, you have a filter cartridge that has

4  removable end pieces that have the cam in it to operate

5  the -- the valves and the protrusion to operate the bypass

6  valve.

7  Q.   What about in Figure 6?

8  A.   In Figure 6, I have cam surface here that's

9  multifaceted.  I have an undercut inlet and outlet for the

10  water flow in the same relationship with the bypass valve.

11  Q.   What about Figure 7?

12  A.   Figure 7 has a larger flat cam face.  Still an undercut

13  inlet and outlet with the bypass protrusion.

14  Q.   And, finally, what about Figure 8?

15  A.   Figure 8 has a long -- a longer cam surface, a full one,

16  and with the flow being through ports that are in the cam

17  face and the protrusion to operate the bypass.

18  Q.   Sir, are you proud of the work that you did on Project

19  Tornado?

20  A.   Yes.

21  Q.   And why is that?

22  A.   We spent a lot of time looking at our voice of the

23  customer pieces to make sure that we got everything right.

24  We're always trying to do continuous improvement.  So we made

25  great improvements over our current Cuno design.  The team

1    did a lot of great work.

2              MR. HUNG:  Your Honor, may I approach with a few

3    physical exhibits?

4              THE COURT:  You may approach the witness.

5              If you will hand them to the Court Security

6    Officer, and he'll give them to the witness.

7              MR. HUNG:  Thank you.  Thank you.

8    Q.   (By Mr. Hung)  Mr. Rose, I think you have before you,

9    PX-502.

10        Do you recognize what this is?

11   A.   PX-502.

12   Q.   Yeah, it's in a Whirlpool PUR box.  Can you take that

13   out of the box and show the jury what it is?

14   A.   Sure.

15   Q.   And what is that, sir?

16   A.   That's the original design that we went forward with for

17   the cartridge.

18   Q.   And can you -- you also have before you Plaintiff's

19   Exhibit 490.  And we've broken that up into the head assembly

20   component and the housing component.  Can you pull -- can you

21   take that out and just show the jury what the housing looks

22   like?

23   A.   Sure.

24             THE COURT:  And, Mr. Rose, you may stand up if it

25   helps.

```
1              THE WITNESS:  Okay.

2              THE COURT:  That's one of the reasons you have that

3   lapel microphone on.

4   Q.   (By Mr. Hung)  And can you show the jury what it looks

5   like when you mate the PUR filter into that assembly, into

6   that head assembly?

7   A.   Yeah.  It's -- it's very similar to the animation that

8   we showed earlier, but the cartridge inserts their -- the

9   O-rings are just now coming into place.  And then as I push

10  all the way in, then they're locked into place.

11  Q.   Now, sir, have you heard of a product called the HDX

12  W-5?

13  A.   Yes.

14  Q.   And what is that product?  Do you know what that product

15  is?

16  A.   It's just another filter.

17  Q.   Does Home Depot manufacture that?

18  A.   Home Depot sells it, yes.

19  Q.   And who manufactures it?

20  A.   TST.

21  Q.   How did you come to learn about the Home Depot HDX 75

22  (sic)?

23  A.   I was -- I came to Beth Jackson's desk who's our filter

24  manager.  I saw it at her desk.

25  Q.   And when you saw the design, what did you think, sir?
```

1  A.    It's a copy of our original PUR filter cartridge.

2  Q.    Can you take out the -- the HDX filter out of that

3  packaging, and can you show the jury what it looks like?

4  A.    Sure.

5  Q.    And, sir, can you take the end cap off?

6        And will that product mate into the head assembly just

7  like the PUR product?

8  A.    Yes, it does.

9  Q.    Okay.

10             MR. HUNG:  Pass the witness.

11             THE COURT:  All right.  Cross-examination by

12  Defendant.

13             Proceed when you're ready, Counsel.

14             MR. MURRAY:  Thank you, Your Honor.

15                        CROSS-EXAMINATION

16  BY MR. MURRAY:

17  Q.    Good afternoon, Mr. Rose.

18  A.    Good afternoon.

19  Q.    Before the Filter 3 was launched, Whirlpool used the

20  Cuno quarter-turn filter, the -- the filter you've been

21  calling the Cuno filter, in its side-by-side refrigerators,

22  correct?

23  A.    Yes, that's true.

24  Q.    And that Cuno quarter-turn filter existed before you

25  designed the Filter 3; is that right?

1    A.   Yes, I did.

2         THE COURT:  Let's wait just a minute.  If you have

3    notebooks to pass out, let's go ahead and get those passed

4    out.

5         MR. GILLETT:  May I approach, Your Honor?

6         THE COURT:  You may.

7    Q.   (By Mr. Murray)  And Whirlpool now calls that Cuno

8    filter, the Filter 5, correct?

9    A.   I believe that's correct, yes.

10   Q.   And can you recognize this as the Whirlpool Filter 5, or

11   would you need to inspect it?

12   A.   I haven't looked at one in a long time.

13        MR. MURRAY:  May I approach, Your Honor?

14        THE COURT:  You may.

15   A.   Yes, it is.

16   Q.   (By Mr. Murray)  And that filter's marked DX-716?

17   A.   Yes.

18        MR. MURRAY:  May I approach to retrieve the

19   physical, Your Honor?

20        THE COURT:  Yes, you may.

21   Q.   (By Mr. Murray)  The -- the housing for the Cuno filter

22   had inlet and outlet valves, correct?

23   A.   Yes.

24   Q.   And those valves extend sideways relative to the

25   cartridge?

1   A.   Yes, they do.

2   Q.   And the Cuno design doesn't have any cam surfaces that

3   actuate these valves that extend sideways, right?

4   A.   I do not believe so.

5   Q.   So it is possible in a prior design that existed before

6   the Filter 3 to have the valves and the tubes coming out the

7   side of the housing without using cam surfaces, correct?

8   A.   Yes.

9   Q.   The head assembly in the Cuno filter housing also has a

10   bypass, right?

11   A.   Yes, it does.

12   Q.   Not having a bypass in the Filter 3 that you designed,

13   that would have been a step backward, right?

14   A.   Yes, it's a basic requirement for our -- our filter

15   system.

16   Q.   Now, you testified -- excuse me, you testified about

17   some drawbacks to the Cuno system.  Do you recall that?

18   A.   Yes.

19   Q.   Those weren't particularly serious drawbacks, were they?

20   A.   The biggest one was probably ease of use when our -- our

21   customers on the quarter-turn to remove.

22   Q.   But that wasn't a particularly serious drawback, was it?

23   A.   If it shows up in all of our -- serious -- define

24   serious.

25   Q.   Well, at your deposition, you couldn't recall any

 1    drawbacks to the Cuno system the first time I asked you about

 2    it, correct?

 3    A.   I'm not sure.

 4              MR. MURRAY:  Mr. Serp, could we please see

 5    Mr. Rose's Slide 11?  Mr. Rose's Slide 11 that he showed -- I

 6    believe it had a picture of a refrigerator.  That's okay.

 7    Q.   (By Mr. Murray)  Mr. Rose, you recall testifying about a

 8    refrigerator design that was not the original design that you

 9    launched where there was little space behind the filter

10    housing?  Do you recall that?

11    A.   Yes.

12    Q.   Do you know when that particular refrigerator was

13    launched?

14    A.   That one -- the one depicted, we started building in

15    2000.

16              MR. MURRAY:  Not that refrigerator.

17              Can we see PX-27 at Page 23, please?

18    Q.   (By Mr. Murray)  Mr. Rose, do you recall testifying

19    about this slide?

20    A.   Yes.  I've seen that slide before.

21              MR. MURRAY:  Could we please see Page 21?  Thank

22    you.

23    Q.   (By Mr. Murray)  So this is one of the slides that you

24    testified about, right?

25    A.   Yes, it is.

1  Q.   And it mentions -- this slide is about the filter and

2  the housing, correct?

3  A.   That's correct.

4  Q.   And the bullet points list some of the features of the

5  filter and the housing?

6  A.   Yes.

7  Q.   The first one is a push button ejection system?

8  A.   Yes.

9  Q.   You didn't invent push button ejection systems, correct?

10 A.   For this -- for this location, yes, but push buttons are

11 available on other products.

12 Q.   Push button ejection systems pre-existed your invention,

13 correct?

14 A.   Yes.

15 Q.   And the bypass valve mechanism, that also pre-existed

16 your invention?

17 A.   Yes.  There are other bypass valves, other designs.

18 Q.   And cartridges with dual ports, inlet and outlet ports,

19 those also pre-existed your invention, correct?

20 A.   It's a basic function of a cartridge to have an inlet

21 and outlet, so, yes.

22 Q.   It's a basic thing, a bypass, correct?

23 A.   No.  A bypass is not sent required for a filter to work.

24 Inlet and outlet would be.

25 Q.   But having a bypass is basic, is it not?

```
 1   A.    It's a basic requirement for Whirlpool design for

 2   refrigerators, yes.

 3         THE COURT:  Mr. Rose, if you could speak up just a

 4   little bit, please?

 5         THE WITNESS:  Sure.

 6         THE COURT:  I want to make sure everybody hears

 7   you.

 8         Go ahead, Mr. Murray.

 9   Q.    (By Mr. Murray)  In some slide of the filter and the

10   housing, it doesn't mention cam surfaces, correct?

11   A.    No, it does not.

12   Q.    It doesn't mention valves that are oriented sideways,

13   does it?

14   A.    No.

15   Q.    It doesn't mention tubes that extend sideways out of the

16   housing, correct?

17   A.    No, it does not.

18   Q.    It doesn't say that the filter and housing save space,

19   correct?

20   A.    No, it does not.

21   Q.    It doesn't say that the filter and housing enable more

22   contaminants to be filtered from the water, correct?

23   A.    Yeah, correct.  This is a slide that we used as an

24   overview.  It does not go into the detail that you're asking

25   about right now.
```

1  Q.   But you chose some features to emphasize on this slide,

2  correct?

3  A.   Yes, that's correct.

4  Q.   And those features were in pre-existing water filters,

5  right?

6  A.   I don't think the combination in this of the push button

7  was in prior Whirlpool products, so it was new for us.

8  Q.   New for you, but these features were in prior products

9  done by others, right?

10  A.   I'm not aware.

11  Q.   So it's your view that orienting the valves sideways in

12  the head assembly saves space, correct?

13  A.   Yes.

14  Q.   And in designing the Filter 3, the only thing that you

15  did to save space was to position the valves sideways, right?

16  A.   That's -- I would say we took a combination of a lot of

17  things together to save space.  Space is a premium each time

18  I design anything for a refrigerator.

19          THE COURT:  Mr. Rose, I'm sorry, you're just

20  mumbling.  See if you can speak up for me, okay?

21          THE WITNESS:  Okay.

22  Q.   (By Mr. Murray)  Mr. Rose, the only thing you did when

23  you were designing the Filter 3 to save space was to orient

24  the valves in the housing sideways, correct?

25  A.   No.  We use space as a criteria for all of our designs.

1    So there were other aspects that we worked on, on the
2    product.
3    Q.    At your deposition, when I asked you how else -- what
4    else did you do to save space, you couldn't recall anything
5    else, correct?
6    A.    If that's what my deposition says, that's correct.
7    Q.    But turning the valves at a right angle, you took
8    advantage of extra space that the refrigerator had on the
9    left of the housing, correct?
10   A.    Yes, that's correct.
11   Q.    You had kind of a tight space behind the filter, right?
12   A.    Yes, we did.
13   Q.    But you got more space to the left of the filter
14   housing, right?
15   A.    Yes.
16   Q.    So you configured the components of the products so that
17   they would be placed in the available space, right?
18   A.    Yes, that's correct.  That's the way we needed to run --
19   to route the water -- the water tubing.
20   Q.    And that was logical, right?
21   A.    It's the way we needed to route it so that I could
22   prevent it from leaking.
23   Q.    Now, the advantage of saving space is that you can put
24   more carbon material in the filter cartridge, right?
25   A.    Yes, that's correct.

1    Q.   If you made the filter wider, then you could make it

2    shorter and still have the same amount of carbon, correct?

3    A.   Yes, that's correct.

4    Q.   But when you were designing the Filter 3, you never

5    ruled out the possibility of making the diameter a bit larger

6    so that you could have the valves coming straight out the

7    back without the need for cam surfaces, correct?

8    A.   No.  We actually iterated quite a bit on the diameter.

9    That is the largest diameter that I can fit in the two -- in

10   the two different platforms, being the side-by-side counter

11   depth and the BIR.

12   Q.   So you're saying that you did rule out the possibility

13   of making the filter wider and then being able to have the

14   valves come straight out the back, you ruled that out?

15   A.   The wider cartridge had a weaker -- it was much weaker

16   in the -- in the stress area.  When you use the cylinder like

17   this, you're able to keep the stress of the component -- it's

18   a much better design to use a circular cylinder.

19   Q.   At the time you were designing the filter, you never

20   ruled out the possibility of making it wider, right?

21   A.   No.  It could have been made wider.  I could not

22   increase the diameter.  You ask -- I think you asked me both.

23   Q.   Now, you recall me discussing this with you in your

24   deposition, right?

25   A.   Yes.  We discussed coming out the back of the cartridge

1  straight, instead of at the 90 degrees.

2  Q.   In your deposition, you were under oath, right?

3  A.   Yes.

4  Q.   And you understood that the proceedings there were

5  comparable to court proceedings, you were going to give

6  answers to the questions that the jury could rely on in this

7  case, right?

8  A.   Yes, that's correct.

9  Q.   I'd like to -- you to turn to your deposition

10  transcript, which is in the binder that we gave you.

11  A.   Okay.

12  Q.   Back on Page 151, Rows 1 through 5.

13      And I asked you:  Well, did you determine that you

14  couldn't make the filter cartridge larger in diameter and

15  leave the valves coming straight out the back of the filter

16  housing?

17      Answer:  No, I do not recall.

18      Do you recall that question and giving that answer?

19  A.   Yes.

20  Q.   It's not Whirlpool's position that the sideways

21  orientation of the valves is important because it lets the

22  tubes come out the side.  And as you said earlier, it doesn't

23  interfere with anything, correct?

24  A.   Yes.  So it improves the quality of the assembly by

25  having them come out the side.

1   Q.   Yeah.

2   A.   That was our preference.

3   Q.   But inlet and outlet water tubes aren't mentioned

4   anywhere in the claims of the '894 patent, correct?

5   A.   No, that's just part of the refrigerator itself.

6   Q.   The '894 patent does have many figures showing the

7   refrigerator's head assembly and housing, correct?

8   A.   Yes.

9   Q.   But isn't it true that the inlet and outlet water tubes

10   aren't even mentioned once anywhere in the '894 patent?

11   A.   I do not recall.  I'd have to look at it, but I don't

12   think they are.

13   Q.   In the refrigerators that use the Filter 3, the tubing

14   just floats in the refrigerator because there's space around

15   it, correct?

16   A.   In the fold-out side-by-side, yes.

17   Q.   And those fold-out side-by-side refrigerators are the

18   ones that you showed in the patents that came out of the

19   Tornado project, right?

20   A.   Yes.

21   Q.   And it's Whirlpool's position in this case that you

22   can't bend those tubes too much without causing problems with

23   the head assembly, right?

24   A.   Yes.  When you put -- when you bend those tubes or put

25   load on them, then you -- then the -- then the valve head

1  starts leaking at the inlet or outlet fitting because you put

2  side load on that O-ring, and they will start leaking.

3  Q.   Some tubes are easier to bend than others, right?

4  A.   Yes, that's correct.

5  Q.   And there isn't one specific type of tubing that must be

6  used in refrigerators, right?

7  A.   There is a specific type that we designed for Whirlpool,

8  yes.

9  Q.   When Whirlpool replaced the Cuno filter with the Filter

10  3, you changed the inlet and outlet tubes in the

11  refrigerator, correct?

12  A.   Yes, I believe we did.

13  Q.   You changed the type of tubing to PEX tubing, right?

14  A.   Yes.

15  Q.   In addition, you changed the diameter of the tubing as

16  well, right?

17  A.   Yes, a standard poka-yoke for assemblies.

18  Q.   Are you aware that TST's technical expert in this case,

19  Mr. Matthew Stein, has stated in his expert report that the

20  water tubes in the Filter 3 come out the -- can come out the

21  side even if the valves extend straight out the back, are you

22  aware of that?

23  A.   No, I'm not.

24  Q.   You yourself don't know whether that's possible, right?

25  A.   No, I'm not sure.

```
 1              MR. MURRAY:  Could we please see DX-309?

 2   Q.    (By Mr. Murray)  Mr. Rose, that's also in your binder.

 3   A.    Okay.

 4   Q.    DX-309 is a PowerPoint presentation given during the

 5   Tornado Project, correct?

 6   A.    Yes, it is.

 7   Q.    And you either put this presentation yourself or you

 8   supervised the person that did, correct?

 9   A.    That is correct.  I was in charge of the project.

10              MR. MURRAY:  Could we please see Slide 4?

11   Q.    (By Mr. Murray)  Do you see this says technical

12   assessment at the top, Mr. Rose?

13   A.    Yes.

14   Q.    And under the bullet point that says technical

15   feasibility, it says:  Filter interface and housing are being

16   designed by PUR.

17         Do you see that?

18   A.    Yes.

19   Q.    So PUR was designing the filter, correct?

20   A.    At that time, they were.

21   Q.    This slide, which is called technical assessment, never

22   mentions orienting the valve sideways, right?

23   A.    This slide particular, no, it does not talk about

24   direction.

25   Q.    But the slide about the technical assessment doesn't
```

1    mention that?

2    A.    No, it does not.

3    Q.    And the technical assessment -- the technical assessment

4    slide doesn't mention cam surfaces either, correct?

5    A.    No.  We typically would not cover the level of detail

6    that is on the drawings in that type of presentation.

7    Q.    But this particular slide does mention the push button

8    ejection system towards the top, does it not?

9    A.    Yes, because we'd be talking about our customer

10   interface, so --

11   Q.    So that was a feature -- excuse me.

12   A.    No, I was finished.

13   Q.    So the push button interface was a feature that was

14   important to you, and you put it on the technical assessment

15   slide, correct?

16   A.    Yes.

17              MR. MURRAY:  Could we see Slide 2 in the

18   presentation, please?

19   Q.    (By Mr. Murray)  This slide is titled market assessment;

20   do you see that?

21   A.    Yes.

22   Q.    And at the bottom of the slide where it says launch

23   objective; do you see that?

24   A.    Yes, I do.

25   Q.    And the launch objective is to increase aftermarket

1  filter revenue, correct?

2  A.  Yes.

3  Q.  And aftermarket filters are the replacement filters that

4  you buy when the original filter that came with your

5  refrigerator is spent, right?

6  A.  Yes, that's correct.

7        MR. MURRAY:  Can we please see DX-315?

8  Q.  (By Mr. Murray)  Mr. Rose, DX-315 is a failure mode

9  effects analysis, or FMEA, that you did when you were

10 developing Filter 3, correct?

11 A.  Yes, it is.

12 Q.  And when you do an FMEA, you identify the possible ways

13 that a device can fail, right?

14 A.  Yes, it's the -- we use one at the start of every

15 project.

16 Q.  And the fact that you're doing an FMEA analysis does not

17 mean that you're having problems with the product, correct?

18 A.  No, it just identifies every point that we need to pay

19 particular attention to in the design.

20 Q.  And when you identify all the ways a product can

21 potentially fail, that doesn't mean you're having

22 unacceptable number of failures, right?

23 A.  That's correct.

24 Q.  And Whirlpool does FMEA analyses on products already on

25 the market in an effort to improve the product, right?

1   A.   Yes.  We would look at the analysis of our own products

2   to improve them.

3   Q.   Are you aware that -- that Whirlpool has discussed in

4   this case TST's FMEA analyses?

5   A.   No, I am not.

6           MR. HUNG:  Your Honor, I'm -- I was going to object

7   because I'm not sure how he would know about TST's

8   confidential information.

9           THE COURT:  You were going to object or you do

10  object?

11          MR. HUNG:  I do object, thank you.

12          MR. MURRAY:  I'm done with this topic, Your Honor.

13          THE COURT:  Nonetheless, let's look at the

14  objection.

15          MR. HUNG:  Your Honor, he's asking -- he's asking

16  Mr. Rose about TST's confidential FMEA analyses.

17          THE COURT:  Well, he asked him was he aware, and he

18  said, no, I'm not.  So he's not attempted to speculate or

19  give other information.

20          MR. HUNG:  That's fine, Your Honor.

21          THE COURT:  I'll overrule the objection.

22          Let's move on, Counsel.

23          MR. MURRAY:  Yes, Your Honor.

24  Q.   (By Mr. Murray)  You discussed quality in your direct

25  testimony, correct?

1  A.    Yes.

2  Q.    Customers sometimes return Whirlpool's Filter 3 filters,

3  right?

4  A.    Yes.

5         MR. MURRAY:  Could we please see DX-316?

6  Q.    (By Mr. Murray)  DX-316 is a lab report about a Filter 3

7  filter that had been returned, correct?

8  A.    Yes, it is.

9  Q.    You were involved in analyzing that filter, were you

10  not?

11  A.    Yes.  In my current position as the quality lead for

12  Amana, this was on a product that was built there, so it came

13  to my attention.

14  Q.    And that Filter 3 had clogged up, correct?

15  A.    Yes.

16  Q.    On the first page, in the information box, it says:

17  According to Todd Rose, the water quality for the respective

18  household shall not be an issue.  Right?

19  A.    Yes.

20  Q.    So the clogging problem there was due to the part

21  itself, right?

22  A.    That's eventually what we were able to find, yes.

23  Q.    But it's normal for any manufacturer of components or

24  parts to have occasional failures of parts, right?

25  A.    Yes.

1   Q.   The reason Whirlpool wanted to develop the Filter 3 was

2   to provide cleaner water, right?

3   A.   Yes.

4   Q.   Filtering out lots of contaminants isn't essential in a

5   good water filter, is it?

6   A.   I would think that it depends on what you want to claim.

7          MR. MURRAY:   Can we see DX-303 at Page 3?

8   Q.   (By Mr. Murray)  DX-303 is a piece of Whirlpool

9   literature that we discussed in your deposition showing

10  Whirlpool's water filters, correct?

11  A.   Yes.

12         MR. MURRAY:   If we could look at Filter 7, please?

13  Q.   (By Mr. Murray)  Whirlpool's Filter 7 is only certified

14  to filter out seven contaminants, correct?

15  A.   Yes.  According to the literature here, yes.

16  Q.   And that's a lot fewer than the Filter 3?

17  A.   Yes.

18  Q.   Whirlpool's Filter 6 --

19         MR. MURRAY:   Can we see that, please?

20  Q.   (By Mr. Murray)  Whirlpool's Filter 6 is certified to

21  filter out nine contaminants, correct?

22  A.   According to this document, yes.

23  Q.   Whirlpool's Filter 8 is certified to filter out four

24  contaminants; is that right?

25  A.   Yes, that's what's here printed.

1  Q.  And Whirlpool's currently transitioning to Filter 2,

2  correct?

3  A.  Yes, they are.

4  Q.  And that filter is currently certified to filter out 24

5  contaminants, correct?

6  A.  Yes, that is correct.

7  Q.  And that's -- that's fewer than the Filter 3?

8  A.  Yes, it is.

9  Q.  And previously the Filter 2 only filtered out seven

10  contaminants, correct?

11  A.  According to this document, yes.

12  Q.  So Whirlpool has sold millions of water filters that

13  have filtered out fewer than 10 contaminants, correct?

14  A.  I don't know how -- what the sales records are.

15  Q.  Certain claims in the '894 patent that have been

16  asserted in this case say that the distances between the

17  inlet, the outlet, and the protrusion, those three features,

18  should each be about two centimeters.  Are you aware of that?

19  A.  Yes, I am.

20  Q.  The benefit to those distances is just to make sure that

21  the filter matches up with the head assembly, correct?

22  A.  It provides that keying feature.  That's how we got the

23  compactness of the head assembly to -- to work in conjunction

24  with each other.

25  Q.  But the benefit to those distances, just having those

1  about two centimeters, that's just so that the filter can

2  match up with the head assembly, correct?

3  A.    Yes.  I mean, that's -- they're the controlling

4  dimensions for the design.

5  Q.    And, likewise, having the corresponding features on the

6  head assembly would also be about two centimeters.  That's,

7  again, just so that the two can be a matched pair, correct?

8  A.    Yes.  That's the controlling features for that side, as

9  well, or dimensions.

10  Q.    When you developed the Filter 3, at that time, you

11  thought you were the first one -- ones to orient valves

12  sideways relative to the filter cartridge, right?

13  A.    I would say all the pieces together, we thought we were

14  the first ones to put the entire piece together.

15  Q.    So you're talking about the arrangement of all the

16  components.  But I just want to ask you about orienting the

17  valve sideways in the head assembly.  When you developed the

18  Filter 3, you thought you were the first ones to orient those

19  valves sideways, correct?

20  A.    I'm not sure.

21  Q.    Well, let's refresh your recollection.  If you look at

22  your deposition at Page 172, Lines 2 through 6.  Just let me

23  know when you've read those.

24  A.    Okay.

25  Q.    So does that refresh your recollection?

1   A.    Yes.

2   Q.    So at the time you developed the Filter 3, you thought

3   you were the first to orient valves sideways, correct?

4   A.    Yes.

5   Q.    And when you filed your patent application on that

6   filter, you thought you were the first ones to use cam

7   surfaces to actuate a valve in a water filter assembly,

8   correct?

9   A.    Yes.

10  Q.    And you also believed that you were the first ones to

11  use a projection to actuate a bypass when a filtration

12  cartridge is inserted, correct?

13  A.    Yes.  I would say that one is in combination with the

14  others.

15  Q.    You thought you were first ones to do that at the time

16  you developed the Filter 3, correct?

17  A.    Yes.

18  Q.    And you also believed that you were the first ones to

19  use inlet and outlet projections that extend from the end of

20  the cartridge in a push-in water filter cartridge, correct?

21  A.    Yes.  I believe the uniqueness of the entire package,

22  yes.

23  Q.    All right.  So that addresses the combination of

24  features, but at the time you developed your invention, you

25  thought you were the first ones to use inlet and outlet

1  projections on the end of a push-in water filter cartridge,

2  correct?

3  A.    I don't know if I -- if the team studied that or not.

4  Q.    Well, I think maybe it might be helpful to refresh your

5  recollection again with your deposition.  If you turn to Page

6  174, please, Lines 12 through 16?

7  A.    Yes, that's correct.

8  Q.    So at the time you developed the Filter 3, you thought

9  you were the first to use projections -- inlet and outlet

10  projections on the end of a push-in water filter cartridge,

11  correct?

12  A.    Yes.

13  Q.    But at the time you thought you were the first to use

14  all of those components, you hadn't reviewed the over 300

15  references in the Patent Office's file, correct?

16  A.    No.  That would not be part of our design level at that

17  point.

18  Q.    You mentioned that cam surfaces are used to convert

19  motion from one direction to another direction.  Do you

20  recall that?

21  A.    Yes.

22  Q.    Cam surfaces are very well-known in the field of

23  mechanical design, correct?

24  A.    Yes, they are.

25  Q.    You studied cam surfaces in college in the introductory

1  class on mechanical design, correct?

2  A.   Yes, that's correct.

3  Q.   The introductory class at your school was called ME360,

4  right?

5  A.   Yes.

6  Q.   And in ME360, you studied cam surfaces used with push

7  buttons -- like the push button on an old style camera,

8  correct?

9  A.   Yes, that's correct.

10  Q.   And in the camera, when the user pushes the button down,

11  the cam surface converts that downward motion into horizontal

12  motion to actuate the shutter, correct?

13  A.   Yes, that's correct.

14  Q.   And in ME360, your class also studied cam surfaces on

15  the camshaft in an automobile engine, correct?

16  A.   Yes, that's correct.

17  Q.   The cams on a camshaft, those lift the intake and

18  exhaust valves in the engine, correct?

19  A.   Yes, they do.

20  Q.   So cams are -- are really old, right?

21  A.   Yes.

22  Q.   They were used back in the 1800s, correct?

23  A.   At least that far.

24  Q.   At least that far?  You kept a lab notebook when you

25  were designing the Filter 3, correct?

1   A.   Yes.  I would have kept a lab notebook on all projects.

2   Q.   And the purpose of keeping a lab notebook is to document

3   your daily work, right?

4   A.   Yes, that's correct.

5   Q.   And that would include notes from meetings, such as

6   meetings with your superiors at Whirlpool, correct?

7   A.   Yes.

8   Q.   You no longer have your lab notebook for the Filter 3,

9   right?

10  A.   No, I would -- I do not.

11  Q.   You took the -- you threw the lab notebook away,

12  correct?

13  A.   At the end of each project, yes.

14  Q.   And you throw the lab notebook away at the end of the

15  project because Whirlpool has a policy on that, right?

16  A.   Yes.

17  Q.   But as for why Whirlpool has a policy asking you to

18  throw away your lab notebooks, that, you don't know, correct?

19  A.   We're asked to retain things that are specific to the

20  products.  And things that were irrelevant to the project, we

21  get rid of.  Just part of the yearly policy.

22  Q.   But you don't know why Whirlpool wanted you to throw

23  away lab notebooks relating to your work on the Filter 3,

24  right?

25  A.   No, not specifically.  It's a general guideline.

1          MR. MURRAY:  I'll pass the witness, Your Honor.

2          THE COURT:  All right.  Is there redirect,

3   Mr. Hung?

4          MR. HUNG:  Yes.  Thank you, Your Honor.

5                   REDIRECT EXAMINATION

6   BY MR. HUNG:

7   Q.   Just a few questions, Mr. Rose.

8        You were asked whether an inlet fitting was known,

9   correct?

10  A.   Sorry?

11  Q.   Mr. Murray asked you whether an inlet fitting had been

12  known in the art, correct?

13  A.   Known to us?

14  Q.   To the world?

15  A.   Yes, to inlet fitting.

16  Q.   And he asked you whether the world knew about outlet

17  fittings before your invention, right?

18  A.   Yes.

19  Q.   And he asked you if the world knew about cam surfaces

20  before your invention, right?

21  A.   Yes.

22  Q.   Sir, let me ask you this question:  Do you think that

23  the world knew of an inlet fitting with a longitudinal axis

24  with a cam surface at the end that actuates an inlet follower

25  on a valve and a protrusion that actuates a bypass valve in a

1   head assembly wherein all three are positioned in an unequal

2   triangle with 2 centimeter distances, about 2 centimeter

3   distances, sir, had you ever heard had of that before?

4   A.   No, I had not.

5   Q.   Did you think -- do you think you were the first person

6   to invent that?

7   A.   Yes, I believe our team is.

8   Q.   Now, sir, you were here during opening, right?

9   A.   Yes.

10   Q.   And you saw that picture of the door -- that door on the

11   table, sir, did you?

12   A.   Yes.

13   Q.   If you took that Cuno quarter-turn filter and you

14   combined it with that door, would you end up with your Filter

15   3 cartridge?

16   A.   No, I don't think I would.

17           MR. HUNG:  Now, let's just blow up really quickly

18   PX-27 at Page 22.

19   Q.  (By Mr. Hung)  Mr. Murray asked you a lot of questions

20   about this slide.  He asked you, it doesn't mention space

21   savings, correct?

22   A.   No, it does not.

23   Q.   It doesn't mention tubes, correct?

24   A.   No.

25   Q.   Sir, does this slide mention water?

1   A.   No, it does not.

2   Q.   Does this slide mention a refrigerator?

3   A.   No -- yes, it does generically, side-by-side.

4   Q.   That's a fair point, sir.

5   A.   It mentions a refrigerator.

6   Q.   Does this slide refer to the PUR relationship?

7   A.   No, it does not.

8   Q.   Does this slide refer to a cam surface or anything that

9   would be inside that cartridge, sir?

10  A.   No, it does not.

11  Q.   Mr. Murray asked you a question about opinions that a --

12  that a Mr. Stein had.  Do you have any idea who Mr. Stein is?

13  A.   No.

14  Q.   If he was in the audience right now listening to your

15  testimony to prepare for his own testimony, would you be --

16  would you be able to identify him in this audience?

17  A.   No, I would not.

18  Q.   He asked you about what information you knew, if you

19  knew anything, about TST's confidential failure mode effects

20  analysis.  Do you know anything about those analysis?

21  A.   No, I do not.

22  Q.   Have you seen a single TST confidential document in your

23  life, to your knowledge, sir?

24  A.   No, I have not.

25  Q.   But let me ask you about the failure mode analyses that

1    you yourself conduct, sir.  Have you ever heard of something

2    called the SIR at Whirlpool?

3    A.    Yes.

4    Q.    And what is the SIR at Whirlpool for the Filter 3

5    cartridge?

6    A.    I'm trying to get the number close.  SIR is a service

7    incident rate, which would be our field rate for reporting

8    back.  Filter 3 runs under 8,000 PPM.

9    Q.    Meaning for 1 million filters that are sold, the service

10   incident rate is less than 8,000?

11   A.    Yes.

12   Q.    And, sir, for all of -- in the last four years you

13   started focusing again on filter issues, right?

14   A.    Yes, I have.

15   Q.    In that time frame Whirlpool has sold millions of these

16   filters that are competing now with TST's filter, right, sir?

17   A.    Yes.

18   Q.    How many filters have you seen that have been returned

19   due to a quality issue as a principal quality engineer for

20   the Amana product that decides whether a product, a new

21   product, ships from that plant?

22   A.    Three or less.

23   Q.    Out of the millions, correct?

24   A.    Yes.

25   Q.    Now, sir, Mr. -- Mr. Murray asked you about Filter 7 and

1   how that had about a seven contaminant reduction rate, sir,

2   right?

3   A.    Yes.

4   Q.    That's the oil can filter, right, that's an enormous

5   filter, isn't it?

6   A.    Yes.

7   Q.    That's a filter that hasn't been sold in over 10 years;

8   is that right?

9   A.    I'm not sure when it went out of production.  It was a

10  long time ago.

11  Q.    Same as Filter 8, right, that's a super old filter?

12  A.    I'd have to go back and look at Filter 8.  I don't

13  remember which one Filter 8 is.

14  Q.    Sir, let me close with this issue, Mr. Murray suggested

15  that you intentionally threw away documents.  When did the

16  work that let to Project Tornado occur, sir?

17  A.    Fifteen years ago.

18  Q.    Do you typically keep documents, corporate documents on

19  your shelves that you create 15 years ago?

20  A.    No, I do not.

21              MR. HUNG:  No further questions.

22              THE COURT:  Further cross-examination, Mr. Murray?

23              MR. MURRAY:  Yes, Your Honor.

24                        CROSS-EXAMINATION

25  BY MR. MURRAY:

1    Q.    Mr. Rose, is it your testimony that Whirlpool is

2    advertising filters that it no longer sells?

3    A.    No, I think they're still for sale.  We no longer

4    produce products.

5    Q.    What products?

6    A.    I'm not selling a new product that -- a new refrigerator

7    that contains it.

8    Q.    So what you discontinued are the refrigerators, correct?

9    A.    Yes.

10   Q.    Just like Whirlpool has transitioned away from the

11   Filter 3, right?

12   A.    Yes.

13   Q.    And with regard to the lab notebooks, when does

14   Whirlpool tell you to throw those away, is it after one year?

15   A.    When they're no longer pertinent.

16   Q.    Is there a policy that you throw them away after one

17   year if they're no longer pertinent?

18   A.    We are supposed to review them after every year to

19   decide if they're no longer pertinent.

20   Q.    Isn't it true that Whirlpool has a policy telling them

21   to throw the lab notebooks away when the project is finished?

22   A.    Yes.  I'm asked to review yearly that documents that are

23   no longer relevant be discarded.

24   Q.    Whirlpool has a policy saying lab notebooks are to be

25   discarded when the project is finished, correct?

1    A.    Non-pertinent data, yes.

2    Q.    And that's when you dispose of your Filter 3 notebook,

3    when the project was finished, correct?

4    A.    Yes, that's correct.

5    Q.    And -- and Filter 3 was launched in 2004, correct?

6    A.    I don't have the exact date.  I believe that's correct.

7                MR. MURRAY:  No further questions.

8                MR. HUNG:  Your Honor, I have one question.

9                THE COURT:  All right.  Go to the podium and ask

10   your one question.

11               MR. HUNG:  Thank you, Your Honor.

12                      REDIRECT EXAMINATION

13   BY MR. HUNG:

14   Q.    Mr. Rose, 14 years ago when you stopped working on the

15   Filter 3 project, Project Tornado, did you anticipate that

16   you needed to save documents so that 13 years in the future

17   you would be sitting in court testifying for the first time

18   and explaining how you invented the Project Tornado filter

19   and your belief that TST copied it and that that product

20   infringes?

21   A.    No, I did not.

22               MR. HUNG:  Thank you.

23               THE COURT:  Further cross-examination, Mr. Murray?

24               MR. MURRAY:  No, Your Honor.

25               THE COURT:  All right.  Mr. Rose, you may step

 1  down.

 2          Ladies and Gentlemen, we're going to take this

 3  opportunity to recess for the day.

 4          I'm going to ask you as you leave the courthouse to

 5  take those notebooks with you.  And as you go through the

 6  jury room, leave them on the table in the jury room.

 7          I'm going to ask that you be back in the jury room

 8  assembled a little bit before 8:30.  We'll try to start about

 9  8:30 each morning.  If you'll try to be in the courthouse and

10  in the jury room by about 8:20.  I can't promise you we'll

11  start exactly on the dot at 8:30, but I will do my best to

12  start at that time.

13          And we are stopping today at about 5:40.  I

14  typically will try to stop each day somewhere between 5:30

15  and 6:00 o'clock.  It depends -- just like with Mr. Rose on

16  when a witness finishes, if we can finish a witness and get

17  them off the stand, then we'll probably keep going within

18  that general time frame and finish them.  If they're going to

19  be a lot longer, then we probably won't go later than 6:00 at

20  the outside.

21          I know you -- I know several of you have fair

22  amounts of distance to travel coming and going from the

23  courthouse.  I have routinely found that juries prefer to

24  have longer days but a fewer number of days away from their

25  homes and their businesses, so that's generally the approach

1   I take.  And that's generally the time frame that you can

2   count on through the rest of this trial.

3           Again, it won't be precise.  We'll have to deal

4   with circumstances as they arise, but that's the general

5   target just for your planning purposes.

6           I'm going to remind you, as I told you I would at

7   the very beginning, when you go home this evening, don't

8   discuss the case at all with anyone.  And when you're asked

9   as you walk through the door what happened in court today,

10  just tell them you can't talk about it.

11          Follow all my other instructions.  Travel safely.

12  And we will see you in the morning.  You are excused until

13  tomorrow morning.

14          COURT SECURITY OFFICER:  All rise for the jury.

15          (Jury out.)

16          THE COURT:  All right.  Be seated, please.

17          Counsel, this should come as no surprise to you,

18  but before I bring the jury in in the morning, I'll expect a

19  representative of each side to go to the podium and read into

20  the record any items from the list of pre-admitted exhibits

21  that were used during today's portion of the trial before the

22  jury so that we can keep a running record of what is actually

23  an admitted exhibit in the record of the case, as opposed to

24  a pre-admitted exhibit which has not been used before the

25  jury.  And we'll do that each morning on a rolling basis

1    before we bring -- before I bring the jury in.

2          Also, I remind you that it's my practice to be in

3    chambers by 7:30 each morning.  I'll expect you to robustly

4    exercise your obligation to meet and confer overnight with

5    regard to demonstratives and other issues in hopes of

6    resolving any disputes.

7          If there are surviving disputes that need the

8    Court's attention, I remind you that we shouldn't be notified

9    by email directed to my law clerks not later than 10:30 p.m.

10   each night, and I'll expect to resolve any of those type

11   problems during that hour between 7:30 and 8:30 each morning.

12          And doing that will maximize the use of your

13   designated trial time and avoid any unnecessary and current

14   intrusions into that trial time.

15          One other minor matter.  Ms. Smith, if you would

16   like to continue to pass notes to co-counsel, please don't

17   walk between the defense table and the jury.  Please walk

18   around and hand it to your co-counsel.

19          MS. SMITH:  Understood, Your Honor.

20          THE COURT:  All right.  Any there questions from

21   Plaintiff before we recess for the evening?

22          MR. WARD:  No, Your Honor.

23          THE COURT:  Any questions from Defendant before we

24   recess for the evening?

25          MR. SGANGA:  No, Your Honor.

1          THE COURT:  All right.  We stand in recess until

2    tomorrow morning.

3          COURT SECURITY OFFICER:  All rise.

4          (Recess.)

5

6                        CERTIFICATION

7

8          I HEREBY CERTIFY that the foregoing is a true

9    and correct transcript from the stenographic notes of the

10   proceedings in the above-entitled matter to the best of our

11   abilities.

12

/s/ Shelly Holmes
13   SHELLY HOLMES, CSR, TCRR            March 6, 2017
     Official Court Reporter
14   State of Texas No.:  7804
     Expiration Date  12/31/18
15

16
/s/ Shea Sloan
17   SHEA SLOAN, CSR, RPR
     Official Court Reporter
18   State of Texas No.:  3081
     Expiration Date 12/31/18
19

20

21

22

23

24

25