1                  IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF TEXAS
2                      MARSHALL DIVISION

3  WHIRLPOOL CORPORATION        )
                           )   DOCKET NO. 2:15cv1528
4     -vs-                )
                           )   Marshall, Texas
5                         )   8:34 a.m.
  TST WATER, LLC            )   March 10, 2017
6

                 TRANSCRIPT OF JURY TRIAL
7                       ALL DAY
         BEFORE THE HONORABLE RODNEY GILSTRAP,
8             UNITED STATES DISTRICT JUDGE

9                A P P E A R A N C E S

10  PLAINTIFFS:

11  RICHARD S.J. HUNG
   BARBARA N. BARATH
12  CHRISTOPHER JAMIESON KENDALL
   RACHEL S. DOLPHIN
13  MORRISON & FOERSTER LLP
   425 Market St.
14  San Francisco, CA 94105

15  MELISSA R. SMITH
   ALLEN GARDNER
16  GILLAM & SMITH, LLP
   303 S. Washington Ave.
17  Marshall, TX 75670

18  T. JOHN WARD, JR.
   WARD, SMITH & HILL, PLLC
19  1507 Bill Owens Parkway
   Longview, TX 75604
20

  COURT REPORTER:        MS. SHELLY HOLMES, CSR-TCRR
21                    FEDERAL OFFICIAL COURT REPORTER
                     TO THE HONORABLE RODNEY GILSTRAP
22                  100 E. Houston Street
                  Marshall, Texas 75670
23

24  Proceedings taken by Machine Stenotype; transcript was
   produced by a Computer.
25

1  DEFENDANT:

2
   JOHN B. SGANGA, JR.
3  SEAN M. MURRAY
   JUSTIN J. GILLETT
4  KIM A. KENNEDY
   KNOBBE MARTENS OLSON & BEAR LLP
5  2040 Main St
   Fourteenth Floor
6  Irvine, CA 92614

7
   ELIZABETH L. DERIEUX
8  CAPSHAW DERIEUX, LLP
   114 E. Commerce Ave.
9  Gladewater, TX 75647

10

11                 ************************

12                 P R O C E E D I N G S

13          COURT SECURITY OFFICER:  All rise.

14          THE COURT:  Be seated, please.

15          All right.  Are the parties prepared to present

16  those items from the list of pre-admitted exhibits used

17  during yesterday's final portion of the trial?

18          You asked for time overnight to get that

19  straightened out.  I assume you have, Ms. DeRieux.  Where is

20  the Defendant on this?

21          MS. DERIEUX:  We're ready, Your Honor.

22          THE COURT:  Then let me have the Defendant's

23  offering, and then I'll hear from Plaintiff.

24          MS. DERIEUX:  During yesterday's proceedings the

25  Defendant admitted Defendant's Exhibits 1, 3, 18, 22, 25, 26,

1   27, 28, 29, 100, 102, 214, 323, and 758.

2          THE COURT:  All right.  Is there objection of that

3   offering from the Plaintiff?

4          MS. BARATH:  No, Your Honor.

5          THE COURT:  Does the Plaintiff have a similar

6   rendition to read into the record?

7          MS. BARATH:  No, Your Honor, we have no additional

8   exhibits at this time.

9          THE COURT:  All right.  Let me say this to our

10  friends in the gallery:  The Court considers closing

11  arguments and its final instructions to the jury as the most

12  serious part of a very serious process.

13         Once I bring the jury in and begin my final

14  instructions leading up to counsel's final arguments, I do

15  not expect any distractions.

16         I do not want an inordinate amount of shuffling,

17  whispering, coming, going, doors opened and being closed.  I

18  want it as quiet and as respectful as reasonably possible.

19  So bear that in mind, if you will, as we move toward that

20  part of the process.

21         Is Plaintiff aware of anything that needs to be

22  taken up before I bring in the jury and begin the final jury

23  instructions?

24         MR. WARD:  No, Your Honor.

25         THE COURT:  Is Defendant?

1          MR. SGANGA:  No, Your Honor.

2          THE COURT:  All right.  Then, Mr. Nance, would you

3    bring in the jury?

4          COURT SECURITY OFFICER:  All rise for the jury.

5          (Jury in.)

6          THE COURT:  Welcome back, Ladies and Gentlemen.

7          Please have a seat.

8          Ladies and Gentlemen of the Jury, you have now

9    heard the evidence in this case, and I will now instruct you

10   on the law that you must apply.

11         Each of you are going to have your own printed copy

12   of these final jury instructions that I'm giving you now, so

13   there's really no need for you to take notes unless you just

14   particularly want to.

15         It's your duty to follow the law as I give it to

16   you.  On the other hand, Ladies and Gentlemen, as I've said

17   previously, you, the jury, are the sole judges of the facts

18   in this case.

19         Do not consider any statement that I have made in

20   the course of the trial or make during these instructions as

21   an indication to you that I have any opinion about the facts

22   in this case.

23         You're about to hear closing arguments from the

24   attorneys.

25         Statements and arguments of the attorneys, I remind

1  you, are not evidence, and they are not instructions on the

2  law.  They're intended only to assist the jury in

3  understanding the evidence and the parties' contentions.

4          A verdict form has been prepared for you.  You are

5  to take this verdict form with you to the jury room; and when

6  you have reached a unanimous decision or agreement as to the

7  verdict, you're to have your foreperson fill in the blanks in

8  the verdict form, date it, and sign it.

9          Answer each question in the verdict form from the

10  facts as you find them to be.  Do not decide who you think

11  should win the case and then answer the questions to reach

12  that result.  Again, your answers and your verdict must be

13  unanimous.

14          In determining whether any fact has been proven in

15  this case, you may, unless otherwise instructed, consider the

16  testimony of all the witnesses, regardless of who may have

17  called them, and you may consider the effect of all the

18  exhibits received and admitted into evidence, regardless of

19  who may have produced or presented them.

20          You, the jurors, are the sole judges of the

21  credibility of each and every witness and the weight and

22  evidence to be given to the evidence in this case -- the

23  weight and effect to be given to the evidence in this case.

24          I knew that didn't sound right.

25          As I've told you previously, the attorneys in this

1    case are acting as advocates for their competing parties and
2    their competing claims, and they have a duty to object when
3    they believe evidence is offered that should not be admitted
4    under the rules of the Court.

5         In that case, when the Court has sustained an
6    objection to a question addressed to a witness, you are to
7    disregard the question entirely, and you may not draw any
8    references from its wording or speculate about what the
9    witness would have said if I had permitted them to answer the
10   question.

11        If, on the other hand, the objection was overruled,
12   then you're to treat the answer to the question and the
13   question itself just as if no objection had been made; that
14   is, like any other question and answer.

15        Now, at times during the trial, it was necessary
16   for the Court to talk to the lawyers here at the bench or
17   outside of your hearing when you were in the jury room.  This
18   happens because during a trial, there are things that
19   sometimes come up that do not involve the jury.

20        You should not speculate, Ladies and Gentlemen,
21   about -- about what was said during such discussions that
22   took place outside of your presence.

23        Now, there are two types of evidence that you may
24   consider in properly finding the truth as to the facts in
25   this case.  One is direct evidence, such as the testimony of

1   an eyewitness.

2          The other is indirect or circumstantial evidence;

3   that is, the proof of a chain of circumstances that indicates

4   the existence or nonexistence of certain other facts.

5          As a general rule, you should know that the law

6   makes no distinction between direct or circumstantial

7   evidence, but simply requires that you, the jury, find the

8   facts based on the evidence presented, both direct and

9   circumstantial.

10          The parties may have stipulated or agreed to some

11   facts in the case.  When the lawyers for both sides stipulate

12   as to the existence of a fact, you must, unless otherwise

13   instructed, accept the stipulation as evidence and regard the

14   fact as proven.

15          Certain testimony in the case has been presented to

16   you through depositions.  A deposition is the sworn, recorded

17   answers to questions asked to a witness in advance of the

18   trial.  If a witness cannot be present to testify in person,

19   then the witness's testimony may be presented under oath in

20   the form of a deposition.

21          As I told you earlier, before the trial, the

22   attorneys representing the parties in this case questioned

23   these deposition witnesses under oath.  At that time, a court

24   reporter was present and recorded their sworn testimony.

25          Deposition testimony is entitled to the same

1    consideration by you, the jury, as testimony given by a

2    witness in person from the witness stand in open court.

3         Accordingly, you should judge the credibility and

4    importance of the deposition testimony to the best of your

5    ability, just as if the witness had testified before you in

6    open court.

7         While you should consider only the evidence in this

8    case, Ladies and Gentlemen, you should understand that you

9    are permitted to draw such reasonable inferences from the

10   testimony and the exhibits as you feel are justified in the

11   light of common experience.

12        In other words, you may make deductions and reach

13   conclusions that reason and common sense lead you to draw

14   from the facts that have been established by the testimony

15   and the evidence in this case.

16        However, you should not base your decision on any

17   evidence not presented by the parties in open court during

18   the trial of this case, including your own personal

19   experiences with any particular refrigerator or water filter.

20        Now, unless I instruct you otherwise, you may

21   properly determine that the testimony of a single witness is

22   sufficient to prove any fact, even if a greater number of

23   witnesses may have testified to the contrary if after

24   considering all of the other evidence you believe that single

25   witness.

1          When knowledge of a technical subject may be

2     helpful to the jury, a person who has special training and

3     experience in that technical field, called an expert witness,

4     is permitted to state his or her opinions on those technical

5     matters to the jury.

6          However, Ladies and Gentlemen, you're not required

7     to accept those opinions.  As with any other witness, it is

8     solely up to you to decide who you believe and who you don't

9     believe and whether or not you want to rely on their

10    testimony.

11         Now, certain exhibits have been shown to you during

12    the trial that were illustrations.  We call these types of

13    exhibits demonstrative exhibits or sometimes just

14    demonstratives for short.

15         Demonstrative exhibits are a party's description,

16    picture, or model to describe something involved in this

17    trial.  If your recollection of the evidence differs from the

18    demonstratives, you should rely on your recollection.

19         Demonstrative exhibits are sometimes called jury

20    aids.

21         Demonstrative exhibits are not evidence, Ladies and

22    Gentlemen, but they are -- but the -- but the witness's

23    testimony concerning the demonstrative evidence or the

24    demonstrative exhibit is evidence.  The demonstrative is not

25    evidence, but the witness's testimony during which they use

1  the demonstrative is evidence.

2         In any legal action, facts must be proven by a

3  required amount of evidence known as the burden of proof.

4         The burden of proof in this case is on Whirlpool

5  for some issues, and it is on TST Water for other issues.

6         There are two burdens of proof that you will apply

7  in this case, the preponderance of the evidence and clear and

8  convincing evidence.

9         The Plaintiff, Whirlpool, has the burden of proving

10 patent infringement by a preponderance of the evidence.  The

11 Plaintiff, Whirlpool, also has the burden of proving willful

12 patent infringement by a preponderance of the evidence.

13        The Plaintiff, Whirlpool, also has the burden of

14 proving damages for any patent infringement by a

15 preponderance of the evidence.

16        A preponderance of the evidence means evidence that

17 persuades you that a claim is more probably true than not

18 true.  Sometimes this is talked about as being the greater

19 weight and degree of credible testimony.

20        The Defendant, TST Water, has the burden of proving

21 patent invalidity by clear and convincing evidence.  Clear

22 and convincing evidence means evidence that produces in your

23 mind an abiding conviction that the truth of the party's

24 factual contentions are highly probable.

25        Although proof to an absolute certainty is not

1  required, the clear and convincing evidence standard requires

2  a greater degree of persuasion than is necessary for the

3  preponderance of the evidence standard.

4      If the proof establishes in your mind an abiding

5  conviction in the truth of the matter, then the clear and

6  convincing evidence standard has been met.

7      These standards are different from what you may

8  have learned about in criminal proceedings where a fact is

9  proven beyond a reasonable doubt.

10      On a scale of the various standards of proof, as

11  you move from the preponderance of the evidence, where the

12  proof need only be sufficient to tip the scales in favor of

13  the party proving the fact, to at the other end beyond a

14  reasonable doubt, where the fact must be proven to a very

15  high degree of certainty, you may think of clear and

16  convincing evidence as being between those two standards.

17      In determining whether any fact has been proved by

18  a preponderance of the evidence or by clear and convincing

19  evidence, you may, unless otherwise instructed, consider the

20  stipulations, the testimony of all the witnesses, regardless

21  of who called them, and all the exhibits received into

22  evidence during the trial, regardless of who may have

23  produced them.

24      Now, as I did at the beginning of the case, I'll

25  give you a summary of each side's contentions, and then I'll

1  provide you with detailed instructions on what each side must

2  prove to win on each of its contentions.

3          As I told you previously, this case concerns one

4  United States patent, that being U.S. Patent No. 7,000,894,

5  which you've consistently heard referred to throughout the

6  trial as the '894 patent.

7          I'll refer to this as the patent-in-suit.  I may

8  also refer to it as the asserted patent.

9          Whirlpool, the Plaintiff, seeks money damages from

10 TST Water, the Defendant, for allegedly infringing the

11 patent-in-suit, the '894 patent, by making, using, selling,

12 and/or offering for sale in the United States its W-5 filters

13 and other filters, which collectively are referred to as the

14 W-5 filters or the accused products, that are designed to fit

15 in the place of Whirlpool's Filter 3.

16         Whirlpool contends that TST's accused products

17 infringe the following claims of the '894 patent:  Claim 1,

18 Claim 4, Claim 10, Claim 15, Claim 17, Claim 20, and Claim

19 27.

20         All of these claims are sometimes referred to as

21 the asserted claims.  Whirlpool has alleged that the accused

22 products infringe the asserted claims either literally or

23 through the Doctrine of Equivalents.

24         Whirlpool also alleges that TST's infringement --

25 TST Water's infringement is and has been willful.  Whirlpool

seeks lost profits and a reasonable royalty for TST Water's
alleged infringement.

TST Water denies that the W-5 filters infringe any
of the asserted claims of the '894 patent, the asserted
patent, either literally or under the Doctrine of
Equivalents.

TST Water further denies that -- it further denies
Whirlpool's allegation that it willfully infringed any claim
of the '894 patent.

TST Water also contends that the asserted claims of
Whirlpool's patent are invalid as being obvious.

The Defendant, TST Water, contends that all the
asserted claims are obvious in view of prior art that existed
before Whirlpool's alleged inventions, and, therefore, the
'894 patent's asserted claims are invalid.

Now, invalidity is a defense to infringement.  TST
Water denies that it owes Whirlpool any damages in this case.

Invalidity and infringement are separate and
distinct issues, however.  And your job is to decide whether
the asserted claims of the asserted patent have been
infringed and whether any of the accused claims of that
patent are invalid.

Now, if you decide that any claim has been
infringed and is not invalid, then you'll need to decide
whether TST's infringement has been willful, and you'll need

1    to decide the amount of money damages that are to be awarded

2    to Whirlpool as compensation for that infringement.

3            Now, before you can decide many of the issues in

4    this case, you'll need to understand the role of the patent

5    claims.

6            The patent claims are the numbered sentences at the

7    end of the patent.

8            The claims are important, Ladies and Gentlemen,

9    because it is the words of the claims themselves that define

10   what the patent covers.  The figures and the text in the rest

11   of the patent provide a description or examples of the

12   invention, and they provide a context for the claims; but it

13   is the claims that define the breadth of the patent's

14   coverage.

15           Each claim is effectively treated as if it were its

16   own separate patent, and each claim may cover more or may

17   cover less than any other claim.  Therefore, what a patent

18   covers collectively or as a whole depends on what each of its

19   claims cover.

20           Claims may describe apparatuses, devices, or

21   products, such as machines.  I'll call those type claims

22   apparatus claims.  Claims may also describe methods for using

23   a product.  And I'll call those type of claims method claims.

24           In this case, Whirlpool has asserted apparatus

25   claims, as well as method claims.

1    You first need to understand what each claim covers

2  in order to decide whether or not there is infringement of

3  that claim and to decide whether or not the claim is invalid.

4    And the first step is to understand the meaning of

5  the words used in the patent claim.

6    Now, the law says that it is my role to define the

7  terms of the claims, but it is your role to apply my

8  definitions to the issues that you're asked to decide in this

9  case.

10    Accordingly, as I explained at the beginning of the

11  case, I've determined the meaning of certain patent

12  limitations, and I've provided those definitions to you in

13  your juror notebooks.

14    You must accept my definitions of these words in

15  the claims as being correct, and it is your job to take these

16  definitions that I have supplied and apply them to the issues

17  that you are asked to decide, including the issues of

18  infringement and invalidity.

19    You should disregard any evidence presented in the

20  trial which contradicts or is inconsistent with the

21  constructions and definitions that I have given to you.

22    For claim limitations where I have not construed,

23  that is defined or interpreted, any particular term, you are

24  to use the plain and ordinary meaning of that term as

25  understood by one of ordinary skill in the art, which is to

1    say, in the field of technology of the patent at the time of

2    the alleged invention.

3              The meanings of the words of the patent claims must

4    be the same when deciding both the issues of infringement and

5    validity.

6              You've been provided with a complete copy of the

7    '894 patent, the asserted patent, inside your juror

8    notebooks, and you may use it, Ladies and Gentlemen, in your

9    declarations.

10             I'll now explain how a claim defines what it

11   covers.

12             A claim sets forth, in words, a set of

13   requirements.  Each claim sets forth its requirements in a

14   single sentence.  If a device satisfies each of these

15   requirements in that sentence, then it is covered by and

16   infringes the claim.

17             There can be several claims in a patent.  A claim

18   may be narrower or broader than another claim by setting

19   forth more or fewer requirements.  The coverage of a patent

20   is assessed on a claim-by-claim basis.

21             In patent law the requirements of a claim are often

22   referred to the "claim elements" or they're sometimes

23   referred to as the "claim limitations."

24             When a product meets all the requirements of a

25   claim, where it meets all of its limitations or all of its

1  elements, the claim is said to cover that product; and that

2  product is said to fall within the scope of that claim.  In

3  other words, a claim covers a product where each of the claim

4  elements or limitations is present in that product.

5       If a product is missing even one limitation or

6  element of a claim, the product is not covered by that claim.

7  If the product is not covered by the claim, the product does

8  not infringe the claim.

9       Now, the beginning portion or preamble of a claim

10  often uses the word "comprising."  The word "comprising," as

11  we've mentioned before, when used in a preamble, means

12  "including but not limited to" or "containing but not limited

13  to."

14       When "comprising" is used in the preamble, if

15  you -- if you decide that the accused product includes all of

16  the requirements of that claim, the claim is infringed.

17  That's true even if the accused instrumentality contains

18  additional or added elements.

19       For example, a claim to a table comprising a

20  tabletop, legs, and glue would be infringed by a table that

21  includes a tabletop, legs, and glue even if the table also

22  includes other elements, such as wheels on the ends of the

23  table's legs.

24       This case involves two types of patent claims:

25  Independent claims and dependent claims.

1    An independent claim does not refer to any other
2  claim in the patent.  An independent claim sets forth all the
3  requirements that must be met in order to be covered by the
4  claim.  It's not necessary to look to any other claim to
5  determine what an independent claim covers.

6    However, a dependent claim does not by itself
7  recite all the requirements of the claim but refers to
8  another claim or claims for some of its requirements.  In
9  this way, the dependent claim depends on another claim.

10    The law considers a dependent claim to incorporate
11  all the requirements of the claim or claims to which it
12  refers or depends, as well as the additional claims set forth
13  in the dependent claim itself.

14    To determine what a dependent claim covers, it's
15  necessary to look at both the independent (sic) claim and any
16  other claim to which it refers.  And a product that meets all
17  the requirements of both the dependent claim and the claim or
18  claims to which it refers is covered by that dependent claim.

19    A patent owner has the right to stop others from
20  using the invention covered by its patent claims in the
21  United States during the life of the patent.

22    If a person makes, uses, sells, or offers for sale
23  within the United States or imports into the United States
24  what is covered by a patent claim without the patent owner's
25  permission, that person is said to infringe the patent.

1          In reaching your decision on infringement, keep in

2     mind, Ladies and Gentlemen, that only the claims of a patent

3     can be infringed.

4          You must compare the asserted patent claims, as

5     I've defined each of them, to the accused products and -- to

6     determine whether or not there is infringement.

7          You should not compare the accused products with

8     any specific example set out in the patent or with the patent

9     owner's commercial products or with the prior art in reaching

10     your decision on infringement.

11          As I've reminded you during the trial, the only

12     correct comparison is between the accused products and the

13     language of the claim itself.

14          You must reach your decision as to each assertion

15     of infringement based on my instructions about the meaning

16     and the scope of the claims, the legal requirements for

17     infringement, and the evidence presented to you by both of

18     the parties.

19          Also, I remind you, the issue of infringement is

20     assessed on a claim-by-claim basis.  Therefore, there may be

21     infringement as to one claim even if there is no infringement

22     as to other claims.

23          I'll now instruct you on the specific rules that

24     you must follow to determine whether the Plaintiff,

25     Whirlpool, has proven that the Defendant, TST, has infringed

1    one or more of the patent claims involved in this case.

2            In order to prove direct infringement of a patent

3    claim, Whirlpool must show by a preponderance of the evidence

4    that the accused product includes each and every requirement

5    or limitation of the claim either literally or under the

6    Doctrine of Equivalents.

7            In determining whether an accused product literally

8    infringes or directly infringes a patent claim in this case,

9    you must compare the accused product with each and every one

10   of the requirements or limitations of that claim to determine

11   whether the accused product contains each and every

12   requirement recited in the claim.

13           A claim requirement is present if it exists in the

14   accused product just as -- just as it is described in the

15   claim language, either as I have explained the language to

16   you; or if I did not explain it or construe it, as it would

17   have been understood by one of ordinary skill in the art.

18           If an accused product omits any element recited in

19   a claim, then you must find that the particular product does

20   not literally infringe that claim.

21           A patent can be directly infringed even if the

22   alleged infringer did not have knowledge of the patent and

23   without the infringer knowing that what it was doing is

24   infringement of the claim.

25           A patent may also be directly infringed, even

1  though the accused infringer believes in good faith that what

2  it is doing is not infringement of the patent.

3       A Plaintiff may show direct infringement by

4  comparing the claims of the accused products and showing that

5  each and every element of the claims is present therein.

6       A claim requirement is literally present if it

7  exists in an accused product, just as it's described in the

8  claim language, either as I have explained it to you, or if I

9  didn't explain it, as it's understood -- or as -- as it would

10 be understood by its plain and ordinary meaning by one of

11 skill in the art.

12      If an accused product omits any requirement recited

13 in the claim, you must find that particular product does not

14 infringe that claim.

15      If a person makes, uses, sells, or offers for sale

16 within the United States a product or practices a method that

17 does not meet all the requirements of a claim and thus does

18 not literally infringe the claim, there can still be direct

19 infringement if that product satisfies the claim under the

20 Doctrine of Equivalents.

21      Under the Doctrine of Equivalents, a product

22 infringes a claim if the accused product performs steps or

23 contains elements corresponding to each and every requirement

24 of the claim that is equivalent to, even though not literally

25 met by, the accused product.

1          You may find that a step or element is equivalent

2   to a requirement of a claim that is not literally met if a

3   person having ordinary skill in the field of the technology

4   of the patent would have considered the differences between

5   them to be insubstantial or would have found that the

6   structure in TST Water's product:

7          (1) performs substantially the same function; (2)

8   in substantially the same way; (3) to achieve substantially

9   the same result as the requirement of the claim.

10         In order to prove infringement by equivalents,

11  Whirlpool must prove the equivalency of each claim element by

12  a preponderance of the evidence.

13         In this case, Whirlpool contends that TST Water has

14  willfully infringed its patent.  If you've decided that TST

15  Water has infringed, you must go on and address the

16  additional issue of whether or not that infringement was

17  willful.

18         You may find that TST Water willfully infringed if

19  you find that TST Water acted egregiously, willfully, or

20  wantonly.  You may find that TST Water's actions were

21  egregious, willful, or wanton if TST Water acted in reckless

22  or callous disregard of or with indifference to the rights of

23  Whirlpool.

24         A Defendant is indifferent to the rights of another

25  when it proceeds in disregard of a high or excessive danger

1   of infringement that is known to it or was apparent to a

2   reasonable person in its position.

3        Your determination of willfulness should

4   incorporate the totality of the circumstances based on the

5   evidence presented during this trial.  If you decide that any

6   infringement was willful, that decision should not affect any

7   damages that you award.  I will take willfulness into account

8   later.

9        Now, Whirlpool has the burden of proving

10   willfulness by a preponderance of the evidence.

11        I'll now instruct you on the rules that you must

12   follow in deciding whether or not TST Water has proven that

13   the asserted claims of the patent are invalid.

14        An issued patent is accorded a presumption of

15   validity based on the presumption that the United States

16   Patent and Trademark Office, which you've heard referred to

17   throughout this trial as the PTO or the Patent Office, acted

18   correctly in issuing the patent.

19        This presumption of validity extends to all issued

20   United States patents.

21        To prove that any claim of a patent is invalid, TST

22   Water must persuade you by clear and convincing evidence that

23   the claim is invalid.  Like infringement, Ladies and

24   Gentlemen, invalidity is determined on a claim-by-claim

25   basis.

1        You must determine separately for each claim

2   whether that claim is invalid.  If one claim of a patent is

3   invalid, this does not mean that any other claim is

4   necessarily invalid.

5        Claims are construed in the same way for

6   determining infringement as for determining invalidity.  You

7   must apply the claim language consistently and in the same

8   manner for issues of infringement and for issues of

9   invalidity.  In making your determination as to invalidity,

10  you should consider each claim separately.

11       Prior art differing from the prior art considered

12  by the Patent Office may, but does not always, carry more

13  weight than prior art that was considered by the Patent

14  Office.

15       TST Water contends in this case that the asserted

16  claims of the asserted patent are invalid as being obvious.

17  Even though an invention may not have been identically --

18  even though each -- even though an invention may not have

19  been identically disclosed or identically described in a

20  single prior art reference before it was made by an inventor,

21  the invention may have been obvious to a person of ordinary

22  skill in the -- in the field of technology of the patent at

23  the time the invention was made.

24       TST Water, the Defendant, bears the burden of

25  establishing obviousness by clear and convincing evidence.

1          In determining whether a claimed invention is

2    obvious, you must consider the level of ordinary skill in the

3    field of technology of the patent that someone would have had

4    at the time the claimed invention was made, the scope and

5    content of the prior art, and any differences between the

6    prior art and the claimed invention, as well as the ordinary

7    knowledge of a person of ordinary skill at the time of the

8    invention.

9          The skill of the actual inventor is not necessarily

10   relevant because inventors may possess something that

11   distinguishes them from workers of ordinary skill in the art.

12         Keep in mind that the existence of each and every

13   element of the claimed invention in the prior art does not

14   necessarily prove obviousness.  Most, if not all, inventions

15   rely on the building blocks of prior art.

16         Now, in considering whether a claimed invention is

17   obvious, you should consider whether, as of the priority date

18   of the asserted patent, there was a reason that would have

19   prompted a person of ordinary skill in the field to combine

20   the known elements in a way that the claimed invention does,

21   taking into account such facts as:

22              (1) whether the claimed invention was merely the

23   predictable result of using prior art elements according to

24   their known function.

25              (2) whether the claimed invention provides an

obvious solution to a known problem in the relevant field.

(3) whether the prior art teaches or suggests the desirability of combining elements in the claimed invention.

(4) whether the prior art teaches away from combining elements in the claimed invention.

(5) whether it would have been obvious to try the combinations of elements in the claimed invention, such as when there is a design need or market pressure to solve a problem, and there are a finite number of identified predictable solutions.

And, (6), whether the change resulted more from design incentives or other market forces.

Now, in determining whether the claimed invention was obvious, consider each claim separately, and consider only what was known at the time of the invention.

In determining whether the claimed invention was obvious, do not use hindsight. In other words, Ladies and Gentlemen, you should not consider what a person of ordinary skill in the art would know now or what has been learned from the teaching of the patent-in-suit.

In making these assessments, Ladies and Gentlemen, you should take into account any objective evidence, sometimes called secondary considerations, that may have existed at the time of the invention and afterwards that shed light on non-obviousness.

The following are possible secondary considerations, but it's up to you to decide whether secondary considerations of non-obviousness exist at all.

(1) whether the invention was commercially successful as a result of the merits of the claimed invention, rather than the result of design needs or market pressure, advertising, or similar activities.

(2) whether the invention satisfied a long-felt need.

(3) whether others had tried and failed to make the invention;

(4) whether others copied the invention;

(5) whether there were changes or related technologies or market needs contemporaneous with the invention;

(6) whether the invention achieved unexpected results;

(7) whether others in the field praised the invention;

(8) whether persons having ordinary skill in the art of the invention expressed surprise or disbelief regarding the invention;

(9) whether others sought or obtained rights to the patent from the patentholder;

And (10) whether the inventor proceeded contrary to

accepted wisdom in the field.

In support of obviousness, you may also consider whether others independently invented the claimed invention before or at about the same time as the named inventor thought of it.

If you find that TST Water has proven the obviousness of a claim by clear and convincing evidence, then you must find that the claim is invalid.

Now, several times in my -- in my instructions, I've referred to an -- a person of ordinary skill in the field of the invention. It's up to you to decide the level of ordinary skill in the field of the invention.

In deciding what the level of ordinary skill is, you should consider all of the evidence introduced at trial including:

(1) the levels of education and experience of persons working in the field;

(2) the types of problems encountered in the field;

(3) prior art solutions to those problems;

(4) rapidity with which innovations are made;

And (5) the sophistication of the technology.

A person of ordinary skill in the art is a hypothetical person who is presumed to have known all of the relevant prior art at the time of the claimed invention.

If you find that the TST Water has infringed any

1   claim of Whirlpool's asserted patent, and if you find that

2   the claim is not invalid, then you must consider what amount

3   of damages to award to Whirlpool.

4       I'll now instruct you on the measure of damages.

5   But by instructing you on damages, I'm not suggesting which

6   party should win this case on any issue.

7       The damages you award must be adequate to

8   compensate Whirlpool for any infringement you may find.  You

9   must not award Whirlpool more damages than are adequate to

10  compensate for the infringement, nor should you include any

11  additional amount for the purpose of punishing TST Water or

12  setting an example.

13      Whirlpool has the burden to establish the amount of

14  its damages by a preponderance of the evidence.  The patent

15  owner is not entitled to damages that are remote or are

16  speculative.

17      I'll give you more detailed instructions on damages

18  shortly.  Note, however, that if you determine that a

19  patent -- that the patent is infringed and not invalid,

20  Whirlpool is entitled to recover no less than a reasonable

21  royalty for each infringing sale or use of its inventions.

22      Whirlpool seeks either a reasonable royalty or lost

23  profits as damages for each of TST Water's sales that you

24  find infringe any valid claim of the patent.

25      The determination, Ladies AND Gentlemen, of a

1    damages award is not an exact science, and the amount need

2    not be proven with unerring precision.  You may approximate,

3    if necessary, the amount to which the patent owner is

4    entitled.

5           It may be proper to award -- to award a damages

6    amount if the evidence shows the extent of the damages as a

7    matter of just and reasonable inference.

8           Whirlpool is seeking its lost profits as part of

9    its patent damages.  Lost profits consist of any actual

10   reduction in business profits that Whirlpool suffered as a

11   result of TST Water's alleged infringement.

12          In this case, Whirlpool seeks to recover lost

13   profits for some of TST Water's sales and a reasonable

14   royalty on the rest of TST Water's sales of the W-5 products.

15          To recover lost profits, as opposed to a reasonable

16   royalty, Whirlpool must show a causal relationship between

17   the infringement and Whirlpool's loss of profits.

18          In other words, Whirlpool must show a reasonable --

19   a reasonable probability that would it -- that it would have

20   made the asserted sales but for the infringement.

21          Whirlpool must prove that if there had been no

22   infringement, Whirlpool would have made some portion of the

23   sales that TST Water made on the infringing products.  In

24   other words, Whirlpool needs to show that TST Water's

25   products took sales away from Whirlpool's products.

1          Whirlpool may only receive damages for lost profits

2    on those products that are sufficiently similar to compete in

3    the same market with the same customers as TST Water's

4    products that you find to infringe.  Two products are

5    sufficiently similar if one does not have characteristics

6    significantly different than the other.

7          In order to be entitled to lost profits, Whirlpool

8    must establish each of the following factors:

9          (1) that there was a demand for the patented

10   products;

11         (2) there was no available acceptable

12   non-infringing substitute products;

13         (3) that Whirlpool has the manufacturing and

14   marketing capability to make the infringing sales actually

15   made by TST Water and for which Whirlpool seeks an award of

16   lost profits;

17         And (4) the amount of profit that Whirlpool would

18   have made if TST Water had not infringed.

19         Now, the parties have stipulated that Factor 2 and

20   Factor 3 are met in this case.

21         Whirl -- Whirlpool can prove there was a demand for

22   the patented product in one of two ways.

23         First, Whirlpool can show significant sales of its

24   own patented products.

25         Second, Whirlpool can show demand for the patented

1  products by showing significant sales of TST Water's products

2  that are covered by the patent-in-suit.

3      If you conclude that Whirlpool has proved that but

4  for TST Water's infringement, Whirlpool would have made some

5  portion of TST Water's sales, Whirlpool may calculate its

6  lost profits by computing the lost revenue for sales it

7  proved that it would have made but for the infringement and

8  subtracting from that figure the amount of additional cost or

9  expenses it would have incurred in making those lost sales

10  such as the cost of goods, sales costs, packaging costs, and

11  shipping costs.

12      Under the patent laws, if infringement of a patent

13  not determined to be invalid is found, Whirlpool is entitled

14  to recover no less than a reasonable royalty for each

15  infringing sales or use of its inventions.

16      This means that if you've determined that Whirlpool

17  is entitled to damages, you should award Whirlpool a

18  reasonable royalty for those TST Water sales of the W-5

19  filter for which you have not awarded any lost profits.

20      A royalty is a payment to a patentholder in

21  exchange for the right to make, use, sell, or import the

22  claimed invention.

23      A reasonable royalty is the amount of money to be

24  paid for a license to make, use, or sell the invention that a

25  willing patent owner and a willing prospective licensee would

have agreed to immediately before the infringement began as a part of a hypothetical negotiation.

In considering this hypothetical negotiation, Ladies and Gentlemen, you should focus on what the expectations of the patentholder and the infringer would have been had they entered into an agreement at that time and had they acted reasonably in their negotiations.

In determining this, you must assume that both parties believed the patent was valid and infringed and that the patentholder and the infringer were willing to enter into an agreement.

The reasonable royalty you determine must be the royalty that would have resulted from this hypothetical negotiation and not simply the royalty that either party would have preferred.

Evidence of things that happened after the infringement first began may be considered in evaluating the reasonable royalty only to the extent that the evidence aids in assessing what royalty would have resulted from a hypothetical negotiation.

Where the parties dispute a matter concerning damages for infringement, it is Whirlpool's burden to prove what is more probable than not that Whirlpool's version is correct.

Whirlpool must prove the amount of its damages with

reasonable certainty, but need not prove the damages by mathematical precision. Whirlpool, again, is not entitled to damages that are remote or speculative.

The amount you find as damages must be based on the value attributable to the patented technology, as distinct from other unpatented features of the accused product.

Whirlpool bears the burden to establish the amounts attributable to the patented feature.

In determining the reasonable royalty, you should consider all facts known and available to the parties at the time the infringement began.

Some of the kinds of factors that you should consider in making your determination are:

(1) the royalties received by the patentee for licensing of the asserted patent proving or tending to prove an established royalty.

(2) the rates paid by the licensee for the use of other patents comparable to the asserted patent.

(3) the nature and scope of the license, as exclusive or non-exclusive, or as restricted or non-restricted, in terms of territory or with respect to whom the manufactured product may be sold.

(4) the licensor's established policy and marketing program to maintain its patent monopoly by not licensing others to use the invention or by granting licenses under

specific conditions designed to preserve that monopoly.

(5) the commercial relationship between licensor and licensee, such as whether they are competitors in the same territory in the same line of business, or whether they are inventor and promoter.

(6) the duration of the patent and the term of the license.

(7) the established profitability of the product made under the patent, its commercial success, and its current popularity.

(8) the utility and advantages of the patented invention over the old modes or devices, if any, that had been used for achieving similar results.

(9) the nature of the patented invention and the benefits to those who have used the invention.

(10) the extent to which the infringer has made use of the invention and any evidence probative of the value of that use.

(11) the value that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

(12) the opinion testimony of qualified experts.

And, (13) the amount that a licensor, such as the patentee, and a licensee, such as the infringer, would have

agreed upon at the time the infringement began if both sides

had been reasonably and voluntarily trying to reach an

agreement.

That is, Ladies and Gentlemen, the amount which a

prudent licensee who desired, as a business proposition, to

obtain a license to manufacture and sell a particular article

embodying the patented invention would have been willing to

pay as a royalty and yet be able to make a reasonable profit

and which amount would have been acceptable to a prudent

patentee who was willing to grant a license.

Now, no one of these factors is dispositive, and

you can and should consider the evidence that has been

presented to you in this case on each of these factors.

Although evidence of the actual profits an

infringer made may be used to determine the anticipated

profits at the time of the hypothetical negotiation, the

royalty may not be limited or increased based on the actual

profits the alleged infringer made.

You may also consider any other factors which in

your minds would have increased or decreased the royalty the

infringer would have been willing to pay and the patent owner

would have been willing to accept acting as normally prudent

business people.

When determining a reasonable royalty, you may

consider evidence concerning the amounts that other parties

1  have paid for rights to the patent in question or for rights

2  to similar technologies.

3       A license agreement need not be perfectly

4  comparable to a hypothetical license that would be negotiated

5  between Whirlpool and TST Water in order for you to consider

6  it.

7       However, if you choose to rely on evidence from any

8  other license agreements, you must account for any

9  differences between those licenses and the hypothetically

10  negotiated license between Whirlpool and TST Water in terms

11  of the technologies and economic circumstances of the -- of

12  the contracting parties when you make your reasonable royalty

13  determination.

14       The date that Whirlpool filed its complaint in this

15  case alleging patent infringement is the date for the start

16  of damages.  Therefore, damages that you may award Whirlpool

17  begin on September the 15th, 2015.

18       Now, with those instructions, Ladies and Gentlemen,

19  we're ready to hear closing arguments from the attorneys in

20  this case.

21       The Plaintiff may now present its first closing

22  argument to the jury.

23       Mr. Ward, would you like a warning on your time?

24       MR. WARD:  I would, Your Honor, 18 minutes.

25       THE COURT:  18 minutes used or 18 minutes left?

1        MR. WARD:  I'm sorry, 18 minutes used.

2        THE COURT:  I'll warn you when you've used 18

3    minutes.  You may proceed.

4        And let me ask those present not to come, go, or

5    leave during closing arguments.  I don't want to see any

6    movement in the gallery.

7        All right.  Mr. Ward, when you're ready.

8        MR. WARD:  May it please the Court.

9        Counsel.

10       Members of the jury, good morning.

11       I want to start by thanking you for your service,

12   because without your showing up for jury selection on Monday,

13   none of this would be possible.  I know you've all got lives

14   to tend to, you've got jobs, and you've given us that time,

15   and we appreciate it.

16       I told you at the beginning of the case that this

17   would be about some simple lessons, I thought.  Don't take

18   things that don't belong to you, and play by the rules.  And

19   we know that when you don't do those things, there are

20   consequences.

21       You've heard a lot of evidence, and you just heard

22   His Honor's instructions about what you're to do now.  You're

23   the sole judges of the credibility of the witnesses, and

24   you're the sole judges of the facts.

25       In the next 20 minutes, I'm going to tell you

 1   briefly where I think the evidence points.  I can't summarize

 2   it all in 20 minutes, and I know you all appreciate that

 3   we've got some time limits because you've been sitting here

 4   for a while, so I'm going to jump right into it.

 5        But I'm going to start with the second question

 6   on -- on your verdict form.  And that is going to be

 7   obviousness, because that's where we -- we left off

 8   yesterday.

 9        And I want to start with the Defendant's burden in

10   this case, clear and convincing evidence; that evidence that

11   produces in your mind an abiding conviction that the truth of

12   TST's factual contentions are highly probable.

13        Because as you've learned, patents are presumed to

14   be valid.  And there's a reason.  Patents are so important to

15   the founders of our country that they included them in the

16   Constitution.  They're in the Constitution.  They're before

17   the Bill of Rights.  They're before the First Amendment and

18   the Second Amendment.

19        And that's what's made our country one of the most

20   innovative countries in the world because of the -- the

21   protection that we afford to those who develop intellectual

22   property, and that -- that protection is embodied in the

23   patent.

24        And because the patent is such a valuable right --

25   can be a valuable right, the law imposes this higher burden

1    because invalidating a patent, which is what TST wants you to

2    do -- they want to you invalidate this patent.  That's not

3    just for this case.  That's for all time.

4           So a decision of invalidity would be like tearing

5    this patent up.  So that's why they have a higher burden.

6           You've -- you've heard the evidence of the

7    re-examination.  You know that it was issued once when the

8    examiners examined the patent back in 2003.

9           Then it was examined a second time, and you learned

10   that there were three examiners who looked at it that time.

11          And after that re-examination proceeding, they

12   said, no, we got it right the first time.

13          So now the Defendant comes before you and says,

14   they got it wrong.  All those folks got it wrong.

15          What evidence did they bring you?

16          They talked to you about a number of patents.

17   These weren't all references that they're going to rely upon

18   for invalidating that they want you to rely upon.  They said

19   they're lots of patents on water filters.

20          They even talked to you about a water filter patent

21   that Mr. Baird had.  Now, that patent had never been licensed

22   by anybody, but they said it's valid.

23          Remember, Mr. Baird said, well, my patent's good.

24   The Patent Office got it right on mine.  The Patent Office

25   got it right on all these other patents.

1          But the Patent Office got it wrong on one of the

2   best-selling water filters on the market.  They want you to

3   believe that the Patent Office messed up on this one, while

4   all the others were right.

5          And so what and who did they bring to you to meet

6   this heavy burden?

7          They brought you Mr. Stein, and he says that one of

8   ordinary skill in the art would have combined a filter from a

9   backhoe with a filter on a beer keg with a wall filter.

10         That's -- that's what they want you to believe one

11  of ordinary skill in the art would combine in order to have

12  you invalidate the '894.

13         But recall from His Honor's instructions, and

14  you'll have a chance to read them, keep in mind the existence

15  of each and every element of the claimed invention in the

16  prior art does not necessarily prove obviousness.  Most

17  inventions rely upon building blocks of prior art.

18         And you are instructed not to use hindsight, which

19  is what Mr. Stein did.  He took the '894, and then he went

20  looking through the prior art to see what he could find that

21  would come up with some of the same elements that are

22  disclosed in the claims of the '894 patent.

23         See if Mr. Sganga can answer this question during

24  his closing:  What is the evidence that one of ordinary skill

25  in the art would have been motivated to combine these

1  references?

2          There was no evidence of that.  Mr. Stein just

3  said, oh, yeah, they -- they would have combined these

4  references.  What was the evidence of that other than Mr.

5  Stein saying it?

6          You can think about the secondary considerations,

7  the commercial success of the filter, whether others had

8  copied it, whether or not it's obvious.  Other folks are

9  copying it, it wasn't obvious to many folks.  They had to

10 copy what Whirlpool came up with.

11         But even if you believe that folks would have

12 combined these references, Mr. Stein says, oh, yeah, they

13 would have combined them, and all the elements are present.

14         That's what he said on direct, and then we learned

15 that he doesn't even know how to hook the hoses up to the

16 right inlet and outlet valves.

17         And then we learned during his cross-examination

18 that Knuth, the backhoe filter, is missing these limitations.

19         And they've got to prove to you that every

20 limitation is present in these references when they combine

21 them.  They have not met their burden.

22         We'd ask that you answer Claim -- or Question No.

23 2, obviousness, no.

24         Infringement.  Remember what they tell us outside

25 of the courtroom.  Outside of the courtroom they guarantee

1    the W-5 filter to fit.  Guaranteed to fit.  In fact, they set

2    up a 1-800 number, and they put a video up on the Internet

3    because folks were calling and saying, my, this looks

4    different, this looks different when I take the protective

5    end caps off.

6            And what does TST say outside of the courtroom?

7    Don't worry about it.  It's going to work just like the

8    original equipment.  It'll work just -- just fine in your --

9    your filter -- in your refrigerator.

10            What did we do to meet our burden?  Who did we

11    bring you?  Dr. Beaman.  A professor at the University of

12    Texas in mechanical engineering.  And he walked you through

13    the claims of the '894 that are being asserted.

14            Because remember, that's what we've got to do.

15    We -- we don't compare the W-5 to the Filter 3.  We compare

16    the claims of the patent to the W-5.  Does the W-5 meet each

17    and every limitation of those claims?

18            And he walked you through that evidence.  He showed

19    you where the limitations were met.

20            And think about this, TST has had a year-and-a-half

21    to prepare for the cross-examination of Dr. Beaman.  They've

22    had his expert report.  They took his deposition.  They

23    reviewed all the documents.  And they conducted a 90-minute

24    examination of him on his opinions on infringement.

25            Did you see them put any of the claim charts up and

1   go through and show where these elements were not met?  No.

2   For 80 of the 90 minutes we talked about the price of plastic

3   tubing, elbow joints, foam in the filter, whether or not you

4   could save an inch, what was the value of saving an inch.

5        Because you know what they were doing, they were

6   trying to say this really isn't that valuable.  It's one

7   of -- they go through their laundry list of defenses.

8        They say, oh, it's invalid.  Well, if it's not

9   invalid, then we don't trespass.  But if we do trespass on a

10  valid patent, then it's really not that valuable.  And that's

11  what that cross-examination was about.

12       Because in the last 10 minutes they kind of did a

13  hand wave about the protrusion extending from the end piece

14  wall and the longitudinal axis.  10 minutes is what they

15  spent with Dr. Beaman.

16       But let's look at it.  You've seen the animation,

17  the melting away of this cosmetic change.  And we learned

18  during Dr. -- Mr. Baird's examination about this drawing

19  where they took -- they did a scan of the Filter 3, and they

20  superimposed it upon Mr. Baird's design.

21       And you can see that these are cosmetic changes.

22  In fact, when I put his -- his models were in front of him,

23  we started talking about what this protrusion extending from

24  the end piece wall, how it changed over time.  You could see

25  it right in front of you.  I said did -- we started talking

1  about function-way-result.

2  Remember, I said did each of these protrusions have

3  the same function-way-result?

4  He said:  Well, they all had the same function or

5  result, we marched through them.  He said:  But my -- the

6  last one, the W-5, does it a different way.

7  His models, I don't think we're going to see them

8  through closing, maybe we will, his models have the same

9  function-way-result for the protrusion.  He only contested

10  "way," that the protrusion didn't act in the same way.

11  The protrusion extends from the end piece wall both

12  literally and under the Doctrine of Equivalents.

13  We were walking out of the courthouse the other

14  day, and a member of our team asked me if the Lady Justice

15  extended from the roof of the courthouse.  Think about this:

16  There's a longitudinal axis running down through the Lady of

17  Liberty into the center of that dome.

18  The Defendants would say, oh, no, she doesn't

19  extend from the roof of the courthouse because there's --

20  there's air in between here.  She can't extend from.  That's

21  what they -- they'd have you believe that she doesn't extend

22  from the roof of the courthouse.

23  Their other challenge is this longitudinal axis.

24  They come in and they -- in the court they start saying,

25  well, there's two longitudinal axes.  This blue line actually

1    ends here.  It ends right at the tip.

2             And then there's another axis.  That's what they

3    tell you in the courtroom, there's two axes.

4             And we start talking to Mr. Baird.  And he admits

5    that, well, for making the measurements to guarantee fit, he

6    uses a longitudinal axis that runs through the center of

7    these inlets, the outlet, both of those fittings, and the

8    protrusion.

9             Then he says, but it's -- it's a different

10   protrusion if you look at it from the side.  Look at it as a

11   design drawing, and what does he get?  He's got a single

12   longitudinal axis running through that inlet/outlet, and

13   through the protrusion.

14            Dr. Beaman explained this to you.  Those are the

15   only two elements -- I told you in opening, I thought those

16   were two -- the two that they would contest, and that's what

17   they did.

18            We think the evidence supports an answer of

19   infringement, yes, as to each of the asserted claims.

20            Willfulness.  The Court has instructed you on what

21   is willfulness when -- if TST, you've got to decide whether

22   they were indifferent to the rights of Whirlpool, whether it

23   proceeded in disregard of a high and excessive danger of

24   infringement that is known to it or apparent to a reasonable

25   person in its position.

1     We know Mr. Baird was aware of the patent in 2010

2 or 2011; that he studied it for four years in coming up with

3 these cosmetic changes.  He was aware that it was challenged

4 at the Patent Office.  He was watching it.  He was aware that

5 it was confirmed.  He was aware that there had been 30 other

6 companies who had been sued and who'd settled.

7     We saw his email where he was watching things going

8 on.  And he said, oh, it's a 50/50 shot, and we learned that

9 he talked to the president of Swift Green while this was

10 going on.

11     You think about that, that phone call, because I

12 think it's reasonable that Mr. Baird might have said, you

13 know what, you take your shot in the Patent Office.  If you

14 invalidate, then good for all of this.  But if you lose

15 there, I'll have my shot at the courthouse.  I'll have two --

16 two bites at this apple.  He knew this was going on.  And

17 when they lost, he proceeded to launch his product.

18     And in opening, I think I gave him too much credit.

19 I said that the reason he did that was because of this

20 7-million-dollar hole because I was confused.  I thought it

21 was -- he was in the hole before he released the product.

22     But it's actually worse than what I thought because

23 the evidence was that he found out about this hole after he

24 released the product.  He made the decision to release the

25 W-5 in early July of 2015.  And it wasn't until later that

1    month that he learned that he'd lost that contract and $7

2    million.

3         And then just two months later, he got sued.  He

4    knew that G -- that Whirlpool was accusing him of

5    infringement, and what did he do?  He kept on digging.  He's

6    proceeded for the year-and-a-half selling these products.

7    That's why we ask -- we ask you to find that he's willful --

8    or TST is willful.

9         Damages.  You've seen this slide.  We know that

10   Whirlpool sales plummeted after the W-5 entered the market.

11   We're seeking to recover lost profits and reasonable

12   royalties.  And this lost profits evidence was virtually

13   unrefuted.

14        The first three factors of that four-factor test

15   that are in your instructions, you can read them.  Two of

16   them are stipulated to.

17        The first one was agreed to by Mr. Hanson, the

18   Defendant's expert.  He admitted that there was demand for

19   the product.

20        So the only one we're down to is whether or not we

21   can prove to you with reasonable certainty that these - these

22   sales were due to infringement, the loss of these sales.

23        Mr. White took the stand, and he talked to you

24   about these forecasts, how Whirlpool relies upon them.  He

25   talked to you about how he went back after the fact and

1  compared actual sales to the forecasts and determined that

2  the actual sales were actually higher than the forecast.

3          But Mr. McFarlane relied upon the forecasted sales.

4  He compared them to the actual sales.  And we know -- we

5  don't have to prove with unerring precision.  I think that's

6  what's -- His Honor just instructed to you.  It's permissible

7  to approximate.

8          But we have a really good idea because we have

9  those forecasts, forecasts that Mr. Hanson put his blinders

10  on and said, oh, they're not reliable, even though he didn't

11  bother to come and listen to Mr. White or even read his

12  testimony while sitting in his hotel room waiting to come

13  testify all week.

14          Only Whirlpool bothered to do that calculation.

15  The amount of the profit is undisputed.  The amount of the

16  total sales is undisputed.  The only dispute is whether or

17  not those sales were due to the entry of W-5.  We've proven

18  that to you.  It's $2.5 million on those sales.

19          We also seek to recover reasonable royalties on

20  these other units.  Again, undisputed that these are TST

21  sales.  What is in pink is undisputed.

22          We brought Mr. McFarlane to you, and he did a

23  reasonable royalty analysis.  Remember, we're starting the

24  day before TST enters the market.  He looked at Whirlpool's

25  profit and TST's profit, and he took you through a lengthy

1   analysis of how he got to his reasonable royalty calculation,

2   because remember, on the eve of infringement, when you've got

3   to go back and figure out what these parties would have

4   agreed to in this hypothetical negotiation, TST had control

5   over what it was going to price its product at, because we

6   all agree -- we know that Whirlpool's never licensed this

7   patent, right?  We know that.

8          We know what TST's profit margin is.  Neither one

9   of them wants to agree to these things a year-and-a-half

10  after the fact.  TST says, oh, well, we've -- we've only been

11  making a profit of $4.

12          THE COURT:  18 minutes have been used.

13          MR. WARD:  Thank you, Your Honor.

14          But what did they know on the eve of this

15  hypothetical negotiation?  And how did Mr. Hanson try to

16  convince you that this is reasonable?

17          He said:  Looks let's at the KX MOU.  We learned

18  that it's not a license.  Whirlpool was not a party.  It was

19  TST that was licensing a patent on a design-around.

20          We learned that that was their business, defeating

21  patents on leak detection technology, 20 cents per filter.

22          He said:  That's where we're going to start, at the

23  low end.

24          Then he said:  I'm going to use the

25  Whirlpool/Proctor & Gamble agreement, the partnership that

1  has lasted up -- at 14 years at the time of this hypothetical

2  negotiation.

3         He's going to look at an eight-year-old agreement

4  between these two companies that Mr. Hanson admitted was very

5  complex; that there was lots of things going on between

6  these -- these companies when they came to this agreement;

7  that if they ever broke up, P&G could have the license to the

8  '894 for $2 a unit.

9         Reminds me of two buddies develop a piece of

10 property.  They spend 15 years developing it.  They build a

11 fence around it for the whole world to see.  They build a

12 nice lodge on it, maybe some lakes.  It's a good partnership,

13 and they have an agreement that if one of them leaves, the

14 other -- the other partner can come back and rent it for,

15 say, $500 a week.  They've worked hard together.  They're on

16 good -- good terms.

17         A squatter comes, cuts the fence, builds a house on

18 the property, lives there for a year-and-a-half.  They end up

19 suing him to kick him off the property.  They have to take

20 him to court.  They get him in front of the jury.

21         What does the squatter say?  Well, the squatter

22 would say the cap on the most that I owe for cutting your

23 fence and coming on your property is half of what you -- you

24 two buddies agreed to back eight years ago when y'all were

25 developing this property.

1      That's what TST says is a cap.  A cap, what P&G and

2  Whirlpool agreed to when they were jointly developing the

3  '894 patent.

4      That's simply not reasonable.

5      That's why we ask you to disregard that testimony,

6  award lost profits of 2.5 million, royalties of 6.2 million,

7  and total damages of 8.7 million.

8      I'm going to have a few minutes to talk to you

9  after Mr. Sganga, and I look forward to responding to some of

10  his arguments.

11      THE COURT:  All right.  Defendant may now address

12  the jury.

13      Mr. Sganga, would you like a warning on your time?

14      MR. SGANGA:  Thank you.  I would, Your Honor, at

15  two minutes, please.

16      THE COURT:  All right.  You may proceed when you're

17  ready.

18      MR. SGANGA:  Thank you.

19      Good morning, Ladies and Gentlemen.  On behalf of

20  Michael Baird, TST Water, all of its employees, and my entire

21  trial team, I really want to just take the time now to thank

22  you for all your time this week, all your attention to this

23  case.  And, as you know, it is a very important case to Mr.

24  Baird and TST Water.

25      It's been quite a journey for TST to get to this

1    courtroom so that it could have a chance to shine a light on
2    Whirlpool's practices.  We believe that when you consider all
3    of the evidence, you should find for TST.

4           You're the first people to hear the full story.
5    You've got all the information in front of you about how
6    Whirlpool got its patent and all of TST's good-faith efforts
7    to avoid the patent.

8           You heard from witnesses that the Patent Office
9    never heard from.  You've been pointed to prior art filter
10   designs that the Patent Office hadn't focused on.

11          You're the first to evaluate all of the changes
12   that Mr. Baird made in his W-5 design, and you're the first
13   to compare those changes to the words in the Whirlpool patent
14   claims that Whirlpool shows, claims that announced to the
15   public where Whirlpool's property lines were drawn.

16          These are lines that they want to redraw now to
17   block fair and legitimate competition from TST.

18          You heard about all those other lawsuits that
19   Whirlpool filed; but none were presented to a jury like you
20   to weigh all the facts, apply the law that the Court just
21   instructed you on, and come to a fair decision about TST's
22   design.

23          I'm going to talk about some of the evidence that
24   you heard this week, but I'm also going to point out some of
25   the things that you didn't hear, gaps in Whirlpool's

1   evidence, things they didn't show you.

2           First, I'm going to start with Michael Baird, who

3   you know who has worked very hard to build a solid,

4   respectable company.  They're proud to sell their quality

5   products that are made here in the USA.

6           And TST Water delivers on Mr. Baird's passion and

7   pledge to bring high-quality water filters at a reasonable

8   price to consumers.

9           Mr. Baird is a firm believer that everyone should

10  be afforded the opportunity to buy filtered water that they

11  can afford.  And you know now from the evidence that TST

12  Water makes a profit of about $4 per cartridge, but Whirlpool

13  makes over $17 per profit in each cartridge.

14          That's a huge difference when you consider the fact

15  that Whirlpool moved production overseas to save costs.

16  That's just a different approach and philosophy to business.

17          Whirlpool talks about the customer brand

18  experience, but the evidence showed is that what they really

19  wanted to do was lock the customers in and keep their filter

20  prices high.

21          Whirlpool justifies this by saying it didn't

22  make -- make enough money selling its refrigerators in the

23  first place.

24          That's a little like a car dealer saying to you,

25  well, you know, you drove a real hard bargain when you bought

that new car or truck from us, and now we're going to make up

for it by forcing you to come back to the dealership every

time you want to change the oil, use an OEM oil filter every

time.

And you -- you can't change the oil yourself. You

can't use your own FRAM oil filter if you wanted to have a

choice to do something other than buy an OEM filter.

Now, there's nothing wrong with FRAM selling oil

filters for cars and trucks built by other OEM manufacturers.

That doesn't make them a free rider. TST is not a free

rider.

And what -- what makes it even worse here in this

situation is that Whirlpool doesn't even tell consumers when

they buy the refrigerators that they are going to get locked

in. You haven't heard a single Whirlpool witness deny that.

They can't.

Here's an exhibit that they explain about what

happens when they have a patent. Well, they like it because

that means they've got a captive audience. Consumers have no

choice.

TST does really the opposite here. It's pro

consumer. It offers high-quality products for reasonable

pricing. TST is willing to let the consumers vote with their

dollars for themselves.

If Whirlpool's got a higher-quality product that

1  reduces more contaminants or you feel more confident in that

2  brand name, well, you can make that choice to spend the extra

3  money on that, but let's -- let's compete fairly, let's

4  compete evenly.

5        Now, I'm going to walk through the evidence that

6  demonstrates that -- demonstrates that Whirlpool's failed to

7  prove that TST infringes the patent.  I'm also going to walk

8  through the clear and convincing evidence that the Patent

9  Office made a mistake and that the patent is invalid for

10  obviousness.

11        Now, that's the same mistake that I pointed out in

12  my opening statement, a mistake that Mr. Matt Stein testified

13  about yesterday, a mistake that Whirlpool has never responded

14  to and never explained.  And maybe that's because after all

15  these five days of trial, the evidence has just been pouring

16  in about this case really being about Whirlpool blocking

17  competition, preventing consumers from choice, and preventing

18  the marketplace from driving prices to their naturally

19  reduced level.

20        And we all know that when you've got competition,

21  that's a good thing.  Prices come down, airline tickets, cell

22  phones, flat screen TVs, all of that -- even appliances, all

23  of that is good for consumers.

24        Whirlpool wants to block it.  You heard Mr.

25  McFarlane admit that the only way that TST could afford to

1    pay his high proposed royalty rate was for TST to raise its

2    prices.

3          Now, that's bad enough on its own; but on top of

4    that, Whirlpool admits that TST is making sales Whirlpool

5    would never make.  Three out of four of TST sales Whirlpool

6    doesn't claim that they make them.

7          So the impact of higher prices would be that 75

8    percent of the consumers, the people that buy the TST brand,

9    would be priced out of the market if Whirlpool were allowed

10   to block TST.  Those consumers would lose their choice of a

11   well quality -- of a high-quality, low-price filter, and that

12   would not be fair.

13         Whirlpool calls it controlling the brand

14   experience.  Looks to me like Whirlpool wants to control its

15   customers' wallets.

16         I want to talk a little bit about TST.  You heard

17   evidence about how they got founded.  You had a chance to

18   meet personally Mr. Michael Baird, Mr. Chuck Lacy, and

19   Mr. Shannon Murphy.

20         You know all of those gentlemen are very passionate

21   individuals, very hard working, very committed to their

22   retail customers and to the ultimate consumers.

23         And one of the great thing about this jury system

24   that you're getting to participate in is that -- that witness

25   stand right there.  You, as jurors, got the opportunity to

1    see the truth from that stand.

2           Now, for a witness to sit there and endure

3    cross-examination, it's a pretty difficult thing, especially

4    with a talented lawyer like -- like Mr. Ward.  I -- I

5    wouldn't want to get cross-examined by him myself.

6           But you saw each of the TST Water witnesses take

7    the stand, swear an oath, and each one withstood

8    cross-examination, they held to their convictions and

9    beliefs.

10          As I said in the opening, TST was a classic

11   American success story, and you've seen the evidence that

12   backs that up.

13          Mr. Baird worked hard to make his company a

14   success.  In the beginning, TST struggled, but Mr. Baird

15   never gave up.  He sacrificed financially.  He took risks,

16   but he never gave up.  It was his strong work ethics, his

17   business values, and commitment to customers that ultimately

18   made his company the success it is today and earned him

19   national retail customers like Home Depot, Lowe's, Ace

20   Hardware.

21          He has now over a hundred employees that are

22   committed to that same mission, which is a customer's first

23   approach.  The company shows it with its quality products,

24   its prices, its rigorous testing of its products, its hundred

25   percent delivery rate to customers, its money back guarantee,

1    and its customer service.

2            And you -- you can tell the quality of Mr. Baird by

3    the people that work for him that came here, took that

4    witness stand, and told their story.

5            Now, did you notice that Mr. Baird was the only

6    person who really testified about how his design, how his

7    invention was created?  He walked you through the entire

8    process, step by step, iteration by iteration, sketch by

9    sketch.

10           Now, he didn't say that some other company came up

11   with that idea, or he couldn't really be sure what

12   improvements he made or why, he didn't throw away his lab

13   notebook.

14           Remember what Whirlpool's inventor, Todd Rose, said

15   when he testified?  Yeah, there's a policy, discard the

16   notebooks when the project's finished.  You know, all the

17   non-pertinent data, that's what you do, you throw it away.

18   So nothing on the Filter 3 project was pertinent by the time

19   he got done with it.

20           But Mr. Baird saved every scrap of paper that

21   showed his -- his process to develop the W-5 product.  That's

22   what -- that's what inventors do.  They don't throw away

23   records of their creative products.

24           He explained, Mr. Baird did, not only what he was

25   thinking about but how he came up with his ideas.  He

expressed to you how he was committed to respecting

Whirlpool's patent and how he worked hard over three years to

ensure that he did not infringe the patent.

He wasn't looking for a fast buck that he could

have made years earlier when he first started on the product.

Instead, he was honoring his business values, his ethics.  He

wouldn't put out a product that he thought would infringe on

the Whirlpool patent.

He's a man with integrity and a man that respects

the patents of others the same way that he would expect

others to respect his own patents.  And, frankly, I think

he's a man of courage who was willing to stand up to

Whirlpool and fight for what he believes was right.

Now, Whirlpool wants you to think that creating

generic products somehow isn't an honorable business, but

they're wrong.  Not everyone can afford brand names,

especially when they're double the price of the generics.

TST offers a solution for those who can't afford to

spend $50 for a Whirlpool filter every six months.

But Whirlpool's witnesses say they've got no plans

to lower prices.  Whirlpool knows that generics are entitled

to work around patents.  Whirlpool employees are talking

about it all the time.

Mr. Dibkey testified here, and he recognized that

workarounds are possibly.  And when that happens, if it's a

1  successful workaround, then Whirlpool has no infringement

2  case.

3         Whirlpool had internal documents listing how many

4  different patent workarounds existed for some of their

5  filters.

6         The inventor, Mr. Mitchell, who testified by

7  videotape, he admitted there were workarounds specifically --

8  it was possible to design around the '894 patent, and that

9  someone experienced in designing filters would be able to do

10 it.

11        And when the W-5 product was launched under the HDX

12 brand at Home Depot, Jennifer Bonuso of Whirlpool writes to

13 her boss, Mr. Dibkey, and says, oh, you better add a bullet

14 point in that presentation, that -- that TST product, that

15 HDX product appears to be a workaround.

16        And the reality is, is workarounds are a fact of

17 life for Whirlpool.  And, frankly, it's good for healthy

18 competition.

19        Now, another piece of Whirlpool's brand experience

20 story is that they're the only ones who can do a good job of

21 controlling the quality of their products.  And they said

22 they would never license their patent to anyone else as a

23 result, couldn't trust them on their quality.

24        But their own engineer, Mr. Guo, he testified by

25 deposition, he was pretty candid when he was asked about

1  quality issues.  Is it a challenge?  Well, he says:  Quality

2  issues happen on every product.

3          And Whirlpool's engineer Beth Jackson talked about

4  a whole list of different kinds of complaints.  You know,

5  there's complaints that the filters get stuck and that

6  there's leaks and it tastes bad sometimes.

7          But, you know, this -- this isn't about whether

8  Whirlpool or TST has the most absolutely trouble-free

9  product.  The point is that anyone making as many filters as

10 these parties are doing, they're -- they're going to

11 occasionally have some returns or complaints or problems.

12         But, you know, if we were taking an exam on how

13 good our quality is, both of us would be getting As, maybe

14 even A pluses, right?  We're talking about 97 percent, 98

15 percent of the product at Home Depot that does not get

16 returned, that has satisfied customers.

17         My point is that Whirlpool can't claim that their

18 quality is so superior to TST's that it justifies blocking

19 competition.

20         Now, let's talk about what happened at the Patent

21 Office that allowed Whirlpool to get its patent in the first

22 place.  Remember, there were these -- these hundreds of

23 patents that were cited at the Patent Office that the

24 examiner was faced with.  Each one of these little images is

25 a patent here.

1        Now, the examiner thought that Whirlpool had done

2    something different and found a little crack in between those

3    old patents that Whirlpool could -- could plant a flag on and

4    say you're different than the prior art.

5        And -- and here's how it happened.  Mr. Stein

6    explained it yesterday.  That other company, Swift Green

7    files the re-exam papers, and here's what they pointed the

8    examiner to, Figure 9 of Fritze.

9        That's a patent we've been looking at.  And they

10    tell the Patent Office, Fritze's got the same kind of thing

11    that Whirlpool claims.  But Swift Green never points the

12    Patent Office examiner to the good stuff.  They point it to

13    the wrong place.

14        On the left, Figure 9, that's what -- that's what

15    Swift Green pointed to, but that doesn't have any cams that

16    actuate a value.

17        On the right is Figure 5.  We've highlighted in red

18    that cam that we keep pointing to.  And we know the examiner

19    missed Figure 5, and maybe all three of them missed Figure 5

20    for sure, because we know when they wrote the paper

21    explaining the reasons for allowing the -- the patent to

22    issue.

23        Here's -- here's a quote.  This is from the Patent

24    Office.  None of the alleged cam surfaces of the prior art

25    includes any surface that physically touches a follower of a

1   valve for the purpose of actuating the valve.

2         We know this is wrong. We know it's a mistake

3   because here it is in Fritze in the figure that Swift Green

4   overlooked. Again, that -- that angled little red surface

5   over here, that's the cam surface, and it's touching the

6   follower, and it actuates a valve.

7         Now, the examiner is human. He made a mistake.

8   That's understandable. But what's really surprising is that

9   Whirlpool did nothing, not at the Patent Office. They never

10   pointed out the mistake. They didn't do anything in this

11   courtroom to explain away the mistake.

12         Mr. -- I pointed it out in my opening. Mr. Stein

13   explained it yesterday in his -- in his direct examination.

14   Whirlpool cross-examined him, but they didn't have any

15   questions about the mistake.

16         Whirlpool had the chance to bring their technical

17   expert, Dr. Beaman, back on the stand after Mr. Stein

18   testified and explain why this wasn't a mistake. But they

19   presented zero evidence to rebut this.

20         Instead, Whirlpool created a lot of confusion about

21   how the patent is obvious.

22         Mr. Stein explained you basically start with this

23   Knuth patent, and, oh, Whirlpool loves to talk about the

24   backhoes and the hydraulics. Well, take a look at the actual

25   words in the Whirlpool claim. It doesn't even say water

1    filter.  It doesn't say refrigerator.  It's just one of these

2    fluid filters.  So it counts as far as the claims are

3    concerned.

4          And if you combine the Knuth patent, which has a

5    cartridge, inlets, outlets, protrusions, bypass valves, and

6    you can combine it with any one of these other patents in

7    this other column, Fritze, Dorfman, the Japanese patent --

8    put them together, you're going to end up with everything

9    that's claimed as the actual wording of the Whirlpool claims.

10          And it would have been obvious to do this, to

11    combine with these other patents to get the results of bypass

12    valves, protrusions, inlets, outlets, cams.

13          And what Whirlpool wants to do, though, is they do

14    point to some other details.  They've got some little details

15    in some of the claims about, well, we positioned the inlet

16    and the outlet and the -- and the protrusion on the corners

17    of the triangle, and they're about 2 centimeters apart.

18          But this is just a simple design choice.  Engineers

19    are faced with issues about picking dimensions every day.

20          Even Dr. Beaman was asked to explain the slide, and

21    he said 2 centimeters is an arbitrary number.  No one has

22    any -- from Whirlpool has ever come in and told you why 2

23    centimeters is better than 3 centimeters or 4 centimeters or

24    1 centimeter, any other one.

25          Instead, the inventor, Donald Bretl said -- when we

1    asked him:  Anything about the design that you thought was

2    special?  Good?

3              Answer:  Special?  No.

4              That doesn't sound like an advance in the art.

5    That doesn't sound like a true invention.

6              Now, Mr. Ward asked about motivation.  What's the

7    motivation to make these changes?  Well, there's only a

8    limited number of choices available.

9              If you're a person of skill in the art and you're

10   trying to decide which way should my valves point at the back

11   end of the cartridge -- cartridge goes in.  I've got valves.

12             Should I put them in line, point them out the back

13   so my hoses come out the back?  Oh, I could put them at a

14   90-degree angle.  Flip a coin.  That's your choice.

15   Engineers make those decisions every day.  That's not an

16   invention.

17             And it's not an invention to pick a shape for your

18   cartridge and then say, oh, well, that's -- has the same

19   matching shape in the head assembly in the refrigerator.

20   It's easy to shape a key when you're making up the lock for

21   that key at the very same time.  It's all they were doing is

22   making a key to fit their lock.  Mr. Rose even said so when

23   he was talking about the triangular shape.

24             Why did they do it?  Well, we came up with an

25   uneven triangle to give us a way to make sure that you would

get the filter to lock in the product the same way every
time.

And he was being asked:  What was that keying
effect you were talking about?

Well, a key and a lock.

And it's not a breakthrough design to design a
filter that fits in their refrigerator.  This is really what
we're talking about.  The filter fits.  The key fits the
lock.  You don't have to be an experienced engineer designing
water filters to know how to make shapes fit.

Now, we've been looking at how small the changes
are that Whirlpool made that differentiate itself from the
prior patents.

Now, let's -- let's look at non-infringement and
how big the changes were that Mr. Baird made to differentiate
the TST product from Whirlpool.

And the Judge just instructed you that the proper
analysis is look at the claims, look at the words of the
claims, not -- not comparing products side-by-side.  And
that's what Whirlpool wants to do.  They just want to look at
the products and say, hey, they both fit.

Claims never call for a filter cartridge that's
just compatible or that just fits in the housing.  They
didn't word it to say that it's the idea of just anything
that fits in a Filter 3.

1          In fact, if you look closely at those claims, the

2    word "fit" is not even in the claim.  Whirlpool has never

3    showed you where it is in the claim because they can't.

4          Instead, Whirlpool chose very specific words about

5    the longitudinal axis of the fittings, specific words about

6    where the protrusion is located, and how it extends from the

7    end wall.

8          So let's look at those exact terms here.

9          Here's the -- the fittings having a longitudinal

10   axis.  This is right out of the claim.  And we know this term

11   has been defined by the Court.  Same definition is in the

12   language of the patent.  Longitudinal axis refers to the

13   axis.

14         It has -- it does two things.  It runs along the

15   length and to -- through the center.  And when you look at

16   that, the only way that that can happen is if the fitting is

17   straight along its whole length.

18         The TST design isn't straight.  We don't literally

19   infringe.  And the axis for the base of the filter only goes

20   so far.  It has to stop here.

21         Why?  Because it's no longer at the center.  The

22   red and the green don't match up.  The bent tip is off

23   center, and it's bent.

24         So it's not literally infringing.  You heard about

25   how it works differently because we've got the wider opening

1   that doesn't get blocked, we've got the -- the wall that can

2   act as a -- a wedge to chisel away ice.

3          And the result is that the customers see this W-5

4   product, and it's so different looking from the Whirlpool

5   product, that customers get confused and they think they got

6   the wrong part for their Filter 3 refrigerator.

7          So Whirlpool hasn't proven Doctrine of Equivalents

8   infringement.

9          Let's talk about the protrusion extending from the

10  end wall.  Here's the language from the claim.  The

11  protrusion must extend from the end wall.  Instead of doing

12  that, TST spaced its protrusion far from the end wall.  Never

13  touches.

14         Whirlpool now says that the -- this -- this bridge

15  supporting the protrusion indirectly extends from the end

16  wall.  Well, "indirectly" isn't in the claims.  And it's too

17  late for them to rewrite the claims.

18         Their arguments really kind of go a little too far

19  and would make everything on the cartridge extend from the

20  end piece wall.

21         Mr. Ward talked about Dr. Beaman and us questioning

22  him on cross-exam, but here's what I remember about the

23  questioning of -- of Dr. Beaman.

24         When Mr. Murray pointed to the other end of the

25  cartridge and said, look -- look at this end cap here, you

1  know, is -- does this end cap at the opposite end, could this

2  be considered extending from the end wall that the patent's

3  talking about?

4      And he agreed.  He agreed.  And if that's true, you

5  know, this -- this claim language about extending from the

6  end wall is -- is basically meaningless.  That's just

7  Whirlpool trying to redraw its property lines, trying to

8  rewrite the claims, trying to erase the words that they put

9  in the claim that they chose that they needed to get that

10  patent issued in the first place.

11      Now, let's look at what they did at the Patent

12  Office again.  They're -- they're in a crowded field.

13  There's hundreds and hundreds of these patents that the

14  Patent Office is considering.

15      And what they did is they wrote in that "extending

16  from the end piece" language.  That's how they found their

17  little crack between all of these prior art patents to plant

18  their flag.

19      Some of these patents had protrusions that actuated

20  the bypass valve.  And you've seen Knuth.  You know, it gives

21  you an example here.  Let me just go back for one -- one

22  moment here.

23      What Whirlpool did is it picked a place right in

24  between -- you know, it found a little -- a little space

25  between all of these patents and -- and described what it had

and said, okay, well, that's -- that's what we're going to
do.  We're going to say exactly where the protrusion is
located.  That's how we're going to determine, which is our
property in -- in the middle of all of this crowded stuff.
It shows the language.  That was them laying out their
property lines.

And for context, I want to look at some of the
patents that had protrusions for bypass valves that were in
front of the Patent Office.

And you saw Knuth.  That's got the protrusion that
presses against the end wall.  Comes down from the top and
presses against it.

You saw Fritze.  That's got this protrusion we
highlighted that goes alongside the end piece wall.  And for
context, in addition, here's another protrusion that starts
inside the cartridge and goes through the end wall.

And you look at all this, that's why it's so
important that the claim says extending from the end wall.

Whirlpool chose those words to draw its property
line.  And in light of this crowded field and the specific
words that Whirlpool chose, the changes that TST made to the
location of the protrusion are very significant.

Now, Whirlpool wants to say the patent still covers
what TST did under Doctrine of Equivalents.

Now, you heard both Mr. Stein and Mr. Baird explain

1    how the lateral support, that V-shaped bridge, in the TST

2    product works in a different way.  Supports the protrusion

3    more sturdily.

4         And when we really look at what Whirlpool is trying

5    to do, is they're using the Doctrine of Equivalents to expand

6    their -- their claim, to state your claim on property that

7    they don't own, property that belongs in the public domain.

8         And a little bit like public -- if you had a public

9    park, right, and someone comes along and just builds a fence

10   around a part of that park and says, well, now it's my

11   private property.  That's a land grab.  You can stop it.  And

12   you can stop it here in this case.  It's Whirlpool redrawing

13   its property lines.

14        The other way they try to do that is they say now

15   that the idea of fit is the invention.  It's too late for

16   Whirlpool to do it now.  It's unfair.  A patent is a public

17   document.  TST was entitled to rely on the written claims in

18   that patent and those property lines.

19        That's what Mr. Baird did.  He looked at the

20   written claims when he designed his filter.  They didn't say

21   just anything that fit.  If they did, he wouldn't have

22   bothered spending all those years designing and redesigning.

23        Whirlpool gave public notice of its property line

24   in the patent.  And you saw that video about the patent

25   process.  That's what the patent is all about.

1        Once a patent is issued by the government, it

2   becomes available for inspection.  That way anyone who learns

3   of the patent can read it, understand it, and know exactly

4   what the inventor invented, and the limits of the patent set

5   forth in the claim.

6        That is what Mike Baird did.  He read the patent,

7   he understood the limits, and he made sure he stayed outside

8   the limits.

9        THE COURT:  Two minutes remaining.

10       MR. SGANGA:  Thank you, Your Honor.

11       Mr. Baird's not an infringer.  He deserves to keep

12  competing fairly.

13       I want to just touch on damages briefly.  Whirlpool

14  was supposed to propose a reasonable royalty rate.  Their

15  high numbers just show how far from reasonable they are.

16       They use their high prices to get a profit margin

17  that's high.  They don't even tell its customers when it

18  sells the refrigerator that they're locked in for life with

19  Whirlpool.

20       And what was really surprising to me is that

21  Mr. McFarlane, their damages expert, said they were raising

22  their prices in 2015 before TST entered the market.  The

23  market's declining for them, sales are dropping down

24  continuously before TST, and they're raising prices.

25       And so if that's -- you know -- and they're getting

1    consumer studies that say high prices are the biggest

2    problem, lower your practices.  This is -- this is the way to

3    handle a brand experience.

4          Well, remember what they thought when they got into

5    the market.  They thought that the patent would give them a

6    guaranteed annuity.  Mr. Kroonblawd said that's a regular

7    payout.  Basically, they're trying to turn their

8    refrigerators into cash machines.  And they don't bother

9    telling the customers about it.

10         Now, Mr. Baird was not willful, he was mindful of

11   the patent.  He was careful.

12         We're going -- I'm going to go through the verdict

13   form real quickly here.  We think you should answer no on

14   infringement.  Those limitations, the -- the longitudinal

15   axis, the protrusion, if you find anyone -- either of those

16   missing, none of the claims are infringed.  And that's a win

17   for TST.

18         It's also a win for TST if you find the patent

19   invalid for obviousness.  Either way, it's a win for TST.

20   And if you look at all of the evidence, we think you can go

21   for TST on both of those.  But what's clear is Mr. Baird

22   wasn't willful.  He was respectful.

23         THE COURT:  Your time is up, Counsel.  Take a few

24   seconds and finish.

25         MR. SGANGA:  Thank you, Your Honor.

1          I want to be -- just say in conclusion that I --
2   I'm thankful to all of you for your service on the jury.  I'm
3   sure you'll be careful, as Mr. Baird was, and consider all
4   the evidence.

5          I'm sure you'll be mindful of the Judge's
6   instructions on the law.  And with all that information
7   before you, I'm hopeful that you will do the right thing and
8   vote for TST.

9          Thank you.

10         THE COURT:  All right.  Plaintiff may now present
11  its final closing argument.  You have 9 minutes and 30
12  seconds remaining, Mr. Ward.  Would you like a warning on
13  your time?

14         MR. WARD:  Two-minute warning, please, sir.

15         THE COURT:  All right.  You may proceed when you're
16  ready.

17         MR. WARD:  I certainly don't have time to respond
18  to everything, but I can respond to a couple of things.

19         First, it was interesting to hear that Mr. Baird
20  came up with this on his own when we know he studied the
21  patent for four years, he bought 150 Filter 3s and studied
22  them.  He superimposed it on his own design drawings, and we
23  saw those design drawings, how he melted -- melted away.

24         I'll respond to Mr. Sganga's comment about what
25  happened at the Patent Office.  We didn't call Mr. Beaman

1  back because I couldn't believe what you all saw for a case

2  of invalidity because we all got to evaluate Mr. Stein, but I

3  invite you to look at Defendant's Exhibit 100.

4          Could you pull that up, Mr. Lee?

5          On Page 3535 -- this is in evidence, DX-100.  The

6  examiner states why this patent is being confirmed valid.  As

7  to Claim 1, the overall claimed combination of an end piece

8  for operatively engaging -- and it goes on for the rest of

9  the page -- and he says:  Is neither anticipated nor rendered

10  obvious by the prior art of record.

11          Over all claimed combination, it's all -- combining

12  all these elements.  It's not picking one thing and saying,

13  oh, I found it in a backhoe patent.

14          May I have the document camera?

15          Found it in a backhoe patent, combined it with a

16  beer keg and wall valve.  That's what they say invalidates

17  the '894.

18          He wants to show you the -- the slide with the oil

19  filter on it.  You go to an auto parts store, and you see

20  lots of oil filters all lined up on the shelves, and they all

21  look alike.  There's only one of these -- there's only one

22  Filter 3 that's the best selling filter on the market.

23          Did you see any evidence in this case of anything

24  similar to this?  Nothing.  You saw a bunch of twist-in

25  valve -- twist-in water filters.

1          What Whirlpool -- what Whirlpool came up with was

2     new and unique.

3          TST wants you to believe that they -- that

4     Whirlpool would go to this hypothetical negotiation, give a

5     license to its patent on a product that it's making over $17

6     in profit, and it'd say, we'll take a dollar.  That -- that's

7     reasonable.  You all set your price wherever you want to,

8     undercut our prices as much as you want to, but we'll take a

9     dollar.

10          Does that sound reasonable?  No less than a

11     reasonable royalty determined on the date just prior to TST

12     entering the market.

13          Could I see the ATM slide?

14          They say that Whirlpool thinks they've got an ATM.

15     Well, they do have an investment.

16          Can we just see the -- the refrigerator?  This is

17     an investment.  And what do you have to do if you want to get

18     money out of the ATM?  You've got to invest.  You got to put

19     money in your account, right?  And that's what Whirlpool has

20     done.  It's invested in this technology.

21          TST wants to sit outside the ATM with no investment

22     and what generates that stream of income.

23          We haven't been knocking TST's quality.  We've

24     talked about general concerns about Whirlpool, but I don't

25     think you ever heard me get up here and say, you all have got

1    a terrible product.  No one can buy it.  It's ruining

2    people's equipment.  We haven't -- we haven't made that

3    allegation.

4            But this is about choices.  This case is about

5    choices.  Whirlpool is a company that has chosen to innovate.

6    It's chosen to invest up to a hundred million dollars in

7    developing new lines of refrigerators.

8            Mr. Sganga talks about overseas production.  You've

9    heard about the manufacturing facilities that Whirlpool has

10   here, the money that it invests in those facilities, the

11   15,000 manufacturing jobs that it has in the United States.

12   And it's proud of that investment.

13           And in addition to investing in that product -- in

14   those products, it invests in protecting it with intellectual

15   property, and it makes no excuses about that.  It patents its

16   innovations.

17           TST makes choices, and we're not saying that

18   consumers shouldn't have a choice of generic if there's not

19   patents on the filters.  In fact, you all learned that

20   there's 20 filters that TST was selling before they started

21   infringing on the '894, and Whirlpool left them alone.

22           They're free to do that.  They're free to -- to

23   manufacture products that aren't covered by patents or

24   products where the patents had expired.

25           The Filter 3 patent, the '894, expires in six more

1    years.  If they want to come into that market in six years,

2    they can.  But what they can't do is say, oh, we need -- we

3    need to give choice.  We need to cut the fence and get in

4    there and undercut Whirlpool's profits.

5            His Honor's instructed you that you treat these

6    companies the same.  You treat them fairly.  They're proud of

7    their property rights.  Whirlpool's proud of its property

8    rights.  But TST doesn't respect those property rights.

9            We ask you to return a verdict that finds all

10   these -- these claims infringed, that holds the patents

11   valid, that finds that TST is a willful infringer -- they're

12   the ones who made this choice -- and award the full amount of

13   damages that Whirlpool has asked for.

14           I appreciate your time, and we look forward to

15   receiving your verdict.

16           THE COURT:  That completes closing arguments for

17   counsel for both of the parties in the case.

18           Ladies and Gentlemen, I have a few more final

19   instructions that I need to give you before you begin your

20   deliberations.

21           You must perform your duty as jurors without bias

22   or prejudice as to any party.  The law does not permit you to

23   be controlled by sympathy, prejudice, or public opinion.  All

24   parties will expect that you will carefully and impartially

25   consider all of the evidence, follow the law as I have given

1  it to you, and reach a just verdict, regardless of the

2  consequences.

3        Answer the questions in the verdict form based on

4  the facts as you find them to be, following the instructions

5  that the Court has given you on the law.  Do not decide who

6  you think should win this case and then answer the questions

7  accordingly.

8        Again, I remind you, your answers and your verdict

9  in this case must be unanimous.

10        You should consider and decide this case as a

11  dispute between persons of equal standing in the community,

12  of equal worth, and holding the same or similar stages in

13  life.  This is true in patent cases between corporations,

14  partnerships, and individuals.

15        A patent owner is entitled to protect its patent

16  rights under the U.S. Constitution.  This includes bringing a

17  suit in a United States District Court for money damages for

18  infringement.

19        The law recognizes no distinction between types of

20  parties.  All corporations, all partnerships, all other

21  organizations stand equal before the law, regardless of their

22  side, regardless of who owns them, and they are to be treated

23  as equals.

24        When you retire to the jury room to deliberate on

25  your verdict, you'll each have a copy of these written jury

1   instructions to take with you.

2          If you desire, during your deliberations, to review

3   any of the exhibits which the Court has admitted into

4   evidence during the trial, you should advise me by written

5   note delivered to the Court Security Officer.  He will bring

6   me your note, and then I will send you that exhibit or those

7   exhibits.

8          Once you retire, you should select your foreperson

9   and then conduct your deliberations.

10          If you recess during your deliberations, follow all

11   the instructions that the Court has given you about your

12   conduct during the trial.

13          After you have reached your verdict, your

14   foreperson is to fill in the verdict form with your unanimous

15   answers to those questions.  You are not to reveal your

16   answers until such time as you're discharged, unless

17   otherwise directed by me, and you must never disclose to

18   anyone, not even to me, your numerical division on any

19   question.

20          Any notes that you've taken over the course of the

21   trial are aids to your memory only.  If your memory should

22   differ from your notes, then you should rely on your memory

23   and not your notes.  The notes are not evidence.

24          And a juror who his not taken notes should not --

25   should rely on his or her own independent recollection of the

1   evidence and should not be unduly influenced by the notes of

2   any other juror.  Notes are not entitled to any greater

3   weight than the recollection or impression of each juror

4   about the testimony.

5         If you want to communicate with me at any time

6   during your deliberations, you should give a written message

7   or a question to the Court Security Officer who will bring it

8   to me.  I'll then respond as promptly as possible, either in

9   writing or by having you brought back into the courtroom

10  where I can address you orally.

11        I will always first disclose to the attorneys in

12  the case your question and my response before I answer your

13  question.

14        After you have reached your verdict and I have

15  discharged you from your duty as jurors, you need to

16  understand that you are not required to talk with anyone

17  about your service in this case.

18        By the same token, after I have discharged you from

19  your duty as jurors, you are completely free to discuss your

20  service as jurors in this case with anyone that you choose

21  to.  The choice is yours, Ladies and Gentlemen, and not

22  alone.

23        You should understand the practice in this Court is

24  that if you wish -- after you are discharged, if you wish to

25  talk about your service as jurors with any of the attorneys

1   in the case -- and I can tell you they would be interested to

2   hear from you -- it's up to you to initiate a conversation

3   with them.  They are not permitted to initiate a conversation

4   with you.

5           Again, whether you discuss your jury service after

6   the receipt of the verdict and you're discharged as jurors is

7   your decision and your decision alone.

8           All right.  I will now hand eight copies of these

9   final jury instructions and one clean copy of the verdict

10  form to the Court Security Officer to deliver to the jury in

11  the jury room.

12          Ladies and Gentlemen of the Jury, you may now

13  retire to the jury room to deliberate.  We await your

14  verdict.

15          COURT SECURITY OFFICER:  All rise for the jury.

16          (Jury out.)

17          THE COURT:  Counsel, so you will know, the Court

18  has ordered the Clerk to provide lunch to the jury today.

19  It's to be delivered at 11:30.

20          You are welcome, during their deliberations, to wait

21  here in the courthouse -- in the courtroom.

22          If you choose to wait outside the courtroom at an

23  area office or location, make sure that my staff has adequate

24  cell phone numbers for lead counsel and local counsel so that

25  we can contact you in the event we receive a note or a

1  verdict.

2          Pending either receipt of a note or a verdict from

3  the jury, we stand in recess.

4          (Recess.)

5          (Jury out.)

6          COURT SECURITY OFFICER:  All rise.

7          THE COURT:  Be seated, please.

8          Counsel, I've received a note from the jury.  It

9  reads as follows:  May we see Filter 3 and W-5?  Thank you,

10  L. Jenice Childers.

11          That would be, by my recollection, Juror No. 5.

12  She's executed it as the foreperson.

13          I'm going to identify this as Jury Note No. 1 by

14  placing a 1 in the lower right-hand corner the note, and

15  I'll deliver the note to the Courtroom Deputy to be included

16  in the papers of the file.

17          In response to the note, Counsel, I'm holding two

18  of the actual filters, one identified as Plaintiff's Exhibit

19  447, and one identified as Plaintiff's Exhibit 496.

20          Is there agreement among the parties that these are

21  the two items that the jury is requesting in the note, and is

22  there any objection to me sending these in to the jury?

23          MR. WARD:  Agreement from the Plaintiff and no

24  objection.

25          MR. SGANGA:  No objection, Your Honor.  I just want

1  to clarify, is the -- on the exhibit numbers, was it

2  Plaintiff's Exhibit 447?

3          THE COURT:  If I'm reading it right, Mr. Sganga,

4  that's what it says.

5          MR. SGANGA:  Okay.

6          THE COURT:  That would be on the HDX filter, and

7  then Plaintiff's 496 on the Whirlpool 3 filter.

8          MR. SGANGA:  Very good.  That -- that is what they

9  appear to be.  We just wanted to make sure.

10          THE COURT:  Now, the jury did not request the

11  packaging that these filters came in, so I would assume we

12  send it in just the naked filters without any packaging.

13          Does anyone disagree with that?

14          MR. SGANGA:  No, Your Honor.

15          MR. WARD:  No.

16          THE COURT:  All right.  Mr. Nance, if you'll come

17  forward, I'll hand these two exhibits, Plaintiff's Exhibit

18  496 and Plaintiff's 447 to you to be handed to the jury.

19          And pending another note or verdict, we stand in

20  recess.

21          (Recess.)

22          (Jury out.)

23          THE COURT:  Be seated, please.

24          Counsel, the Court's received a second note from

25  the jury.  I'll read it to you.

1    Would like to see prototype model set, parentheses,

2   3D printed set, close parenthesis.  Signed Jenice Childers.

3    Below that it says:  Also head assembly and

4   insertion tube.

5    And then she's put her initials below the second

6   request.

7    I'll mark this note in the lower right-hand corner

8   as No. 2 to identify it, and hand it to the Courtroom Deputy

9   for inclusion in the papers of this case.

10    I'm open to suggestion as to exactly what the jury

11   wants.  Hopefully, we can identify that with clarity.  I'm

12   assuming the first item is that long board with the

13   cream-colored various iterations of Filter 2 being on them.

14    Was that an exhibit, Counsel, or was that a

15   demonstrative?

16    MR. SGANGA:  No, those were each individually

17   marked as a series of exhibits, and that was just the

18   platform to carry them --

19    THE COURT:  Okay.  I remember the tags on them,

20   Mr. Sganga.  You're right.  So that clearly is -- at least to

21   me, that's what the first request is.

22    Anybody feel differently about that being the first

23   request?

24    MR. WARD:  No, I think that's right.

25    MR. SGANGA:  Agreed, Your Honor.

1          THE COURT:  Okay.  Then it says also a head

2    assembly and insertion tube.  Do we have suggestions as to

3    what might accurately respond to that request?

4          MR. HUNG:  Your Honor, I think  it's PX-190 -- 190,

5    which is the tube, and then in the same bag are 190A and B,

6    which are the valve assemblies taken out.  We did use the

7    valve assembly during the case.  That was P-90 -- PX-190B.

8    So I think it's PX-190.

9          MR. SGANGA:  Well --

10          THE COURT:  Let me ask this, where are these

11    things?  I don't see them in the courtroom.

12          MR. WARD:  They're -- they're up here in boxes.

13          THE COURT:  They're in front of me.  All right.

14    Let's --

15          MR. HUNG:  So, Your Honor, here is a -- the full

16    device, and we had separately marked -- I'm sorry, it's 490,

17    PX-490B, which is the valve portion of it.

18          THE COURT:  What about the tubes, Mr. Hung?

19          MR. HUNG:  I think the tube -- I think this is the

20    tube that they're referring to.

21          MR. SGANGA:  Yeah, Your Honor, DX-4 is the

22    assembled tube with the head assembly on the end of it.  This

23    one -- the one that Plaintiff's counsel just pointed to I

24    think has been disassembled.  So we could give them both

25    and --

1          THE COURT:  Where is DX-4?

2          MR. SGANGA:  We also have that here, Your Honor.

3          THE COURT:  All right.  Let's all talk one at a

4    time because we are on the record.

5          MS. KENNEDY:  Your Honor, this is DX-4, and it's

6    the assembled version of their PX --

7          MR. HUNG:  490.

8          MS. KENNEDY:  -- 490.

9          THE COURT:  All right.  Well, it seems to me the

10   assembled version would be simpler to send than the

11   unassembled version.

12         MR. HUNG:  The only reason why I'd encourage the

13   unassembled version, Your Honor, is this is what we used to

14   demonstrate whether it fits, because the tube is so long you

15   can't actually fit it and see the engagement if it's

16   assembled.

17         THE COURT:  All right.  Again, let me ask what

18   about the hoses because they spec -- or tubes?

19         MR. SGANGA:  I understood that request, Your Honor,

20   to refer to the -- the -- this --

21         THE COURT:  This.

22         MR. SGANGA:  -- longer --

23         THE COURT:  Okay.

24         MR. SGANGA:  -- end of it as the -- as the tube.

25         THE COURT:  All right.  Can -- I agree now that you

1    mentioned that.

2              Can we pull out the board with the various models

3    or tubes on it that was mentioned in the first request?

4              MR. MURRAY:  Your Honor, we have the prototypes

5    themselves.  As for the board, I'm not sure where the board

6    is.

7              THE COURT:  Well, I'd like to take it in the same

8    way they saw during the trial, if possible.

9              MR. SGANGA:  We don't have that here in the

10   courtroom, Your Honor.  But we certainly could --

11             THE COURT:  Is it next door?

12             MS. STONEMAN:  It's 10 minutes away.

13             THE COURT:  All right.  Why don't you go get it,

14   please?

15             MS. STONEMAN:  Okay.

16             THE COURT:  Let's do this, Counsel, just so we can

17   kind of all know what we're talking about, let's take the

18   items that were on the board that addressed the first request

19   and let's line them out behind Mr. Hung on this ledge right

20   here so that all they have to do is be placed on the board

21   and carried into the jury room; and that way, I can get

22   everybody's agreement on the record that what's there on the

23   ledge is what should be carried on the board into the jury

24   room.

25             Then with regard to the second request, I would

1    suggest that what Mr. Sganga has in his hands, as well as

2    what Mr. Ward has in his hands both be sent in in response to

3    the second request.

4           If there's objection to that, let me know?

5           MR. SGANGA:  No, Your Honor.

6           THE COURT:  That way they have the assembled tube

7    with the head, and then they have the head separately.

8           Now, what are the numbers on what you're holding,

9    Mr. Sganga?

10           MR. SGANGA:  This is Exhibit DX-4.  The other

11    labels are deposition exhibit numbers.

12           THE COURT:  All right.  DX-4.

13           And then, Mr. Ward, what's the identification on

14    the item you're holding?

15           MR. WARD:  PX-490B.

16           THE COURT:  All right.  Unless there's any

17    disagreement, and if there is, let me know.  Hand both of

18    those items to Mr. Nance, gentlemen, if you will.

19           Mr. Nance, those two things are going into the

20    jury.  Why don't you take those into the jury room and

21    return, and then we'll address this -- tell them that the

22    rest of it will be coming, and then come back, please, sir.

23           COURT SECURITY OFFICER:  Yes, sir.

24           THE COURT:  Ms. Andrews, are you clear on exactly

25    the two exhibits that were taken into the jury room?

1          COURTROOM DEPUTY:  Yes, yes.

2          THE COURT:  Okay.  Counsel, let's let you continue

3     to work on those items.  We're going to go off the record;

4     and when both sides are satisfied that we have what addresses

5     the jury's request, let me know, we'll go back on the record,

6     and then identify those items clearly for the record before

7     they're sent in.

8          We're off the record.

9          MR. SGANGA:  Thank you, Your Honor.

10         (Recess.)

11         (Jury out.)

12         THE COURT:  Let's go back on the record.

13         Counsel have jointly identified the various

14    exhibits that together comprise an accurate response to the

15    first portion of this second note from the jury.

16         Would you send in the prototype model set -- 3D

17    printed set?

18         I think we have agreement from both Plaintiff and

19    Defendant that those items that accurately respond to that

20    request have been identified; and if so, Mr. Ward, you're the

21    closest to it, why don't you read off those exhibit numbers

22    for the record, please?

23         MR. WARD:  DX-697.1, 697.2, 697.3, 697.7, 697.5,

24    697.6, and 697.4.

25         THE COURT:  And those are all Defendant's Exhibits,

1    correct?

2              MR. WARD:  Correct.

3              THE COURT:  All right.  Mr. Sganga, do you agree

4    that that's an accurate reply to the request from the jury?

5              MR. SGANGA:  I do, Your Honor.

6              THE COURT:  All right.  Then the only thing missing

7    is the little nondescript flat piece of board that they were

8    put on when they were shown to the jury.

9              MR. SGANGA:  Correct.

10             THE COURT:  I'm going to direct the Court Security

11   Officer to wait until that little piece of board is returned

12   by somebody's paralegal who went to get it, and then to place

13   those exact exhibits in that order on that board and carry it

14   into the jury.

15             COURT SECURITY OFFICER:  Yes, sir.

16             THE COURT:  All right.  And with that, Counsel, is

17   there anything else we need to cover before we recess?

18             MR. WARD:  No, sir.

19             MR. SGANGA:  No, Your Honor.

20             THE COURT:  All right.  The Court will consider

21   that an effective and accurate response to the second jury

22   note.

23             And with those instructions to the Court Security

24   Officer, we stand in recess.

25             (Recess.)

1          COURT SECURITY OFFICER:  All rise.

2          THE COURT:  Be seated, please.

3          All right.  Counsel, I've received the following

4   from the jury:

5          We have a verdict.

6          Signed by Ms. Childers as jury foreperson.

7          I'll hand this note to the Courtroom Deputy to be

8   included in the papers of this case.

9          And let's bring in the jury, please.

10          COURT SECURITY OFFICER:  All rise for the jury.

11          (Jury in.)

12          THE COURT:  Please be seated.

13          Ms. Childers, I understand you're the foreperson of

14   the jury; is that correct?

15          THE FOREPERSON:  Yes, sir.

16          THE COURT:  Has the jury reached a verdict?

17          THE FOREPERSON:  Yes.

18          THE COURT:  All right.  In that case, I'll ask you

19   to hand the signed and dated verdict form to the Court

20   Security Officer who will bring it to me.

21          All right.  Ladies and Gentlemen, I'm going to

22   announce the verdict at this time.  And I'm going to ask each

23   of the members of the jury to listen very carefully as I do

24   that, because after I have announced the verdict, I'm going

25   to ask each of you if this is your verdict so that we can

confirm on the record that it's the unanimous decision of all

eight members of the jury.

Turning to the verdict form itself, and Question 1

located on Page 2 thereof:

Did Whirlpool prove by a preponderance of the

evidence that TST Water directly infringes the following

claims of the '894 patent either literally or under the

Doctrine of Equivalents?

Claim 1, the jury's answer is yes.

Claim 4, the jury's answer is yes.

Claim 10, yes.

Claim 15, yes.

Claim 17, yes.

Claim 20, yes.

And Claim 27, yes.

Turning to Question 2 on the verdict form found on

Page 3 thereof, the question is:

Did TST Water prove by clear and convincing

evidence that any of the asserted claims of the '894 patent

are invalid as obvious over the prior art?

The jury's answers are as follows:

Claim 1, no.

Claim 4, no.

Claim 10, no.

Claim 15, no.

1        Claim 17, no.

2        Claim 20, no.

3        And Claim 27, no.

4        Turning to Question 3 on Page 4 of the verdict

5   form:

6        Did Whirlpool prove by a preponderance of the

7   evidence that any of the asserted claims of the '894 patent

8   are willfully infringed by TST Water?

9        The answer from the jury to this question is yes.

10       Turning to Question 4 on Page 5 of the verdict

11  form:

12       For the claims that you have found TST Water

13  infringed, what sum of money do you find by a preponderance

14  of the evidence would fairly and reasonably compensate

15  Whirlpool for past acts of infringement up to and including

16  today's date?

17       The jury's answer is $7,600,000.  $7,600,000.

18       Turning to Page 6 of the verdict form, I find that

19  the verdict form is dated today's date, March the 10th, 2017,

20  and signed by Ms. Jenice Childers as jury foreperson.

21       Ladies and Gentlemen, let me poll you to make sure

22  this verdict is the unanimous verdict of all eight members of

23  the jury.

24       If this is your verdict as I have read it, would

25  you please stand up at this time?

1          (Jury polled.)

2          THE COURT:  Thank you, please have a seat.

3          Let the -- let the record reflect that upon the

4   Court asking the jury whether this was their verdict, all

5   eight members of the jury immediately stood in response

6   confirming that this is the unanimous verdict of all eight

7   members of the jury.

8          I'm going to hand the verdict form to the Courtroom

9   Deputy to be included and filed in the papers of this cause.

10          Ladies and Gentlemen, this now completes the trial

11  of this case.  From the very beginning, I've instructed you

12  not once, not twice, but many times about not discussing this

13  case with anyone in any way, in any shape, or any fashion.

14          I'm now releasing you from that and all the

15  obligations that you've undertaken as jurors in this case.

16          You're free to talk among yourselves.  You're free

17  to talk with anyone.  You're now free to post on Facebook or

18  tweet on Twitter or all those things I told you not to do

19  when we started this process.

20          However, I want you to understand, to the extent

21  you elect to communicate or -- or talk with anyone about your

22  service in this case, it's strictly and completely up to you.

23          As I mentioned earlier, the lawyers are not

24  permitted to come to you and initiate a conversation about

25  the case.  But I can tell you having practiced in this very

1    courtroom over a long period of time, don't be surprised if

2    they're not positioned outside the courthouse so that when

3    you leave, you will have to walk by them.

4              And if you want to talk with them, they will smile

5    at you, and you can stop and talk as long as you want to.

6              And if you don't want to talk, just smile back and

7    keep on walking.  It is 100 percent your decision, your

8    personal choice.

9              Either way, they won't initiate or anyone else

10   won't initiate a conversation with you.  It will be up to you

11   to do that.  You're free to do that now; you're also free to

12   not to.  It is completely your choice and your choice alone.

13             Also, Ladies and Gentlemen, on behalf of the Court

14   as an institution, the Court staff, and I think fairly on

15   behalf of the parties and the lawyers in this case and

16   everyone in the courtroom, we want you to know that we

17   appreciate very much and very deeply what you've done and how

18   you've discharged your important public service as jurors in

19   this case.

20             Every one of you had other places to be throughout

21   this week that were important in your respective lives, and

22   you've sacrificed those individual concerns and

23   responsibilities to be here and to serve as the jury in this

24   case.

25             And you have performed a very real and substantial

1   public service, and that is no small thing.  As a matter of

2   fact, that is a very important thing, and the Court

3   recognizes it and thanks you for it, as does I think everyone

4   in this courtroom.

5            I would like to mention to you that it's my

6   practice, and I hope you will accommodate me in this regard,

7   that after I've accepted a verdict in a case like this and

8   discharged the jury, I ask the jury before they leave the

9   courthouse to go back to the jury room for just a few minutes

10  and let me come in, and I'd like to thank each one of you

11  personally, I'd like to look you in the eye and shake your

12  hand and tell you face-to-face how much I appreciate what

13  you've done in serving as a juror in this case.

14           I think what you've done warrants that, and I'd

15  like that honor and privilege if you would afford it to me.

16           If you care not to do that, you have been

17  discharged and you're free to leave.  But if you would

18  accommodate me with a personal privilege in that regard, I

19  would certainly appreciate it.  And I promise, I won't keep

20  you very long.  But I would like the opportunity to thank you

21  each in person for your hard work and public service in this

22  case.

23           That completes the trial of this case, Counsel.

24           You are discharged and released.

25           Members of the jury, if you'll afford me that

1    privilege, I'll meet you in the jury room.

2              COURT SECURITY OFFICER:  All rise for the jury.

3              (Jury out.)

4              THE COURT:  Court stands in recess.

5              (Court adjourned.)

6

7                        CERTIFICATION

8

9              I HEREBY CERTIFY that the foregoing is a true

10   and correct transcript from the stenographic notes of the

11   proceedings in the above-entitled matter to the best of our

12   abilities.

13
     /s/ Shelly Holmes
14   SHELLY HOLMES, CSR, TCRR                March 10, 2017
     Official Court Reporter
15   State of Texas No.:  7804
     Expiration Date  12/31/18
16

17
     /s/ Shea Sloan
18   SHEA SLOAN, CSR, RPR
     Official Court Reporter
19   State of Texas No.:  3081
     Expiration Date:  12/31/18
20

21

22

23

24

25