# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| WHIRLPOOL CORPORATION, | § | |
| | § | |
| | § | CIVIL ACTION NO. 2:15-CV-01528-JRG |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| TST WATER, LLC, | § | |
| | § | |
| | § | |
| *Defendant*. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Whirlpool Corporation's ("Whirlpool") Motion for Judgment, for an Order Designating Whirlpool the Prevailing Party, for Enhanced Damages, for an Exceptional Case Finding, and for an Order Awarding Pre- and Post-judgment Interest (Dkt. No. 175). Having considered the Motion, the Court is of the opinion the Motion should be and hereby is **GRANTED-IN-PART** and **DENIED-IN-PART**, as set forth herein.

### I. Whirlpool is Entitled to Judgment in Its Favor and a Declaration That It Is the Prevailing Party

TST Water, LLC ("TST") does not dispute this portion of Whirlpool's Motion. (*See generally* Dkt. No. 178; *id.* at 1 ("That Whirlpool . . . prevailed overall, is hardly noteworthy.")). Under Rule 54(c) of the Federal Rules of Civil Procedure, the Court's judgment should "grant the relief to which each party is entitled." Accordingly, and consistent with the jury's verdict (Dkt. No. 148), Whirlpool is entitled to a Judgment that:

(i)     TST infringed claims 1, 4, 10, 15, 17, 20, and 27;

(ii)    those claims are not invalid;

(iii)    TST's infringement was willful; and

(iv)    Whirlpool's damages through the verdict's date (excluding interest, any
        enhancement, and any attorney's fees award) are $7.6 million.

(*Id.*)

A prevailing party must have "received at least some relief on the merits," and "[t]hat relief must materially alter the legal relationship between the parties by modifying one party's behavior in a way that 'directly benefits' the opposing party." *Shum v. Intel Corp.*, 629 F.3d 1360, 1367 (Fed. Cir. 2010) (citations omitted). Here, Whirlpool has "received at least some relief on the merits" which "modifie[s]" TST's behavior and "directly benefits" Whirlpool. Accordingly, Whirlpool is properly designated the prevailing party for purposes of Rule 54(d).

As the prevailing party, Whirlpool is entitled to costs under Rule 54(d), 28 U.S.C. §1920, Local Rule CV-54, and this Court's Standing Order Regarding Bill of Costs. The Parties are **ORDERED** to meet and confer to resolve any disputes regarding Whirlpool's taxable costs and submit any unresolved disputes to the Court as necessary. For the reasons set forth above, Whirlpool's Motion is hereby **GRANTED** with respect to prevailing party status. (Dkt. No. 175 at 2).

## II.    Enhanced Damages

The jury found that TST's infringement of the asserted claims was willful. (Dkt. No. 148, Jury Verdict at 4). Such a finding "invites the Court to exercise its discretion to determine whether enhanced damages are appropriate under 35 U.S.C. § 284." *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, No. 14-cv-912-JRG, Final Judgment Order, Dkt. No. 47 at 1 (E.D. Tex. Nov. 1, 2016). In addition to determining whether to award enhanced damages, courts also have discretion as to the amount of damages to be awarded. *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923,

1932 (2016) ("District courts enjoy discretion in deciding whether to award enhanced damages, and in what amount."); *see also id*. at 1926 ("§ 284 allows district courts to punish the full range of culpable behavior.").  The Court may increase damages up to three times the damages assessed by the Jury. *See Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1570 (Fed. Cir. 1996).  To determine whether and how much to enhance damages, courts consider the "*Read* factors:"

(1) "whether the infringer deliberately copied the ideas or design of another";

(2) "whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed";

(3) "the infringer's behavior as a party to the litigation";

(4) "[d]efendant's size and financial condition";

(5) "[c]loseness of the case,"

(6) "[d]uration of defendant's misconduct";

(7) "[r]emedial action by the defendant";

(8) "[d]efendant's motivation for harm"; and

(9) "[w]hether defendant attempted to conceal its misconduct."

*Read Corp. v. Portec Inc.*, 970 F.2d 816, 826–27 (Fed. Cir. 1992), *abrogated in part on other grounds by Markman v. Westview Instr. Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc).  The Court addresses each factor in turn.

## II.A.    Copying [*Read* Factor 1]

Whirlpool submits that "direct evidence shows TST deliberately copied Whirlpool's patented design."  (Dkt. No. 175 at 3).  Specifically, Whirlpool points to the following:

- TST's President, Michael Baird, was aware of the '894 patent as early as 2010 and studied it. (Dkt. No. 162, Mar. 8, 2017 A.M. Tr. at 69:3–13);

- TST knew that Whirlpool's patented Filter 3 was one of the "best selling replacement filters in the market." (*Id*. at 74:25-75:2; Dkt. No. 175, Ex. 9 at 58258 (TST noting Filter 3 is "one of the highest-sellers for everyone in retail"));

- TST bought more than 150 Filter 3 filters and several of their corresponding head assemblies. (Dkt. No. 163, Mar. 8, 2017 P.M. Tr. at 36:9–14);

- TST's internal design files for the W-5 and its computer-aided design ("CAD") files contained:

  o Whirlpool website printouts relating to the Filter 3 (Dkt. No. 175, Ex. 10 at 3711–12);

  o Schematic renderings of the Filter 3 (*id*. at 3708–10; Dkt. No. 163 Mar. 8, 2017 P.M. Tr. at 49:4–12, 133:9–13 (admissions re: Filter 3 rendering and CAD files)); and

  o Schematic renderings of the Filter 3 specifically of the head assembly (*id*. at 3633–39).

(Dkt. No. 175 at 3–4). Whirlpool argues that "TST [] made cosmetic changes to Whirlpool's Filter 3 design to arrive at the W-5. As Whirlpool's expert, Joseph Beaman, explained, TST effectively 'carved away' portions of Filter 3's dome to make it appear 'sunk down.'" (*Id*. at 4 (quoting Dkt. No. 159, Mar. 7, 2017 A.M. Tr. at 27:5–28:1, 28:16–21)). "TST even 'superimposed' the end piece of Whirlpool's Filter 3 onto its own W-5 product to ensure its compatibility:"



(*Id*. at 5 citing Dkt. No. 175, Ex. 10 at 3642; *see also id*. at 3643-44; Dkt. No. 163, Mar. 8, 2017 P.M. Tr. at 49:13–50:5 (Baird explaining that a TST employee "superimposed the Whirlpool product on top of [his] design" to "understand whether he got it right on those areas that needed to be compatible")). In addition, "no witness testified that TST independently developed its design." (Dkt. No. 175 at 6).

In response, TST argues that "There was no evidence at trial that TST simply copied the Filter 3, as did so many others. Rather . . . TST presented abundant evidence that [] Mr. Baird spent years and tens of thousands of dollars carefully studying the '894 patent and developing a different, noninfringing design." (Dkt. No. 178 at 20). TST also points to "Mr. Baird [being] so confident that his design was different and an improvement over Whirlpool's that he filed multiple patent applications describing his improvements." (*Id*.) Further, "TST refused Home Depot's request to sell a replacement for the Filter 3 in 2014 because Mr. Baird was not completely satisfied that the then-existing design would not infringe." (*Id*.) According to TST, the facts that Whirlpool relies upon were the same facts that "always exist when someone makes a good-faith effort to design around a patent." (*Id*.)

Considering the totality of the circumstances and all of the evidence of record, the Court finds that this factor weighs in favor of enhancement. It is, of course, true that "[d]esigning around patents is, in fact, one of the ways in which the patent system works to the advantage of the public in promoting progress in the useful arts, its constitutional purpose," *Slimfold Mfg. Co. v. Kinkead Indus., Inc.*, 932 F.2d 1453, 1457 (Fed. Cir. 1991), and that "[e]very man has a right to make an improvement in a machine, and evade a previous patent, provided he does not invade the rights of the patentee." *Burr v. Duryee*, 68 U.S. 531, 574 (1863). However, an attempted design around that ultimately fails to actually design around and is adjudged to be infringing necessarily copies where, as here, the adjudged infringer begins with a copy already existing technology and then proceeds to make changes. That the attempted design around process engaged in by TST began with copying cannot be disputed; it is confirmed by the "carving away" of the Filter 3 dome whilst leaving the protrusion in the required location, as seen in the evidence, discussed *supra*.

TST's objective was not to improve on Whirlpool's technology or to bring a new, alternative design to the market and consumers. In essence, TST brought an infringing filter to market while simply pretending otherwise. The Court notes that it is cognizant of the "so-called 'negative incentive' to 'design around' a competitor's products, even when they are patented, thus bringing a steady flow of innovations to the marketplace." *Westvaco Corp. v. Int'l Paper Co.*, 991 F.2d 735, 745 (Fed. Cir. 1993) (quoting *State Indus., Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1235-36 (Fed. Cir. 1985)). However, the Court believes that this case is one where the copying exhibited is "so obnoxious as to clearly call for" "discourage[ment] by punitive damage[s]." *Westvaco*, 991 F.2d at 745.

## II.B.    Good-Faith [*Read* Factor 2]

Whirlpool argues that TST had "no good-faith belief in non-infringement or invalidity." (Dkt. No. 175 at 6).  Despite TST's President, Mr. Baird's, awareness of the '894 patent prior to suit, (Dkt. No. 162, Mar. 8, 2017 A.M. Tr. at 69:3–13), "his testimony and TST's related design files, [] confirm that TST did not adequately investigate the scope of the '894 patent claims when designing the W-5." (Dkt. No. 175 at 6).  Mr. Baird, testified in this case that he read the patent and its claims.  (Dkt. No. 163, Mar. 8, 2017 P.M. Tr. at 3:20–23).  This is insufficient, on its own, to establish a good-faith belief.  Also, this appears to be uncorroborated, as TST offered no written evidence that anyone at TST considered the full claim scope or alternative embodiments which might fall within it.  As Whirlpool points out "[n]ot a single page of TST's 252-page design file— which records the entire development of the W-5—includes a figure, description, or reference to the embodiments from Whirlpool's patent that illustrate the broad scope of its claims." (Dkt. No. 175 at 7).

Further, Whirlpool argues that TST's W-5 Design "plainly infringed" such that TST could not plausibly assert a "good-faith" belief of non-infringement.  (*Id*.)  Specifically, TST conceded that the W-5 practices virtually all of the claim limitations. (*See, e.g.*, Dkt. No. 175, Ex. 13 at Nos. 1 ("end piece"), 2 ("end piece wall"), 3 ("inlet fitting"), 4 ("outlet fitting"), 5 ("protrusion").) At trial, TST advanced only two non-infringement theories at trial—that the W-5 lacks (1) an inlet fitting with a "longitudinal axis" and (2) a protrusion that "extends from the end piece wall." (Dkt. No. 164, Mar. 9, 2017 A.M. Tr. at 116:5–20).  Whirlpool criticizes both theories as being "inconsistent with [TST's] technical documents."  (Dkt. No. 175 at 7).  Specifically, Whirlpool submits that "TST's design drawings depicted a longitudinal axis running 'along the length and through the center' of the inlet fitting no fewer than 16 times."  (*Id*. (citing *id*., Ex. 10 at 3561–

3562, 3599–3601, 3610, 3612, 3621, 3626, 3629–3630, 3693, 3705, 3788, 3791, 3792); *accord id.*, Ex. 14 at 96701, 96692, 96698; *see also* Dkt. No. 159, Mar. 7, 2017 A.M. Tr. at 46:2–15 (Mr. Beaman explaining that drawings depict axis)).

In addition, Whirlpool argues that "TST's design drawings also contradicted its second non-infringement position, *i.e.*, that the W-5 did not infringe because it lacked a protrusion that 'extended from the end piece wall'" since "TST's drawings (*e.g.*, [Dkt. No. 175,] Ex. 10 at 3642) revealed that the W-5's design changes from the Filter 3 product were purely cosmetic—the protrusion still remained at the exact same position," and "Mr. Baird further conceded that the W-5's protrusion performs the same function and achieves the same result as the patented invention." (Dkt. No. 175 at 8 citing Dkt. No. 163, Mar. 8, 2018 P.M. Tr. at 51:17–52:11).

Finally, regarding the invalidity of the '894 patent, Whirlpool argues that TST knew that the Patent Office had "confirmed the patent's validity twice": once at issuance, and once when one of Whirlpool's competitors, Swift Green, challenged the validity of the patent via reexamination, which ultimately failed. (Dkt. No. 175 at 8–9). Additionally, "by its own concession, TST always 'assumed' that the '894 patent was valid before this lawsuit was filed." (*Id.* at 9, citing Dkt. No. 162, Mar. 8, 2017 A.M. Tr. 78:22–79:13; *accord id.* at 79:20–25, 80:7–14). As to the invalidity defense presented at trial, "TST's expert, Mr. Stein, openly acknowledged that three of the four references (Knuth, Fritze, and Dorfman) were before the Patent Office during the unsuccessful reexamination proceedings that Swift Green initiated," (Dkt. No. 175 at 9 citing Dkt. No. 165, Mar. 9, 2017 P.M. Tr. at 7:19–8:8). Further, he "conceded that none of the four references expressly disclosed the 'about 2 cm' limitations of all asserted claims," (Dkt. No. 175 at 9 citing Dkt. No. 165, Mar. 9, 2017 P.M. Tr. at 10:19–11:9, 12:11–18, 14:17–23, 15:20–16:6), and he also

"admitted that TST's attorneys conceived of this combination before he was hired for this case." (Dkt. No. 175 at 9 citing Dkt. No. 164, Mar. 9, 2017 A.M. Tr. at 128:14–29:13).

TST submits the same arguments as described *supra,* Part II.A at 5, namely "that (1) Mr. Baird spent years and tens of thousands of dollars carefully studying the '894 patent and developing a different, noninfringing design; (2) Mr. Baird was so confident that his design was different and an improvement over Whirlpool's that he filed multiple patent applications describing his improvements; and (3) TST refused Home Depot's request to sell a replacement for the Filter 3 in 2014 because Mr. Baird was not completely satisfied that the then-existing design would not infringe." (Dkt. No. 178 at 20).

The Court is unpersuaded by TST's arguments. TST does not dispute Whirlpool's assertion that the record lacks any "written evidence that anyone at TST considered the full claim scope or alternative embodiments that might fall within it." (Dkt. No. 175 at 7). This is particularly troubling, as the lack of a written record directly undermines Mr. Baird's testimony regarding the reasonableness of TST's investigation and its good-faith belief. *See, e.g., Golden Hour Data Sys., Inc. v. emsCharts, Inc.*, No. 2:06-cv-381-JRG, 2014 WL 8708239, at *17 (E.D. Tex. Mar. 31, 2014) ("Further, aside from his own words, emsCharts produced no written evidence at trial reflecting Mr. Goutmann's investigation of the '073 Patent or analysis of the patent scope. This, when considered together with his subsequent statement to Mr. Cromer that he had known about the patent but blown it off, casts doubts on the extent of Mr. Goutmann's purported investigation."); *accord Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings,* 370 F.3d 1354, 1371 (Fed. Cir. 2004) (the district court "could easily have determined" that the defendant had not conducted a reasonable investigation into potential infringement when the defendant formed its belief of non-infringement based solely on the opinion of a person who lacked training in patent law).

Furthermore, Mr. Baird's actions alone do not establish a good faith belief of non-infringement or invalidity. Filing a patent application, without more, does not demonstrate that a good faith belief has been formed.[1] The time and money spent by Mr. Baird does not compel a different result, especially given the dearth of documentary evidence or other corroborating testimony that TST actually considered the full claim scope or alternative embodiments. *See Arctic Cat Inc. v. Bombardier Rec. Prods.*, 876 F.3d 1350, 1371 (Fed. Cir. 2017) (where "substantial evidence demonstrated that [Defendant] knew about the patents before they issued, conducted only a cursory analysis of the patents, waited years before seeking advice of qualified and competent counsel," a district court's denial of a renewed motion for judgment as a matter of law on willfulness properly refused to "'second-guess the jury or substitute [the court's] judgment for [the jury's] judgment' where the verdict [was] supported by substantial evidence."); *see also WesternGeco L.L.C. v. ION Geophysical Corp.*, 837 F.3d 1358, 1362 (Fed. Cir. 2016) (noting that *Halo* "emphasized that subjective willfulness alone—i.e., proof that the defendant acted despite a risk of infringement that was either known or so obvious that it should have been known to the accused infringer,"—can support an award of enhanced damages.") (citing *Halo*, 136 S. Ct. at 1930) (internal quotations omitted). Furthermore, Mr. Baird's refusal to sell an apparently more blatant infringement of the '894 patent does not create some the inference that his decision to sell the W-5 was properly supported by a good faith belief in its non-infringement.

Accordingly, the Court finds this factor to weigh strongly in favor of enhancement.

---

[1] The Court recognizes that such a filing, supported by adequate evidence of other analyses undertaken to ensure non-infringement, may demonstrate good faith. This, however, is not that case. Filing a patent application does not automatically mean that other analyses were undertaken to ensure non-infringement or permit such an inference, as TST suggests.

## II.C.  Litigation Behavior [*Read* Factor 3]

Whirlpool argues that, even though "the parties' interactions during the litigation were overwhelmingly and consistently professional, cooperative, and positive," some of "TST's positions and conduct stretched the limits of zealous advocacy, burdened Whirlpool and the Court, and skirted (if not violated) the Court's rulings."  (Dkt. No. 175 at 10).  Specifically, Whirlpool argues that:

- TST rehashed claim construction arguments rejected by the Court as a Motion *in Limine*, which the Court had to reject a second time;

- TST raised a frivolous non-infringement defense in that the W-5 filter did not satisfy the "about 2 cm" argument, a position it abandoned on "the eve of trial" "only after Whirlpool wasted valuable trial time addressing it";

- TST's eighteen-reference combination was improper and "forced" Whirlpool "to devote significant time to responding" to it;

- TST's expert, Mr. Stein "so obviously" lacked independent judgment that TST's retention of Mr. Stein warrants enhancement;

- TST "repeated[ly]" violated the Court's *in limine* rulings; and

- "TST's repeated references to its products as being 'made in the USA' tested the limits of fair advocacy";

(Dkt. No. 175 at 10–15).

In response, TST argues that TST's failure to prevail on those issues resolved in Whirlpool's favor is not evidence of litigation misconduct.  (Dkt. No. 178 at 21–22).  Rather, TST contends that its "behavior as a party in the litigation has been cooperative and professional," as "Whirlpool acknowledges."  (*Id*. (internal quotations omitted)).  As examples of this cooperative and professional advocacy, TST points to its "stipulat[ion] that the '894 patent covered the Filter 3 product, and did not require Whirlpool to spend time at trial proving this central part of its case,"

and its "stipulation to a permanent injunction, obviating the need for Whirlpool to litigate this often-contentious issue." (*Id*. at 22).

The Court does not find evidence of litigation misconduct in TST's actions in this case.[2] Litigation tactics do not cross the line from zealous advocacy into abusive gamesmanship by merely being "vigorously employed and at times not well received, by the jury or the court." *Barry v. Medtronic, Inc.*, 250 F. Supp. 3d 107, 117 (E.D. Tex. 2017); *See also, Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, Case No. 09-cv-05235-MMC, 2017 WL 130236, at *4 (N.D. Cal. Jan. 13, 2017) ("[H]aving reviewed the asserted misconduct on which [the patentee] relies, [the court] finds 'this was a hard fought case but did not cross the line into improper conduct.'") (quoting *Finjan*, 2016 WL 3880774, at *16); *but see Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co.*, 203 F. Supp. 3d 755, 763–64 (E.D. Tex. 2016) (trebling damages where the court found that defendants "made multiple misrepresentations under oath" in their sworn interrogatories, gave false testimony to the jury on key topics, and failed to produce key documents—despite repeated requests for them—until the fourth day of trial). To the contrary, the acknowledged "overwhelmingly and consistently professional, cooperative and positive" interactions of counsel, are the opposite of improperly contentious, dirty, or uncivil litigation tactics. This factor weighs against enhancement.

## II.D.   Size and Financial Condition [*Read* Factor 4]

Defendant's size and financial condition should be viewed both relative to the Plaintiff and also individually to ensure that enhanced damages would "not unduly prejudice the [defendant's]

---

[2] The Court notes that while TST invites the Court to consider "Whirlpool's attempt to use its commercial embodiment to prove infringement, in contravention of the Court's motion-*in-limine* ruling forbidding the practice," (Dkt. No. 178 at 22), this comparison is not appropriate in considering an enhancement of damages. As the third *Read* factor makes clear, the inquiry is properly focused on "*the infringer's behavior* as a party to the litigation." *Read Corp.*, 970 F.2d at 827 (emphasis added). The patentee's litigation conduct is not relevant to this inquiry. Rather, that comparative inquiry is properly undertaken during the Court's evaluation of the exceptionality of the case under 35 U.S.C. § 285.

non-infringing business." *Krippelz v. Ford Motor Co.*, 670 F. Supp. 2d 815, 822 (N.D. Ill. 2009) (internal citations omitted); *Read*, 970 F.2d at 827.

TST employs approximately one hundred people in a 150,000 square foot, multi-building facility. (Dkt. No. 162, Mar. 8, 2017 A.M. Tr. at 118:14–16, 120:15–20). TST manufactures all the replacement filters that The Home Depot sells under its HDX "house brand." (Dkt. No. 160, Mar. 7, 2017 P.M. Tr. at 57:4–8, 58:6–12). TST also sells roughly 20,000 W-5 filters per month over the Internet. (Dkt. No. 163, Mar. 8, 2017 P.M. Tr.at 66:17–19). TST has approximately $30 million in total annual revenues company-wide (Dkt. No. 163, Mar. 8, 2017 P.M. Tr. at 38:18–39:4; Dkt. No. 162, Mar. 8, 2017 A.M. Tr. at 118:14–16).

However, TST's company-wide profit in 2015 was only about 14% of revenues or $4.4 million. (Dkt. No. 163, Mar. 8, 2017 P.M. Tr. at 29:9–12). Accordingly, the jury's award is upwards of two years' worth of TST's company-wide profits.

Whirlpool argues that "TST's ability to pay any enhanced damages favors enhancement," and that "any potential impact on TST's non-infringing business lines does not bar enhancement." (Dkt. No. 186 at 9). However, the test requires looking at whether enhanced damages would "unduly prejudice the defendant's non-infringing business." *Krippelz*, 670 F. Supp. 2d at 822 (citations omitted). As the Jury's award represents more than a year's (and approaching two years') worth of company-wide profits, this factor weighs against enhancement.

### II.E.    Closeness of the Case [*Read* Factor 5]

Whirlpool submits that "[t]he case was not close. Within a three-hour period, the jury returned a verdict that: (i) all seven asserted claims were infringed; (ii) all seven asserted claims are valid; (iii) TST owes damages of $7.6 million; and (iv) TST acted willfully." (Dkt. No. 175 at 16 (citing Dkt. Nos. 148, 153)). "The jury's $7.6 million award was over ten times TST's

evaluation and nearly all of Whirlpool's $8.7 million ask." (Dkt. No. 175 at 17). Accordingly, Whirlpool argues, "[i]n view of the jury's decisive verdict in Whirlpool's favor, this factor favors enhancement." (*Id*.)

TST argues that the fifth factor is "[t]he *Read* factor most relevant to this case," because "the central issue of infringement was not merely close," but, in fact, incorrectly decided by the jury. (Dkt. No. 178 at 17–18). This conclusory assertion is without support. TST also advances similar arguments regarding its obviousness defense. (*Id*. at 19).

The Court does not view this as a particularly close case. While TST believes this was a close case because it presented what it views as a compelling case of non-infringement and invalidity, the sole judges of the facts of this case, the jury, did not arrive at a verdict which indicates a close case. The Jury found the '894 to be not invalid and willfully infringed. (Dkt. No. 148). In addition, the jury awarded Whirlpool approximately 90% of Whirlpool's proposed damages, far more than TST's proposed damages. The jury reached these conclusions within three hours. This case was not close. *See SSL Servs., LLC v. Citrix Sys., Inc.*, No. 08-CV-158-JRG, 2012 WL 4092449, at *5 (E.D. Tex. Sept. 17, 2012), *vacated and remanded on other grounds*, 769 F.3d 1073 (Fed. Cir. 2014) (factor favored enhancement where jury found that defendant willfully infringed and that the patent was not invalid and awarded a $10 million lump-sum award). That a defendant's position on various defenses "may have required resolution at trial . . . does not dictate that the case was close." *PPC Broadband, Inc. v. Corning Optical Commc'ns RF*, LLC, No. 5:11-cv-761-GLS-DEP, 2016 WL 6537977, at *7 (N.D.N.Y. Nov. 3, 2016), *appeal dismissed*, No. 16-4106, 2016 WL 10655596 (2d Cir. Dec. 12, 2016). This Court has surveyed the evidence independently of the jury's verdict and has found it to strongly support Whirlpool's case. (*See,*

*generally,* Memorandum Opinion and Order on Defendant's Motions for JMOL, issued contemporaneously).

Accordingly, the Court finds that this factor weighs in favor of enhancement. *WCM Indus., Inc. v. IPS Corp.*, No. 2016-2211, 2018 WL 707803, at *10 (Fed. Cir. Feb. 5, 2018) ("[T]he closeness of the case was also in WCM's favor because the jury verdict was not a close call and the evidence strongly supported WCM's case.").

### II.F. Duration of Misconduct [*Read* Factor 6]

TST knew of Whirlpool's '894 patent as early as 2010. (Dkt. No. 162, Mar. 8, 2017 A.M. Tr. at 69:3–5.) TST announced the pending release of the W-5 filter in October 2014 and again in March 2015. (Dkt. No. 175, Ex. 28 (October 2014); *id*, Ex. 29 (March 2015)). It started selling the W-5 product to The Home Depot and others in July 2015. (Dkt. No. 159, Mar. 7, 2017 A.M. Tr. at 110:25–111:8; Dkt. No. 160, Mar. 7, 2017 P.M. Tr. at 29:21–30:2; Dkt. No. 163, Mar. 8, 2017 P.M. Tr. at 27:17–20). TST continued selling the W-5 filter nationwide following the filing of this lawsuit. (Dkt. No. 163, Mar. 8, 2017 P.M. Tr. 35:22–36:2). By the time of the jury verdict, TST had made and sold approximately 600,000 infringing filters. (*See* Dkt. No. 160, Mar. 7, 2017 P.M. Tr. at 109:14–15; *id*. Sealed Portion at 9:14–23).

Whirlpool argues that, in addition to the facts above, TST encouraged its customers to continue to sell infringing filters even after Whirlpool filed suit. "For example, it agreed to indemnify both The Home Depot and Pavel Water Filtration for their continued sales." (Dkt. No. 175 at 18 (citing Dkt. No. 175, Ex. 30; Dkt. No. 175, Ex. 31).

In response, TST contends that its "push" for a quick resolution weighs against a finding that the continued infringing sales warrant enhancement. (Dkt. No. 188 at 8). Specifically, TST argues that "[u]nlike many defendants who actively seek delay, TST sought a judicial resolution

of Whirlpool's allegations as quickly as possible, with the remarkable result that the case went to trial on the originally scheduled date." (*Id*.) TST argues that this quick resolution resulted in TST selling the W-5 filter for "only a year and eight months, between mid-July 2015 and March 10, 2017." (*Id*. (citing Dkt. No. 163, Mar. 8, 2017 P.M. Tr. at 27:17–20).

Although TST's continued infringement lasted for "only a year and eight months," the Court must nonetheless weigh the period of time against TST's pre-suit notice and continued infringement. There is uncertainty among courts as to the weight these facts are given. *Compare Broadcom Corp. v. Qualcomm Inc.*, No. SACV 05-467-JVS, 2007 WL 2326838, at *3 (C.D. Cal. Aug. 10, 2007) ("The length of [the infringer's] infringement (approximately two years), coupled with the fact that infringement continued after [the patentee] filed its suit, supports an increase in damages."), *vacated on other grounds*, 2007 WL 8030058 (C.D. Cal. Nov. 21, 2007), *and PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, No. 5:11-CV7-61 (GLS/DEP), 2016 WL 6537977, at *8 (N.D.N.Y. Nov. 3, 2016), *appeal dismissed*, No. 16-4106, 2016 WL 10655596 (2d Cir. Dec. 12, 2016) ("[C]ontinuing to sell the infringing products after notice of infringement and during the course of litigation supports enhancement."), *with Barry v. Medtronic, Inc.*, No. 1:14-cv-104, 2017 WL 1536492, at *8 (E.D. Tex. Apr. 20, 2017) (holding that infringement for more than two years—from March 2010 through 2013—did not support enhancement) *and Spectralytics, Inc. v. Cordis Corp.*, 834 F. Supp. 2d 920, 928 (D. Minn. 2011), *aff'd*, 485 F. App'x 437 (Fed. Cir. 2012) (holding that willful infringement for "about one [] year[]" was a "relatively short" "period of willful infringement" and did "not weigh in favor of enhanced damages."). Given that TST's period of willful infringement was under two years which included the period during the course of litigation, this factor only slightly favors enhancement.

## II.G. Remedial Action [*Read* Factor 7]

Whirlpool argues that TST undertook no remedial action and that all of TST's actions prior to verdict were consistent only with misconduct (Dkt. No. 175 at 17).

TST responds that it "carefully designed around the '894 patent," and had a "well-reasoned and good-faith belief that the W-5 filter did not infringe." (Dkt. No. 178 at 23). In support, TST points to "the correspondence that TST's counsel sent to The Home Depot immediately after Whirlpool filed suit, in which TST expressed confidence in its defenses." (*Id.* (citing Dkt. No. 160, Mar. 7, 2017 P.M. Tr. at 72:23–73:22; PX17). TST also argues that it "did not offer the W-5 to other national retail customers, such as Lowe's and Target,"[3] "stopped selling and shipping the W-5 the moment the jury returned its verdict, and has since stipulated to a permanent injunction." (Dkt. No. 178 at 23).

There is a difference between preventative action and remedial action. Here, TST's actions were preventative; they served to prevent expansion of the scope of the ongoing infringement as found at trial. Remedial actions are those actions that serve to decrease scope, or entirely eliminate, the scope of ongoing infringement. *See Barry v. Medtronic, Inc.,* 250 F. Supp. 3d 107, 116 (E.D. Tex. 2017) (finding "no evidence" of "remedial action" where defendant did not "discontinue[] distribution or otherwise curb[] use of potentially infringing devices as a remedial measure or in response to that potential (now proven) infringement."); *accord WCM Indus., Inc. v. IPS Corp.,* No. 2016-2211, 2018 WL 707803, at *10 (Fed. Cir. Feb. 5, 2018) ("Remedial action by the defendant, [] may also weigh slightly against enhancement because [the defendant] attempted to

---

[3] TST clarifies that this refers to offers "after TST was served with Whirlpool's complaint," such that where it had reached out to other retailers prior to the suit, "it stopped all efforts to sell the W-5 in the stores of new retail customers, with the result that 85% of W-5 sales were made in Home Depot's brick-and mortar stores." (Dkt. No. 188 at 8 (citing Dkt. No. 163, Mar. 8, 2017 P.M. Tr. at 67:6–8). "TST's W-5 sales to customers other than Home Depot were so small that Whirlpool did not bother to seek lost profits for those sales." (*Id.* (citing Dkt. No. 162, Mar. 8, 2017 A.M. at Tr. at 63:9–23).

take remedial action (albeit ineffectively) when it modified its Classic Product and began selling its Revised Product *during the pendency of this litigation*") (quotation omitted) (emphasis added); *Intra Corp. v. Hamar Laser Instruments, Inc.*, 662 F. Supp. 1420, 1439 (E.D. Mich. 1987), *aff'd*, 862 F.2d 320 (Fed. Cir. 1988) (damages only doubled because defendant "voluntarily ceased manufacture and sale of infringing systems *during the pendency of this litigation*") (emphasis added). Accordingly, because there is no evidence of remedial action, only preventative action, this factor weighs in favor of enhancement.

### II.H.   Motivation for Harm [*Read* Factor 8]

Whirlpool argues that "TST intended not only to free ride on Whirlpool's investment in developing the patented Filter 3 product, but eventually to drive Whirlpool out of the replacement filter market entirely." (Dkt. No. 175 at 18). Whirlpool argues that record evidence shows it costs upwards of $100 million to bring a new refrigerator to market, that designing a refrigerator filter is a non-trivial process, that the low profit margins of refrigerators are buttressed by sales of replacement filters to help recover development expenditures. (*Id*.) Whirlpool also argues that "the Filter 3 became one of the best selling replacement filters in the market," due to Whirlpool's efforts and investment. (*Id*. (quotation omitted)).

As such, Whirlpool accuses TST of "free rid[ing]" on Whirlpool's efforts relating to its Filter 3 product via the sales of its W-5 product. (*Id*. at 19). "In particular, TST has competed with Whirlpool and 'converted' (or stolen) Whirlpool's customers using only one thing—price," with an asserted "ultimate goal [] to '[e]liminate OEM products,' i.e., to 'kick[] out companies like Whirlpool who have developed the refrigerators with these filters once TST's filters are in the stores.'" (*Id*. (citations omitted)). "Whirlpool's Filter 3 sales at places like The Home Depot have 'plummeted' since the W-5's introduction." (*Id*.)

TST characterizes its actions as "just good old-fashioned competition, the sort of commercial behavior that our nation's free-market economic system actively encourages."  (Dkt. No. 178 at 23).  TST also argues that Whirlpool's investment in developing refrigerators does not "give it the exclusive right to profit from all after-market sales of replacement parts," since "[b]y that logic, Ford would be the only company permitted to sell after-market oil filters, tires and maintenance service for the cars and trucks it manufactures."  (*Id.*)

TST's position is not persuasive.  It is not "good old-fashioned competition" to trespass upon other competitor's property rights in pursuit of profits.  The creative interaction that undergirds the nation's free-market economic system presumes healthy, but fair, competition.  TST is welcome to undermine Whirlpool's dominance in the Filter 3 space—once the patent expires or TST develops a true non-infringing alternative.  However, that is not what happened here.  TST's reliance on Whirlpool's install base evinces an attempt to "free ride" and improperly undercut a patentee's rightly earned profits.  On the record evidence, the Court finds that TST possessed a motivation for harm, and such weighs in favor of enhancement.

### II.I.    Concealment of Misconduct [*Read* Factor 9]

Whirlpool argues that TST engaged in extensive concealment of its misconduct.  (Dkt. No. 175 at 19–20).  Specifically, Whirlpool argues that  TST "created a design that superficially differed from Whirlpool's," "modifyi[ng] the Filter 3's dome design so it looked less like it was

one piece" and "disguis[ing] its fittings to appear angled—even though the fittings were designed to fit within the same envelope, as shown in TST's engineering drawing."[4] (*Id*. at 19).

Whirlpool argues that Mr. Baird's testimony at trial, wherein he stated that the W-5's "angled" tips helped to clear lodged ice and that the "bridge" of the protrusion helped with tolerances, (*see* Dkt. No. 163, Mar. 8, 2017 P.M. Tr. at 6:12–18 (ice clearing), 40:4–14 (same), 23:1–20 (benefits of "bridge")), were a "fiction" created to "obscure" TST's infringement since no packaging, label, or pamphlet to a single consumer mentions these improvements. (Dkt. No. 175 at 20).

TST argues that, contrary to Whirlpool's argument, "TST's fittings are actually angled." (Dkt. No. 178 at 20). TST asserts its conduct was "open and candid," evincing a belief that its "different design [did] not infringe the '894 patent" by "openly disclos[ing] this in its own published patent applications that compare the W-5 design to Whirlpool's patented design and describe Mr. Baird's improvements." (*Id*. (citing DX784 at 11–12; DX784 at 10–11)). In addition, these improvements, accused of being a fiction by Whirlpool, were specifically addressed during prosecution at the Patent Office. (*Id*.)

Surveying the record, the Court does not find that TST engaged in improper concealment. While TST's infringement may have been willful, as found by the Jury, it acted with flagrancy rather than subterfuge. This is confirmed by TST's submissions to the Patent Office, wherein the

---

[4]



(Dkt. No. 175 ,Ex. 10 at 3562)

application specifically represents that the "replacement cost of [] filters from the manufacturer of the appliance is high as the appliance manufacturer attempts to configure the filter cartridges in ways that enable the manufacturer to make it difficult for others to make the cartridge, thus creating a captive market for which the original manufacturer is the sole supplier and for which the manufacturer can charge a premium price. There is thus a need for a filter cartridge that can replace such filter cartridges as they wear out, but that is available at a lower cost." (DX 784 (Part 1) at 11). Whirlpool believes that every Filter 3-compatable filter infringes the '894 patent and because TST clearly positioned the W-5 as a Filter 3-compatable filter, the Court does not find there to have been concealment of TST's misconduct of infringement. This factor weighs against enhancement.

### II.J.    Enhanced Damages Conclusion

The *Read* factors provide "useful guideposts" in the court's exercise of discretion but are not binding or exhaustive. *Imperium*, 203 F. Supp. 3d at 763–64; *see also Finjan v. Blue Coat Sys.*, Case No. 13-cv-0399-BLF, 2016 WL 3880774, at *16 (N.D. Cal. July 18, 2016). "While the *Read* factors remain helpful to the [c]ourt's execution of its discretion, an analysis focused on egregious infringement behavior is the touchstone for determining an award of enhanced damages rather than a more rigid, mechanical assessment." *Imperium*, 203 F. Supp. 3d at 763; *accord Halo*, 136 S. Ct. at 1934 ("we eschew any rigid formula for awarding enhanced damages under § 284").

The Court has considered each of the *Read* factors as guideposts in its determination as to whether enhancement is appropriate in this case.[5] Having considered the factors, and mindful of

---

[5] Summary of the *Read* factor holdings: (1) copying: "heavily in favor of enhancement"; (2) good faith belief: "heavily in favor of enhancement"; (3) litigation misconduct: "against enhancement"; (4) size and financial condition: "against enhancement"; (5) closeness of the case: "in favor of enhancement"; (6) duration of misconduct "slightly favors enhancement"; (7) remedial action: "in favor of enhancement"; (8) motivation for harm: "in favor of enhancement"; (9) concealment of misconduct: "against enhancement".

the Court's obligation to focus its analysis on determining whether egregious infringement behavior is present, the Court finds that such behavior is present and enhancement is appropriate on that basis. "[W]hen only a subset of factors weigh in favor of enhanced damages a court should award less than treble damages." *WCM Indus., Inc. v. IPS Corp.*, No. 2016-2211, 2018 WL 707803, at *10 (Fed. Cir. Feb. 5, 2018). As such, Court finds that less than treble damages are appropriate in this case.

Accordingly, the Court hereby **GRANTS** Whirlpool's Motion as to enhanced damages, having found enhancement to be appropriate in this case and **ORDERS** enhanced damages in the amount of $3.8 million dollars be awarded to Whirlpool, in addition to the jury's compensatory award.

### III. Exceptional Case

Under 35 U.S.C. § 285, a court "may award reasonable attorney fees to the prevailing party" in "exceptional cases." An "exceptional" case under § 285 is "simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1751 (2014). Courts "may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id.*

"[B]ad faith litigation, objectively unreasonable positions, inequitable conduct before the PTO, litigation misconduct, and (in the case of an accused infringer) willful infringement" may support a finding of exceptionality. *Stragent, LLC v. Intel Corp.*, No. 6:11-cv-421, 2014 WL 6756304, at *3 (E.D. Tex. Aug. 6, 2014) (Dyk, J., sitting by designation). "Ultimately, a party's entitlement to attorney fees need only be proved by a preponderance of the evidence." *DietGoal*

*Innovations LLC v. Chipotle Mexican Grill, Inc.*, No. 12-cv-764, 2015 WL 1284826, at *1 (E.D. Tex. March 20, 2015) (Bryson, J, sitting by designation) (citing *Octane*, 134 S. Ct. at 1758).

Whirlpool submits that "TST's adjudicated status as a willful infringer" and its "objectively unreasonable litigation positions" warrant an exceptional case finding. (Dkt. No. 175 at 21). Whirlpool also states that "[t]his case more than 'stands out from' the dozens of other matters before this Court in which the defendants admitted infringement, conceded validity, and ceased sales of Filter 3-compatible filters. Here, TST forced Whirlpool to spend millions of dollars to obtain a unanimous jury verdict that went resoundingly in its favor." (*Id*.)

TST submits that "[n]o bad-faith conduct, weakness in TST's defenses, or unprofessional conduct by TST's counsel makes this pedestrian patent dispute stand out from other patent cases," and that, accordingly, Whirlpool "should not be awarded attorneys' fees." (Dkt. No. 178 at 24).

The Court first addresses the issue raised by Whirlpool as to the proper scope of the exceptionality inquiry. Whirlpool seems to argue that the analysis as to whether this case "stands out from" other patent cases should be limited so as to consider *only* the dozens of other matters between Whirlpool and other Filter 3-compatible filter manufacturers before this Court in which those defendants admitted infringement, conceded validity, and ceased sales of Filter 3-compatible filters. (Dkt. No. 175 at 21). Whirlpool repeats this refrain in its reply, noting that "29 other defendants—including two W-5 customers—conceded infringement and validity." (Dkt. No. 186).

The actions of other defendants in similar positions to TST may be, perhaps, informative to the inquiry as points of comparison. However, the inquiry is not limited solely to the small pool of all defendants whom Whirlpool sued for infringement. Rather, the inquiry is, as the Court instructs, "simply one that stands out from others." *Octane*, 134 S. Ct. at 1751. There is no

23

indication that, under *Octane*, courts are to directly compare the litigation posture and conduct of various defendants to each other to determine exceptionality. Reaching such a conclusion necessarily imposes an unfair result on defendants generally. Accordingly, the proper scope of the exceptionality inquiry is the whole of patent litigation—the actions of the defendant are to be compared relative to the ordinary patent litigation defendant.

Just as Whirlpool's "motivation to implement the statutory patent right by bringing suit based on a reasonable belief in infringement is not an improper motive," *Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*, 858 F.3d 1371, 1375 (Fed. Cir. 2017), so too is TST's choice to defend itself in court. Requiring Whirlpool to prove its case at trial by jury is not inherently improper, regardless of the choices of the other various Whirlpool Filter 3 defendants.

"The [Supreme] Court has cautioned that fee awards are not to be used 'as a penalty for failure to win a patent infringement suit.'" *Checkpoint*, 858 F.3d at 1376 (quoting *Octane Fitness*, 134 S.Ct. at 1753). As the Federal Circuit has noted, "[t]he legislative purpose behind § 285 is to prevent a party from suffering a 'gross injustice': 'The exercise of discretion in favor of [awarding attorney fees] should be bottomed upon a finding of unfairness or bad faith in the conduct of the losing party, or some other equitable consideration of similar force, which makes it grossly unjust that the winner of the particular lawsuit be left to bear the burden of his own counsel fees.'" *Id.*, 858 F.3d at 1376 (quoting committee report).

Taking all relevant factors into account, the Court is not persuaded that this is an exceptional case. First, while the Court found that enhanced damages are appropriate as a remedy resulting from the jury's finding of willful infringement, *supra* at 22, the factors did not uniformly weigh in favor of enhancement. While a case may be exceptional if it stands out from others because of the weakness of a party's litigating position, *Octane Fitness*, 134 S.Ct. at 1756, TST's

litigating positions, while unsuccessful, were not sufficiently weak to stand out in this manner. Further, the manner in which TST has litigated this case certainly does not support a finding of exceptionality. As Whirlpool itself noted, "the parties' interactions during the litigation were overwhelmingly and consistently professional, cooperative, and positive." (Dkt. No. 175 at 10). This is not the sort of "unreasonable conduct[ which]—while not necessarily independently sanctionable—is nonetheless so 'exceptional' as to justify an award of fees." *Octane*, 134 S. Ct. at 1757. In taking into account the totality of the circumstances of this case, closely observed by the Court during and throughout trial, the Court finds this case does not warrant a finding of exceptionality.

Accordingly, Whirlpool's Motion is **DENIED** with respect to its request for a finding of exceptionality under 35 U.S.C. § 285.

## IV. Pre-Judgment Interest

TST did not oppose Whirlpool's motion on this issue. (*See generally*, Dkt. No. 178). Whirlpool moves the Court to award pre-judgment interest in this case. (Dkt. No. 175 at 23). "Upon finding for the claimant, the court shall award the claimant damages adequate to compensate for the infringement but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284 (emphasis added.) "[A]n award of prejudgment interest . . . ensure[s] that the patent owner is placed in as good a position as he would have been in had the infringer entered into a reasonable royalty agreement." *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655 (1983) (citation omitted).

The Court finds that pre-judgement interest is appropriate in this case and, accordingly, hereby **GRANTS** Whirlpool's Motion with respect to pre-judgment interest. The Court finds that

the appropriate rate for prejudgment interest is the 5 year T-bill rate compounded monthly and that the interest is to accrue from April 21, 2017 to entry of the Court's Final Judgment.[6]

## V. Post-Judgment Interest

TST does not oppose Whirlpool's motion on this issue. (*See generally*, Dkt. No. 178). Whirlpool moves the Court award post-judgment interest in this case (Dkt. No. 175 at 24). Post-judgment interest is fixed by statute and "calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961; *Rialto Capital Advisors, LLC v. Lewis*, No. 11-cv-698, 2013 WL 1701590, at *5 (E.D. Tex. Apr. 18, 2013) (applying statutory rate). Post-judgment interest applies to patent cases and is mandatory. *Goodwall Constr. Co. v. Beers Constr. Co.*, 991 F.2d 751, 759 (Fed. Cir. 1993); *Mathis v. Spears*, 857 F.2d 749, 760 (Fed. Cir. 1988).

The Court finds that post-judgment interest is appropriate in this case and, accordingly, hereby **GRANTS** Whirlpool's Motion with respect to post-judgment interest. The Court finds that post-judgment interest shall apply from the date of the entry of the Court's final judgment entering the Jury's actual award, the Court's enhanced damages award, accrued pre-judgment interest, once determined, and any and all costs awarded to Whirlpool.

## VI. Conclusion

Accordingly, for the reasons provided above, Whirlpool's Motion for Judgment, for an Order Designating Whirlpool the Prevailing Party, for Enhanced Damages, for an Exceptional

---

[6] *Sanofi-Aventis v. Apotex Inc.*, 659 F.3d 1171, 1184–85 (Fed. Cir. 2011) ("Prejudgment interest is awarded on actual damages in order to treat the injured party fairly. In *Beatrice Foods Co. v. New England Printing & Lithographing Co.*, 923 F.2d 1576, 1580 (Fed.Cir.1991), the court explained that 'prejudgment interest can only be applied to the primary or actual damage portion and not to the punitive or enhanced portion,' and that 'prejudgment interest is designed 'to compensate for the delay a patentee experiences in obtaining money he would have received sooner if no infringement occurred,' while 'on the other hand, damages are trebled as punishment.").

Case Finding, and for an Order Awarding Pre- and Post-judgment Interest (Dkt. No. 175) is hereby

**GRANTED-IN-PART** and **DENIED-IN-PART** as set forth above.

**So ORDERED and SIGNED this 29th day of March, 2018.**

RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE